**Nos. 25-2803, 25-3256 & 26-1598**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

JANIAH MONROE, MARILYN MELENDEZ, SORA KUYKENDALL, and SASHA REED,
Plaintiffs-Appellees,

v.

LAMENTA CONWAY, MELVIN HINTON, and LATOYA HUGHES,
Defendants-Appellants.

---

On Appeal from the United States District Court for the
Southern District of Illinois
Case No. 3:18-cv00156-NJR
The Honorable Nancy J. Rosenstengel

---

**BRIEF OF PLAINTIFFS-APPELLEES AND SUPPLEMENTAL APPENDIX**

---


Brent P. Ray
Arnold & Porter
70 West Madison St., Ste. 4200
Chicago, IL 60602
312-583-2325
brent.ray@arnoldporter.com

Malita Picasso
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2561
mpicasso@aclu.org

Michelle T. García
*Counsel of Record*
Camille E. Bennett
Mason Strand
Rachel Caldwell
Samantha Reed
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
mgarcia@aclu-il.org
cbennett@aclu-il.org
mstrand@aclu-il.org
rcaldwell@aclu-il.org
sreed@aclu-il.org

*Attorneys for Plaintiffs-Appellees*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2803

Short Caption: Janiah Monroe, et al. v. Steven Bowman, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),
Sora Kuykendall (Plaintiff-Appellee), Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kirkland & Ellis LLP, Roger Baldwin Foundation of ACLU, Inc., King & Spalding LLP
Arnold & Porter Kaye Scholer, LLP, Kennedy Hunt P.C., American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Michelle Garcia Date: 10/30/25

Attorney's Printed Name: Michelle Garcia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 150 N. Michigan Avenue, Ste. 600
Chicago, IL 60601

Phone Number: 312-201-9740, ext. 319 Fax Number: 312-201-9760

E-Mail Address: mgarcia@aclu-il.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2803

Short Caption: Janiah Monroe, et al v. Steven Bowman, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),

Sora Kuykendall (Plaintiff-Appellee), Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kirkland & Ellis LLP, Roger Baldwin Foundation of ACLU, Inc./ACLU of Illinois, King & Spalding LLP,

Arnold & Porter Kaye Scholer, LLP, Kennedy Hunt P.C., American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: ______________ Date: 10/20/25

Attorney's Printed Name: Brent P. Ray

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: Arnold & Porter Kaye Scholer, LLP

70 West Madison Street, Suite 4200 Chicago, IL 60602-4321

Phone Number: (312) 583-2325 Fax Number: (713) 576-2499

E-Mail Address: Brent.Ray@arnoldporter.com

Save As Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2803

Short Caption: Janiah Monroe, et al. v. Steven Bowman, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),
Sora Kuykendall (Plaintiff-Appellee), Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kirkland & Ellis LLP, Roger Baldwin Foundation of ACLU, Inc., King & Spalding LLP
Arnold & Porter Kaye Scholer, LLP, Kennedy Hunt P.C., American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Camille E. Bennett Date: 10/30/25

Attorney's Printed Name: Camille E. Bennett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 150 N. Michigan Avenue, Ste. 600
Chicago, IL 60601

Phone Number: 312-201-9740, ext. 336 Fax Number: 312-201-9760

E-Mail Address: cbennett@aclu-il.org

Save As Clear Form



**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2803

Short Caption: Janiah Monroe, et al. v. Steven Bowman, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),
Sora Kuykendall (Plaintiff-Appellee), Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kirkland & Ellis LLP, Roger Baldwin Foundation of ACLU, Inc., King & Spalding LLP
Arnold & Porter Kaye Scholer, LLP, Kennedy Hunt P.C., American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Mason Strand Date: 10/30/25

Attorney's Printed Name: Mason Strand

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 150 N. Michigan Avenue, Ste. 600
Chicago, IL 60601

Phone Number: 312-201-9740, ext. 313 Fax Number: 312-201-9760

E-Mail Address: mstrand@aclu-il.org

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2803

Short Caption: Janiah Monroe, et al. v. Steven Bowman

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),
Sora Kuykendall (Plaintiff-Appellee) and Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Roger Baldwin Foundation of ACLU, Inc.; King & Spalding, LLP; Arnold & Porter Kaye Scholer, LLP;
Kennedy Hunt P.C.; American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Malita Picasso Date: 01/06/2026

Attorney's Printed Name: Malita Picasso

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 125 Broad Street, 18th Floor, New York, NY 10004

Phone Number: 212-549-2561 Fax Number:

E-Mail Address: mpicasso@aclu.org

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2803 and 25-3256

Short Caption: Janiah Monroe, et al. v. Lamenta Conway, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),
Sora Kuykendall (Plaintiff-Appellee), Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kirkland & Ellis LLP, Roger Baldwin Foundation of ACLU, Inc., King & Spalding LLP
Arnold & Porter Kaye Scholer, LLP, Kennedy Hunt P.C., American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Samantha R. Reed Date: 2/24/26

Attorney's Printed Name: Samantha R. Reed

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 150 N. Michigan Avenue, Ste. 600
Chicago, IL 60601

Phone Number: 312-201-9740, ext. 310 Fax Number: 312-201-9760

E-Mail Address: sreed@aclu-il.org

Save As Clear Form



## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2803

Short Caption: Janiah Monroe, et al. v. Steven Bowman, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janiah Monroe (Plaintiff-Appellee), Marilyn Melendez (Plaintiff-Appellee), Lydia H. Vision (Plaintiff-Appellee),

Sora Kuykendall (Plaintiff-Appellee), Sasha Reed (Plaintiff-Appellee)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kirkland & Ellis LLP, Roger Baldwin Foundation of ACLU, Inc., King & Spalding LLP

Arnold & Porter Kaye Scholer, LLP, Kennedy Hunt P.C., American Civil Liberties Union Foundation

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Rachel Lillian Caldwell Date: 12/12/25

Attorney's Printed Name: Rachel Lillian Caldwell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 150 N. Michigan Avenue, Ste. 600, Chicago, IL 60601

Phone Number: 312-201-9740, ext. 343 Fax Number: 312-201-9760

E-Mail Address: rcaldwell@aclu-il.org

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS ..... ii

TABLE OF CONTENTS ..... ix

TABLE OF AUTHORITIES ..... xi

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUES ..... 5

STATEMENT OF THE CASE ..... 6

Complaint and 2019 injunction ..... 6

August 2021 trial and subsequent injunctions ..... 7

Appointment and reports of Co-Monitors. ..... 9

2023 appeal and remand ..... 10

2023 motion concerning Menard ..... 10

2025 motion and first preliminary injunction concerning Menard ..... 11

Motion for re-issuance of injunction and December hearing and injunction ..... 17

SUMMARY OF ARGUMENT ..... 22

ARGUMENT ..... 23

I. Standard of Review ..... 23

II. The September and December preliminary injunctions expired, so those appeals are moot. ..... 24

III. The district court had authority to enter the preliminary injunctions. ..... 26

IV. There was no clear error in finding Plaintiffs likely to succeed on the merits of their Eighth Amendment claim. ..... 36

a. Gender dysphoria is a serious medical condition, and the standards of care are not contested. ..... 39

b. For years, Defendants knew that the class could not get adequate treatment at Menard. ..... 40

c. Defendants failed to provide constitutionally adequate medical care. ..... 41

d. Defendants failed to take reasonable steps to fix deficiencies. ..... 45

V. The Menard injunctions satisfied the needs-narrowness-intrusiveness requirements of the PLRA. ..... 46

CONCLUSION ..... 57

**CERTIFICATE OF COMPLIANCE WITH RULE 32** ........ 58
**CERTIFICATE OF SERVICE** ........ 59

# TABLE OF AUTHORITIES

## Cases

*Ahlman v. Barnes*,

20 F.4th 489, (9th Cir. 2021) .......... 4,24

*Ashcroft v. Iqbal*,

556 U.S. 662 (2009) .......... 33

*Auto Driveaway Fran. Sys., LLC v. Auto Driveaway Richmond, LLC*,

928 F.3d 670 (7th Cir. 2019) .......... 32,33

*Banks v. Booth*,

3 F.4th 445 (D.C. Cir. 2021) .......... 4,24

*Bell Atlantic Corp. v. Twombly*,

550 U.S. 544 (2007) .......... 33

*Brown v. Plata*,

563 U.S. 493 (2011) .......... 29

*Calhoun v. DeTella*,

319 F.3d 936 (7th Cir. 2003) .......... 27

*City of Los Angeles v. Lyons*,

461 U.S. 95, (1983) .......... 24

*Davis v. Federal Election Comm'n*,

554 U.S. 724 (2008) .......... 27

*De Beers Consol. Mines v. U.S.*,

325 U.S. 212 (1945) .......... 36

*Dunn v. Dunn*,

219 F. Supp. 3d 1100 (M.D. Ala. 2016). .......... 31

*Dunne v. Olson*,

67 Fed. App'x 939 (7th Cir. 2003) .......... 27

*Franks v. Bowman Transp. Co. Inc*,

424 U.S. 747, (1976) .......... 28

*Helling v. McKinney*,

609 U.S. 25, (1993) ........................................................................ 29

*Hodgers-Durgin v. de la Vina*,

199 F.3d 1037 (9th Cir. 1999) ........................................................ 27

*Lawson Products, Inc. v. Avnet, Inc.*,

782 F.2d 1429, 1437 ........................................................................23,24

*Lewis v. Casey*,

518 U.S. 343 (1996) ........................................................................29

*Lujan v. Defs. of Wildlife*,

504 U.S. 555 (1992) ........................................................................28

*Mayweathers v. Newland*,

258 F.3d 930 (9th Cir. 2001) ........................................................ 10

*Monroe v. Bowman*

122 F.4th 688 (7th Cir. 2024.......................................... 2,4,10,24,52

*Ortiz v. Fibreboard Corp.*,

527 U.S. 815 (1999) ........................................................................28

*Parsons v. Ryan*,

289 F.R.D. 513 (D. Ariz. 2013)........................................................29

*Payton v. County of Kane*,

308 F.3d 673 (7th Cir. 2002) ........................................................27,28

*Smith v. Edwards*,

88 F.4th 1119 (5th Cir. 2023).................................................4,24,25,48

*Sosna v. Iowa*,

419 U.S. 393 (1975), ........................................................................28

*Tobin for Governor v. Illinois State Bd. of Elections*,

268 F.3d 517 (7th Cir. 2001). ........................................................25

*United States v. Sec'y, Fla. Dep't of Corr.*,

778 F.3d 1223 (11th Cir. 2015)....24

*Whitlock v. Johnson*,

153 F.3d 380 (7th Cir.1998)....27

*Worldwide St. Preachers' Fellowship v. Peterson*,

388 F.3d 555 (7th Cir. 2004)....25

**Statutes**

28 U.S.C. § 1292(a)(1)....4
28 U.S.C. § 3626....20
42 U.S.C. § 1983....1

**Rules**

Cir. R. 28....1
Fed. R. Civ. P. 23....7

## JURISDICTIONAL STATEMENT

Defendants-Appellants' January 27, 2026, jurisdictional statement is incomplete and incorrect under Fed. R. App. P. 28(b) and Cir. R. 28(b).

On January 31, 2018, Plaintiffs Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, transgender women in the custody of the Illinois Department of Corrections ("IDOC") filed this class action for all IDOC prisoners who have requested gender dysphoria evaluation or treatment, seeking declarative and injunctive relief. Doc. 1.[1] Plaintiffs sued Defendants—the Governor,[2] IDOC Chief of Health Services, IDOC Mental Health Supervisor and IDOC Director—in their official capacities under 42 U.S.C. § 1983 claiming that Defendants violated the U.S. Constitution's Eighth Amendment by subjecting Plaintiffs and the class to a "substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria." *Id.* at 36. Because the claim raised a federal question, the court had subject matter jurisdiction under 28 U.S.C. § 1331.

Following a hearing, the court entered a preliminary injunction in December 2019. Doc. 187. In March 2020, the court amended the injunction (Docs. 211–12) and certified the class (Doc. 213). In August 2021, after a trial (Docs. 319–20, 324, 327), the court found that the "evidence introduced at trial show[ed] serious ongoing

[1] Citation to the district court's docket is "Doc. _."

[2] The court dismissed the governor as a defendant in 2018. Doc. 97.

violations of the Eighth Amendment" (Doc. 331 at 6) and entered a preliminary injunction (Docs. 332, 336).

In February 2022, the court issued a memorandum and order (Doc. 383) and entered an injunction. Doc. 384. In November 2022, Plaintiffs moved for contempt because Defendants failed to provide mandated medical care to the class. Doc. 455. From January 2023 to May 2023, the court entered three enforcement orders. Docs. 522, 552, 584. In May 2023, Defendants moved to vacate the orders (Doc. 587) and stay compliance with them (Doc. 588).

After the court denied Defendants' motion to vacate, re-labeled the February injunction as permanent, and entered the judgment (Doc. 678 at 4), Defendants appealed. Doc. 699. In December 2024, this Court held that the February 2022 injunction had automatically expired after 90 days pursuant to § 3626(a)(2) of the Prison Litigation Reform Act (PLRA), and that the district court had not "made a finding that might have allowed extension of that preliminary injunction" during those 90 days. *See Monroe v. Bowman*, 122 F.4th 688, 694 (7th Cir. 2024). This Court vacated all injunctions, dismissed the appeal challenging the finding of contempt, and remanded to the district court. *Id.* at 691.

On February 14, 2025, Plaintiffs moved for a preliminary injunction prohibiting placement of class members at Menard. Docs. 873, 874. Plaintiffs filed a supplemental complaint on May 15. Doc. 935. After a hearing from May 27 to May 30, the court granted the motion (A1–71) and entered the injunction (A72–74) on September 12, 2025.

On October 10, 2025, Defendants filed a timely notice of an interlocutory appeal. Doc. 1016. *See* 28 U.S.C. § 2107; Fed. R. App. P. 4(a)(1)(A). Defendants later moved to partially stay the September injunction in the district court (Doc. 1024) which the court denied on November 24, 2025. Doc. 1048 at 10. Defendants did not move to stay the injunction in this Court.

Plaintiffs moved to reissue the September injunction (Doc. 1028), but Defendants did not respond. The court held another hearing on December 8, 2025. On December 11, 2025, the September injunction expired under the PLRA's 90-day limit, *See* 18 U.S.C. § 3626(a)(2); the court granted Plaintiffs' motion (A75–107) and reissued the injunction (A108–10). The court modified the September injunction's relief to reflect some of Defendants' compliance and "provide[] Defendants more time to evaluate and implement transfers and is consistent with IDOC's own policy regarding the timing of evaluations for gender dysphoria." A104–05. The court also limited required transfers out of Menard to class members who IDOC, "*in its sole discretion*," confirms have gender dysphoria. Doc. 1125 at 29.

On December 15, 2025, Defendants timely appealed, No. 25-3256. *See* 28 U.S.C. § 2107(a); Fed. R. App. P(a)(1)(A). This Court then consolidated the appeals of the expired September injunction and the December injunction. 7th Cir. Doc. 17.

On February 27, 2026, Plaintiffs moved to reissue the preliminary injunction (Doc. 1111). Defendants responded on March 6, 2026 (Doc. 1120). On March 11, 2026, the December injunction expired under the PLRA's 90-day limit. *See* 18 U.S.C. § 3626(a)(2). On March 12, 2026, the district court granted the motion and

reissued the preliminary injunction with a modification requiring timely follow-up appointments for prisoners at Menard who received an inconclusive gender dysphoria evaluation. Doc. 1124, 1125. On March 26, 2026, Defendants timely appealed the injunction, No. 26-1598. *See* 28 U.S.C. § 2107(a); Fed. R. App. P(a)(1)(A). This Court consolidated the appeals and set a briefing schedule which allows Defendants to file their supplemental brief on the March injunction by May 13, 2026, and requires Plaintiffs to respond by May 27, 2026. 7th Cir. Doc. 34.

This Court only has jurisdiction over the March preliminary injunction (which is not addressed in this brief) under 28 U.S.C. § 1292(a)(1). This Court does not have jurisdiction over the September or December injunctions because, as this Court held in *Monroe*, 122 F.4th at 694, PLRA injunctions automatically expire after 90 days. 18 U.S.C. § 3626(a)(2). This moots the appeals of the September and December preliminary injunctions. *See, e.g.*, *Smith v. Edwards*, 88 F.4th 1119, 1126 (5th Cir. 2023) (dismissing appeal as moot because preliminary injunction expired after 90 days under PLRA); *Ahlman v. Barnes*, 20 F.4th 489, 493, 495 (9th Cir. 2021) (same); *Banks v. Booth*, 3 F.4th 445, 448–49 (D.C. Cir. 2021) (same).

## STATEMENT OF THE ISSUES

1. Whether this Court has jurisdiction over the September and December preliminary injunctions which expired under the PLRA after 90 days, mooting the appeals?

2. Whether there was no abuse of discretion to grant the preliminary injunctions because (a) the class had standing, the relief pertained to the class, and the injunctions were within the scope of the complaints; (b) there was no clear error where the evidence demonstrated that Defendants were likely deliberately indifferent in providing medical care to class members at Menard through social transition, hormone therapy, surgery, and psychotherapy; and (c) the relief was narrowly tailored and the least intrusive means of correcting these likely violations?

## STATEMENT OF THE CASE

### Complaint and 2019 injunction

This case was filed in January 2018 by six transgender women on behalf of a class of all prisoners in IDOC who had requested evaluation or treatment for gender dysphoria. Doc. 1. The complaint alleged that Defendants (currently the Director of IDOC, the IDOC Chief of Health Services, and the IDOC statewide Mental Health Supervisor) systematically failed to provide necessary medical treatment for gender dysphoria in violation of the Eighth Amendment of the United States Constitution and sought declaratory and injunctive relief. *Id.* A supplemental complaint was filed in May 2025. Doc. 935.

The matters at issue in these appeals arise after eight years of litigation and multiple injunctions. The district court entered its first preliminary injunction in December 2019 after an evidentiary hearing. Doc. 187. In this and subsequent orders, the court has consistently found—and Defendants have agreed—that gender dysphoria is an "objectively serious medical condition", which is "a condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender." Doc. 186 at 3, 32. The court has further consistently held the World Professional Association for Transgender Health (WPATH) "dictates medically-accepted Standards of Care for treating gender dysphoria," that the Endocrine Society Guidelines are the "internationally recognized baseline guidelines for

adequate treatment," and that therapy that falls below these guidelines is "less than adequate." *Id.* at 3, 6, 29–30. The court also found that IDOC "purport[ed] to follow the Standards of Care," incorporating them in its mental health operating procedure manual. *Id.* at 3. The court concluded in 2019 that "IDOC is well-aware that transgender prisoners are at a high risk of suffering from mental health issues and resorting to self-harm," and that there was evidence that IDOC "denies and delays the diagnosis and treatment of gender dysphoria without a medical basis or penological purpose." *Id.* at 32–33.

The 2019 injunction directed Defendants to develop policies and procedures to ensure adequate medical care for gender dysphoria and advise the court on steps taken to train correctional staff. Doc. 187. The court ordered the named Defendants to read the hearing transcript and certify that they had done so. Doc. 186 at 38.

<u>**August 2021 trial and subsequent injunctions**</u>

In March 2020, the court certified a class of "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria" under Fed. R. Civ. P. 23(b)(2). Doc. 213. In August 2021, the court held a four-day trial which included testimony from medical and psychological experts in treating gender dysphoria as well as an expert in prison security. At the conclusion, the court delivered a preliminary ruling from the bench and then issued a written order. Doc. 328, 332. These rulings highlighted Defendants' ongoing failure, two years after the first injunction, to address what they had acknowledged was a serious medical condition and the injurious effects of that failure. The court found, "those delays

amount to deliberate indifference, because Plaintiffs' pain has been prolonged and in some cases their injuries exacerbated" and pointing to the evidence of suicide attempts, attempted self-castration, and "ongoing harassment and humiliation," among other mistreatment. Doc. 328 at 11–12; Doc. 331 at 8–9.

On February 7, 2022, the court issued a memorandum and order which summarized the trial evidence, factual findings, and conclusions of law, and ordered additional injunctive relief. Doc. 383, 384. The testimony included Plaintiffs' security expert James Aiken, who had opined without rebuttal that there were no legitimate reasons for denying transgender prisoners medically necessary social transition including housing placements aligned with gender identity, clothing, grooming items, and using names and pronouns consistent with gender. Doc. 383 at 31–32. Additionally, the placement of transgender women in a female facility reduces the possibility of random and systemic violence. *Id.* at 32. Prison Rape Elimination Act (PREA) standards required individualized placement determinations, but Defendants' policy failed to comply with PREA, and Defendants improperly relied on security concerns to deny medically necessary placements. *Id.* at 32–33.

The court concluded that "evidence at the August 2021 trial amply demonstrated that Defendants were aware that Plaintiffs were not receiving adequate medical care or social transition for their gender dysphoria and have suffered serious harm including suicide attempts as a result—yet they allowed

these conditions to persist over the two-year period following the 2019 evidentiary hearing." Doc. 383 at 64.

<u>**Appointment and reports of Co-Monitors.**</u>

In April and May 2022, the court appointed monitors Dr. Amanda Harris and julie graham to report on Defendants' compliance with the injunctions. Docs. 418, 423. Dr. Harris's responsibilities included monitoring defendants' provision of hormone treatment, gender-affirming surgeries, and placement and transfer; julie graham's responsibilities included monitoring medically necessary social transition for class members. *Id.* The Co-Monitors issued multiple reports on Defendants' compliance with the injunction between fall 2022 and the fall/winter of 2024-25. *See* Docs. 439, 444, 502, 647, 674, 682, 865–66.

In January 2023, Dr. Harris's second report found:

> Transfer requests continue to be considered, but are very rarely approved. Security concerns, behavioral issues, and inadequately managed hormone levels are commonly cited as the reasons for denial. The Catch-22 here is worth noting. Many transwomen cite personal safety concerns as the reason for not pursuing their transition when housed in male facilities. . . [T]o physically and socially transition requires a safe space to do so, one they may not find in a male facility.

Doc. 502 at 7.

Over time, graham's reports increasingly noted Menard's ongoing problems. Doc. 718 at 2–3; Doc. 745 at 3–4. In 2024, graham devoted two reports exclusively to Menard. Docs. 764, 788. The April 2024 report noted that transgender women had not felt safe at Menard two years ago and still did not feel safe. Doc. 764 at 1–2.

The June 2024 report noted the ongoing problem of Defendants placing transgender women in Menard's West House, "with no cameras"; "Transgender people are a vulnerable population . . . [and] should be placed in areas that are safer rather than less safe." Doc. 788 at 1. "Overall, transgender individuals at Menard do not feel safe and express higher degrees of fear than other individuals I have interviewed. Even in protective custody, women report they do not feel safe. Multiple individuals [s]ay that the culture at Menard is particularly brutal towards transgender women." *Id.* julie graham concluded, "I am deeply concerned about the safety of transgender women at Menard." Doc. 788 at 4.

## 2023 appeal and remand

In May 2023, Defendants moved under Rule 60(b) to vacate the district court's injunction. Doc. 587. That motion was denied (Doc. 678), and Defendants appealed. In December 2024, this Court vacated the injunction, because it had expired in 90 days by operation of the PLRA. *Monroe*, 122 F.4th 688. The opinion instructed that, "The district court need not forget what has happened in the last six years of litigation," and that plaintiffs were free to seek "a new injunction, preliminary or permanent," since the PLRA's 90-day limit on preliminary injunctions did not "limit[] the number of times a court may enter preliminary relief." *Id.* at 697 (quoting *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001)).

## 2023 motion concerning Menard

During the appeal, Plaintiffs filed their first motion to transfer class members out of Menard. Doc. 705, 715. Eighteen class members submitted

declarations which described repeated sexual and physical assaults by male guards and prisoners, strip searches by male guards, no private showers, lack of gender-affirming clothing, unanswered requests for gender-affirming surgery and transfers, and no or delayed or inconsistent hormone therapy. *See* Doc. 705, Exs. 3–11 (SA93-157); Docs. 739, 740 (SA158-219), 779, 780 (SA244-249), 786, 787 (SA250-255), 762, 763, 811 (SA256-261), 823 (SA262-267), 843 (SA68-289), 843 (SA268. The district court stayed ruling on this motion pending resolution of the appeal. Doc. 826 at 17.

<u>2025 motion and first preliminary injunction concerning Menard</u>

In February 2025, after this Court ruled on the appeal, Plaintiffs filed a renewed motion for preliminary injunctive relief prohibiting class members from living at Menard. Docs. 874–75. Between February and June 2025, Plaintiffs submitted additional declarations from fourteen class members at Menard describing further instances of abuse and absence of medical and mental health care to treat gender dysphoria. *See* Docs. 874, 875, 880, 881, 909 (SA276-289), 940, 941 (SA290-334), 961, 962 (SA335-366).[3]

The district court held an evidentiary hearing from May 27–30, 2025. Six class members then at Menard[4] testified about the conditions including little or no mental health treatment for gender dysphoria; hormone therapy that was delayed for

[3] All class member declarations were filed under seal in the district court; some docket entries contain duplicate entries for the same declaration because counsel supplemented electronically signed versions with handsigned versions whenever possible. Plaintiffs filed a motion for leave to file a portion of the Supplement Appendix under seal with the final versions of the declarations.

[4] One class member from Menard refused to testify out of fear. A23.

long periods or so erratic that it was ineffectual; and many incidents of sexual violence and savage mistreatment by staff, or other prisoners and witnessed by staff who did not intervene. A8–30. Other serious problems included delays by mental health staff in evaluating class members for gender dysphoria; repeated cross-gender body searches; delays by Menard staff and the Transgender Administration Committee (TAC) to consider transfer requests out of Menard, coupled with cursory evaluations and denials; and lack of gender affirming clothing and other items. The class members who had been at other IDOC prisons said that conditions were much worse at Menard; one, A.M., who had been at three other maximum-security prisons, testified that compared to the others, Menard was "horrible": there's "no way to be a trans woman in Menard." Doc. 973 at 27–28.

The district court also heard testimony from Menard's warden, Anthony Wills, and four other defense witnesses, Dr. William Puga, IDOC's Chief of Psychiatry; Dr. LaMenta Conway, Deputy Chief of Medicine for IDOC's Office of Health Services; Major Joshua Shoenbeck, a shift supervisor at Menard; and Dr. Shane Reister, IDOC Southern Regional Psychologist Administrator. None rebutted the class member testimony.

Warden Wills acknowledged that most class members were housed in West House's protective custody unit, which lacked cameras, though he said he had repeatedly requested them. A35. He acknowledged that transgender individuals at Menard are especially vulnerable to verbal, emotional, and physical abuse and that the lack of cameras in West House was a safety issue, making it difficult to verify

staff misconduct. A7. Although he did not believe there was a "pattern" of harassment of transgender prisoners, he acknowledged that, "there could be a substantial amount of harassment." A34. He admitted to being aware of "50 to 100" reports of harassment or assault of transgender individuals at Menard but admitted that no investigation had ever found such a complaint to be substantiated, and no staff member had ever been disciplined as a result. A38. Warden Wills testified regarding Menard's policies for transgender prisoners, including private showers and strip searches, but admitted that there "no way" for him "to monitor and ensure compliance [of] all 800 staff members." Doc. 978 at 271.

Similarly, Schoenbeck testified to the general policies and procedures at Menard but had no personal knowledge of whether these policies were followed as, he did not personally assist with showering procedures and did not observe transgender individuals being searched. A50–52.

Defendants' other witnesses—Drs. Puga, Conway[5], and Reister—all higher-level medical or mental health administrators, likewise had no direct knowledge of the healthcare treatment of class members at Menard. Dr. Puga, the Chief of Psychiatry (who had told the court in 2021 that he believed IDOC had addressed the problems identified in the 2019 Preliminary Injunction, Doc. 383 at 56) testified that he was tasked with trying to "ensure[] that IDOC's medical vendor acts appropriately" but he only directly supervised his secretary. He did not oversee patient care or treat any patients. A40. Dr. Puga had reviewed the declarations

[5] Dr. Conway later, became a Defendant, after Dr. Bowman's retirement. Doc. 1065.

submitted by class members regarding Menard but did not personally investigate the complaints. A45.

Dr. Conway, then Deputy Chief of Medicine, testified that she did not oversee patient care at Menard or treat patients herself. A46. Dr. Conway testified generally about the functions of the THAW committee and the structures by which medical care is supposed to be provided to class members in IDOC, but the THAW committee does not monitor hormone levels for transgender prisoners (this is done at the local facility level). A46. The THAW committee also does not facilitate diagnoses, as this is also done at the facility level by facility-level providers. A48. Dr. Conway, who is now IDOC Chief of Health Services, agreed that medical care for prisoners with gender dysphoria includes the ability to safely social transition and transfers. A49.

The Southern Regional Psychologist Administrator, Dr. Reister, had some familiarity with Menard, testifying that there were some 600 patients requiring mental health care at Menard and it had suffered from mental health staffing shortages. A53. He did not know, however, whether Menard makes private showers available, or whether transgender prisoners are strip searched by female guards. He had not reviewed the class members' written declarations or investigated their claims; he does not speak directly with the transgender prisoners. A55. Doc. 978 at 644–45. Like Dr. Conway, Dr. Reister agreed that social transition is a component of adequate treatment for gender dysphoria. *Id.* at 637, 640. He acknowledged that a transgender incarcerated person cannot effectively

socially transition if they are not safe. *Id.* at 637–40. Dr. Reister could not state that Menard is a safe place for transgender prisoners. *Id.* at 643; A57.

In evaluating plaintiffs' request for relief, the district court concluded that class members universally described a culture of disrespect, harassment and violence by Menard guards and prisoners, which exacerbated class members' gender dysphoria, and hindered social transition. A65. Despite official policies, Defendants "failed to indicate any measures have been taken to prevent future assaults against class members. *Id.* The court found the testimony of Plaintiffs' witnesses to be "credible," and uncontroverted. A64, A66. The court concluded that the evidence "demonstrate[d] serious backsliding in the provision of basic hormone therapy since the cessation of active monitoring" as well as serious deficits in mental health care. A67.

The court also reviewed the evidence concerning placement and transfer of class members at Menard, including Defendants moving class members into and out of Menard during the pendency of Plaintiffs' motion. The court specifically concluded that "class members face the possibility of transfer there in the future, as Menard houses medium-security and minimum-security prisoners in addition to the maximum-security population." Thus, "Plaintiffs' motion is properly brought as seeking relief applicable to all class members. The harms alleged in the instant motion stem from IDOC's system-wide policies and practices, the same as described in the original and supplemental Complaints." A62–63.

The court held that Plaintiffs had satisfied the factors for a preliminary injunction finding Defendants were "well informed of the relevant standards for medical and mental health care for individuals with gender dysphoria," but had been deliberately indifferent in failing to meet those standards, including the importance of social transition, which includes providing a safe environment for transgender individuals." A63. By contrast, the harm to Defendants was minimal, given the presence of other maximum-security prisons and the limited number of individuals involved. A68–69.

The court ordered: (1) Defendants to transfer every class member housed at Menard to another facility no later than October 15, 2025, taking into consideration the individual's preference, each class member's gender dysphoria condition, gender identity, related safety issues, and whether a transfer to a facility matching the individual's gender identity is appropriate, among security and other criteria; and allowing Defendants to make the final decision; (2) Defendants to notify class members of their new placement within seven days of transfer, and explain the reasons and criteria considered for transfer; (3) no class member shall be transferred to Menard and later-identified class members shall be transferred within 21 days; (4) class members transferred from Menard who are not moved to Logan or another facility matching their gender identity are allowed to request a transfer to Logan or another facility within 60 days of their transfer; and (5) Defendants to report about class members at Menard, transfer requests, status of mental health vacancies and PRISM. *See* A71; A72–74.

The court rejected Plaintiffs' request for another mental health professional trained in WPATH to be a member of TAC and revisions to TAC's procedures, as outside the scope of the motion and not necessary to provide relief to class members at or who might be placed at Menard. A69–70.

**Motion for re-issuance of injunction and December hearing and injunction**

Defendants filed an interlocutory appeal of the September injunction on October 10, 2025 (Doc. 1016) and subsequently moved to stay portions of the injunction pending the appeal. Doc. 1024. The court denied the motion for a stay on November 24, 2025. Doc. 1048.

On October 24, 2025, plaintiffs moved for re-issuance of the injunction preventing class member placement at Menard. Doc. 1028. Defendants did not respond to the motion. The district court held an evidentiary hearing on December 8, 2025. Four class members testified, of whom three—A.R., J.D., and T.S.—had also testified in May. A.R. had remained at Menard until October, and testified to continued failures in hormone treatment, threats of mace from correctional officers in response to complaints of being improperly searched, and increased hostility and name-calling from officers. A79. A.R. had been transferred to Pontiac, and. testified that if they were sent back to Menard they would have to be placed on suicide watch. *Id.*

Similarly, J.D. testified that before she was transferred out of Menard, she had ongoing problems with hormone treatment, searches, and access to gender-affirming items, and after being assaulted by other prisoners, with resulting injury to her eye, had been maced by guards and placed in restrictive housing. Like A.R.,

J.D. said she would be suicidal if forced to return to Menard. A80–A81. T.S. testified that, between her testimony in May and her October transfer, she was repeatedly searched by men and that on the very day of her transfer out, she was mocked and harassed as she went through the body scanner. A82. Defendants could not provide T.S. with reliable hormone treatment, which resulted in T.S.'s hormone levels being off the targeted levels, setting back her progress, causing the doctor to question her compliance, and causing T.S. to experience stress, depression, and self-harm. *Id.* Once transferred to Lawrence, T.S. said she felt as if she could "finally breathe" again. A83.

The final class member who testified, L.J., recounted a sequence of violent mistreatment at Menard in the weeks before her October transfer—events which happened almost entirely after the September preliminary injunction. L.J. was supposed to be single-celled but was placed in a cell with another prisoner who sexually assaulted her. A83. Her efforts to get help over a period of several days were not successful. On September 13, her cellmate wrapped a piece of bed sheet around her neck and attempted to choke her against the cell bars within view of two officers, and one of those officers—after the cellmate had stopped trying to strangle L.J.—picked up the cord and continued to do it himself until L.J. passed out, while shouting homophobic slurs. *Id.* She received no medical attention and remained celled with her assaulter for three more days, until September 17, when she was able to call the PREA hotline; she was then sent to a hospital. A84. On return to Menard, she was placed in a cell with no sheets, towels, soap, bed, or any of her

property, in which the toilet and water did not work. *Id.* She remained there, and experienced continued harassment and physical assault from the officer who had choked her, until her transfer to Lawrence almost a month later. *Id.* Her bruised neck still had marks visible during the December hearing and on her IDOC photograph. *Id.*

Warden Wills also testified, confirming prior testimony. Menard's West House remained without cameras. A85. He lacked the authority to hire or fire staff, relied on staff to report issues to him, and he would not know of any issues unless such reports were made. *Id.* No staff were disciplined in connection with incidents previously reported. He had not mandated any additional trainings or enacted any new policies at the prison. *Id.*

Defendants' witnesses were Justin Hammers, former IDOC Chief of Operations; Dr. Puga; and Michelle Malone, who had various positions in the IDOC Transfer Coordinator's Office. The witnesses testified that the injunction had increased the number of transfers IDOC dealt with (normally 200–300 weekly) by 4–6 transfers weekly, totaling 60 additional transfers from September to December. A86–87; Doc. 1089 at 89. Mr. Hammers testified that the number of buses available to transfer prisoners is limited, and that the buses often break down. A87. Similarly, Dr. Puga testified that, after the September injunction, additional residents of Menard had sought evaluation for gender dysphoria. Because of the court's order, they had to be assessed within 14 days because a seven-day notice was required before they are moved to another facility. However, Dr. Puga said,

IDOC could not always complete an assessment for gender dysphoria within those 14 days. A89. Finally, Michelle Malone also testified to struggles with the 21-day deadline imposed by the court's September order, including that the buses "are breaking down weekly" and that these issues were further compounded by a recent snowstorm. A90; Doc. 1089 at 226. However, she also disclosed that a wing recently opened at one prison (Illinois River) to house Menard transfers. A91. Like the May hearing, Defendants' witnesses did not address or challenge the class members' testimony.

On December 11, 2025, the district issued a preliminary injunction. The court found, based on the class member testimony, conditions at Menard "remained problematic—to put it mildly," with continued deficiencies in medical and mental health care, lack of ability to socially transition, and a described "culture of disrespect, harassment, and violence by Menard correctional officers that encourages the same mistreatment by fellow prisoners." A99. The court noted that Defendants put on no evidence "refuting the[] incidents" testified to by class members: "In fact, Warden Wills testified that he would not be surprised that class members faced substantial harassment at Menard." A99–100.

The evidence of irreparable harm to class members was clear to the court:

> Although Plaintiffs' witnesses have not resided at Menard for nearly two months, the Court considers their testimony persuasive evidence of present conditions. That is so because Defendants' witnesses all but admitted that little at Menard had changed since the May hearing. . . [T]he evidence suggested remarkably little action by Defendants on any of the issues made plain by the May hearing, constituting persuasive evidence of deliberate indifference."

A100.

The court, reissued the previous injunction with modifications to address Defendants' claims of burden, considering 28 U.S.C. § 3626(a)(2)'s requirements as to intrusiveness. The court noted that it had asked Defendants to address, post-hearing, how the order might be modified to address their concerns, but Defendants had failed to do so. A104. The court modified its order to provide that any Menard resident who had requested a gender dysphoria diagnosis should receive that evaluation within seven working days (the time provided in IDOC's own procedures) and Defendants should "confirm such diagnosis in its sole discretion within 14 days of the evaluation"—meaning that no individual with an unconfirmed diagnosis would be required to be transferred. Any individual with a confirmed diagnosis "shall be transferred to a different facility within 21 days of such confirmation." A106. Defendants appealed on December 15, 2025.

## SUMMARY OF ARGUMENT

The Court does not have jurisdiction over the September and December preliminary injunctions, because the PLRA required the injunctions to automatically terminate after 90 days, mooting the appeals.

Alternatively, Defendants' appeal should be denied because the district court did not abuse its discretion in granting preliminary injunctions that prohibit placing class members at Menard, a dangerous men's prison where Defendants systemically fail to provide evaluation and treatment to the class. First, the certified class had standing, and the relief was tailored to the class because any class member could be transferred to Menard. Second, the injunctions fell within the scope of the complaints, which alleged Defendants' deliberate indifference in providing: (1) social transition, including housing class-members where they can live in their gender identity openly and safely without abuse; (2) hormone therapy and surgery; and (3) psychotherapy.

Third, the court made no clear error in finding that Defendants knew of the substantial risk of serious harm and failed to take steps to prevent it. Defendants had actual knowledge of the conditions at Menard through years of litigation, court-appointed monitor reports, dozens of class member declarations detailing abuse and failures, and two evidentiary hearings. Yet, Defendants took no meaningful corrective action. Under *Farmer* and *Rasho*, persistence in a course of action known to be ineffective supports an inference of deliberate indifference. Class members credibly testified about mistreatment at Menard, including: (1) their inability to

socially transition due to repeated sexual violence and abuse by guards or prisoners, cross-gender strip searches, lack of access to gender affirming items, and no private showers, (2) delays in gender dysphoria evaluations, (3) untimely and inconsistent hormone treatment, (4) no approvals for surgery, (5) delays and denials of transfer requests, and (6) no mental health care for gender dysphoria. The evidence showed that any purported steps taken by Defendants as to their policies did not translate to changes on the ground. Hiring one or two mental health staff did not ameliorate the timeliness or adequacy of treatment. Single-cell placement has not stopped the violence and abuse that prevents class members from safely transitioning because Defendants have not enforced the policies intended to protect class members. Finally, the injunctions were narrowly drawn and the least intrusive means of correcting the ongoing violation because the Court did not direct Defendants where to transfer class members to, relied on Defendants' discretion to make individualized assessments, and modified the relief in December to address administrative concerns.

## ARGUMENT

### I. Standard of Review

For preliminary injunction orders, "factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given *de novo* review." *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986) (citations omitted). The "ultimate evaluation and balancing of the

equitable factors is a highly discretionary decision and one to which this court must give substantial deference." *Id.* This Court reviews a grant of preliminary relief for abuse of discretion—a deferential standard. *See id.*

## II. The September and December preliminary injunctions expired, so those appeals are moot.

As this Court recognized in *Monroe*, 122 F.4th at 694, preliminary injunctions governed by the PLRA, 18 U.S.C. § 3626(a)(2), automatically expire after 90 days. The district court explicitly stated that the September injunction would expire in December (Doc. 1048). Many other circuits have held that the automatic expiration of a preliminary injunction under the PLRA moots an appeal. *See, e.g.*, *Smith v. Edwards*, 88 F.4th 1119, 1126 (5th Cir. 2023) (dismissing appeal as moot because injunction expired after 90 days under PLRA); *Ahlman v. Barnes*, 20 F.4th 489, 493 (9th Cir. 2021) (same); *Banks v. Booth*, 3 F.4th 445, 448–49 (D.C. Cir. 2021) (same); *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1229 (11th Cir. 2015) (same). Because both injunctions expired under the PLRA after 90 days, and the appeals are moot.

Furthermore, the "capable of repetition, yet evading review" exception to mootness does not apply to expired PLRA injunctions. The Supreme Court has declared that the "doctrine applies only in exceptional situations." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). And this Court only applies the exception "when (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable

expectation that the same complaining party will be subjected to the same action again." *Worldwide St. Preachers' Fellowship v. Peterson*, 388 F.3d 555, 559 (7th Cir. 2004) (quoting *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 529 (7th Cir. 2001)).

In applying this same test to expired PLRA preliminary injunctions, other circuit courts have found that the exception does not apply. *See, e.g.*, *Smith,* 88 F.4th at 1126 (dismissing appeal as moot because injunction expired after 90 days under PLRA and capable of repetition but evading review exception did not apply); *Ahlman,* 20 F.4th at 495 (same); *Banks*, 3 F.4th at 448–49 (same); *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229) (same). First, "ninety days is not in itself necessarily too short a time fully to litigate a challenge to a PLRA injunction." *See Smith*, 88 F.4th at 1125–26. Second, any issues capable of repetition would not evade review, because the court could just review the issues repeated in the new preliminary injunction. The Fifth Circuit explained in *Smith* that "it [wa]s not clear that [Defendants] w[ould] again be subject to the same action, i.e., that the preliminary injunction is capable of repetition," because "any new injunctive relief would be based on different facts and potentially different law, and any challenge to such a ruling would constitute a new controversy." *Id.* at 1126.

In reissuing the preliminary injunction in March, the court has narrowed the requirements and lessened the administrative burden on Defendants only requiring transfers class members at Menard to another prison if IDOC, "*in its sole discretion*," confirms the class member's gender dysphoria diagnosis. *See* Doc. 1125

at 29. The court also extended the deadline by which IDOC must transfer a class member after a request is made. *Id.*

While the preliminary injunction does *not* require all class members to be transferred out of Menard, Defendants continue to frame the issue and their arguments on these expired terms. *See* Br. at 35. Opining on the terms of an expired injunction that no longer affects either party would require this Court to "decide an unnecessary question that cannot affect the rights of the litigants before it." All questions requiring this Court's review can be resolved by adjudication of the March 2026 preliminary injunction. This means that the only repetitious parts of the subsequent preliminary injunctions are not evading review. Therefore, this Court should follow its sister circuits and hold the appeals moot.

## III. The district court had authority to enter the preliminary injunctions.

Defendants challenge the named plaintiffs' standing to seek relief specific to Menard because they were not currently housed at that facility and argue that because the scope of the relief was limited to Menard, it did not apply to the whole class. Neither argument has merit.

Once a class has been certified, standing must be assessed in relation to the class—not the individual named plaintiffs. That the *named plaintiffs* were not housed at Menard when the injunctions were issued, does not matter. *Cf.* Br. at 36–39. This argument disregards that the class was certified over six years ago and settled precedent regarding the legal status of a certified class. Defendants' next argument fares no better, as it ignores that, without the injunction, any member of

the class can be sent to Menard, and all members of the class face an inherent risk of harm if housed at Menard.

**a. The class had standing to seek this injunction.**

Six years ago, in a ruling that Defendants did not appeal, the district court certified a class as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." Doc. 213. In certifying the class, the district court found that the named plaintiffs adequately represented the interests of all individuals with gender dysphoria in seeking reformed policies and practices regarding evaluation and treatment for gender dysphoria throughout the IDOC system. *Id.* at 9.

Once a class has been certified, it "has a legal status separate from and independent of the interest asserted by the named plaintiff." *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (*citing Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir.1998)). Yet, in arguing against standing, Defendants repeatedly cite cases where no class had been certified. *See* Br. at 36.[6] This Court's precedent clearly holds that, after class certification, "statutory and Article III standing requirements must be assessed with reference to the *class as a whole*, not simply

[6] *Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008) is a case about standing for an individual plaintiff's lawsuit and does not address how standing operates in a case with a certified class, while *Calhoun v. DeTella*, 319 F.3d 936 (7th Cir. 2003), *Knox v. McGinnis*, 998 F.2d 1405 (7th Cir. 1993), and *Dunne v. Olson*, 67 Fed. App'x 939 (7th Cir. 2003), involve mootness of *individual litigants'* requests for injunctive relief after those individuals were transferred out of the facilities they sought to enjoin. No class was certified in *Hodgers-Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir. 1999).

with reference to the individual named plaintiffs." *Payton*, 308 F.3d at 680 (emphasis added); *see also Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831 (1999) (explaining that "class certification issues are ... logically antecedent to Article III concerns…").

The Supreme Court has likewise recognized the independent legal status of a certified class. *See Sosna v. Iowa,* 419 U.S. 393, 399 (1975) (mootness of named plaintiff's individual claim did *not* moot class action where class had been properly certified); *Franks v. Bowman Transp. Co. Inc,* 424 U.S. 747, 753 (1976) (same). Thus, the fact that the named plaintiffs were not housed at Menard when the September and December injunctions were issued is irrelevant to whether *the class* had standing to seek injunctive relief specific to Menard.

**b. The certified class had standing to seek relief specific to Menard.**

The evidentiary record demonstrated that, for individuals with gender dysphoria, being housed at Menard exposes them to an imminent risk of serious harm.

Article III standing requires the plaintiff class to show an injury-in-fact traceable to Defendants' actions and likely to be redressed by a favorable court decision. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692–97 (7th Cir. 2015). An "injury-in-fact" is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And, in injunctive cases like this one, "a plaintiff need not wait until he suffers an

actual injury because the constitutional injury *is* the exposure to the risk of harm." *Parsons v. Ryan,* 289 F.R.D. 513, 521 (D. Ariz. 2013) (citing *Brown v. Plata*, 563 U.S. 493, 506 n.3 (2011), *aff'd*, 754 F.3d 657 (9th Cir. 2014); *see also Helling v. McKinney,* 609 U.S. 25, 33 (1993) (explaining that "[i]t would be odd to deny an injunction to prisoners who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event.").

Multiple unrefuted accounts from class members demonstrated that Menard staff denied or delayed access to evaluation and treatment for gender dysphoria, including by making it unsafe to socially transition through a constant barrage of verbal and sometimes physical harassment and abuse. A66 ("Defendants notably failed to controvert any of the class members' testimony regarding their experiences and the conditions at Menard."); *see also* SA93–392 (under seal).

These facts are in stark contrast to *Lewis v. Casey,* 518 U.S. 343, 356 (1996), upon which Defendants rely. First, the plaintiffs in *Lewis* sought permanent, system-wide relief, regarding access to the legal research facilities but were only able to demonstrate that two class members had experienced "actual injury" due to unaccommodated illiteracy. The Supreme Court held that this limited injury was insufficient to justify injunctive relief mandating detailed and systemwide changes to the prison law libraries and legal assistance program.

The robust evidentiary record below, demonstrating system-wide harm to dozens of class members, is a far cry from the limited failure to provide access to the court to two individuals in *Lewis.* The district court found that Plaintiffs' motion for preliminary relief regarding Menard was "properly brought as seeking relief applicable to all class members." A62–63. district court made this finding because the harms alleged in Plaintiffs' motion "stem from IDOC's system-wide policies and practices," and because class members continued to be housed at Menard. The district court cited the fact that "[c]lass members continued to be moved to Menard (or were newly identified as transgender) during the pendency of" plaintiffs' first motion for a preliminary injunction, noting that Defendants had informed Plaintiffs of six new class members at Menard who had not been identified previously. *Id.* The court further noted that "[o]ther class members face the possibility of transfer there in the future, as Menard houses medium-security and minimum-security prisoners in addition to the maximum-security population." A63. These findings are not clearly erroneous.

The certified class is comprised of individuals who inherently face a risk of harm merely by being placed at Menard. Just as prisoners with serious mental illnesses had standing to challenge severe inadequacies in the mental health treatment provided by a prison system in *Dunn v. Dunn,* these class members have standing to challenge placement in a men's facility that is hostile to their very existence. "What these plaintiffs must show" — and have shown here—"is that they have been subjected to the harmful policies and practices at issue, not (necessarily)

that they have already been harmed by these policies and practices." *Dunn v. Dunn,* 219 F. Supp. 3d 1100, 1123 (M.D. Ala. 2016). And, "to the extent that they allege a condition has existed for a length of time, they generally must show that some prisoners—themselves or others—have been harmed in order to demonstrate an objectively substantial risk of serious harm." *Id.* at 1123–24.

Thus, the named plaintiffs need not be currently housed at this dangerous facility for the class to challenge the placement of any class member there. Instead, their demonstration that numerous class members housed there have experienced serious harm as a result of systemic conditions, coupled with the fact that any class member could be transferred there at any time, is sufficient to establish that housing at Menard as a person with gender dysphoria creates an objectively substantial risk of harm and is an injury-in-fact for standing purposes.

Without the injunction, new class members who enter IDOC custody through Menard's intake facility could be stuck there; any class member currently housed at Menard would continue to be subjected to the imminently dangerous conditions there; and any class member at other facilities could be transferred to Menard at any moment. As the evidence presented to the district court made clear, having gender dysphoria at Menard creates a real risk of harm to one's physical, mental, and emotional health.

#### c. The injunctions did not go beyond the scope of the complaints.

The district court did not abuse its discretion in issuing injunctions which arose out of the case and controversy in the complaints. At a minimum, the

complaints notified Defendants of their deliberate indifference in evaluation and treatment of gender dysphoria with hormone therapy, surgery, mental health care, and social transition throughout IDOC, including at Menard, under the Eighth Amendment. Subsequent motions for preliminary injunctions detailed Defendants' deliberate indifference in these categories, while emphasizing dangerous failures to accommodate—and in some cases, deliberately impede—social transition at Menard. The complaints seek preliminary and permanent injunctions stopping Defendants' unconstitutional conditions and practices. Defendants ignore this Court's precedent, instead relying on out-of-circuit law (*see* Br. at 33–36) to argue that these injunctions impermissibly address unpled claims (they do not) and grant Menard-specific relief.

**i. The injunctions are not beyond the case and controversy.**

A preliminary injunction cannot go "beyond the scope of the complaint" meaning not "beyond the case and controversy before the court," and it cannot "surprise" a defendant. *See Auto Driveaway Fran. Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 675 (7th Cir. 2019). But an injunction can concern claims, facts, or interim relief not specified in the complaint without going *beyond* the case and controversy. *See id.* ("Any failure to include the specifics [defendant] identifies does not offend the requirements of [F.R.C.P.] 8(a)(2).").

In *Auto Driveaway*, this Court upheld an injunction prohibiting a franchisee from operating companies in competition with the franchisor, even though the complaint did not assert claims against the franchisee personally, include "post-

termination breach of contracts," or specify an enjoined company. *See id.* Deeming these counterarguments "quibbles," the Court explained that "federal courts require notice pleading, not fact pleading complete with all the minutiae." *See id.* "[T]here is no rule requiring parties to plead legal theories or elements of a case." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Here, the injunctions neither go beyond the "case or controversy," nor surprise Defendants. The complaints provide the bones of the case and controversy, alleging an Eighth Amendment claim of deliberate indifference in gender dysphoria evaluation and treatment –including hormone therapy, gender-affirming surgery, psychotherapy, and social transition—across IDOC prisons, including Menard. *See generally*, Docs. 1; 935. The motions for preliminary injunctions simply put the meat on the bones of the complaints by vividly describing how Defendants have continued to violate the Eighth Amendment at Menard.

Both the complaints and motions address:

- Defendants' failure to provide adequate hormone therapy systemwide, including at Menard. *See* Docs. 1 at 22–25; 935 at 12–15 (detailing how Menard staff retaliated against transgender women, who complained about male guards watching them pull their pants down for hormone injections, by denying some subsequent injections and groping one). *See* Docs. 873 at 7–8, 11–12; 1028 at 2–3, 8, 13–14.

- Defendants' delay or denial of necessary surgeries to class members. *See* Docs. 1 at 28–29; 935 at 2–3, 19–23; 873 at 4; 1028 at 6.

- Defendants' failure to provide psychotherapy to diagnose and treat gender dysphoria, and deal with abuse because of their gender identity. *See* Docs. 1 at 29–32; 935 at 15–19;; 1028 at 7–8.

Finally, the complaints explain how Defendants were and are deliberately indifferent in facilitating social transition, a treatment for gender dysphoria, where class members can live openly and *safely* as their gender identity. *See* Docs. 1 at 2, 26–27; 935 at 24–36. Defendants routinely place and keep class members in men's prisons based on sex assigned at birth, without considering the appropriateness of a female facility based on national standards to prevent rape (Doc. 1. at 26) or the standards of care for gender dysphoria (Doc. 935 at 24–27). This neglects class members' health and safety by making them vulnerable to sexual harassment, rape, and abuse at men's prisons like Menard. *See* Doc. 935 at 25–26, 32. As a result, class members either do not come out as transgender, or they discontinue social transition or hormones. Doc. 935 at 26. Defendants also fail to provide other social transition care, private showers, gender affirming clothing, and strip-searches by male guards. *See* Docs. 1 at 26–27; 935 at 33–35.

The motions build on the complaints explaining how Defendants impede class members' social transition at Menard. *See* Docs. 873, 1028. The motions describe Defendants placement of class members at Menard despite knowing that social transition was ineffectual. *See* Doc. 873 at 7, 11, 13. The motions describe guards and prisoners raping, assaulting, macing, sexually and verbally harassing class members. *See* Docs. 873 at 4, 7, 9, 14–15; 1028 at 6. The motions also describe class members being denied private showers and gender-affirming commissary items. *See* Docs. 873 at 9, 12–13; 1028 at 6. Even after the September renewal motion describes how Defendants had done little to stop abuse, hold guards

accountable, or enforce procedures to ensure private showers and same gender strip searches. *See* Doc. 1028 at 4–5.

Defendants, without any authority, argue that allegations about Menard's "culture of violence"—which allows guards and prisoners to abuse class members—could only support a "conditions of confinement" or "failure to protect claim" in the complaint. *See* Br. at 34. While these facts could undoubtedly support additional claims, that does not mean they are outside the scope of Plaintiffs' deliberate indifference claim. They reflect interference with treatment for gender dysphoria. The Court should ignore Defendants' "quibbles." *See Auto Driveaway,* 928 F. 3d. at 675 (rejecting defendant's attempt to describe injunctions' facts as anything more than complaint's claims).

**ii. The injunctions' relief was not beyond the scope of the complaints.**

The interim relief was not beyond the scope of the complaints, either. *See Auto Driveaway,* 928 F. 3d. at 675. The complaints requested injunctive relief—for Defendants to develop and implement a plan addressing the violations (Doc. 1 at 37)—does not foreclose the court from ordering other relief. The complaints also request that the court: *"Preliminarily* and permanently enjoin Defendants, . . . , from subjecting Plaintiffs and the Plaintiff Class to . . . unconstitutional conditions, acts, omissions, policies, and practices". *See* Doc. 1 at 37. And "grant other relief as the Court may deem just and proper under the circumstances." *Id.* at 38. The operative unconstitutional acts included, among other things, Defendants' deliberate indifference in accommodating social transition by placing prisoners with

gender dysphoria in Menard, a men's prison with abusive guards and prisoners hostile to transgender prisoners. The interim relief prohibited placement of class members at Menard and required Defendants to conduct an individualized assessment placing class members into other facilities. *See* A70-1; A108-110.

The cases Defendants use to argue that interim relief must match final relief, are not apt. *See De Beers Consol. Mines v. U.S.,* 325 U.S. 212, 219–220(1945) (vacating preliminary injunction preventing foreign companies from transferring or selling any property in United States because case concerned monopoly of industrial diamonds and the law only allowed court to restrain monopolies); *Omega World Travel, Inc. v. TransWorld Airlines,* 111 F. 3d. 14, 16 (4th Cir. 1997) (antitrust suit which sought to declare contract void could not support injunction to uphold contract). It is well within the theory of the case—that Defendants' provision of medical and mental health treatment is deficient statewide—for the court to prevent placement of class members at one prison where this deficient treatment presents acute danger to the class. To hold otherwise would allow Defendants to continue to place class members at Menard, where abuse interfering with medical treatment persists, simply because Defendants' practices violate the Eighth Amendment in other prisons, too.

## IV. There was no clear error in finding Plaintiffs likely to succeed on the merits of their Eighth Amendment claim.

The court's ruling that Defendants likely violated the Eighth Amendment with their deliberate indifference to a serious medical condition should be upheld. Plaintiffs presented ample evidence that Defendants knew of and permitted gross systemic deficiencies at Menard that made access to treatment for gender dysphoria nearly impossible. *See Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983); *Ollison v. Gossett*, 136 F.4th 729, 736 (7th Cir. 2025) (explaining showing required for systemic deliberate indifference claim); *see id.* at 746 (Hamilton, J. dissenting) (agreeing with majority that prison officials can be found deliberately indifferent to "serious and systemic deficiencies in prison health care").

The Eighth Amendment protects prisoners from cruel and unusual punishment, including pain and suffering caused by deliberate indifference to a serious medical need. *Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002). Prison officials violate the Eighth Amendment when plaintiffs 1) "suffer[] from an objectively serious medical condition" and (2) defendants are "deliberately indifferent to that [medical] condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1970)). Deliberate indifference requires a showing that Defendants knew of a substantial risk of serious harm and failed to take steps to prevent it. *Farmer*, 511 U.S. at 837. Defendants' knowledge of the risk must be actual, subjective knowledge (*Id.* at 839), but "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. A risk is obvious if it is "longstanding, pervasive, well-documented, or … the circumstances suggest that the

defendant-official being sued had been exposed to information concerning the risk". *Id.* at 842–43. Defendants cannot escape liability because they "merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Id.* at 843, fn. 8.

Plaintiffs' medical care is examined as a whole, including whether persistent, ongoing negligent errors amount to a systemic failure to provide medical care. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022); *see also Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing systemic deficiencies as a distinct category of deliberate indifference). Systemic failure can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the prisoner population in effectively denied access to adequate medical care." *Wellman*, 715 F.2d at 272. It may also be supported by "repeated examples of negligent acts which disclose a pattern of conduct by prison medical staff." *Id.*

An official with knowledge of a substantial risk can avoid liability if they take reasonable steps to ameliorate that risk. *Farmer*, 511 U.S. at 844. The official's course of action does not have to be the best solution, or even successful, but "persistence in a course of action known to be ineffective" may support a finding of deliberate indifference. *Rasho v. Jeffreys*, 22 F.4th at 710. So, "while plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Id.* at 713 (citations omitted).

Neither is it enough for Defendants to show they provided "some medical care". *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016). Rather, prison officials must protect prisoners from "wanton and unnecessary infliction of pain", including through "grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019). Defendants must be able to show that those providing the medical care, at the very least, exercised minimally competent medical judgment (*Petties,* 836 F.3d at 729), and that plaintiffs were not subjected to "prison guards [] intentionally denying or delaying access to medical care, or intentionally interfering with [] treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

**a. Gender dysphoria is a serious medical condition, and the standards of care are not contested.**

Defendants concede that gender dysphoria is a serious medical condition, (Br. at 40) [7] and do not contest the standards of care used to evaluate their treatment (*see* Br. at 40–50; Doc. 186 at 3). Since 2019, the court has evaluated Defendants' treatment using the WPATH Standards of Care and Endocrine Society guidelines as the "appropriate benchmark." A5-A6. In 2022, the court found that "[s]ocial transition (including housing in a facility matching one's gender identity and access to gender-affirming clothing and other items) is a medically necessary

[7] Defendants suggest that the initial relief included prisoners without gender dysphoria because the certified class includes prisoners seeking an evaluation. *Id.* The class includes these prisoners because Defendants delay evaluations for months or even years. Doc.1 at 7, 18–20. Class members at Menard still face this issue. A64. Transfer from Menard allowed these class members to have their gender dysphoria evaluated and treated.

component of treatment for some prisoners with gender dysphoria." Doc. 383 at 65. The court ruled that Defendants need to "determine on a timely basis the initial assignment of a transgender inmate to a prison matching their gender identity, as well as other matters, without inordinate delay." *Id.* at 69.

The court also considered Defendants' Administrative Directive 04.03.104 ("A.D."), "Evaluation, Treatment and Correctional Management of Transgender Offenders," effective April 1, 2021. A6. The A.D. outlines Defendants' policies for people with gender dysphoria, and the committees responsible for overseeing that care. *Id.* The A.D. also requires individualized assessments of appropriate housing for a prisoner's gender dysphoria before placement. Doc 335 at Ex. B.

**b. For years, Defendants knew that the class could not get adequate treatment at Menard.**

The case history and the testimony show that Defendants had actual knowledge of the systemic deficiencies in accessing gender affirming care, particularly at Menard. Officials do not have to be directly involved in the misconduct to be held liable for deliberate indifference. *Ollison*, 136 F.4th at 736. It is enough that a plaintiff makes the official aware of the misconduct, and the official "turns a blind eye" to the possible harm. *Id.* at 736. Plaintiffs spent years informing Defendants of the misconduct at Menard.

Plaintiffs' first motion to transfer class members out of Menard, filed in December 2023, was supported by 19 class member declarations detailing inadequate care. *See* SA158–274. In 2024, Warden Wills spoke to and read court monitor reports explaining their safety concerns for class members at Menard. A38. Plaintiffs'

March 2025 motion for preliminary injunction barring class members from Menard included 14 additional class member declarations. *See* SA276–340. At the May 2025 evidentiary hearing, eight class members credibly testified to their mistreatment. *See* A8–30; A64. After, Warden Wills read the declarations and the court's September order. A85. And in October 2025, Plaintiffs included six declarations with their motion to reissue the preliminary injunction. *See* SA367–392. Given this, the court appropriately found that "Defendants have been well informed of the harms experienced by class members at Menard (and elsewhere) when their treatment for gender dysphoria, including medical treatment and necessary social transition, has been denied, delayed, or both." A98.

**c. Defendants failed to provide constitutionally adequate medical care.**

Defendants point to written policies and "sincere intentions to improve conditions" for class members as evidence they cannot be deliberately indifferent. Br. at 42. But Defendants' inability to implement their policies belied their intentions, and denied Plaintiffs constitutionally required care. *Rasho*, at 713 (persisting in course of action known to be ineffective can be deliberate indifference).

i. Social transition

Defendants do not dispute that they placed class members at Menard, a men's prison, without considering their gender identity. *See generally*, Br. at 42–48. This deprived class members of medically necessary social transition, which

requires that a prisoner with gender dysphoria be able to live in their gender identity openly and safely.[8] But transgender people at Menard faced such extreme hostility and violence from staff and prisoners that they had to hide their gender identity and forego care. Without social transition, there was "no way to be a transgender woman at Menard." A8; *see also* A15 (guards and prisoners have a "religious hatred" of transgender individuals).

ii. Assaults and verbal abuse

Defendants' assertion that this abuse toward class members did not affect their medical care (*see* br. at 50) is absurd. Menard guards habitually abused class members, terrorizing them into abandoning social transition and worsening their gender dysphoria. *See, e.g.*, A16 (after guards assaulted and raped J.D., she stayed in her cell 24 hours a day to avoid future assaults); A9 (guard sexually assaulted A.M. in mental health waiting room; when she requested medical treatment, guards pepper sprayed her, tackled her, and put her in segregation for months); A25-26 (guard choked A.R. while supervisor watched, called A.R. a "fag"). Guards additionally misgendered and harassed class members. *See, e.g.*, A27 (harassment prevented D.F. from transition); A22-23 (guards outed T.S. to other prisoners, so T.S. only felt safe expressing her gender in her cell at night; would not leave her cell due to physical threats). A guard who abused class members was even promoted to head of Internal Affairs by the Warden, despite him knowing of abuse reports. A39.

[8] Defendants conflate social transition with gender affirming items (*see* Br. at 46) which, while medically necessary (*see infra* pp.45–46), are part of facilitating social transition.

Guards failed to intervene when male prisoners assaulted class members, exposing them to violence for expressing their gender identity. *See, e.g.*, A13 (four male prisoners pinned D.H. down by her dreadlocks, beat and sexually assaulted her in shower while staff ignored her cries for help. Afterwards, she cut her long hair and stopped showering).

Defendants suggest that single-celling some class members was reasonable amelioration. Br. at 50. While single-celling may address abuse by a cellmate, it cannot stop guards and prisoners' abuse outside it. *See* A29; Doc. 1089 at 12, 123–40.[9] Nor does it keep abusive guards from coming in. The Warden also admitted to knowing about 50–100 reports of transgender prisoners feeling unsafe, harassed or assaulted even after implementing a single-cell policy. A38. Additionally, class members' single cells are in West House where there are no cameras. *Id.* And Warden Wills cannot fire anyone for their misconduct. *Id.*; Doc. 1089 at 63. Thus undeterred, class members continue to face prison guards intentionally interfering with their medical care for gender dysphoria. *See Estelle*, 42 U.S. at 104-05.

iii. Searches and showers

Class members testified that male guards strip searched them (A16, A18, A21, A25, A29, A30), violating standards of care and IDOC policy. A36. Warden Wills admitted being aware of 25–50 search violations. A37. Many class members testified that they had no access to private showers, also violating policy. *See* A10, A13, A14, A16, A19, A25, A27. While A.M. testified that she could use a single

[9] While D.F. testified she preferred being single-celled at Menard to a medium security *men's* facility, she wanted to transfer to Logan, the women's facility. A30.

shower, guards mocked her while making her walk in front of prisoners in her bra and underwear. A10.

vi. Gender affirming items

Gender-affirming items like makeup, magic shave and razors, or female clothing were not routinely available to the class. A11, A15, A19. While Defendants rely on out of circuit law to suggest those accommodations are not medically necessary (Br. at 46), they presented no evidence contesting the court's previous finding of their medical necessity.

v. Hormones and surgery

Contrary to Defendants' assertion that class members "acknowledged that they were prescribed appropriate hormone therapy" (Br. at 43), class members' testimony described care that was incompetently administered, delayed for years, or denied. *See* A10, A12, A15, A20, A21, A24, A25. No class members received timely evaluation or approval for surgery. *See* A67.

vi. Psychotherapy

Class members received little or no mental health care for evaluation and treatment of gender dysphoria. *See* A67, A16–17, A49. Dr. Reister testified that Menard had chronic mental health staffing problems, estimating 600 prisoners at Menard needed mental health services, but Menard went for years with only one provider. A54. Class members received no group therapy. A10. Several class members had mental health visits held at their cell door, where other prisoners could hear. *See* A13, A22. Dr. Reister agreed this was not adequate care. A55.

**d. Defendants failed to take reasonable steps to fix deficiencies.**

Defendants had seven months after the May hearing to ameliorate the harm to class members but made no meaningful improvements. Warden Wills "testified that he would not be surprised that class members faced substantial harassment at Menard." A100. Still, Wills did not order additional trainings or enact policies to address the harm. A85–86. Besides assisting with court-ordered transfers, "[Wills] could not point to any action he had taken since the May hearing to improve the treatment of transgender individuals housed at Menard." A100.

Dr. Puga testified that seven out of ten mental health positions at Menard remained vacant. A89. So, three providers treated 600 prisoners. *See* A53. Defendants hired one Transgender Patient Advocate for all IDOC, but Dr. Puga could not specify their job duties. A90. At the May hearing, Dr. Puga promised a new A.D. was forthcoming, but testified in December that Defendants had yet to issue it. *Id.*

Lacking intervention, guards and prisoners continued to abuse class members. *See* A80-81 (after assault by two male prisoners, guards did not come to J.D.'s aid but sprayed her with mace)); A83 (cellmate sexually assaulted L.J. and guard refused to remove L.J. from her attacker); A83–84 (cellmate assaulted L.J.; guard joined in to choke her and call her slurs); A84 (guard threatened to kill L.J. for filing PREA complaint against him and attacked L.J. day of transfer). Male guards strip-searched class members (A79, A80, A82), threatened to mace a class

member for requesting a female guard search her (A79), and used slurs to mock class members' gender identity while in the body scanner (A82).

Defendants also failed to provide timely and adequate hormone care. *See* A82 (T.S.'s hormone doses so infrequent that endocrinologist was concerned); A80 (J.D. missed hormones doses five times); A79 (A.R.'s hormones routinely delayed or provided at 2:00 a.m., when sleeping). Guards also interfered with class members attending group therapy by making them late or falsely documenting refusal of care. *See* A79; A84.

Contrary to Defendants' assertion, Defendants did not make reasonable efforts to address the denial of care. *Rasho*, 22 F.4th at 711; *Whiting*, 839 F.3d at 664. Defendants put on *no* evidence that they addressed their deliberate indifference. A99–100 ("[t]he evidence suggested remarkably little action by Defendants."). Defendants "all but admitted that little had changed at Menard" (A100) and that "conditions at Menard remain substantially the same as they were in May." A101. "Put simply," the court concluded, "the facility does not allow class members to safely seek treatment for their gender dysphoria as is their right under the Eighth Amendment." *Id.*

## V. The Menard injunctions satisfied the needs-narrowness-intrusiveness requirements of the PLRA.

The PLRA mandates that courts shall not grant prospective relief unless it finds that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(1)(A). The Seventh

Circuit has "identified two dimensions to the PLRA's mandate against overbreadth." *Howe v. Hughes*, 74 F.4th 849, 857 (7th Cir. 2023). First, an injunction that imposes numeric requirements may not "exceed[] the constitutional floor," or "extend further than necessary to address the violation at issue." *Id.* Second, the "relief may not be too prescriptive," meaning that it must ensure that "substantial discretion and flexibility remain in the hands of prison administrators." *Id.* (internal citations omitted).

The PLRA's "need-narrowness-intrusiveness" requirement does not require a "provision-by-provision explanation of a district court's findings." *Fields v Smith*, 653 F.3d 550 at 558 (7th Cir. 2019) (quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010); *see also Smith v. Arkansas Dep't of Corr.*, 103 F.3d 637, 647 (8th Cir. 1996); *Williams v. Edwards*, 87 F.3d 126, 133 n.21 (5th Cir. 1996). Instead, the court is required to show that it "evaluated the record as a whole and identified evidence that fully supports the scope of the injunctive relief granted." *Fields*, 653 F.3d at 558.

**a. Defendants waived any argument that the injunctions' relief exceeded the PLRA's Needs-Narrowness-Intrusiveness Requirements.**

Defendants waived any argument that the injunctions' relief violated the needs-narrowness-intrusiveness requirements of the PLRA. In their response to Plaintiffs' motion resulting in the September injunction, Defendants' arguments about the scope of requested relief were undeveloped, unsupported, and lacked any logical connection to the needs-narrowness-intrusiveness factors. *See* SA41–73.

Defendants failed to even respond to Plaintiffs' motion to re-issue the injunction, waiving any argument that the relief exceeded the PLRA's requirements.

In response to Plaintiffs' first motion, Defendants argued the characteristics of Menard made it a "critical" facility, but failed to explain how this mattered to class members or rendered the requested relief overly broad.[10] SA 67. Defendants argued that Menard was one of three maximum facilities, but this is inaccurate.A68 at n.61. Besides, not all class members are maximum-security level, and Defendants presented no evidence that there was insufficient space to house class members at other maximum facilities. Defendants also argued that Menard's proximity to St. Louis creates access to medical facilities (SA67) but never presented evidence that class members received care out of state in St. Louis. As this Court has held, "perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

Defendants failed to respond to Plaintiffs' motion to re-issue the injunction. Instead, Defendants moved to stay partially the September injunction, arguing that an influx of individuals requesting evaluation for gender dysphoria was burdensome. *See* Doc. 1024. And despite focusing their argument at the December hearing on this purported administrative burden, (A86-89), Defendants failed to

---

[10] Defendants also noted that the Transfer Coordinator Officer (TCO) must consider certain factors in placing prisoners in housing. *See* SA67. But the court crafted its relief so that the TCO would continue using those same factors. *See* A108-109.

provide any input on how to relieve that burden, even when asked. *See* A103–04.[11] Defendants' lack of engagement in crafting appropriate relief led the district court to reasonably "question the depth of their concern regarding the scope of this preliminary relief." A104. Defendants' refusal to engage with the court's crafting of relief waives their ability to challenge the relief's scope on appeal. *See Fields,* 653 F.3d at 558 (defendants' failure to challenge injunction on needs-narrowness-intrusiveness grounds in the district court precluded that argument on appeal).

**b. The injunctions were necessary to correct the violation of a federal right.**

The district court had an ample record of the systemic deficiencies in care at Menard to support its issuance of the first and second injunctions. For the September injunction, Plaintiffs produced 33 written declarations (SA93–392) and six witnesses, all of which detailed pervasive and uniquely intractable problems at Menard. As described above *(supra* pp. 11, 43–44*)*, class members testified to the lack of evaluation and treatment, including inability to socially transition because of endemic abuse and harassment from both guards and other prisoners.

Crucially, Defendants did not refute Plaintiffs' evidence or class member testimony at either hearing. (A66; A99-100). At the first hearing, Defendants presented testimony about systemwide policies and procedures that, *if followed,* could ensure that class members received appropriate treatment, including the ability to socially transition. However, Defendants did not present *any* evidence

[11] These post-hearing briefings were not filed on the docket but submitted to the court directly.

that these policies were followed. A66. Indeed, Defendants did not present any evidence of *actual* conditions at Menard whatsoever. Their witnesses had not been to Menard for years either and/or could not say whether Menard staff followed department policies. *Id.* Moreover, Warden Wills admitted that the unit where most class members were housed lacked any video cameras to deter or identify abuse against class members or monitor compliance with directives—meaning that the physical structure of this facility fostered violations of class member rights. *Id.* Indeed, he admitted that "a substantial amount of harassment" towards class members could be going on, and he would not know about it. A65–66.

After the first hearing, the district court found that class members at Menard were at imminent risk of irreparable harm due to inability to access evaluation and treatment for gender dysphoria—*despite* official changes in policy. A68. Staff at Menard further interfered with social transition by permitting other prisoners to assault class members and failed to provide consistent and effective gender-affirming medical care. *Id.* Because officials at both the facility and Department level were unable to protect class members' rights while at Menard, the court concluded it was necessary to transfer class members out of Menard. *Id.*

At the second hearing, Defendants failed to present any evidence of improvement at Menard. The district court concluded that "despite IDOC officials being aware of the deficiencies, little, if anything, has been done." A101. Thus, the court correctly concluded that its remedy of prohibiting Defendants from housing class members at Menard remained necessary to protect their constitutional right to

adequate medical treatment. Defendants do not identify any evidence in the record to show that relief was not necessary, or even that less intrusive relief was available, given Menard's persistent conditions for class members.

Crucially, these dire circumstances at Menard were not new—they were going on for *years* before Plaintiffs moved for the present relief. The court's prior injunctions in 2019, 2020, and 2021—which focused on the development of policies and procedures and provision of treatment for gender dysphoria—had failed to prompt Defendants to change anything at Menard. Even regular monitoring by court-appointed experts, which revealed ongoing concerns about class member safety and ability to access appropriate treatment, yielded no results. *See* Doc. 718 at 2–3; Doc. 745 at 3–4; Docs. 764, 788; A64. Per this Court's directive, the district court was not required to forget this long history of rights violations at Menard in fashioning prospective relief. *Monroe*, 122 F.4th at 697.

#### c. The Menard injunctions were narrowly tailored to the need.

The PLRA mandates that relief cannot extend further than necessary to address the violation. *See Howe v. Hughes,* 74 F.4th 849, 857 (7th Cir. 2023). Narrow tailoring requires a "fit between the remedy's ends and the means chosen to accomplish those ends." *Brown v.* 563 U.S. at 531 (internal citations omitted).

##### i. The September injunction was narrowly tailored to prevent class members from suffering harm due to Menard's inability to treat gender dysphoria.

The first injunction ordered Defendants to transfer class members out of Menard and not to transfer any individual class member to Menard. A70–71. The

court found that this relief was narrowly tailored to address the harms facing class members, since the 16–20 class members known to be at Menard could "be accommodated in other suitable institutions without difficulty." A68–69. Contrary to Defendants' inaccurate statements, there are at least five IDOC facilities with maximum-security units. *See* A68 at n.61. Additionally, not all class members transferring out of Menard require maximum-security placement. *See* A68. Some are eligible for lower security clearance. *Id.* Others were never designated maximum security because Menard is an intake facility, where some new prisoners once classified, are minimum or medium security. Doc. 1089 at 72.

The court also found that consolidating class members could actually "improv[e] efficiency for Defendants in providing constitutionally adequate care." A68-69. Indeed, Defendants were considering, recommended by a former monitor, to "consolidate class members into a smaller number of prisons [], which would enable IDOC to concentrate resources and training regarding the transgender population." A69.

The court's conclusions follow case law and common sense: it is easier for Defendants to relocate a few dozen class members than it is for Defendants to change the persistent "culture of disrespect, harassment, and violence" impeding care at Menard. A65, A67. In issuing the September injunction, the district court did not rubber stamp the relief requested by Plaintiffs. For example, Plaintiffs asked the court to require IDOC to add one mental health professional certified in

treating gender dysphoria as a voting member of TAC. The court denied this request as beyond the scope of Plaintiffs' motion. A69–70.

ii. The December injunction accommodated Defendants' concerns and narrowed relief.

In October 2025, Defendants moved to stay portions of the September injunction's relief pending appeal. Doc. 1024. Defendants argued that about 25 additional individuals had requested evaluation for gender dysphoria since the injunction was entered, and that they expected additional people to request evaluation "[g]iven the nature of the relief ordered by the Court." *Id.* at 5. Per Defendants, many of these individuals did not meet the criteria for gender dysphoria after evaluation. *Id.* at 5–6. The district court rejected the request for stay, finding Defendants' suggestion that some individuals were seeking evaluation for gender dysphoria as a path out of Menard "speculative at best." Doc. 1048 at 11–12. It also noted that it was unsurprising that those now requesting evaluation had not done so previously, given the sporadic availability of mental health services at Menard. *Id.*

Nonetheless, when the court re-issued the injunction, it considered Defendants' concerns and narrowed the relief. *See* A108–09. The court allowed Defendants to keep individuals without a diagnosis of gender dysphoria at Menard, and to evaluate them on an expedited timeline; only with a confirmed gender dysphoria diagnosis would the individual be transferred out of Menard within 21 days. A109 (¶4). Thus, the district court reasonably tailored the relief to that purported burden. This belies Defendants' argument that these injunctions left

Defendants "no discretion to decide how to correct [the] issues" at Menard. Br. at 53–54. Nothing about the court's injunction *prevents* Defendants from addressing the deficient conditions at Menard. Defendants have simply chosen not to do so.

**d. The injunctions were the least intrusive means of correcting the violations.**

An order is not overly broad simply because it "shape[s] or control[s] the State's authority in the realm of prison administration" in some respects. *Brown,* 563 U.S. at 533. Even an order mandating a reduction in a prison system's population is not overbroad if it leaves discretion to prison officials as to how they achieve that requirement. *Id.*

The district court carefully crafted the injunctions, preserving Defendants' discretion to make housing decisions while also protecting class members' constitutional rights. A108-109. The injunctions neither mandate where class members must be housed, nor cede housing decisions to class members. The injunctions require only that class members not be housed at Menard.

The court's injunctions differ from the overly prescriptive injunctions discussed in Defendants' brief. Br. at 52–53. They do not mandate implementation of an administrative directive or dictate how Defendants decide transfers, as in *Westefer v. Neal*, 682 F.3d 679, 681–82, 686 (7th Cir. 2012). Defendants' crude analyses of *Rasho* and *Howe* disregard that the specifics were rejected in those cases because the evidence did not show that those specifics were narrowly needed

to protect a constitutional right. *Howe* itself makes clear that the PLRA does not forbid the use of specific numbers. 74 F.4th at 857–58.

Here, the court concluded that transfer was the only means to protect the class, but bent over backwards to preserve Defendants' discretion. The injunctions explicitly acknowledge that housing decisions will be made *by Defendants*, using their own criteria. *See* A70 (¶3); A108-A109 (¶2). Curiously, Defendants seem to take issue on appeal with their given discretion, arguing that the relief violates the PLRA in part because it "identified the criteria that defendants must use in making transfer decisions." Br. at 54. But the criteria mentioned in the injunction are the very criteria that *Defendants* insisted they needed to make appropriate housing determinations. *See* A70 ("Defendants shall also consider the transfer criteria they previously described to this Court…") (emphasis added); SA67 (explaining factors that transfer coordinator's office considers in making appropriate housing decisions).

Likewise, Defendants take issue with the inclusion of specific time frames in the December injunction for evaluation and diagnosis of gender dysphoria at Menard. Br. at 54. But the Federal Rules require that injunctions "state their terms specifically" and "describe, in reasonable detail . . . the acts restrained or required." Fed. R. Civ. P 65(d)(1)(B), (C). And the specific time frames for confirming a diagnosis were included because Defendants complained that individuals without confirmed diagnoses were seeking transfer out of Menard. As discussed above, Defendants forfeited their opportunity to provide any input on

crafting this relief, even when invited to do so by the court. *See supra,* Section VI.A. On the evidence before it, the court could have concluded that *any* delay in transfer posed too serious a risk of harm, but instead, it deferred to Defendants and incorporated Defendants' own timeline for confirming a diagnosis of gender dysphoria, just as it deferred to Defendants' criteria for transfer decisions.

## CONCLUSION

For the above reasons, Plaintiffs-Appellees request that this Court dismiss the appeals of the September and December injunctions because they expired within 90 days under the PLRA or in the alternative, affirm these preliminary injunctions.

Dated: April 10, 2026

Respectfully submitted,

/s/ Michelle T. Garcia

Brent P. Ray
Arnold & Porter
70 West Madison St., Ste. 4200
Chicago, IL 60602
312-583-2325
brent.ray@arnoldporter.com

Malita Picasso
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2561
mpicasso@aclu.org

Michelle T. Garcia
*Counsel of Record*
Camille E. Bennett
Mason Strand
Rachel Caldwell
Samantha Reed
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-970
mgarcia@aclu-il.org
cbennett@aclu-il.org
mstrand@aclu-il.org
rcaldwell@aclu-il.org
sreed@aclu-il.org

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

The undersigned, counsel of record for Plaintiffs-Appellees, furnishes the following in compliance with Fed. R. App. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) and 7th Cir. R. 32 for a brief produced with a proportionally spaced font. The length of this brief is 13,857 words.

/s/ Michelle T. Garcia
Michelle T. Garcia
*Attorney for Plaintiffs Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2026, I filed the foregoing BRIEF OF PLAINTIFFS-APPELLEES AND SUPPLEMENTAL APPENDIX electronically with the Clerk of Court for the U.S. Court of Appeals for the Seventh Circuit using that Court's CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

/s/ Michelle T. Garcia
Michelle T. Garcia
*Attorney for Plaintiffs-Appellees*