Nos. 25-2803, 25-3256 & 26-1598

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

JANIAH MONROE, MARILYN MELENDEZ, SORA KUYKENDALL, and SASHA REED,
Plaintiffs-Appellees,

v.

LAMENTA CONWAY, MELVIN HINTON, and LATOYA HUGHES,
Defendants-Appellants.

---

On Appeal from the United States District Court for the
Southern District of Illinois
Case No. 3:18-cv00156-NJR
The Honorable Nancy J. Rosenstengel

---

**REDACTED SUPPLEMENTAL APPENDIX**

---

Brent P. Ray
Arnold & Porter
70 West Madison St., Ste. 4200
Chicago, IL 60602
312-583-2325
brent.ray@arnoldporter.com

Malita Picasso
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2561
mpicasso@aclu.org

Michelle T. García
*Counsel of Record*
Camille E. Bennett
Mason Strand
Rachel Caldwell
Samantha Reed
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
mgarcia@aclu-il.org
cbennett@aclu-il.org
mstrand@aclu-il.org
rcaldwell@aclu-il.org
sreed@aclu-il.org

*Attorneys for Plaintiffs-Appellees*

## PLAINTIFFS' SUPPLEMENTAL APPENDIX


| Document | District Court Docket # | Page # |
|---|---|---|
| Plaintiffs' Redacted January 9, 2024 Motion | Doc. 715 | SA1 |
| Plaintiffs' February 14, 2025 Motion | Doc. 873 | SA14 |
| Defendants' March 21, 2025 Response | Doc. 892 | SA38 |
| Plaintiffs' October 24, 2025 Motion to Re-Issue PI | Doc. 1028 | SA71 |
| Class Member Declarations | Doc. 705 | SA93 |
| Declaration of A.M. | Doc. 705 exhibit | SA115 |
| Declaration of M.L. | Doc. 705 exhibit | SA123 |
| Declaration of J.P. | Doc. 705 exhibit | SA128 |
| Declaration of K.M. | Doc. 705 exhibit | SA133 |
| Declaration of M.D. | Doc. 705 exhibit | SA137 |
| Declaration of C.B. | Doc. 705 exhibit | SA141 |
| Declaration of R.C. | Doc. 705 exhibit | SA146 |
| Declaration of T.F. | Doc. 705 exhibit | SA149 |
| Declaration of T.S. | Doc. 705 exhibit | SA154 |
| Declaration of M.L. (signed) | Doc. 740 | SA161 |
| Declaration of J.P. (signed) | Doc. 740 | SA166 |
| Declaration of M.D. (signed) | Doc. 740 | SA171 |
| Declaration of C.B. (signed) | Doc. 740 | SA175 |
| Declaration of R.C. (signed) | Doc. 740 | SA180 |

| | | |
|---|---|---|
| Declaration of T.F. (signed) | Doc. 740 | SA183 |
| Declaration of T.S. (signed) | Doc. 740 | SA188 |
| Declaration of P.M. | Doc. 740 | SA192 |
| Declaration of C.P. | Doc. 740 | SA196 |
| Declaration of D.F. | Doc. 740 | SA212 |
| Declaration of D.L. | Doc. 740 | SA217 |
| Declaration of A.M. (signed) | Doc. 763 | SA223 |
| Declaration of D.F. | Doc. 763 | SA231 |
| Declaration of D.L (signed) | Doc. 763 | SA236 |
| Declaration of S.M. (signed) | Doc. 763 | SA240 |
| Declaration of D.H. (signed) | Doc. 780 | SA247 |
| Supplemental declaration of T.F. | Doc. 787 | SA253 |
| Declaration of M.M. (signed) | Doc. 811 | SA259 |
| Declaration of A.B. (signed) | Doc. 823 | SA265 |
| Supplemental declaration of D.H. | Doc. 843 | SA271 |
| Amended declaration of D.F. (signed) | Doc. 909 | SA279 |
| Declaration of A.R. (signed) | Doc. 909 | SA283 |
| Supplemental declaration of A.B. (signed) | Doc. 909 | SA287 |
| Supplemental declaration of T.S. | Doc. 941-1 | SA294 |
| Declaration of B.M. (signed) | Doc. 941-2 | SA299 |
| Declaration of K.A. | Doc. 941-3 | SA303 |

| | | |
|---|---|---|
| Supplemental declaration of C.B. | Doc. 941-4 | SA308 |
| Supplemental declaration of D.L. | Doc. 941-5 | SA312 |
| Declaration of K.M. | Doc. 941-6 | SA316 |
| Declaration of M.S. | Doc. 941-7 | SA322 |
| Declaration of H.W (signed) | Doc. 941-8 | SA326 |
| Declaration of G.R. | Doc. 941-9 | SA330 |
| Declaration of Z.M. | Doc. 941-10 | SA333 |
| Declaration of C.A. | Doc. 962-1 | SA337 |
| Second declaration of C.A. in support of re-issuance | Doc. 1080-1 | SA343 |
| Supplemental declaration of Z.M. | Doc. 1061-2 | SA348 |
| Supplemental declaration of Z.M. | 1061 | SA352 |
| Declaration of L.D. in support of re-issuance | Doc. 1094-1 | SA356 |
| Declaration of K.W. in support of re-issuance | Doc. 1067 | SA363 |
| Second Declaration of C.A. (signed) | Doc. 1080-1 | SA369 |
| Declaration of R.K. in support of re-issuance (signed) | Doc. 1088-1 | SA375 |
| Declaration of L.D. in support of re-issuance (signed) | Doc. 1094-1 | SA382 |
| Declaration of S.H. in support of re-issuance (signed) | 1094-2 | SA 389 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) |
| Plaintiffs, | ) Civil No. 3:18-cv-00156-NJR |
| v. | ) |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) |
| Defendants. | ) |

REDACTED

**MOTION FOR TRANSFER OF CLASS MEMBER [redacted] AND ALL OTHER CLASS MEMBERS OUT OF MENARD CORRECTIONAL CENTER**

Plaintiffs, by their attorneys, hereby move the Court to (1) order that class member [redacted] (known to IDOC as [redacted]) be immediately transferred out of Menard Correctional Center ("Menard") to Logan Correctional Center ("Logan") or another IDOC facility where she will be safe, and (2) also order the transfer (or immediate evaluation for transfer) of all other class members currently at Menard who wish to be transferred.

**INTRODUCTION**

Class members confined at Menard are enduring unimaginable terror. There is a pattern and practice of assault and sexual assault by male guards and inmates alike against class members that reside at Menard. Class members are beaten and raped and suffer relentless abuse and misgendering by staff and others at Menard. Class members have sporadic or no access to hormones, gender-affirming commissary items, or private showers. Cross-gender strip searches are the norm as the body scanner touted by IDOC there is broken. Female class members are

double-celled with cis-gender men who assault and threaten them because they are transgender, while others are consigned to segregation ("seg") or protective custody ("PC"), but even then, still share space with angry and violent inmates. Class members are routinely denied access to grievance forms, the law library, and now even phone calls with counsel. As this court has long recognized, "[s]ocial transition is 'an important component of medical treatment'" for transgender individuals. Dkt. 186 at 34. The conditions at Menard deprive class members of necessary medical care by making any meaningful social transition unsafe and, in the vast majority of cases, impossible. This Court has also ordered injunctive relief in an attempt to mitigate "the harm caused by misgendering and harassment." Dkt. 331 at 13. That harm is pervasive at Menard. Based on the accounts of class members, the conditions at Menard are worse than any other IDOC facility.

On October 12 and 23, 2023, this Court heard evidence about the shocking conditions at Pinckneyville. Plaintiffs presented witnesses that described, among other things, the failures by IDOC to comply with this Court's injunctive orders relating to access to private showers and cross-gender strip searches. The evidence was enough to convince this Court to issue an Order for IDOC to swiftly and comprehensively evaluate all class members at Pinckneyville for transfer to a facility where they can be safe. *See* Dkt. 680.

The Menard class members suffer the same harms caused by IDOC's failure to provide private showers and avoid cross-gender strip searches. That alone should be enough for this Court to grant this motion to transfer Ms. [redacted] and other class members out of Menard. But IDOC's failings about showers and strip-searches pale in comparison to the trauma caused by Menard's culture of rape, abuse, and torture of class members. The Court should immediately order IDOC to transfer (or evaluate for transfer) all class members to Logan or a safer prison if they want to be transferred.

## FACTUAL BACKGROUND

### A. Despite repeated requests from Plaintiffs' Counsel, Defendants Have Taken No Action to Protect Class Members at Menard.

On November 8, 2023, Plaintiffs' counsel notified Defendants and the Monitors by email that "class members that we have been able to talk to so far at Menard report consistent levels of abusive treatment (including beatings and sexual assault by staff) based on their status with gender dysphoria that are worse than any other facility we have heard of in the IDOC system." *See* Exhibit 1. Plaintiffs' counsel requested that Defendants transfer class members out of Menard, or we would be preparing to file another motion. *See id*. Defendants' response was less than helpful, suggesting we "encourage our clients to follow up by using the grievance procedure at Menard" and that they would "pass your message as to Ms. [redacted] to medical and mental health staff so that someone may look into that." *See id.*

On December 15, Plaintiff's counsel sent another email to Defendants concerning Ms. [redacted] experience to ask for an immediate transfer and offered to negotiate the transfers of other class members out of Menard, rather than file an enforcement motion. Defendants responded that they were "trying to get more information." *See* Exhibit 2. On December 19, Plaintiffs' counsel sent a final email requesting Defendants' voluntary assistance but to no avail. *See id.* On December 21, Defendants' counsel responded that "IDOC does not intend to move all class members out of Menard Correctional Center." *Id.* The present motion followed.

### B. Ms. [redacted] Experience at Menard

1. <u>Repeated sexual assaults by male guards and inmates.</u>

Ms. [redacted] is a transgender woman who has lived at Menard since October 2022. During that year, Ms. [redacted] has been raped or sexually assaulted four (4) times: twice by IDOC staff and twice by an inmate at knifepoint who was out of his cell as part of his employment at Menard. She has been beaten and maced by guards and officers have tampered with and possibly destroyed rape kit evidence. Each time, Ms. [redacted] cried out for help, but no one responded.

Ms. [redacted] most recent rape at the hands of IDOC was the catalyst of the present motion. On or about December 12, 2023, Ms. [redacted] was removed from the yard for pretextual reasons relating to her clothing when she was helping another transgender inmate in the yard. After the guards were provoking her, she was so upset that she asked the guards to take her to see mental health because she was in crisis. One male guard, c/o Dunbar, escorted her to mental health and was waiting with her in a private room. C/o Dunbar forced Ms. [redacted] to perform oral sex on him and Ms. [redacted] spit his semen onto her clothing as evidence. She reported the assault to mental health but instead of going to the hospital for a rape kit, she was returned to her cell.

Later that night, IDOC sent a TAC team (akin to a SWAT team) to take Ms. [redacted] from her cell to healthcare, where she believed she would get a rape kit. After a brief stop at healthcare where she was *not* treated, the TAC team took her to Reception and Classification Center ("R&C"). The TAC team placed her in a cell, uncuffed her through the chuck hole, then immediately maced her through the chuck hole. The macing was so significant that everyone in R&C was affected and Ms. [redacted] curled into a ball, struggling to breathe for nearly thirty (30) minutes. At that time, a sergeant led her to a different cell to get relief, but the TAC team returned and maced her again. From there, the TAC team pushed her to the ground and dragged her to seg. Ms. [redacted] horrifying account is corroborated entirely by the sworn declaration of class member Ms. [redacted]. *See* Exhibit 5.

The following day, on or about December 13, Lieutenant Hanks from internal affairs interviewed her, took her statement, and made her initial it, but he did not let her read it first. He, too, ordered her back to her cell without a rape kit.

Later that day, Ms. [redacted] convinced the nurse who was bringing her hormone patch to send her to Memorial Hospital for a rape kit. At the hospital, IDOC officers took the rape kit and

Ms. [redacted] clothing back with them to Menard, despite the protests and phone calls to "legal" by nursing staff. When Ms. [redacted] returned to Menard, officers took her medical paperwork so she had no record of the visit.

This series of events is more than sufficient to order Ms. [redacted] transfer. But she and other class members suffer from IDOC's failure to provide constitutionally required and court-ordered care daily.

2. Hormones

For example, medical staff at Menard routinely administer hormone shots to Ms. [redacted] Ms. [redacted] and others with one or more male officers in the room, where female nursing staff require the male officers to remove clothing of the inmate to administer a shot in the buttocks. This inappropriate practice has been reported widely among class members; class members routinely protest this behavior and instead seek privacy during these medical appointments. If they complain, they do not get their hormones and are recorded as refusing medication. Medical staff at Menard even wrongly administered a hormone shot into Ms. [redacted] lower back in September 2023, causing a severe reaction that she was hospitalized for, but only after suffering extreme symptoms including vomiting blood in her cell for days.

3. No private shower and strip-searches by male guards

Ms. [redacted] does not have access to a private shower, despite living in PC. Her shower is open on two sides and guards and other inmates can easily watch as she bathes. In July, IDOC Lieutenant Dallas coerced her to perform oral sex on him in the shower with promises for her protection. In November, when she brought in her own rug for privacy, a guard told her to "take that faggot shit down." During her time at Menard, Ms. [redacted] has *never* been strip searched by a female guard, despite her ID badge reflecting she is female and a member of this class, and

despite her request for a female officer. She has been strip-searched by male guards approximately thirteen (13) times.

4. Unanswered requests for transfers and gender-affirming surgery

Ms. [redacted] has been seeking a transfer from Menard to Logan or any other facility (including back to Pontiac where she was badly beaten by guards), but there is no evidence she has ever been presented to TAC or received a written denial or feedback from IDOC. She also has been requesting gender-affirming surgery for years, but there is no evidence she has ever been presented to THAWC nor has she received any formal written denial.

5. Interference with grievance forms and access to counsel

Menard staff have interfered with class members' ability to file grievances and with counsel's ability to provide representation. For example, Ms. [redacted] has been interrogated by Internal Affairs without counsel present, and IDOC regularly denies Ms. [redacted] access to grievance forms and the law library. Ms. [redacted] was told by a c/o that he was intentionally interfering with her ability to access the PREA hotline. On December 6, 2023, IDOC cancelled Ms. [redacted] phone call with counsel without any justification, and others in the class have experienced similar problems, including Ms. [redacted] and Ms. [redacted]

Ms. [redacted] fears for her life daily at Menard. Ms. [redacted] will testify before this Court and has provided a sworn declaration of her personal experience at Menard. *See* Exhibit 3.

**C. Other Class Members' Experience at Menard**

Sadly, Ms. [redacted] experience is consistent with that of other class members at Menard who have suffered sexual assault by guards and cellmates, macing, refusal to provide hormones and other medicine (including for epilepsy), and commissary items. Many class members have no access to private showers, and several report having to shower with a group of 20 men at a time. Class members are routinely strip-searched by male guards. *See e.g.*, Dkt. 697 at 4 ("At Menard,

all seven class members who responded to the survey, said they could not ask for an officer of their preferred gender to search them.").

Declarations of these class members are attached. These declarations are replete with quotations reported by class members of slurs, misgendering, and harassing remarks by IDOC staff. The following evidence should come to the attention of the Court immediately:

- [redacted] who is a class member that testified in the Pinckneyville hearing on October 12, was transferred shortly thereafter to Menard. On or about October 26, 2023, she was raped by a guard and no one would perform a rape kit for her. *See* Exhibit 4.

- [redacted] is afraid of her cell mates, forced to shower with 20 men at once, and has not received hormones in six months. She also felt the effects of the TAC team macing Ms. [redacted] on or about December 12, 2023. *See* Exhibit 5.

- [redacted] has been assaulted by staff, including choking her; she has attempted suicide several times in recent months (including an attempt so severe she was airlifted out). Instead of providing Ms. [redacted] with the urgent medical care she needed, each time, IDOC guards maced her. *See* Exhibit 6.

- [redacted] refuses to shower because there is no privacy and has been maced several times by officers. *See* Exhibit 7.

- [redacted] was forced to shower with groups of men, has been assaulted and threatened by her cell mates, and allegedly cannot be transferred due to a medical hold from a gunshot wound to the arm in 2012. *See* Exhibit 8.

- [redacted] is non-binary and Menard staff will not recognize them as a member of the class or provide any ordered relief. *See* Exhibit 9.

- [redacted] has been missing hormone shots, cannot get access to bras or panties at commissary, and has witnessed officers spitting in her food. *See* Exhibit 10.

- [redacted] identifies as transgender and recently got a cisgender man cellmate that she is so afraid of that she feels she has to hide the only gender-affirming items she has access to: her makeup and underwear. She has been denied gender-affirming medical care and a change on her ID. She has stopped showering because she is forced to do so with 20 men. *See* Exhibit 11.

## ARGUMENT

### A. Legal Standard

This Court set forth the proper legal standard for a motion to modify the permanent injunction to "adapt to changed circumstances" in its Order granting-in-part the Pinckneyville Transfer Motion. *See* Dkt. 680 at 23 (quoting *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 920 (7th Cir. 1996)). Lack of full compliance can be the sort of changed circumstance that justifies extending a means contemplated by the original injunction or issuing additional substantive measures and injunctive relief. *Norman v. McDonald*, 930 F. Supp. 1219, 1227 (N.D. Ill. 1996); *see also Hutto v. Finney*, 437 U.S. 678, 687 (1978) (a pre-PLRA case finding that the "long and unhappy history of the litigation" justified a comprehensive order with time limits to insure against the risk of inadequate compliance); *see also United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 358 (7th Cir. 2019) (approving the district court's reasonable modifications of a permanent injunction to ensure compliance with the spirit of the original injunction and prevent future similar harms that led to such injunction).

To grant any prospective relief under the Prison Litigation Reform Act, the court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id*.

### B. The Failures by IDOC at Menard are the Same (and Worse) That Supported This Court's Order Transferring Class Members from Pinckneyville.

This Court recently affirmed a permanent injunction against Defendants requiring them to provide constitutionally adequate medical and mental health care to class members in custody. *See* Dkt. 680 at 4 ("The Third Order for injunctive relief, filed in February 2022, provided permanent

injunctive relief after the bench trial on the merits [in August 2021] (Doc. 678)."). For Plaintiffs' Motion to Transfer class members from Pinckneyville, the Court stated, "the additional relief directed Defendants to update the Court on steps taken to avoid cross-gender body searches including IDOC's transgender identification policy, consideration of transfer requests, and measures taken to ensure private shower access (Doc. 383, pp. 78-81, 86-87)." Dkt. 680 at 4.

After hearing evidence in October regarding IDOC's failures to comply with the Court's injunctive orders to provide private showers and avoid cross-gender strip searches, the Court found a violation: "More than two years after the August 2021 bench trial, the testimony given in connection with Plaintiffs' Motion to Transfer, as well as the Declarations from class members, demonstrates Defendants' ongoing failure to comply with this Court's Order to provide class members with private showers and to honor their choice of gender of the official who will perform body searches at Pinckneyville." *See* Dkt. 360 at 26-27. The Court stated, "[c]lass members' testimony regarding cross-gender body and strip searches is extremely concerning." *See* Dkt. 360 at 28. "These ongoing violations of the unambiguous Orders of this Court are unacceptable, especially in light of IDOC officials' knowledge that these Orders and IDOC's own policies are not being followed." *Id.*

In summary, the Court granted (in relevant part) Plaintiffs' prior motion because "the evidence demonstrates that the constitutional violations previously found by this Court regarding searches and showers are still ongoing at Pinckneyville. The Court finds that to remedy the continuing constitutional violations experienced by the 22 class members at Pinckneyville who submitted a Declaration in support of the Motion to Transfer, additional injunctive relief is necessary. The additional relief outlined below is narrowly tailored to address the repeated and rampant harm and harassment faced by inmates at Pinckneyville, especially regarding shower and

search procedures. This relief is warranted due to the repeated violations of the Court's permanent injunction and constitutional violations described above." Dkt. 360 at 29-30.

The additional injunctive relief sought by Plaintiffs in the present motion should be granted because: (i) the evidence presented herein about lack of access to private showers and consistent cross-gender strip-searches is of the same type that the Court relied upon in its prior ruling regarding Plaintiffs' Pinckneyville motion; (ii) the relief sought in the present motion is the same as the Court previously ordered; (iii) additional, significant evidence presented by class members in the form of declarations supports this Court ordering immediate action by IDOC to transfer class members out of a prison where they suffer ongoing beatings, rapes, and mental abuse, and a critical lack of medical care, among many other things.

## CONCLUSION

For these reasons, Plaintiffs respectfully but urgently request that the Court (1) order that class member Ms. [redacted] (known to IDOC as [redacted]) be immediately transferred out of Menard to Logan or another IDOC facility where she will be safe, and (2) also order the transfer (or evaluation for transfer) of all other class members currently at Menard who want to be transferred to Logan or other safer IDOC facilities due to Menard's repeated violations of the Court's orders.

Dated: December 21, 2023

Respectfully submitted by:

*/s/ Abby L. Parsons*

**Abby L. Parsons**
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

**Camille E. Bennett**
**Michelle T. García**
**Alexis Picard**
**Mason Strand**
ROGER BALDWIN FOUNDATION
OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*apicard@aclu-il.org*
*mstrand@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Ashton Dubey**
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*ashton.dubey@kirkland.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on December 21, 2023, I electronically filed the foregoing document and any exhibits with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: */s/ Abby L. Parsons*

# Exhibits 1-11

(filed under seal
with Unredacted Motion at Dkt. 705)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION PROHIBITING CLASS MEMBERS FROM LIVING AT MENARD CORRECTIONAL CENTER**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. Representative Class Members at Menard Are Presently Experiencing Constitutionally Inadequate Medical and Mental Health Treatment and Fear for Their Safety. ..... 2

B. Menard has a Long and Established History of Failing to Support the Needs of the Class and a Culture of Violence. ..... 9

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. IDOC SHOULD BE ENJOINED FROM HOUSING CLASS MEMBERS AT MENARD. ..... 11

A. Plaintiffs are Likely to Succeed on Claims of Deliberate Indifference at Menard. ..... 11

B. There is No Adequate Remedy at Law. ..... 13

C. The Class is Suffering Irreparable Harm. ..... 14

D. On Balance, the Equities Support No Further Housing of Class Members at Menard. ..... 15

II. IDOC SHOULD ONLY BE PERMITTED TO TRANSFER CLASS MEMBERS TO FACILITIES THAT COMPLY WITH CONSTITUTIONAL REQUIREMENTS. ..... 16

CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ....................14

*Edmo v. Idaho Dep't of Corr.*,
358 F. Supp. 3d 1103 (D. Idaho 2018) ....................12

*Foodcomm Int'l v. Barry*,
328 F.3d 300 (7th Cir. 2003) ....................13

*Foster v. Ghosh*,
4 F. Supp. 3d 974 (N.D. Ill. 2013) ....................14

*Graham v. Med. Mut. of Ohio*,
130 F.3d 293 (7th Cir. 1997) ....................10

*Helling v. McKinney*,
509 U.S. 25 (1993) ....................11

*Hicklin v. Precynthe*,
2018 WL 806764 (E.D. Mo. 2018) ....................12

*Iglesias v. Fed. Bureau of Prisons*,
2021 WL 6112790 (S.D. Ill. Dec. 27, 2021) ....................12

*Ill. Republican Party v. Pritzker*,
973 F.3d 760 (7th Cir. 2020) ....................11

*Mays v. Dart*,
974 F.3d 810 (7th Cir. 2020) ....................10

*Monroe v. Bowman*,
122 F.4th 688 (7th Cir. 2024) ....................12, 13

*Nelson v. NASA*,
530 F.3d 865 (9th Cir. 2008) ....................14

*Norsworthy v. Beard*,
87 F. Supp. 3d 1164 (N.D. Cal. 2015) ....................12

*Petties v. Carter*,
836 F.3d 722 (7th Cir. 2016) ....................11

*Ty, Inc. v. Jones Grp., Inc.*,
237 F.3d 891 (7th Cir. 2001) ....................10

*Westefer v. Neal*,
682 F.3d 679 (7th Cir. 2012) ....................10, 11, 16

**Statutes**

18 U.S.C. § 3626(a)(2)....................10, 16

**Other Authorities**

U.S. CONST. AMEND. VIII .................... *passim*

Plaintiffs, by their attorneys, hereby move the Court for a preliminary injunction (i) enjoining Defendants from housing any class member at Menard Correctional Center ("Menard") and (ii) requiring Defendants to offer a transfer for all class members to Logan and/or consolidating class members in a few, safer facilities at the Illinois Department of Corrections ("IDOC") with concentrated services to evaluate and treat gender dysphoria.[1]

## INTRODUCTION

At Menard, there is a documented pattern and practice of physical and sexual assault by male guards and inmates alike against class members that reside there. Class members are beaten, raped, and suffer relentless abuse and misgendering by staff and others at Menard. Class members have sporadic or no access to hormones, gender-affirming commissary items, or private showers. Cross-gender strip searches are the norm, as the body scanner touted by IDOC is broken. Female class members are double-celled with cis-gender men who assault and threaten them because they are transgender, while others are consigned to segregation or protective custody, but even then, these women still share space with angry and violent inmates. Class members are routinely denied access to grievance forms, the law library, and even phone calls with counsel. And to compound these problems, class members must deal with this trauma—and gender dysphoria itself—without any access to mental health services.

[1] Plaintiffs bring this Menard-specific motion based on the pendency of Plaintiffs' Motion for Transfer of Class Member [Redacted] and All Other Class Members Out of Menard Correctional Center, [Dkt. 715], and the procedural posture of this case. Plaintiffs contend that the conditions at Menard are a result of IDOC's policies and practices regarding the treatment of individuals with gender dysphoria. These policies and Defendants' deliberate indifference result in constitutionally inadequate care at all IDOC facilities. Plaintiffs will seek class-wide relief at a full trial on the merits but the present conditions at Menard, including the pervasive culture of harassment and mistreatment, is harm felt not just the class members currently housed at Menard; any class member transferred to Menard would suffer from the same treatment.

As this court has long recognized, "[s]ocial transition is 'an important component of medical treatment'" for gender dysphoria. Dkt. 186 at 34; Dkt. 383 at 65. The conditions at Menard deprive class members of necessary medical care for gender dysphoria as required by the Eighth Amendment by making any meaningful social transition unsafe and, in the vast majority of cases, impossible. This Court previously ordered injunctive relief in an attempt to mitigate "the harm caused by misgendering and harassment." Dkt. 331 at 13. Such harm is pervasive at Menard.

Recent accounts from class members at Menard detail Defendants' continued constitutional violations that support immediate preliminary injunctive relief here. Plaintiffs' prior motion to transfer class members out of Menard—supported by nearly twenty sworn declarations—fell on deaf ears at IDOC for more than a year. A pending appeal of this Court's prior orders is no excuse for the deliberate indifference to medical and mental health needs of class members at Menard.

## FACTUAL BACKGROUND

### A. Representative Class Members at Menard Are Presently Experiencing Constitutionally Inadequate Medical and Mental Health Treatment and Fear for Their Safety.

Class members living at Menard paint the same grim picture Plaintiffs have shown this Court before; for some class members, conditions have measurably, worsened. These reports demonstrate, Defendants are not providing constitutionally adequate medical and mental health treatment of gender dysphoria, warranting preliminary injunctive relief.

1. [redacted]

Ms. [redacted] continues to suffer. Menard staff placed her in segregation a *year* ago, and she has been told she still has another seven months left. Her solitary confinement is the result of bogus disciplinary tickets and retaliation for her bravery in speaking out against the horrific conditions class members are subjected to and the related mistreatment by staff at Menard. IDOC recently increased her security risk status because she reported to a judge at a recent hearing

that she felt unsafe due to the conditions at Menard. Based on that testimony, Menard staff cited her for "conspiracy to escape," and punished her by forcing her to live an additional six months in segregation. As set forth in her prior declaration (Dkt. 705, Ex. 3) and a recent lawsuit she filed against officers at Menard,[2] Ms. [redacted] has been repeatedly raped and assaulted by guards and inmates alike—a product of the culture of violence towards class members so pervasive at Menard, so that no class member is safe there.

Ms. [redacted] constantly struggles to get her hormones in range and has conflict with the nursing staff at Menard during administration of those shots. For example, in her declaration, she detailed an incident from September 2023 when a nurse injected her hormone shot into her lower back instead of her buttocks that resulted in her hospitalization and still causes pain today. Dkt. 705, Ex. 3 at 20-21. Ms. [redacted] has not seen a mental health provider in months; she is aware of mental health providers coming to Menard but they refuse to meet with her or skip over her for services out of retaliation. Ms. [redacted] resorts to trading her own food for grievance forms, makeup, and clothing. And despite years of making requests, Ms. [redacted] has never been considered or presented for surgery or transfer out of Menard.

2. Ms. [redacted] ([redacted]

Ms. [redacted] filed a declaration in support of Plaintiffs' original motion to transfer class members from Menard. *See* Dkt. 705, Ex. 7. Ms. [redacted] reports that the violent and unsafe conditions for class members at Menard persists, including outward defiance of gender-affirming practices previously recognized by this Court as the constitutional minimum, including those relating to cross-gender strip searches, access to mental health care, social transition, and surgery. This treatment is contrary to the WPATH standards of care that this Court has previously

[2] *See* Complaint, No. 3:25-cv-109 (S.D. Ill. filed Jan. 24, 2025), attached hereto as **Exhibit A**.

determined "are the appropriate benchmark for treating gender dysphoria." (Dkt. 186, p. 31). For example, Ms. [redacted] filed a motion for a temporary restraining order and preliminary injunction on December 12, 2024 (*see* Dkt. 845) because she was pulled out of her cell and strip-searched in the shower by two male officers despite her protests, reportedly being told "as long as you have a dick and balls, you are a man." The officers kept her gender-affirming panties after the search, and she was returned to her cell with a warning: "how many times do I have to tell you that transgenders don't have rights at Menard?" For speaking up about the incident, she was given a false ticket about altering her pajamas.

In addition, Menard staff have interfered with Ms. [redacted] ability to have surgery, socially transition, and live in a facility consistent with her gender identity. Prior to arriving at Menard, Ms. [redacted] was approved for surgery after completing the necessary "Pathways to Informed Consent" process and meeting with IDOC's consultant Dr. Loren Schecter. Since her arrival at Menard, there has been no progress or updates regarding her surgery. Menard staff have rejected Ms. [redacted] transfer requests, allegedly because of a "medical hold" due to her eye cataracts, a condition for which she has not received surgery despite it being previously scheduled for December 2024.

3. [redacted] ([redacted])[3]

[redacted] (they/them pronouns) is a non-binary class member that transferred into Menard in April 2023. In their nearly two years at Menard, they have felt unsafe, faced constant harassment from officers, endured humiliating strip searches, and have been denied adequate medical care and social transition. In August 2024, after a fight with a cellmate [redacted] was supposed to be kept separate from, officers sprayed [redacted] with bear spray. Instead of following procedures

[3] Undersigned counsel spoke with [redacted] on February 5, 2025 to discuss their declaration. A follow-up call is necessary to finalize it before filing. Plaintiffs will submit this declaration in support of this motion as soon as practicable.

and allowing [redacted] to shower, [redacted] only got to wash out their eyes and change clothes, but the spray was all over them, and it burned for hours.

This was not the first time [redacted] had been sprayed; they have been subject to this abuse and mistreatment by officers multiple times. During an invasive strip-search—where officers humiliated [redacted] by ordering them to bend over so they could look up [redacted] anus and laugh as they did so—the officers inexplicably sprayed [redacted] with mace without justification. [redacted] also was sprayed with mace out of the blue while shackled and waiting to see mental health. [redacted] was then ticketed for simply looking out the window because the officer falsely believed [redacted] was trying to escape.

[redacted] reports retaliation and a culture of violence at Menard based on their attempts to live in a way that affirms their gender: "they treat transgender people like a disease". [redacted] does not feel safe, does not receive adequate healthcare, cannot access the law library, and has no access to a private shower. [redacted] has filed numerous grievances but nothing has changed. [redacted] attributes these issues to retaliation by Menard staff because of their gender identity.

4. [redacted] [redacted] ([redacted])[4]

Ms. [redacted] [redacted] filed two declarations—the most recent of which was in November 2024—to report being raped by her cellmates at Menard. *See* Dkt. 780, Ex. 17; Dkt. 843, Ex. 21. The first rape occurred in March 2024, and the second took place in July 2024. There is no question that she was targeted and assaulted because she is a trans woman living in a men's facility.

---

[4] Undersigned counsel was scheduled to speak with Ms. [redacted] on Friday, February 14, 2025 but Menard cancelled this call, offering to reschedule it for March 3 or 5, 2025. The same is true for counsel's call with class member [redacted] [redacted] and other class members that counsel is trying to reach.

Following her March 2024 rape, Ms. [redacted] was placed in a single cell in protective custody. However, in July 2024, she was suddenly housed with a Vice Lord gang member, a gang whose members are known at Menard to hate transgender prisoners. Corrections Officer Shepard even warned Ms. [redacted] to "be careful" around her new cellmate because he was "crazy."

Within five days of being housed with him, Ms. [redacted] cellmate knocked her unconscious, pinned her face down to her bed, and violently raped her. She tried fighting to get him off of her and injured her hand in the process. A corrections officer walked by during the attack and made no effort to try and stop the rape or to protect Ms. [redacted] leaving her to fend for herself. After calling out to the guards for help, both Ms. [redacted] and her attacker were told to cuff up. Instead of taking remedial action following the assault, the guards wrote up Ms. [redacted] for "fighting" in her cell with her attacker.

Ms. [redacted] tried to report the rape, file a PREA complaint, and seek medical help, but no one would help her. Instead, adding insult to injury, she was sent to segregation. The same corrections officer (Corrections Officer Shepard) that had warned her just days before about her violent cellmate later said to Ms. [redacted] "I told you so." Several days later, Ms. [redacted] was finally able to see medical staff, and they discovered that her finger was broken and fit her with a cast. When Ms. [redacted] got out of segregation, she was placed in general population and housed with another known Vice Lord gang member despite her pleas and protests. Ms. [redacted] believes that Menard staff are retaliating and harassing her by housing her with the Vice Lords because of her gender identity. She cannot socially transition or live safely as a woman under the conditions at Menard.

5. [redacted]

Ms. [redacted] was sexually assaulted by Corrections Officers Loesing and Farrar in October 2024 because of her gender identity. She had previously filed a federal lawsuit against Officer Loesing as a result of a prior assault; that case also is pending in the Southern District of Illinois. She was beaten and the officers forced her to give oral sex, and both men sodomized her in her cell. Ms. [redacted] filed a PREA complaint against the officers and sought immediate transfer to any other facility besides Menard. Recently she learned that her grievances about the incident were denied.

Ms. [redacted] living conditions at Menard are punitive and violate her constitutional rights. While she lives in protective custody, she cannot go out of her cell (even to shower), speak to her family or her lawyers, or receive legal mail. Menard staff have interfered with her legal calls, either cancelling them for bogus reasons or providing her a phone with a poor connection. Menard staff confiscated her gender-affirming items, including her clothing and makeup. Menard nurses Locke and Schultz even stopped administering her hormone shots about two months ago, claiming she is "not transgender." In addition, Ms. [redacted] is not able to shower properly because Menard staff also took away her access to private showers. Several different Menard staff members, including Officer McDonnell, have falsely ticketed Ms. [redacted] to intimidate and retaliate against her.

6. [redacted]

Finally, Ms. [redacted] is struggling with Menard's failure to provide adequate hormone therapy. Following a recent trip to the endocrinologist, Ms. [redacted] learned that her testosterone levels are the same as a cis-gender man despite being on hormone therapy for a year. She raised concerns with nursing staff at Menard, who told her they are only required to give her shots, and not to ensure her levels are within normal ranges. In addition, they told her she "isn't really trans

anyway" because she does not "present" like a trans woman should. Her inadequate hormone therapy and the outrageous harassment she is subjected to by her healthcare providers do not meet basic constitutional requirements for treating individuals with gender dysphoria.

Ms. [redacted] details another traumatic incident at Menard in the attached Supplemental Declaration (**Exhibit B**). On September 6, 2024, male officers at Menard forcibly strip-searched Ms. [redacted] as part of a facility-wide contraband shakedown. Three officers in tactical gear ordered Ms. [redacted] out of her cell and—over her protestations that she was transgender—demanded she remove her clothing or be sprayed with the mace that one of the officers was brandishing. Ms. [redacted] complied under duress, removing all of her clothing. The officers proceeded to mock her about being transgender while inspecting her anus. Feeling utterly dehumanized, Ms. [redacted] returned to her cell to find that her make-up, bras, and underwear had all been thrown away by the guards who tossed her cell. Ms. [redacted] was so upset that, for the first time in 6 years, she felt like self-harming.

These accounts of conditions at Menard by class members [redacted] and [redacted] reflect present conditions there—conditions that are well below the constitutional floor. Eleven class members remain at Menard but these individuals could be *any* of the class members, as any class member may be transferred by IDOC to Menard at any time. The violence and mistreatment they face are more than sufficient to demonstrate the need for preliminary injunctive relief that *no class member should ever reside at Menard under these conditions*.

Plaintiffs will offer live testimony from class member residents at Menard during the April 2025 hearing.

**B. Menard has a Long and Established History of Failing to Support the Needs of the Class and a Culture of Violence.**

The recent accounts by class members at Menard do not reflect "new" living conditions; they reflect a policy and practice of violating class members constitutional rights based on their gender identities. Plaintiffs have been alerting Defendants to these unacceptable conditions for over a year; Plaintiffs even filed a motion seeking the transfer of all class members out of Menard on December 21, 2023. *See* Dkt. 705, 715. In support of that Motion, Plaintiffs attached eight declarations. Plaintiffs continued to document and file additional declarations of class members as recently as November 2024. In total, Plaintiffs provided the Court with nineteen declarations from class members regarding their experiences at Menard. Attached as **Exhibit C** is a table reflecting a summary each declarant's testimony.

The class members' sworn affidavits are not the only evidence of constitutional violations at Menard. At least as of July 2024, former expert co-monitor, julie graham, filed a Status Report that corroborated the testimony of the class. Dkt. 788. In that report, co-monitor graham noted that Menard's culture is one in which "transgender individuals at Menard do not feel safe and express higher degrees of fear than other individuals [graham has] interviewed" and that multiple class members say, "the culture at Menard is particularly brutal towards transgender women." *Id.* at 1. graham goes on to say that "[t]he situation for transgender women at Menard continues to be distressing," and that the "culture seems intractable." *Id.* at 4.

julie graham also reported the following: (i) there are no cameras in West House where most class members live, which contributes to the lack of accountability at Menard (*id.* at 1), (ii) there is no safe protective custody because the living conditions are worse than in general population (*id.* at 2), (iii) there are no private showers and that many class members wash up in their cells (*id.* at 3), (iv) reports of staff assaults on class members, (v) reports of staff encouraging

of other incarcerated persons to attack and retaliate against class members, (vi) no effective procedure for grievances, and many class members are reluctant to file them for fear of retaliation (*id.* at 3), (vii) there is a culture of violence and retaliation (*id.* at 1, 3), and (viii) class members experience universal terror. *See generally,* Dkt. 788. In concluding the report, graham expressed "deep[] concern[] about the safety of transgender women at Menard." *Id.* at 4.

**LEGAL STANDARD**

To obtain a preliminary injunction, the plaintiff must establish: (1) they have some likelihood of prevailing on the merits of their claims, (2) there is no adequate legal remedy, and (3) they will suffer irreparable harm if the requested injunctive relief is not granted before final resolution of their claims. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)).

Where the plaintiff makes such a showing, the court must then weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Id.* (citing *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). This balancing process involves a sliding scale approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weight in plaintiff's favor, and vice versa. *Id.*; *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). To the extent the injunction requires an affirmative act by the defendant, the preliminary injunction is mandatory. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

In the prison litigation context, an incarcerated individual's request for a preliminary injunction is further limited by the Prison Litigation Reform Act (the "PLRA"). *See* 18 U.S.C. § 3626(a)(2); *see also Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Where prison conditions are found to violate federal rights, remedial injunctive relief must be "narrowly drawn,

extend[ ] no further than necessary to correct the violation of the Federal right, and [use] the least intrusive means necessary to correct the violation of the Federal right." *Id.*

## ARGUMENT

### I. IDOC SHOULD BE ENJOINED FROM HOUSING CLASS MEMBERS AT MENARD.

#### A. Plaintiffs are Likely to Succeed on Claims of Deliberate Indifference at Menard.

A plaintiff must first show they have some likelihood of prevailing on the merits of their claim. As the Seventh Circuit explained, this does not mean the plaintiff must show they will assuredly win the case. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). This prong also does not require a plaintiff to show proof they will win, by a preponderance of the evidence that will "spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending." *Id.* Rather, the standard requires a plaintiff to demonstrate how they will establish the key elements of their case. *Id.*

The Eighth Amendment protects all people from "cruel and unusual punishment." U.S. CONST. AMEND. VIII. "[D]eliberate indifference to serious medical needs of prisoners violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993).[5] A violation of the Eighth Amendment based on insufficient treatment of medical conditions within a prison requires a showing that (i) "plaintiff suffered from an objectively serious medical condition" and (ii) "defendant was deliberately indifferent to that [medical] condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1970)).

Gender dysphoria is a "serious medical condition" in which a person has "mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity."

---

[5] All internal quotations and citations omitted, and emphasis added, unless otherwise noted.

*Iglesias v. Fed. Bureau of Prisons*, 2021 WL 6112790, at *2 (S.D. Ill. Dec. 27, 2021), *modified,* 598 F. Supp. 3d 689 (S.D. Ill. 2022) (citing *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019)). The Seventh Circuit recently recognized that Plaintiffs and Defendants in this case "agree that the Eighth Amendment calls for appropriate medical treatment of a prisoner's gender dysphoria. Appropriate treatment options include social transitioning, cross-sex hormone therapy, psychotherapy and surgery." *Monroe v. Bowman*, 122 F.4th 688, 691 (7th Cir. 2024).

Courts across the country—including this District—consistently hold that a failure by prison officials to provide adequate treatment for gender dysphoria constitutes deliberate indifference and warrants preliminary injunctive relief. *See, e.g.*, *Iglesias,* 2021 WL 6112790, at *2 (granting in part preliminary injunction to order Defendants to evaluate plaintiff for gender confirmation surgery); *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1129 (D. Idaho 2018) (granting preliminary injunction ordering Idaho's Department of Corrections to provide transgender prisoner with "adequate medical care, including gender confirmation surgery"); *Hicklin v. Precynthe*, 2018 WL 806764, at *15 (E.D. Mo. 2018) (granting preliminary injunction and ordering defendant "to provide [plaintiff prisoner] with care that her doctors deem to be medically necessary treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to 'gender-affirming' canteen items"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal. 2015) (granting preliminary injunction ordering the California Department of Corrections and Rehabilitation to provide transgender prisoner "adequate medical care, including sex reassignment surgery…as promptly as possible").

Based upon the filed declarations from class members, former co-monitor julie graham's report, and the testimony at the upcoming hearing in April, Plaintiffs are likely to succeed on the merits of their motion. Namely, Defendants engage in deliberate indifference by creating and

maintaining a systemically hostile and unsafe environment for class members at Menard. As set forth above, Menard has a long history of violence, harassment and mistreatment of transgender prisoners. These issues are pervasive—class members at Menard do not feel safe, and many are routinely subject to physical, mental and sexual abuse at the hands of IDOC employees solely based on their gender identity. Simply put, a culture of deliberate indifference appears to exist at Menard, which cannot be fixed in time to save class members from irreparable harm.

That such conditions still exist today is particularly egregious in view of the history of this litigation and show that Defendants are acting with deliberate indifference. While this Motion is based on current conditions, the Court does not need to forget its prior findings and six years of litigation. *See Monroe*, 122 F.4th at 697. Specifically, the Court previously and repeatedly found constitutional violations occurred when Defendants failed to protect and provide for class members based on the applicable standard of care. *See, e.g.*, Dkt. 383 at 66, 70; *see also* Dkt. 349 at 979-81; Dkt. 331 at 8. Despite these findings over the course of years, conditions at Menard remain abhorrent for class members and continue to facilitate conditions, policies, and practices that violate class members' Eighth Amendment rights. These conditions are squarely within Defendants' control; the fact that Defendants allow them to persist is strong evidence that its indifference toward class members is, in fact, deliberate. Otherwise, after six years of litigation Menard—and all IDOC facilities—would be a suitable correctional center for Plaintiffs. The record shows it is not.

**B. There is No Adequate Remedy at Law.**

Given the type of constitutional violations at issue here—deliberate indifference to the class members' serious medical conditions (i.e., gender dysphoria)—there is no adequate remedy at law. Having an inadequate remedy at law does not mean money damages are wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered. *Foodcomm Int'l v. Barry*,

328 F.3d 300, 304 (7th Cir. 2003). Monetary relief "cannot adequately compensate for a known risk to [an individual's] health that could be presently addressed." *See Foster v. Ghosh*, 4 F. Supp. 3d 974, 983 (N.D. Ill. 2013). That is precisely the case here; no amount of compensatory damages could mitigate Defendants' deliberate indifference to class members' medical needs.

**C. The Class is Suffering Irreparable Harm.**

It is beyond debate that class members housed at Menard are suffering irreparable harm based on the facility's policies and practices towards individuals diagnosed with or seeking treatment for gender dysphoria. "[T]he deprivation of [Plaintiff's] constitutional right to adequate medical care is sufficient to establish irreparable harm." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-98 (9th Cir. 2019) (affirming preliminary injunction requiring the provision of gender-affirming surgery for transgender woman in prison) (citing, *e.g.*, *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). No remedy at law can adequately compensate the class members for their ongoing injuries.

The class members continue to be irreparably injured by Defendants' actions and continued violations of the Eighth Amendment. The class members have been and will continue to be subject to conditions of violence and outward defiance of this Court's prior holdings regarding constitutionally adequate care, including practices relating to cross-gender strip searches, mental health care, social transition, and surgery. Class members continue to experience verbal and physical harassment by the guards based on their gender identity and interference with their medical treatment for gender dysphoria. *See* Section A, *supra*; Ex. C. Other class members report being subject to ongoing and deliberate violence and sexual assault at the hands of guards and other prisoners due to their gender identity. *Id.* Class members cannot socially transition when they

are being targeted for violence and harassment because they are attempting to live in a way that affirms their gender identity.

There are currently at least eleven class members living at Menard, a male facility. Not a single class member feels safe at Menard, and none of them are receiving constitutionally adequate care for their gender dysphoria. Nearly all of the class members at Menard report being raped or sexually assaulted by guards and other inmates. All of them feel targeted and retaliated against by virtue of their gender dysphoria and mere affiliation with this lawsuit. Treatment of these class members are not an anomaly. Other class members housed at Menard previously experienced the same traumatic conditions, including rape, assault, misgendering, hostility, and general mistreatment. *See* Section B, *supra*. The only way to prevent this irreparable harm is with preliminary injunctive relief.

### D. On Balance, the Equities Support No Further Housing of Class Members at Menard.

The balance of equities in this motion almost universally favors the Plaintiffs. As set forth above, life as an individual with gender dysphoria at Menard is untenable. Conditions are so bad, Plaintiffs request the transfer of class members currently held at Menard to suitable facilities (*see infra*, Section II), and they further request that Defendants be prohibited from housing class members at that facility, at least until the Court has an opportunity to hear a full trial on the merits of Plaintiffs' class-wide relief. Preliminary injunctive relief is "extraordinary," but so is the persistent mistreatment of class members at Menard.

On the other hand, Defendants will not suffer any harm or prejudice from (i) transferring all class members out of Menard to suitable facilities, and (ii) refraining from placing any additional class members at Menard until conditions improve. IDOC has numerous other facilities with capacity to house transgender prisoners, including other maximum-security prisons.

For these reasons, the balance of equities strongly tips in Plaintiffs' favor.

## II. IDOC SHOULD ONLY BE PERMITTED TO TRANSFER CLASS MEMBERS TO FACILITIES THAT COMPLY WITH CONSTITUTIONAL REQUIREMENTS.

As Plaintiffs demonstrate above, Defendants are likely liable for deliberate indifference to the medical and mental health needs of the class. The injunctive relief from this Court, however, must comply with the PLRA. This remedial injunctive relief must be "narrowly drawn, extend[ ] no further than necessary to correct the violation of the Federal right, and [use] the least intrusive means necessary to correct the violation of the Federal right." *Westefer*, 682 F.3d at 683. In this case, and upon these facts, this Court should enjoin Defendants from housing any class member at Menard. Ample evidence demonstrates Menard staff's failures to provide: (i) effective hormone therapy; (ii) private showers; (iii) gender-affirming commissary items; (iv) the ability to permit social transition, including because class members are locked in segregation for months or years at a time based upon bogus tickets, and because class members suffer a barrage of violence, sexual assault, and rape by guards and inmates alike; and (v) respect or recognition for gender identity in any way.

Expert testimony at the 2021 trial was conclusive and unrebutted: people with gender dysphoria should be permitted to live in a facility that aligns with their gender identity. *See, e.g.*, Dkt. 348, Aug. 3, 2021 Tr. at 245-50 (Aiken); Dkt. 325, Aug. 4, 2021 Tr. at 529-32 (Ettner). For transgender women (i.e., the majority of the class), the *only* facility that meets those constitutional demands is Logan, a women's facility and many class members at Menard want to transfer to Logan. Accordingly, ordering Defendants to first offer transfers to Logan reflects the only way to correct the Federal right. *Westefer*, 682 F.3d at 683. At present, Logan has capacity and Defendants have not and cannot set forth sufficient evidence on an individualized basis to refuse this accommodation. In fact, many class members already reside there, largely without incident. As

part of the requested relief, both here and at the upcoming trial, the Court should require Defendants to demonstrate why any transgender woman and other class members who want to live in a facility consistent with their gender identity should *not* reside at Logan.

To the extent that Defendants cannot house all transgender and non-binary class members at Logan, the Court should alternatively order Defendants to consolidate class members in fewer, safer facilities with demonstrable services to evaluate and treat gender dysphoria. Since the 2021 trial, co-monitor julie graham repeatedly recommended consolidation of facilities for the benefit of the class:

- "There must be a way to consolidate the training, commissary, and treatment needs of transgender people in fewer facilities until all facilities are competent to house transgender individuals." (Dkt. 546 at 4);
- "I again recommend a reduction in the number of facilities … IDOC has not been able to shift the culture in every facility so creating facilities that are targeted for more training and where the commitment to keeping transgender people is paramount[.]" (Dkt. 602 at 6);
- julie graham recognizing that IDOC is working on a consolidation plan and that julie graham "believe[s] the consolidation of facilities is the answer to many problems like this [with staff.]" (Dkt. 630 at 1, 7);
- "IDOC needs to reduce the number of facilities and place concentrated resources in those facilities" to address shortage of mental health treatment. (Dkt. 647 at 5);
- Dr. Reister affirming that IDOC is working on a consolidation plan (Dkt. 682 at 1, 5);

- julie graham observes that IDOC's handling of transfers out of Pickneyville demonstrated the "immediate need for consolidation" (Dkt. 745 at 1, 5);
- In julie graham's final report, recommending a reduction in "the number of facilities to six (two min, two max, two med) and concentrate transgender individuals who volunteer in those facilities." (Dkt. 830 at 8).

Consolidation is important because Defendants could consolidate necessary treatment for gender dysphoria—like commissary, counseling, group therapy, and administration of hormone therapy—in fewer facilities with more qualified staff. In making this determination, Defendants must prioritize whether the facilities are safe for class members by evaluating the availability of private showers, female staff to conduct strip-searches, and the number of grievances and PREA complaints concerning sexual and physical abuse by correctional officers and other prisoners.

**CONCLUSION**

For these reasons, Plaintiffs respectfully request preliminary injunctive relief enjoining Defendants from housing any class member at Menard. Furthermore, Plaintiffs request that Defendants be ordered to offer transfers to Logan for all class members and/or order Defendants to transfer class members to a few safer facilities to consolidate the class.

Dated: February 14, 2025

Respectfully submitted by:

/s/ Abby L. Parsons

**Abby L. Parsons**
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

**Camille E. Bennett**
**Michelle T. García**
**Alexis Picard**
**Mason Strand**
ROGER BALDWIN FOUNDATION
OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*apicard@aclu-il.org*
*mstrand@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Ashton Dubey**
KIRKLAND & ELLIS LLP
333 Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*ashton.dubey@kirkland.com*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 14, 2025, I electronically filed the foregoing document and any exhibits with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: */s/ Abby L. Parsons*
Counsel for Plaintiffs

# Exhibit A
# (Sealed)

# Exhibit B

# (Sealed)

# Exhibit C

# (Sealed)

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, | ) | |
| Plaintiffs, | ) | |
| - vs- | ) | No. 18-156-NJR |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION PROHIBITING CLASS MEMBERS FROM LIVING AT MENARD CORRECTIONAL CENTER**

# TABLE OF CONTENTS


Page

INTRODUCTION ... 1

LEGAL STANDARD ... 2

ARGUMENT ... 3

I. Plaintiffs' Motion is Procedurally Improper and Should Therefore be Dismissed. 3

A. Rule 23(b)(2) Prohibits the Relief Sought in Plaintiffs' Motion. ... 3

B. Plaintiffs' Motion and Allegations Contained Therein Are Not Related to the Allegations in Their Initial Complaint. ... 5

C. Most of the Individuals Whom Plaintiffs Rely Lack Standing ... 7

II. Plaintiffs' Motion Is Mostly Based on Previously Filed Declarations of *Previous* Conditions, Not *Current* Conditions. ... 8

III. Plaintiffs Are Not Likely to Succeed on Their Eighth Amendment Claims ... 10

A. Plaintiffs' Conditions Allegations Do Not Rise to the Level of "Cruel and Unusual Punishment" for Purposes of the Eighth Amendment. ... 10

B. Plaintiffs' Vague Allegations Are Insufficient. ... 12

C. Plaintiffs Fail to Adduce Sufficient Evidence That Defendants Acted with Deliberate Indifference. ... 12

i. No Deliberate Indifference As to Alleged Assaults or Harassment. ... 14

ii. No Deliberate Indifference As to Administration of Hormone Shots. ... 14

iii. No Deliberate Indifference As to Private Showers. ... 15

iv. No Deliberate Indifference As to Alleged Cross-Gender Searches. ... 16

v. No Deliberate Indifference As to Gender-Affirming Commissary Items. ... 17

vi. No Deliberate Indifference As to Transfers. ... 17

vii. No Deliberate Indifference As to Gender-Affirming Surgeries. .. 18

viii. No Deliberate Indifference As to Grievance Forms, Law Library, or Calls. .......... 19

ix. No Deliberate Indifference As to Alleged Double-Cells. .......... 19

IV. Plaintiffs' Request Is Barred by the PLRA and Applicable Case Law. .......... 19

V. Plaintiffs' Requested Relief is Barred by the Eleventh Amendment. .......... 22

CONCLUSION .......... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Dent v. Dennison*,
No. 17-cv-1356-MJR-SCW, 2018 U.S. Dist. LEXIS 153948 (S.D. Ill. June 15, 2018) ....8

*Doe v. Univ. of S. Ind.*,
43 F.4th 784 (7th Cir. 2022) ....12

*Dunmore v. Hodge*,
No. 3:14-184-JPG-PMF, 2014 U.S. Dist. LEXIS 150404 (S.D. Ill. July 22, 2014) ....21, 22

*Eason v. Pritzker*,
18-CV-2553, 2020 U.S. Dist. LEXIS 215779 (N.D. Ill. Nov. 18, 2020) ....24

*Endelman v. Jordan*,
415 U.S. 651 (1974)....23

*Estelle v. Gamble*,
429 U.S. 97 (1976)....12

*Farmer v. Brennan*,
511 U.S. 825 (1994)....11

*Hampton v. Faiyaz Ahmed*,
No. 20-cv-1300-DWD, 2024 U.S. Dist. LEXIS 176257 (S.D. Ill. Sep. 28, 2024) ....12

*Hearne v. Bd. of Educ. of City of Chicago*,
185 F.3d 770 (7th Cir. 1999) ....24

*Holloway v. Delaware County Sheriff*,
700 F.3d 1063 (7th Cir. 2012) ....12

*Horne v. Flores*,
557 U.S. 433 (2009)....22

*Hunter v. Mueske*,
73 F.4th 561 (7th Cir. 2023) ....13

*Iglesias v. True*,
No. 19-cv-00415-JPG, 2020 U.S. Dist. LEXIS 247720 (S.D. Ill. Jan. 7, 2020) ....6

*Jackson v. Pollion*,
733 F.3d 786 (7th Cir. 2013) ....................11

*Knight v. Wiseman*,
590 F.3d 458 (7th Cir. 2009) ....................10, 12

*Lavite v. Hertz*,
No. 13-53-GPM, 2013 U.S. Dist. LEXIS 79317 (S.D. Ill. June 6, 2013)....................12

*Lewis v. Casey*,
518 U.S. 343 (1996)....................8, 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................8

*Mann v. Miller*,
No. 3:22-CV-839-RLM-MGG, 2022 U.S. Dist. LEXIS 212355 (N.D. Ill. Nov. 22, 2022) ....................12

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)....................2

*McCree v. Sherrod*,
408 F. App'x 990 (7th Cir. 2011)....................11

*Monroe v. Bowman, et al.*,
122 F.4th 688 (7th Cir. 2024) ....................2, 9

*Padilla v. Wills*,
No. 24-cv-02478-SPM, 2025 U.S. Dist. LEXIS 15207 (S.D. Ill. Jan. 28, 2025) ....................8

*Peate v. McCann*,
294 F.3d 879 (7th Cir. 2002) ....................13

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)....................23

*Portis v. City of Chicago*,
347 F. Supp. 2d 573 (N.D. Ill. Nov. 24, 2004) ....................8

*Rasho v. Jeffreys*,
22 F.4th 703 (7th Cir. 2022) ....................13, 14, 19, 21

*Renolds v. Ahmed*,
No. 21-cv-00345-SPM, 2021 U.S. Dist. LEXIS 163412 (S.D. Ill. Aug. 30, 2021) ....................8

*Robinson v. Wallace*,
No. 2:19-cv-00560-JPH-MJD, 2020 U.S. Dist. LEXIS 132354 (S.D. Ind. July 27, 2020) ....11

*Rodgers v. Rankin*,
99 F.4th 415 (7th Cir. 2024) ....13

*Roe v. Elyea*,
631 F.3d 843 (7th Cir. 2011) ....12

*Roman v. Hileman*,
No. 18-CV-1288-SMY-GCS, 2019 U.S. Dist. LEXIS 32273 (S.D. Ill. Feb. 28, 2019) ....3, 19

*Rosario v. Brawn*,
670 F.3d 816 (7th Cir. 2012) ....12

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ....7

*Simpson v. Joseph*,
2007 U.S. Dist. LEXIS 8226 (E.D. Wis. Feb. 5, 2007), *aff'd by Simpson v. Joseph*, 248 F. App'x 746 (7th Cir. 2007) ....15

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....7

*United States v. Furando*,
40 F.4th 567 (7th Cir. 2022) ....7

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....3, 4

*Warth v. Seldin*,
422 U.S. 490 (1975) ....7

*Watkins v. Blinzinger*,
789 F.2d 474 (7th Cir. 1986) ....23

*Wolff v. McDonnell*,
418 U.S. 539 (1974) ....20

*Ex Parte Young*,
209 U.S. 123 (1908) ....22, 23, 24

**Statutes**

18 U.S.C. § 3626(a)(1)(A) .......... 3

**Other Authorities**

Rule 23(b)(2) .......... 1, 3, 4, 5

Rule 23(b)(3) .......... 4

NOW COME the Defendants, LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN (hereinafter "Defendants"), sued in their official capacities as IDOC administrators, and hereby provide their Response to Plaintiffs' Motion for Preliminary Injunction Prohibiting Class Members from Living at Menard Correctional Center (Dkt. No. 873) (hereinafter "Motion"), and state as follows:

## INTRODUCTION

Plaintiffs' Motion is outside the scope of this class action, certified under Federal Rule of Civil Procedure (hereinafter "Rule") 23(b)(2), which requires that the relief sought be cohesive and applicable to each and every class member at once. Rule 23(b)(2) does not allow piecemeal requests for relief, as Plaintiffs attempt to do here by seeking relief specific only to class members housed at Menard Correctional Center (hereinafter "Menard"). Because Plaintiffs' Motion is procedurally improper, it should be dismissed in its entirety.

Additionally, Plaintiffs' Motion is procedurally improper because the majority of the allegations do not pertain to the class-wide issue of medical treatment as plead in their governing complaint; instead, Plaintiffs assert new allegations not related to their complaint involving individual concerns, such as law library access, phone calls with counsel, and intermittent access to gender-affirming commissary items, to name a few.

Further, their Motion is procedurally improper because the declarations are mostly from individuals who have been already discharged from Menard or transferred to another facility, resulting in a lack of standing under Article III. In fact, as discussed below, Plaintiffs cite the declarations of six individuals who have been discharged from Menard and three who have been transferred to a different facility. *Id.*

Moreover, in relying on declarations alleging *past* conditions, some dating back to November and December of 2023, Plaintiffs' Motion fails. Importantly, the Seventh Circuit in its recent order vacating all existing injunctions in this matter and remanding for further proceedings, specifically instructed that any injunction, whether preliminary or permanent, must "address the current situation" as opposed to what allegedly occurred in the past, such as those allegations presented by Plaintiffs in their Motion. *Monroe v. Bowman, et al.*, 122 F.4th 688, at *22 (7th Cir. December 5, 2024).

With regard to the few declarations that allege current, individual complaints from individuals who have Article III standing, Plaintiffs fail to meet their burden of demonstrating they are likely to succeed on their Eighth Amendment claim because they fail to adduce sufficient evidence of "deliberate indifference," and many of Plaintiffs' new allegations regarding conditions of confinement do not rise to the level of "cruel and unusual punishment" for purposes of the Eighth Amendment. As such, those allegations are not actionable.

Even further, the Prison Litigation Reform Act (hereinafter "PLRA") prohibits the relief Plaintiffs seek given it is not narrowly drawn, extends further than necessary to correct any alleged harm, and is not the least intrusive means necessary to correct any alleged harm. Finally, the Eleventh Amendment bars the relief Plaintiffs seek.

For these reasons, as discussed further below, this Court should deny Plaintiffs' Motion.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). In order to obtain a preliminary injunction, the plaintiff has the burden of establishing that: (1) she is likely to succeed on the merits of her claim; (2) she has no adequate remedy at law; and (3) she is likely to suffer irreparable harm without the

injunction. *Roman v. Hileman*, No. 18-CV-1288-SMY-GCS, 2019 U.S. Dist. LEXIS 32273, *4 (S.D. Ill. Feb. 28, 2019). In the context of prisoner litigation, the scope of the Court's authority to issue an injunction is circumscribed even further by the PLRA. *Id.* (citing *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012)). Under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Roman*, 2019 U.S. Dist. LEXIS at 4 (citing 18 U.S.C. § 3626(a)(2); *Westefer*, 682 F.3d at 683 (noting the PLRA "enforces a point repeatedly made by the Supreme Court . . . prisons officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted)); *see also* 18 U.S.C. § 3626(a)(1)(A). Further, a court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

## ARGUMENT

I. Plaintiffs' Motion is Procedurally Improper and Should Therefore be Dismissed.

A. *Rule 23(b)(2) Prohibits the Relief Sought in Plaintiffs' Motion.*

Rule 23(b)(2), under which this class was certified, requires any relief sought be applicable to all members of the class. *See* Class Order, Dkt. No. 213, 10. The "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). In other words, under Rule 23(b)(2), "the relief sought must perforce affect the entire class at once." *Id.* at 361-62. Therefore, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class . . . . [and] [i]t does not authorize class certification

when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.* at 360.

Notably, this distinction and requirement were crucial to Plaintiffs obtaining class certification in the first place because Plaintiffs only sought and obtained certification under Rule 23(b)(2). *See* Class Order, Dkt. No. 213. They did not have to make the elevated showings required under Rule 23(b)(3) relating to predominance and superiority. *Id.*; *see also Wal-Mart Stores, Inc.,* 564 U.S. at 361-62 ("When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute.").

As the Seventh Circuit has recognized, "Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs*, Local No. 139, 216 F.3d 577, 580 (7th Cir. 2000). Consistent with this rule, the Court certified the class here based in part on a finding that the Plaintiffs established IDOC department-wide policies and practices related to medical treatment for Plaintiffs that applied to the class. *See* Class Order, Dkt. No. 213, 6. The Court also acknowledged it was certifying a class under Rule 23(b)(2) because a single injunction or declaration would provide relief to all members of the class, rather than providing different relief to individual class members. *Id.* at 9.

Yet, here, Plaintiffs now proffer new allegations, not plead in the complaint, that the conditions are so poor at Menard—many conditions unrelated to the care of transgender prisoners—that these few class members should be transferred. There are no new allegations about class members residing at any other IDOC facility. Plaintiffs' new allegations do not form the basis



40432\324235638.v1

for any injunctive relief applicable to the entire class. As such, Plaintiffs' Motion violates Rule 23(b)(2) and should be denied.

B. *Plaintiffs' Motion and Allegations Contained Therein Are Not Related to the Allegations in Their Initial Complaint.*

In their Complaint, filed on January 31, 2018, Plaintiffs outlined allegations from various individuals in custody who either sought a gender dysphoria diagnosis or who had received such a diagnosis, but allege that IDOC had failed to provide proper medical treatment for said diagnosis. *See* Complaint, Dkt. No. 1. The allegations from each individual plaintiff all fall into these general categories: (1) necessary medical treatment for gender dysphoria, including but not limited to hormone therapy, gender-affirming surgery, and access to medical professionals with specialized knowledge of treating gender dysphoria, (2) individualized evaluation and consideration of medical and placement decisions; and (3) social transition support. *Id.* Specifically, their Complaint outlines that class members sought the following relief:

> d. Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the Plaintiff Class suffer due to Defendants' inadequate evaluation and treatment of gender dysphoria. At minimum, this plan should include: (i) Prisoner access to clinicians to treat gender dysphoria who meets [sic] the competency requirements stated in the Standards of Care; (ii) Prompt evaluation for gender dysphoria upon request or clinical indication of the condition; (iii) Timely fulfillment of medical prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and gender affirming surgery; (iv) Accommodation of medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender affirming clothing and grooming items; and (v) Ceasing the practice whereby medical decisions regarding gender dysphoria are second-guessed and treatment is governed by the GID Committee.

*Id.* at 37.

Nowhere in their Complaint do Plaintiffs complain of individual concerns related to assaults, transfers, or lack of access to the law library, grievance forms, legal phone calls, or private

showers. Similarly, the Court, in its previous preliminary injunction orders, made no mention of lack of access to the law library, grievance forms, or legal phone calls.[1] Plaintiffs cannot now, five years after filing their Complaint, seek injunctive relief for a portion of the class based on new, individual claims.

Notably, "preliminary injunctive relief sought in a case must relate to the claims pending in the underlying lawsuit." *Iglesias v. True*, No. 19-cv-00415-JPG, 2020 U.S. Dist. LEXIS 247720, at *3 (S.D. Ill. Jan. 7, 2020) (citing *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (holding that "a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint"). "A motion for preliminary injunction is not a proper avenue to pursue additional claims or name additional defendants." *Iglesias*, 2020 U.S. Dist. LEXIS at *3.

Here, as noted above, Plaintiffs' complaint brings one Eighth Amendment claim, alleging that "Defendants subject all Plaintiffs and the Plaintiff Class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria." *See* Complaint, Dkt. No. 1, ¶ 120. However, in their Motion, Plaintiffs seek relief that is wholly unrelated, including relief related to alleged assaults, private showers, transfers, and interference with grievance forms, the law library, and phone calls with counsel. This relief does not relate to "inadequate and delayed evaluation and treatment of gender dysphoria." Plaintiffs' attempt to piggy-back individual claims onto those that the parties have been actively litigating for the past five years is not only prejudicial to Defendants, but is procedurally improper, and their Motion

---

[1] The Court did, however, in its August 9, 2021 Order, add that private showers be provided to transgender individuals in custody. *See* Dkt. No. 212; Dkt. No. 331, 10-14; Dkt. No. 332. These orders though were vacated by the Seventh Circuit; however, the mention of these orders and the Court's direction in them is necessary to show that neither in Plaintiffs' Complaint nor in the Court's Orders did the topics of access to law library, grievances, or phone calls appear.

fails as a matter of law.

*C. Most of the Individuals Whom Plaintiffs Rely Lack Standing Pursuant to Article III.*

Many of the individuals who provided declarations in support of Plaintiffs' motion are no longer housed at Menard. Specifically, M.L., J.P., K.M., C.B.,[2] T.F., P.M., R.C., S.M., and Ms. M. have either been discharged from IDOC custody or have been transferred to other facilities. *See* Moskus Declaration, attached as Ex. A, ¶ 4-6, 8, 12, 14, 16, 18. Accordingly, these individuals lack standing under Article III and the Court lacks jurisdiction. The declarations brought forth by these individuals should therefore be disregarded in their entirety.

The Supreme Court has made clear that a suit's status as a class action "adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016), citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) and *Warth v. Seldin*, 422 U.S. 490, 502 (1975). It also is well established that "[s]tanding must be demonstrated for each claim the claimants seek to press and for each form of relief that is sought." *United States v. Furando*, 40 F.4th 567, 575 (7th Cir. 2022) (emphasis added). As such, a class representative in a certified class must establish Article III standing for each form of relief sought. This is setting aside the Article III limitation that a federal court "act only to redress injury that can fairly be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 41-42.

[2] C.B. was paroled from Menard on July 23, 2024, and has since been returned to the Northern Reception Center as a parole violator and is awaiting transfer to a parent facility. *See* Moskus Declaration, attached as Ex. A, ¶ 8.

"[S]tanding is not dispensed in gross …. nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see also Portis v. City of Chicago*, 347 F. Supp. 2d 573, 579 (N.D. Ill. Nov. 24, 2004) (named plaintiffs cannot "revive a dead claim for injunctive relief by 'piggybacking' on the claims of the class they represent."). As individuals M.L., J.P., K.M., C.B., T.F., P.M., R.C., S.M., and Ms. M. are not currently incarcerated at Menard, they cannot show they face an injury where it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Therefore, the Court should disregard in their entirety these individuals' declarations.

## II. Plaintiffs' Motion Is Mostly Based on Previously Filed Declarations of *Previous* Conditions, Not Current Conditions.

Plaintiffs' Motion is mostly based on previously filed declarations that address alleged, *past* conditions at Menard. Motions for preliminary injunctions must focus on *current* conditions, not *past* conditions. *Dent v. Dennison,* No. 17-cv-1356-MJR-SCW, 2018 U.S. Dist. LEXIS 153948, at *23 (S.D. Ill. June 15, 2018) ("Plaintiff has evidence of his previous conditions which he can use in furtherance of his claims . . . . [b]ut as to Plaintiff's current cell conditions, the undersigned finds that Plaintiff is not entitled to a preliminary injunction ."); *Padilla v. Wills*, No. 24-cv-02478-SPM, 2025 U.S. Dist. LEXIS 15207, at *9 (S.D. Ill. Jan. 28, 2025) (denying preliminary injunction because "[i]n the original motion, Plaintiff states that he is no longer in segregation and does not discuss his current conditions of confinement."); *Renolds v. Ahmed*, No. 21-cv-00345-SPM, 2021 U.S. Dist. LEXIS 163412, at *13 (S.D. Ill. Aug. 30, 2021) (finding a "'possibility' of harm based on past conduct . . . is insufficient to demonstrate that 'irreparable injury is *likely*' without Court interference."). As such, Plaintiffs' Motion should be denied.

Notably, the Seventh Circuit in its remand order, specifically instructed that "[i]f plaintiffs believe, as they argue here, that defendants have been *continuing* to violate their Eighth Amendment rights, they may ask the district court for a new injunction, preliminary or permanent" and "new injunctive relief will need to address the *current* situation." *Monroe*, 122 F.4th at *22 (emphasis added). Therefore, Plaintiffs much "address the current situation" as opposed to what allegedly occurred in the past. *Id.* Plaintiffs acknowledge this requirement. *See* Plaintiffs' Motion for Extension, Dkt. No. 870 ("time has passed, and Plaintiffs' counsel have been diligently working . . . to ensure that the motion reflects current information about the conditions at that facility . . . . as the Court observed in its order, the case has 'changed substantially' since the original motion was filed (*id.* at 2-3), necessitating revision of the motion."). They fail to do so.

Specifically, most of Plaintiffs' cited declarations in their initial Motion allege *past* conditions, some dating back to December of 2023,[3] and, as noted above, are mostly from individuals who are not even still housed at Menard. *Id*. These declarations are not even from this year. *Id.* Of note, Plaintiffs attach a second declaration from T.S., dated February 7, 2025; however, it only alleges one *past* incident from September 6, 2024. *See* Second T.S. Declaration, Dkt. No. 874-2, 1-3. They also attach a complaint filed on February 14, 2025, by A.M.; however, it only alleges *past* incidents from December 12, 2023; December 13, 2023; December 14, 2023; January

[3] Out of those declaration from individuals who are actually housed at Menard, Plaintiffs cite to the following: (1) A.M., dated December 21, 2023 (Dkt. No. 705-3); (2) Ms. D., dated December 11, 2023 (Dkt. Nos. 705-7; 740, Ex 7); (3) T.S., dated December 21, 2023 and January 23, 2024 (Dkt Nos. 705-11; 740, Ex. 11); (4) C.P., dated January 18, 2024 (Dkt. Nos. 716-2; 717, Ex. 13; 740, Ex. 13); (5) Ms. F., dated January 18, 2024, January 19, 2024 and February 8, 2024 (Dkt. Nos. 739, Ex. 14; 740, Ex. 14; 763, Ex. 14); (6) D.L., dated January 25, 2024 and February 26, 2024 (Dkt. Nos. 739, Ex. 15; 740, Ex. 15; 763, Ex. 15); (7) D.H., dated April 24, 2024 (Dkt. Nos. 779; Ex. 17; 780, Ex. 17); (8) D.H. (#2), dated November 19, 2024 (Dkt. No. 843, Ex. 21); and (9) A.B., dated July 1, 2024 and July 15, 2024 (Dkt. Ns. 800, Ex. 20; 823, Ex. 20).

1, 2024; and February 22, 2024. *See* A.M. Complaint, Dkt. No. 874-1, 1-15. Such allegations are outdated and do not account for the significant developments and changes the Department has made such as new administrative directives and procedures since the prior declarations, as further discussed below.

After Plaintiffs filed their initial Motion, they unsuccessfully attempted to address and remedy this fatal deficiency by untimely filing three additional declarations. *See* D.F. Declaration, Dkt. No. 881-1; B.M. Declaration, Dkt. No. 881-2; A.R. Declaration, Dkt. No. 881-3. These three newly filed declarations also though mostly fail to allege the current conditions. *Id.*

D.F. alleges a past sexual assault, a request for protective custody made two years ago, and a past incident in December of 2024. *See* D.F. Declaration, Dkt. No. 881-1, 4, 7. B.M. alleges past incidents from June and August of 2024. *See* B.M. Declaration, Dkt. No. 881-2, 7-9. A.M. alleges past incidents in 2024. *See* A.M. Declaration, Dkt. No. 881-3, 5-8. The other, vague allegations about current, individual issues in their declarations including alleged abusive behavior of guards and prisoners, transfers, cross-gender searches and/or lack of access to a private shower, gender-affirming commissary items, and hormone therapy, do not amount to an Eighth Amendment violation for the reasons described below.

As a result, Plaintiffs' Motion should be dismissed.

III. <u>Plaintiffs Are Not Likely to Succeed on Their Eighth Amendment Claims.</u>

*A. Plaintiffs' Conditions Allegations Do Not Rise to the Level of "Cruel and Unusual Punishment" for Purposes of the Eighth Amendment.*

On the outset, the Eighth Amendment prohibits "cruel and unusual punishment" and includes only freedom from excessive force, protection from other inmates, and "adequate food, clothing, shelter, and medical care." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (citing *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006). Specifically, Plaintiffs must show that it is

likely that the conditions denied them "basic human needs" or "the minimal civilized measure of life's necessities." *McCree v. Sherrod*, 408 F. App'x 990, 992 (7th Cir. 2011) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "[P]rison life [is] often uncomfortable by necessity and that only deprivations denying prisoners 'the minimal civilized measure of life's necessities,' constitute violations of the Eighth Amendment." *Id*. "Only 'extreme deprivations . . . make out a conditions-of-confinement claim,' because routine discomfort is 'part of the penalty that [prisoners] pay for their offenses against society.'" *McCree*, 408 F. App'x 990 at 992 (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Babcock v. White*, 102 F.3d 267, 273 (7th Cir. 1996); *Rhodes*, 452 U.S. at 347). Plaintiffs fail to meet this burden in their Motion.

Instead, Plaintiffs allege conditions that are not related to "basic human needs" or "the minimal civilized measure of life's necessities" including sporadic or no access to private showers, cross-gender strip searches, sporadic or no access to gender-affirming commissary items, and interference with grievance forms, the law library, and phone calls with counsel. *See, e.g., Robinson v. Wallace,* No. 2:19-cv-00560-JPH-MJD, 2020 U.S. Dist. LEXIS 132354, at *2 (S.D. Ind. July 27, 2020) ("A temporary denial of law library access does not rise to the level of inhumane treatment that is proscribed by the Eighth Amendment.") (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (Eighth Amendment rights include freedom from excessive force, protection from other inmates, "adequate food, clothing, shelter, and medical care.")).

Further, as to the remaining allegations, Plaintiffs have couched individual medical malpractice claims as constitutional violations, which are not equivalent. Neither medical malpractice nor common law negligence are sufficient to meet the high hurdle of deliberate indifference. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (distinguishing between a serious medical condition and the risk of harm for failure to treat condition); *see also Farmer*, 511

U.S. at 837 (finding that there must be some form of punishment at issue.); *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (finding "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.")

B. *Plaintiffs' Vague Allegations Are Insufficient.*

Most of the allegations in the declarations that Plaintiffs rely on in their Motion are vague and generalized without sufficient details as to dates or parties involved, making it impossible for Defendants to properly investigate and respond to the Motion. This is insufficient. *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (when addressing a preliminary injunction, the court need not accept the allegations as true or give the plaintiff the benefit of all reasonable inferences). "Vague allegations regarding the sporadic loss of phone privileges, showers, recreation time, and food trays—without more—are not the type of non-speculative irreparable harm the extraordinary remedy of mandatory preliminary injunctions are meant to address." *Mann v. Miller*, No. 3:22-CV-839-RLM-MGG, 2022 U.S. Dist. LEXIS 212355, at *8 (N.D. Ind. Nov. 22, 2022) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)). This Court should disregard the vague allegations.

C. *Plaintiffs Fail to Adduce Sufficient Evidence That Defendants Acted with Deliberate Indifference.*

Further, an Eighth Amendment cruel and unusual punishment claim requires Plaintiffs to establish that Defendants acted with deliberate indifference. *Hampton v. Faiyaz Ahmed*, No. 20-cv-1300-DWD, 2024 U.S. Dist. LEXIS 176257, at *8 (S.D. Ill. Sep. 28, 2024); *Lavite v. Hertz*, No. 13-53-GPM, 2013 U.S. Dist. LEXIS 79317, at *6 (S.D. Ill. June 6, 2013). Deliberate indifference requires a showing of more than mere or gross negligence. *Knight*, 590 F.3d at 463 (citing *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *Proffitt v. Ridgway*, 279 F.3d 503,

506 (7th Cir. 2002) (explaining that deliberate indifference to a prisoner's safety implies avoidance of known risk, not merely foreseeable risk)). It requires Plaintiffs to show that Defendants "actually knew of and disregarded a substantial risk of harm." *Rodgers v. Rankin*, 99 F.4th 415, 419 (7th Cir. 2024). "So long as [Defendants] took measures reasonably calculated to address the risk [the Plaintiffs] faced, they cannot be held liable under § 1983, even though they ultimately failed to prevent [ ] injury." *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (citing *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008)).

Deliberate indifference "is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys,* 22 F.4th 703, 710 (7th Cir. 2022) (citing *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). In fact, "[e]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho*, 22 F.4th at 710 (citing *Farmer*, 511 U.S. at 844; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002); *Sinn v. Lemmon*, 911 F.3d 412, 423-24 (7th Cir. 2018)). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate*, 294 F.3d at 882. It does not matter whether those efforts "fell short" because "that does not equate to a constitutional violation." *Rasho*, 22 F.4th at 710. "It is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm." *Id.*

Like IDOC's efforts in *Rasho*, numerous reasonable steps have been taken so there can be deliberate indifference. IDOC follows an Administrative Directive[4] titled "Evaluations of Transgender Offenders." *See* Directive 04.03.104, attached as Ex. B. The Department seeks to

---

[4] IDOC personnel have been actively working issuing an updated version of this AD to provide even more direction and support to DOC staff.

foster an environment where transgender individuals in custody are living in a dignified manner with full respect of their right to be free from discrimination, harassment, victimization, bullying or violence whether emotional, physical or verbal. *Id*. And, it seeks to meet the medical, mental health, transition and security needs of all segments of the population. *Id*.

Further, two committees were created to better foster such an environment: the Transgender Administrative Committee (TAC) and the Transgender Health and Wellness Committee (THAWC). *Id*. TAC reviews placement, transfer, safety, commissary, and security concerns of transgender individuals in custody. *Id*. THAWC provides medical oversight for medical and mental health care. *Id*. All staff participate in transgender training and annually thereafter. *Id*.

i. No Deliberate Indifference As to Alleged Assaults or Harassment.

It is the policy of Menard and all of IDOC to provide a safe and secure environment for all individuals in custody and to maintain a program for the prevention of sexual assaults. *See* Menard Orientation Manuel, attached as Ex. C; Warden Wills Declaration, attached as Ex. D, ¶ 5. IDOC has zero tolerance for sexual abuse or sexual harassment of any person or sexual relationships between staff and individual in custody. *Id*. That means IDOC is "committed to investigating EVERY allegation, getting services to EVERY victim, and punishing EVERY perpetrator." *Id*. Further, the Warden of Menard, Anthony Wills, has confirmed this policy and reports of feeling unsafe or sexual harassment are of concern to him. *See* Warden Wills Declaration, attached as Ex. attached as Ex. D, ¶ 5. If Warden Wills' office receives allegations concerning staff or staff conduct, those complaints are forwarded to Internal Affairs for investigation. *Id*.

ii. No Deliberate Indifference As to Administration of Hormone Shots.

Per IDOC policy, if an offender arrives to the facility having already started on cross-gender hormones, the medical provider continues the prescription of the hormone treatment unless

there are any contraindications as determined by the medical provider. *See* Directive 04.03.104, attached as Ex. B. Also, the facility medical provider provides transgender individuals with appropriate gender-related mental health and cross-gender hormone services, as necessary, throughout their incarceration. *Id.* When issues arise at Menard concerning access to hormone treatment, the Health Care Unit is contacted to review the medical chart and follow up. *See* Warden Wills Declaration, attached as Ex. D, ¶ 10. Notably, C.P. admitted that, while at Menard (she is no longer housed there as noted above), she had "been on hormones for approximately 4-5 years now and I have been told that my hormones are in a good range for surgery." *See* C.P. Declaration, Dkt. Nos. 716-2; 717, Ex. 13; 740, Ex. 13. As to A.B., the doctor allegedly told her he did not want to refer her for hormone treatment because of stomach issues. *See* A.B. Declaration, Dkt. No. 705-3.

Here, Plaintiffs allege that A.M. has once been administered hormone shots in the presence of male officers. *Id.* Security staff though may be present during the administration of medications, especially injections, to assist medical staff and address security concerns. *See Simpson v. Joseph*, 2007 U.S. Dist. LEXIS 8226, at *37-41 (E.D. Wis. Feb. 5, 2007), *aff'd by Simpson v. Joseph*, 248 F. App'x 746 (7th Cir. 2007) (finding no Eighth Amendment violation in policy requiring security staff to remain in close proximity to individuals during medical examinations). Further, Plaintiffs allege one incident in which A.M. was allegedly injected a hormone shot on September 7, 2023, in the lower back. *Id.* One alleged mistake in administration of the shot does not amount to an Eighth Amendment violation. *Id.* Notably, T.F., while at Menard (she is no longer housed there as noted above), indicates that the nurse denied her hormone shots "going forward because she didn't have a female officer available to be present while she does the shot." *See* T.F. Declaration, Dkt. No.. 705-10.

iii. No Deliberate Indifference As to Private Showers.

As to showers, transgender individuals are provided access to private showers. *See*

Directive 04.03.104, attached as Ex. B. Photographs of the showers at Menard show that private showers are available, which Warden Wills confirms. *See* Shower Photographs, attached as Ex. E; Warden Wills Declaration, attached as Ex. D, ¶ 6. Further, in instances where there are allegations of violations of shower policies at Menard, Warden Wills follows up with the Major of the relevant cell house and has the policies and procedures reiterated for the staff. *Id*. Per IDOC policy, ID Cards note gender difference for purposes of separate showers. *See* Directive 04.03.104, attached as Ex. B. And, transgender individuals are allowed the same frequency of showers, and showers are separate and private from other offenders." *Id.*

iv. No Deliberate Indifference As to Alleged Cross-Gender Searches.

As to unclothed visual searches, IDOC policy requires them to occur in a manner designed to ensure as much privacy to the offender as practical and in a respectful and professional manner and in the least intrusive manner possible consistent with security needs. *Id.* To that end, transgender individuals are searched by the gender of the staff designated on their offender identification card. *Id.* For those individuals who have not yet been identified as transgender, the TAC is notified, and the TAC assists with ensuring proper searches. *Id.*

Specific to Menard, it maintains policies that allow transgender individuals to be searched by a female officer when their identification card indicates transgender status (or the scanner is used). *See* Warden Wills Declaration, attached as Ex. D, ¶ 7. In instances where there are allegations of violations of search policies at Menard, Warden Wills follows up with the Major of the relevant cell house and has the policies and procedures reiterated for the staff. *Id.* Per IDOC policy, ID Cards note gender difference for purposes of searches. *See* Directive 04.03.104, attached as Ex. B.

Also, Menard prepares for large shakedowns by having female TACT members available. *See* Warden Wills Declaration, attached as Ex. D, ¶ 8. When instances of alleged violations occur,

Warden Wills and the administration respond accordingly, reiterating policies and procedures where necessary and looking into allegations of alleged violations. *Id.* This is done through inquiries with Internal Affairs, Warden's memorandums, cycle training, and the Department's planned trainings. *Id.*

v. No Deliberate Indifference As to Gender-Affirming Commissary Items.

As for commissary items, a number of gender-affirming commissary items are offered including hair ties, eyebrow pencils, eye shadow, lip gloss, lip stick, blush, eyeliner pencil, tinted hydrator, mascara, magic shave, hair net, sport bra, underwear, and foundation. *See* Menard Inmate Commissary Fund, attached as Ex. F. Further, when issues concerning commissary or clothing at Menard are raised, Warden Wills contacts his business administrator to follow up on the reports. *See* Warden Wills Declaration, attached as Ex. D, ¶ 9. In the event there is a shortage or lack of items, the business administrator goes through the relevant process to procure those items. *Id*. The individual would be notified in the event there is a shortage and placed on a list that allows the facility to provide that item once it is received. *Id*. Further, per IDOC policy, transgender individuals are allowed access to commissary items consistent with the offender's gender identity and are allowed to have undergarments of their identified gender, which the Department will provide throughout incarceration. *See* Directive 04.03.104, attached as Ex. B.

vi. No Deliberate Indifference As to Transfers.

As for transfers, per IDOC policy, transgender individuals are not assigned to gender-specific facilities based solely on their external genital anatomy. *Id.* The facility reviews placement and programming assignments twice annually to review any threats to safety experienced or posed. *Id.* TAC makes "individualized determinations about how to ensure the safety of each offender including considering transfer from one gender-specific facility to an opposite gender facility and specifying the gender of staff which will perform searches of the offender" and "consider[s], on

a case-by-case basis, whether a specific placement would ensure the offender's health and safety, and whether the placement would present management or security concerns." *Id.* TAC "make[s] these determinations without the necessity of a referral . . . . [h]owever, an offender may be referred for these reviews by written request of the offender, the offender's treating mental or medical providers, or the CAO." *Id.* A number of factors are considered. *Id.* Further, the decision is documented and the individual is be notified by letter from the Chairperson of the TAC or designee. *Id.*

Importantly, the only two individuals in which Plaintiffs rely on declarations and whom are still housed at Menard and have made a request to TAC for transfer to an alternative gender facility are A.M. and C.P. *See* TAC TG Transfer Requests, attached as Ex. G. A.M.'s transfer request was denied due to aggression, disciplinary issues and psychiatric instability. *Id.* TAC letters were sent on February 15, 2022, and June 1, 2023. *Id.* C.P.'s transfer request was denied due to security issues, her recent serious assault of a Mental Health personnel, psychiatric instability, new to hormones, and the need for BMU level of programming. *Id*. TAC letters were sent on November 1, 2021, and June 1, 2023. *Id*

vii. No Deliberate Indifference As to Gender-Affirming Surgeries.

As for surgeries, per IDOC policy, individuals may request gender-affirming surgery to THAWC or ask a QMHP or the CAO to submit the request on their behalf. *See* Directive 04.03.104, attached as Ex. B. The Agency Medical Director or Deputy Chief of Health Services, in consultation with an interdisciplinary team of medical and mental health professionals, make the decision as to the medical necessity of the surgery. *Id.* Additionally, the determination of the decision whether the surgery is approved is communicated to the individual. *Id.* Further, when issues at Menard arise concerning access to medical care, the Health Care Unit is contacted to review the medical chart and follow up. *See* Warden Wills Declaration, attached as Ex. D, ¶ 10.

As of March 14, 2025, fifty-four (54) patients have been approved for gender approved surgery, eight (8) patients have had/received surgery, and six (6) more patients are currently scheduled for surgery in 2025. *See* Transgender Patients Approved for Surgery, attached as Ex. H.

viii. No Deliberate Indifference As to Grievance Forms, Law Library, or Calls.

With regard to access to grievances forms, the law library and phone calls with counsel, Menard's policy allows access. *See* Warden Wills Declaration, attached as Ex. D, ¶ 11. When issues arise at Menard, Warden Wills advises the relevant cell house Major of the issue to be looked into and addressed and also sends out a memorandum or bulletin that reiterates the appropriate procedures for staff. *Id.*

ix. No Deliberate Indifference As to Alleged Double-Cells.

Per IDOC policy, any time a cellmate is considered for a transgender individual, the Placement Officer considers the placement on a case by case basis to ensure the offender's health and safety and whether the placement would present management or security concerns. *See* Directive 04.03.104, attached as Ex. B. *Id.* When issues concerning double-cells are raised by individuals at Menard, Warden Wills advises the relevant cell house Major of the issue to be looked into and addressed and also send out a memorandum or bulletin that reiterates the appropriate procedures for staff. *Id.*

IV. <u>Plaintiffs' Request Is Barred by the PLRA and Applicable Case Law.</u>

Plaintiffs' requested relief is barred by the requirements set forth in the PLRA. As noted in the above legal standard section, under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Roman*, 2019 U.S. Dist. LEXIS at 4 (citing 18 U.S.C. § 3626(a)(2)). The Supreme Court has repeatedly emphasized that prison administrators have substantial discretion over the institutions they manage. *Rasho v.*

*Jeffreys*, 22 F.4th 703, 711-12 (7th Cir. 2022) (citing *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012)). Here, Plaintiffs move for (i) "enjoining Defendants from housing any class member at Menard," and (ii) "requiring Defendants to offer a transfer for all class members to Logan and/or consolidating class members in a few, safer facilities at the IDOC with concentrated services to evaluate and treat gender dysphoria." *See* Motion, Dkt. No. 874, 1, 16-18. This requested relief far exceeds the PLRA.

First and foremost, "the operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell,* 418 U.S. 539, 566 (1974). In fact, Menard is one of only three maximum correctional facilities in the state of Illinois. In considering and granting transfers, the Transfer Coordinator's Office ("TCO") must consider a variety of factors, including but not limited to height, weight, security threat group affiliation, "Keep Separate From" orders, committing county, home county, security level, escape risk, and other factors. *See* Transcript of Motion Hearing (Day 2), Dkt. No. 668, 23:1-24:22; Redacted Transcript of Motion Hearing (Day 2), Dkt. No. 670, 23:1-24:22. Another factor that is considered is the available resources at a particular facility, for instance mental health programs, group therapy programs, proximity to outside medical facilities, and other similar factors. *Id.* Importantly, Menard is a critical facility for the Department, as it is the maximum-security facility in the southwestern portion of the state, close to many medical facilities within the St. Louis metropolitan area and serves as a Reception and classification facility. The importance of Menard's close proximity to the St. Louis metropolitan area and its numerous medical facilities cannot be understated, especially with regard to the medical treatment of individuals diagnosed with gender dysphoria who often require specialized treatment.

Given this background, transferring class members at Menard to Logan and/or consolidation would have a substantial adverse effect on the operation of the correctional system in Illinois, in violation of the PLRA and existing case law, as it would directly place Plaintiffs in the position of directing their own placement within the IDOC, through the Court, and placing an undue burden upon prison officials. Plaintiffs' requested relief therefore is not narrowly drawn, extends much further than necessary to correct the alleged harm, and is not the least intrusive means necessary to correct any alleged harm.

Additionally, instead of focusing on what Menard can do, such as updating its procedures to reasonably address the concerns alleged by Plaintiffs, Plaintiffs simply seek to transfer class members out of Menard (or consolidate). This is not the narrow tailoring that the PLRA requires. It is up to IDOC or the facility itself to craft procedures, which they have done, that meet constitutional requirements. Importantly, the Seventh Circuit has emphasized that a jail need not go beyond what is constitutionally required. *Rasho v. Jeffreys*, 22 F.4th 703, 712 (7th Cir. 2022) (citing *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012)). "The court should do no more than to order IDOC officials to do so in general terms and to verify that the plan they submit satisfies the relevant constitutional standards." *Id.* Plaintiffs provide no authority that their requested relief is constitutionally *required*, and in fact, as noted herein, goes well beyond what is required by the Constitution.

Likewise, the public would not be served by Plaintiffs' requested relief. *Dunmore v. Hodge*, No. 3:14-184-JPG-PMF, 2014 U.S. Dist. LEXIS 150404, at *3-4 (S.D. Ill. July 22, 2014) ("Moreover, the public would not be served by this type of injunctive relief . . . .[t]he public is best served by allowing prison officials, who are most familiar with the varied needs of the inmate population, to determine housing assignments.). Institutional reform injunctions, such as the one

sought here, raise "sensitive federalism concerns" because they involve "areas of core state responsibility." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Here, Plaintiffs ask this Court to usurp the role of the IDOC and, by extension, the State. But this is not the role given to federal courts. Rather, as elucidated by the Supreme Court:

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

*Lewis v. Casey*, 518 U.S. 343, 349 (1996). For these reasons, in addition to those raised by Defendants in prior filings, the relief sought by Plaintiffs and the manner in which they have tried to obtain it disserves the public interest.

For all these reasons, the particular relief requested — a transfer to another prison facility or consolidation — is not narrowly drawn, extends further than necessary to correct the harm the court may find requires preliminary relief, and is not the least intrusive means to correct any anticipated harm. *Dunmore v. Hodge*, No. 3:14-184-JPG-PMF, 2014 U.S. Dist. LEXIS 150404, at *3 (S.D. Ill. July 22, 2014) (finding "[t]he most appropriate relief would be attention from qualified medical providers who are familiar with [the plaintiff's] medical history, his prior treatment, his response to treatment, and his current condition.).

Accordingly, Plaintiffs' Motion should be denied.

V. <u>Plaintiffs' Requested Relief is Barred by the Eleventh Amendment.</u>

The E*x Parte Young* exception requires an unconstitutional act carried out by a state official claimed to be proceeding under authority of their government capacity to enforce an unconstitutional and, therefore, void law. *Ex Parte Young*, 209 U.S. 123, 159-60 (1908). Such an act strips the individual of "official or representative character" and subjects them "to the

consequences of [their] individual conduct." *Id.* at 160. This very limited purpose treats the official as outside of "the state" to render the Eleventh Amendment inapplicable. *Id.; Green*, 474 U.S. at 68. But, without this clear violation of the law, such a suit against a state officer "should be treated for what it is: a suit against the state." *Watkins v. Blinzinger,* 789 F.2d 474, 484 (7th Cir. 1986) ("Young is a narrow and somewhat anomalous sidestep . . . ."). And, suits brought against the state—whether for damages or injunctive relief—are barred. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). The *Ex Parte Young* exception is limited though to complaints alleging an ongoing violation of federal law and those that seek relief properly characterized as prospective. *Lukaszczykv. Cook County*, 47 F.4th 587, 604 (7th Cir. 2022). The Eleventh Amendment does not allow "reparation for the past." *Endelman v. Jordan*, 415 U.S. 651, 665 (1974) (quoting *Rothstein v. Wyman*, 467 F.2d 226 (2d Cir. 1972)). Nor does it allow for deterrence or notice injunctions based on past conduct. *Green*, 474 U.S. at 68-69.

Here, Plaintiffs' Motion neither alleges an ongoing violation of federal law nor seeks prospective relief. As noted above, Plaintiffs cannot show an Eighth Amendment violation, and instead tries to control and interfere with the public administration of IDOC duties. Further, Plaintiffs only complain of past conditions, not current conditions, which do not account for the significant developments and changes the Department has made such as new administrative directives and procedures since the prior declarations, as further discussed above. As such, Plaintiffs do not seek "prospective relief," and the *Ex parte Young* exception does not apply.

Further, for the *Ex parte Young* exception to apply, the official sued must have a connection with the enforcement of the challenged act, or else it is merely making him or her a party as a representative of the state, and thereby attempting to make the state a party. *Ex parte Young,* 209 U.S. at 158 (the defendant must be "specially charged with the duty to enforce the statute"); *see*

*also Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999) (holding that plaintiff challenging the constitutionality of state statutes had failed to state a viable claim against the governor who "had no role to play in the enforcement of the challenged statutes" and did not have "the power to nullify legislation once it ha[d] entered into force"). For example, high-level executives do not automatically satisfy the requirement simply by sitting atop the executive branch. *Eason v. Pritzker*, 18-CV-2553, 2020 U.S. Dist. LEXIS 215779, at *7-8 (N.D. Ill. Nov. 18, 2020). A plaintiff must instead show the defendant's specific involvement in the unconstitutional policy or practice. *Eason*, 18-CV-2553, 2020 U.S. Dist. LEXIS 215779, at *7-8 (N.D. Ill. Nov. 18, 2020).

Here, Plaintiffs fail to provide any evidence the named Defendants have the requisite connect necessary. Even Plaintiff's request for relief implicitly undermines their argument—specifically, Plaintiffs ask for all class members housed at Menard to be transferred to Logan. Plaintiffs cannot argue both sides here. Plaintiffs seek that Defendants be held liable for "IDOC's [allegedly constitutionally inadequate] policies and practices"—the very same policies and practices that exist at Logan. If IDOC's policies and practices are the impetus for such alleged deliberate indifference and such policies and procedures are consistent throughout all of IDOC facilities, the requested transfer of class individuals out of Menard would not provide any relief from the alleged violations.

For these reasons, the *Ex Parte Young* exception does not apply, and Plaintiffs' Motion should be denied.

## CONCLUSION

WHEREFORE, for the above and foregoing reasons, Defendants respectfully request that this Honorable Court deny Plaintiffs' Motion for a Preliminary Injunction, and any other relief this Court deems just.

Date: March 21, 2025

Respectfully submitted,

DEFENDANTS LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN

*/s/ Justin Penn*
One of the Attorneys for Defendants

Justin Penn
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Telephone: 312-704-3000
jpenn@hinshawlaw.com
DEFENDANTS LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 21, 2025, I, Erin Pisani served *Defendants' Response to Plaintiffs' Motion for Preliminary Injunction* to all counsel of record via ECF filing, which will accomplish service electronically to all counsel of record.

/s/ Peggy A. Michael
Peggy A. Michael

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,[1]<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**PLAINTIFFS' MOTION TO REISSUE PRELIMINARY INJUNCTION**

At Menard, Defendants have done little to improve the evaluation and treatment of class members' gender dysphoria and nothing to combat the culture of violence towards class members. Because conditions at Menard remain essentially unchanged, reissuing the injunction is necessary to prevent irreparable harm to class members who may live at Menard now and in the future. Plaintiffs request that this court reissue its September 12, 2025, preliminary injunction before its 90-day expiration date of December 12, 2025 under the Prison Litigation Reform Act (PLRA). 18 U.S.C. § 3626(a)(2) ("Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.").

## FACTUAL BACKGROUND

[1] Dr. LaMenta Conway has succeeded former defendant, Dr. Steven Bowman, who was sued in his official capacity as the Medical Director for the Illinois Department of Corrections (IDOC). *See* Doc. 935. Following Fed. R. Civ. P. 25(d), Plaintiffs substitute Dr. LaMenta Conway for Dr. Steven Bowman in the caption.

### A. Preliminary Injunction Hearing, Memorandum and Order, and Injunction

On September 12, 2025, the Court granted Plaintiffs' Motion for Preliminary Injunction Prohibiting Class Members from Living at Menard Correctional Center after a four-day evidentiary hearing at the end of May. Docs. 1008, 1009. In the Memorandum and Order, the Court assessed the six-year case history, including prior injunctions and findings that Defendants' policies and practices have subjected the class to a substantial risk of serious harm and injury from inadequate and delayed treatment of gender dysphoria in violation of their rights under the Eighth Amendment. *See* Doc. 1008 at 1–3, 63. The Court found that Defendants conceded that gender dysphoria is a serious medical condition (*id.* at 61) and discussed the uncontroverted standards of care for the treatment of gender dysphoria (*id.* at 4–5). The Court recognized Plaintiffs' prior efforts to transfer class members out of Menard in December 2023, which were stayed during the pendency of an appeal, and Co-Monitor julie graham's reports, which identified "persistent serious safety concerns at Menard" for class members in April and June 2024. *See id.* at 4 *citing* Docs. 764, 788. With this context, the Court found that:

> Defendants have been well informed about the relevant standards for medical and mental health care for individuals with gender dysphoria, including the importance of social transition, which includes providing a safe environment for transgender individuals, rather than allowing them to be targeted for mistreatment, misgendering and assault.

Doc. 1008 at 63.

The Court found the testimony of eight class members (seven who lived at Menard) "credible" and uncontroverted. *Id.* at 64, 66; *see also, id.* at 8–33. This testimony included: (1) details about assaults by guards and prisoners, and failures by guards to intervene; (2) delays by mental health staff in evaluating class members for gender dysphoria; (3) failure by the medical staff to provide timely, proper, or consistent medically necessary hormone treatment; (4) repeated cross-gender body searches by guards and supervisors of class members; (5) delays by Menard

staff and the Transgender Administration Committee (TAC) to consider transfer requests, and cursory and questionable evaluations and denials; and (6) lack of access to gender affirming clothing and other items. *See id.* at 64 - 65. The Court concluded that class members:

> universally described a culture of disrespect, harassment and violence by Menard correctional officers that encourages the same mistreatment by fellow prisoners. This culture exacerbates class members' gender dysphoria and hinders social transitioning.

*Id.* at 65.

Critically, despite official policies, "Defendants' evidence failed to indicate any measures have been taken to prevent future assaults against class members." *See id.* at 65, 68. Warden Wills decided to house class members in Westhouse, which does not have security cameras (*id.)* and "cannot know whether guards who interact with inmates on a day-to day-basis, conducting body searches, overseeing showers, transporting class members to medical appointments, etc., are complying with the prison's policies regarding transgender inmates" (*id.* at 66). Major Schoenbeck "could only speak of general procedures", was unlikely aware of officers misgendering transgender inmates (*id.* at 65), and did not know if prisoners were provided private showers (*id.* at 66). "Correctional officers routinely ignore the directives against cross-body searches, interfere with social transition by confiscating and/or destroying gender affirming items and permit hostile inmates to mistreat and assault class members." *Id.* at 68.

Besides failing to protect class members from violence, exacerbating class members' gender dysphoria, and hindering their social transition, Defendants also failed to provide consistent and effective medical and mental health treatment of class members' gender dysphoria. *See id.* at 66–68. Class members described "serious problems with obtaining consistent and effective hormone treatment, including delays in obtaining confirmation" of their gender dysphoria. *Id.* at 67. According to testimony and TAC records, the ability for transgender women to transfer

to Logan, the woman's prison, is dependent whether they reach a targeted female hormone level. *Id.* Likewise, class members cannot progress to obtaining gender-affirming surgery if their hormones levels are not appropriate. *Id.* Finally, the Court found that the mental health care at Menard provided to diagnose and treat gender dysphoria was "sporadic at best" with only one mental health provider at the entire prison for months or years, and "significant shortfalls in mental health staffing." *Id.* The Court was not reassured that Defendants' "significant shortfalls in mental health staffing" would be corrected in a timely fashion. *Id.*

After evaluating the evidence and the legal factors for a preliminary injunction, the Court granted the injunction and ordered: (1) Defendants to transfer every class member housed at Menard to another facility no later than October 15, 2025, taking into consideration the individual's preference, each class member's gender dysphoria condition, gender identity, related safety issues, and whether a transfer to a facility matching the individual's gender identity is appropriate, among security and other criteria; and allowing Defendants to make the final decision; (2) Defendants to notify class members of their new placement within seven days of transfer, and explain the reasons and criteria considered for transfer; (3) no class member shall be transferred to Menard and later-identified class members shall be transferred within 21 days; (4) class members transferred from Menard who are not moved to Logan or another facility matching their gender identity are allowed to request a transfer to Logan or another facility within 60 days of their transfer; and (5) Defendants to report about class members at Menard, transfer requests, status of mental health vacancies and PRISM. *See* Docs. 1008 at 71; 1009.

**B. Current Conditions**

**1. Menard's culture of violence, where class members face abuse and cannot socially transition, continues, and Defendants have done little to fix it.**

In the months since the hearing, little has changed at Menard, which class member A.R. described as "the pits of hell." Doc. 957 at 205. Warden Wills testified that he does not have the authority to hire and fire Menard employees, including those Correctional Officers (COs) who abused class members or failed to intervene when other inmates abused class members. Doc. 957 at 243. And since Warden Wills testified that he cannot ensure compliance with the Administrative Directive regarding transgender inmates by all 800 staff members, these abuses are free to continue without so much as a reprimand. *Id.* at 272. This was made painfully apparent at the hearing when, despite the rampant cruelty class members described and the many grievances they had filed, Warden Wills testified that he was not aware of any violations of the Administrative Directive (*id.*), that he did not believe and had not been made aware there was a pattern of harassment of transgender prisoners at Menard (*id.* at 249), and that he had not been made aware of any pattern of misconduct or misgendering of transgender inmates by staff at Menard. *Id.* And class members cannot request objective documentation of the abuse, because Westhouse, where most class members are housed, does not have cameras. Warden Wills testified that he has requested them yearly since 2021, but the requests have always been denied. *Id.* at 254–55.

Because of this lack of oversight, there are few protections in place for class members to allow them to socially transition free from abuse and harassment. In the hearing, both Warden Wills and Major Schoenbeck could not confirm that officers were following procedures to protect class members, such as ensuring private showers and no cross-gender body searches. *See* Doc. 1008 at 66–67. According to Defendants' document production for the period following the May hearing, class members filed grievances describing violence and threats of violence from both staff and other incarcerated individuals, retaliation for testifying at the preliminary injunction hearing, and continued inability to take private showers.

In one example from August 25, 2025, class member J.S., a witness at the May hearing, grieved that Officer Kevin Beuttner has repeatedly sexually harassed her and that she had "filed over five grievance[s]," that she wanted to be kept away from Officer Beuttner, and that her "crys [sic] have gone unheard." *See* Exhibit A (Grievances of Class Member J.S.) at 5. The official response to this grievance was that "This is a duplicate ... and will not be reviewed further... this Counselor cannot substantiate staff misconduct." *See id.* at 6. On September 1, 2025, J.S. filed another grievance, writing that even though she was in restrictive housing, "influential gang members" said, "Bitch-ass fag. You going [sic] to East or West population on the 19th when you get out seg. We gone stick a mopstick up yo ass and kill you [sic]." *Id.* at 1-2. The grievance went unanswered until September 23, 2025, after J.S. had already been transferred to Easthouse. *Id.* at 3.

Another class member and May hearing witness, J.D., filed a grievance after she was physically assaulted on July 8, 2025, by two people in custody who kicked her in the face and stole her commissary money. Doc. 989 at 8-9. She was kicked in the eye, where she had recently had surgery, causing her face to swell to twice its size. *Id.* at 9. She grieved that nobody took a picture of her face and claimed that the failure to protect was retaliation for "testify[ing] about the mistreatment of transgender women in Menard by staff and people in custody." *See* Doc. 989 at 10; Exhibit B (Grievance of class member J.D.) at 2. On July 17, 2025, J.D. learned from her mental health provider, Ms. Klausing, that J.D.'s request for gender affirming surgery had been denied because of the ticket J.D. received from the assault. Doc. 989 at 9-10, 14.

Yet another class member, T.M. reported on June 1, 2025, that she is still not provided with a private shower, feels compelled to wash up in her cell for safety, and that she cannot hang up a sheet for privacy when doing so. *See* Ex. C at 1-3. Menard staff simply responded that "West

House Staff ensured me transgender showering procedures are followed" and that "[h]anging a sheet up is a ticketable offense." *Id.* at 1, 3.

**2. Defendants' "significant shortfalls" in mental health staff continue, and class members are not treated for gender dysphoria at Menard.**

Menard does not have adequate mental health providers to treat class members' gender dysphoria. According to Defendants, there are 13 vacancies for both mental health leaders and necessary staff at Menard. *See* Doc. 1011-2. For example, there are vacancies for the Site Services Director, Mental Health Director, two psychologists, seven Qualified Mental Health Providers (QMP), and two Behavioral Health Therapists (BHT). Doc. 1011-2. As a result, multiple transgender group sessions have been cancelled since May. While the groups are supposed to be held monthly, they were cancelled on July 17, August 7, and September 4 "due to no available staff." *See* Exhibit D (Notices of Mental Health Group Cancellation).

Class members have also continued to wait months to hear back about mental health requests and stated that they do not feel comfortable reporting issues to correctional officers for fear of retaliation. Class member, K.D. wrote the following plea to Mental Health on September 18, 2025:

> I have been in restrictive housing for the past 28 days, without a pen or paper to write a request, but have repeatedly verbally requested to see a mental health provider concerning significant stress and depression regarding an evaluation. I am being threatened by individuals in custody at Menard CC because of my trans woman identity and have been in fear of socially transitioning. I am currently 5'5 and 110 pounds, therefore, vulnerable to attack by individuals in custody. They have sent me death threats to stab me, or even beat me to death, based on my small stature. I don't feel safe, so I checked into pre protective custody and am awaiting approval. I don't feel safe communicating with Menard c/os about gender dysphoria so I have tried to remain in the closet. This is my only chance to be who I am or risk losing my chance. I hope to get an evaluation and a safe and secure social transition very soon. Thank you in advance.

*See* Exhibit E at 1.

Class Member S.T. grieved on July 8, 2025, that she had requested mental health every day for thirty days to every correctional officer and told the officers that she needed to report a PREA to no avail. *See* Exhibit F. She did not feel comfortable reporting the PREA in February because a correctional officer was listening and told her afterwards that "If you call another PREA we will take you to seg." *Id.*

When another class member, J.S., filed a PREA in June, "they threw it out" and "wrote [her] a ticket for false information." She told her psychiatrist during a 12-minute telehealth appointment that "[t]his place doesn't give you a chance to talk about your issues." *See* Exhibit G.

**3. Defendants continue to inadequately provide medical care and other care for class members' gender dysphoria at Menard.**

When class members work up the courage to seek gender affirming care, they are denied that care and met with hostility. Class member S.P. filed a grievance on June 3, 2025, stating that the nurse who passed out her PM hormone medication had spit in the medication cup. *See* Exhibit H.. Menard simply responded that the "nurse did not recall the incident and also states [she] would not spit in [the] cup." *Id.* S.P. filed another grievance in July because she could not access hair removal supplies. *See* Exhibit H. Without these supplies, she grew a beard every time she was in restrictive housing. *Id*. While in restrictive housing, she requested hair removal supplies from Correctional Officer James every other day, but "kept getting a hell NO" from the officer. *Id.*

In August, class member J.S. had to request to receive hormones via injection rather than pill in an attempt to increase her hormone levels because "they are always running out of her hormones" and she is not able to take them "on a regular basis." *See* Exhibit G.

These are examples of Defendants' continued inability to provide necessary medical and other care for class members' gender dysphoria. Any class member entering Menard would face similar obstacles to getting care mandated by the Eighth Amendment.

**4. Defendants transferred class members but failed to consider class members' gender dysphoria and notify Plaintiffs' counsel of transfers.**

Defendants transferred the 39 known class members out of Menard by October 15, as ordered by the Court. However, Defendants failed to follow the court's order to consider class members' gender dysphoria and safety needs when making transfer decisions. *See* Doc. 1009 at 3; *see also, generally*, Exhibit I (TAC Transfer Letters). Nor did the letters include an explanation of how Defendants considered each of the court-ordered criteria in making their transfer decision. *See* Ex. A; Doc. 1009 at 3. Instead, each letter included between two and four brief, unexplained reasons for the transfer decision, such as "your Max security level, Protective Custody status, and medical follow up needs." Ex. I at 7.

Notably, Defendants failed to consider class members' preferences for the majority of the transfer requests. Of the 39 individuals transferred, only 10 were moved to a facility they listed as preferred, despite an additional 17 requesting facilities that matched their security level. *See* Table 1; Exhibit J (Class Preference Transfer Memos). Defendants did not transfer anyone to Logan or Centralia PRISM, despite 21 class members listing either one or both of those as preferred facilities. *See* Table 1; Ex. J. Of the 11 class members who requested a transfer to Logan, three got the unexplained, conclusory response that they were not currently eligible for Logan. Ex. I at 1, 19, 29. The rest received no explanation regarding Logan at all. Ex. I at 2, 8, 10, 25, 28, 30, 35, 37.

Table 1:

| Class Member | Preferred Facilities | Transfer Facility | Reasons Given |
|---|---|---|---|
| C.A. | Big Muddy, Centralia, Galesburg (Hill) | Pontiac | Max security level, protective custody status |
| C.A. | Centralia, Graham, Big Muddy | Pontiac | Max security level, protective custody status |
| C.B. | Logan, Centralia, Dixon | Pontiac | Max security level, protective custody status, Medical follow up needs, and MH follow up |
| J.B. | Centralia, Big Muddy, Sheridan | Pontiac | Max security level, protective custody status, Medical follow up needs |
| K.D. | Dixon, Centralia (PRISM), Pontiac | Pontiac | Security level, protective custody status, and expressed preference |
| J.D. | Logan, Dixon, Centralia | Pontiac | Max security level, protective custody status, Medical follow up needs |
| D.F. | Logan, Centralia, Lawrenceville | Illinois River | Max security level, protective custody status, and restrictive housing placement |
| C.F. | Illinois River, Pontiac, Stateville (also mentions Big Muddy) | Pontiac | Max security level, protective custody status, and stated preference |
| C.G. | Big Muddy, Graham, Centralia | Pontiac | Max security level and medical follow-up needs |
| J.H. | Big Muddy, Lawrence, Pontiac | Illinois River | Max security level, protective custody status, and restrictive housing placement |
| D.H. | Dixon, Pontiac, Graham | Lawrence | max security level, protective custody status, and recent transfer out of Pontiac |
| J.H. | East Moline, Dixon, Galesburg (Hill) | Pontiac | Max security level and protective custody status |
| D.H. | Centralia, Mount Sterling (Western Illinois), Logan | Western Illinois | medium security level, dropping protective custody status, and preferred placement |
| M.J. | Big Muddy, Centralia, Graham | Pontiac | Max security level and protective custody status |
| A.J. | Danville, Big Muddy, Hill | Big Muddy | security level, signing out of PC, and "your placement" |
| L.J. | Pontiac, Centralia/Logan, Big Muddy | Lawrence | max security level, PC status, KSF, and recent transfer out of Pontiac |
| L.J. | Southwestern, Galesburg (Hill), Big Muddy | Pontiac | Max security level, PC status and KSF |
| D.L. | Logan, Lawrence, Illinois River | Lawrence | Max security level, PC status, preferred placement |
| L.M. | Logan, Centralia, Big Muddy | Pontiac | Max security level, PC status, and "not meeting criteria for Logan at this time" |
| T.M. | Big Muddy, Galesburg (Hill), Centralia | Pontiac | Max security level, PC status |
| M.M. | Centralia, Graham, Big Muddy | Lawrence | Max security level, PC status, previous poor adjustment at Pontiac |
| L.M. | Dixon, Stateville, Graham | Pontiac | Max security level, PC status, medical follow up needs |
| K.M. | Taylorville, Big Muddy, Danville | Hill | medium security level and signing out of protective custody status |
| B.M. | Pontiac | JTC | mental health needs |
| R.M. | Pontiac, JTC, Dixon special treatment center, Big Muddy | Pontiac | max security level, protective Custody status, preferred placement |
| S.P. | Centralia, Lawrence, Illinois River | Illinois River | Max security level, PC status, preferred placement, KSF at Lawrence, Restrictive Housing |
| D.P. | Big Muddy, Lawrence, Pontiac | Illinois River | Max security level and restrictive housing |
| A.R. | Galesburg (Hill), Mt. Sterling (Western Illinois), Pontiac | Pontiac | max secrity level, PC status, preferred placement |
| A.R. | Centralia, Dixon, Logan | Pontiac | Max security level and PC status |
| M.S. | Pontiac, Lawrence | Lawrence | Max secruity level and preferred placement |
| J.S. | Logan, Dixon, Hill | Lawrence | Max security level, previous poor adjustment to Pontiac, not currently eligible for Logan |
| N.S. | Centralia, Shawnee, Dixon | Pontiac | max security level and PC status |
| S.T. | Pontiac, Lawrence, Dixon | Illinois River | max secruity level, PC stastus, and due to being in restrictive housing |
| C.T. | Logan, Lawrence, Pontiac | Illinois River | Max security level, PC status, current Restrictive Housing, not being eligible for Logan |
| H.W. | Lawrence, Illinois River, dixon | Pontiac | Max security level and PC status |
| C.W. | Pontiac, Centralia, Illinois River | Pontiac | max security level, PC status, preferred placement |
| H.W. | Logan, Danville, Centralia | Pontiac | max security level, PC status |
| T.W. | Pontiac, Sheridan, Big Muddy | Pontiac | Max security level, PC status, preferred placement |

*See also,* Exhibit K (Table of Class Member Transfers); Exhibit L (Affidavit of Defense Counsel Mason Strand).

Defendants also failed to simultaneously notify class counsel of transfer decisions. Instead, a few class members alerted Plaintiffs' counsel that they had received transfer decisions, and Plaintiffs' counsel asked Defense counsel to provide the court-ordered decision. *See* Doc. 1009 at 2; *see, e.g.*, Exhibit M. (Camille Bennett's Oct. 8, 2025, email to Defense counsel). Defendants also did not send Plaintiffs' counsel notice when class members were transferred.

**5. Class members who were transferred to Pontiac face threats of transfers back to Menard.**

Today, class member A.R., who testified at the May hearing and "identifies as non-binary transgender" (Doc. 1008 at 24), spoke to Plaintiffs' counsel.[2] Despite having a gender dysphoria diagnosis since March 2025 and a class ID (*id.*), Pontiac staff took A.R.'s class ID and the IDs of other non-binary class members who were transferred from Menard. Pontiac staff, including a mental health provider, have told non-binary class members that they should not have IDs because they are not female and should never have left Menard. This perspective is not only contrary to the definition of the class (all prisoners seeking evaluation of or treatment of gender dysphoria) but is also dangerous. Without a class ID, A.R. and other non-binary class members at Pontiac are terrified that Defendants will not treat them as *Monroe* class members, provide them the necessary medical and mental health care and social transition that they need for their gender dysphoria, and transfer them back to Menard.

Reissuing the preliminary injunction, including the prohibition on transferring class members into Menard is critical to class members' safety.

[2] Plaintiffs counsel spoke to A.R. briefly and given the emergency, did not have time to submit a declaration for A.R. A.R. gave permission to Plaintiff's counsel to share details of what occurred in this motion. Plaintiffs have scheduled a legal call with A.R. for next week and will file A.R.'s declaration at that time.

## ARGUMENT

1. *The Court Is Empowered to Reissue Its Preliminary Injunction Prior to the Expiration of the 90-Day Period Under the PLRA.*

The Court should reissue its preliminary injunction before the 90-day expiration because the relief remains necessary to address the violation of class members' Constitutional rights. The preliminary injunction also meets the PLRA's requirements of being narrowly drawn, extending no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. 18 U.S.C. § 3626(a)(1).

Courts may extend preliminary relief subject to the PLRA's 90-day expiration by issuing subsequent injunctions, so long as the court finds that the relief is still needed and meets the PLRA's needs-narrowness-intrusiveness requirements. *See Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001). Indeed, the Seventh Circuit in this very case held that the district court had the power to issue subsequent preliminary injunctions where those injunctions were needed. *See Monroe v. Bowman*, 122 F.4th 688, 697 (7th Cir. 2024) (*quoting Mayweathers*, 258 F.3d at 936 (9th Cir. 2001)) ("Nothing in the statute limits the number of times a court may enter preliminary relief. If anything, the provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted.").

The Court performs the same analysis whether considering a first or a subsequent preliminary injunction under the PLRA. First, it must determine whether Plaintiffs have shown that they have some likelihood of prevailing on the merits, that there is no adequate legal remedy for their harm, that Plaintiffs will suffer irreparable harm if the requested injunctive relief is not granted, and that the balance of harms tips in Plaintiffs' favor. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Plaintiffs already met this burden when the initial injunction was ordered; at this

stage all that is needed is a showing that the conditions meriting relief still exist. *Mayweathers*, 258 F.3d at 936.

2. *The Preliminary Injunction Remains Necessary to Protect the Rights of the Plaintiff Class*.

Continued relief is required to prevent class members from being transferred to Menard in the future. Inmates in IDOC are regularly moved from facility to facility. Without a preliminary injunction, any class member may be subject to transfer to Menard at any time – including the class members who were just transferred out of Menard. Additionally, because Menard is an intake center, new class members may enter the IDOC system through Menard.

Allowing class members to be transferred into Menard would violate their Eighth Amendment right to treatment for gender dysphoria, including the ability to socially transition. The conditions and culture at Menard remain as toxic as when the Court issued the first preliminary injunction on September 12, 2025. Any class member transferred into Menard would be subject to the same culture of violence: verbal, physical, or sexual abuse either by COs or fellow inmates whose behavior is tolerated by COs, cross-gender searches, and deprivation of private showers and gender affirming items. *See, e.g.*, Doc. 1008 at 65-67; *supra* at 5-7. And if class members are placed in protective custody in Westhouse, there are no cameras to hold Defendants accountable. *See* Doc. 1008 at 10.

Class members transferred into Menard would also be deprived of both medical and mental health care to treat their gender dysphoria. Many mental health positions remain open at Menard, allowing gaps in care to continue. *See* Doc. 1011-2. The experiences class members described above show that these vacancies make access to mental health care sporadic or nonexistent, at times cutting off class members' ability to begin treatment for their gender dysphoria. *See supra* at 7-8. Distribution of hormones continues to be similarly unreliable. Class members describe

ongoing issues with doses being skipped, and medical staff who disrespect class members because they are transgender, or even attempt to tamper with their medication delivery. *See supra* at 8.

The conditions at Menard alone warrant continued relief, but they are not the only basis for Plaintiffs' request. To date, Defendants have not fully complied with the requirements in the court's initial injunction, and further oversight is needed. While Defendants did transfer 39 class members to other facilities by the Court's mandated deadline of October 15, 2025, the documentation they produced regarding those transfers does not indicate that they gave more than glancing consideration to class members' gender dysphoria, gender identity, or related safety issues when transferring class members. *See* Doc. 1009 at 3, Ex. I. Safety issues came up repeatedly at the hearing, but despite the Court's specific order to consider them, Defendants' letters do not indicate that they considered whether transgender individuals would be safe at these new correctional facilities. Given recent information that staff at Pontiac have stripped some class members of their IDs and told them they are not members of the class, this was a critical oversight. In addition, the letters provided to class members did not include the court-ordered "explain[ation of] the reason(s) for the placement/transfer decision and the consideration of each of the above criteria." Doc. 1009 at 4. [3]

Given that Defendants have not fixed the culture of violence as described in the May 2025 hearing, and continue to fail to provide adequate medical and mental treatment for gender dysphoria, injunctive relief is still necessary to prevent Defendants from transferring class members into Menard, where they would suffer irreparable harm.

[3] The Court also ordered Defendants to produce all documentation related to class members at Menard, including "transfer requests, grievances, PREA complaints and investigations, TAC notes, and medical and mental health records including documentation of hormone levels for those on such therapy." Doc. 1009 at 7. Because Defendants delivered several multi-thousand-page, often non-chronological documents to Plaintiffs' counsel, Plaintiffs have not been able to fully determine to what extent the production is complete.

3. *Reissuing the Preliminary Injunction Meets the Needs-Narrowness-Intrusiveness Requirements of the PLRA.*

The PLRA requires a preliminary injunction directed at "prison conditions" to be "narrowly drawn"; "extend no further than necessary to correct the harm the court finds requires preliminary relief"; and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

These principles boil down to the mandate that "the order must extend no further than necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 531 (2011). The Seventh Circuit has repeatedly emphasized that the PLRA requires district courts to leave "flexibility" to prison administrators in shaping orders remedying constitutional violations. *Rasho v. Jeffreys*, 22 F.4th 703, 713 (7th Cir. 2022); *Howe v. Hughes*, 74 F.4th 849, 857 (7th Cir. 2023) ("…relief may not be too prescriptive. At bottom, federal courts must ensure that substantial discretion and flexibility remain in the hands of the prison administrators. . . That is essential if an injunction is to be narrowly drawn and as unintrusive as possible").

In the Memorandum and Order, the Court made clear that it was aware of the provisions of Section 3626(a)(2). Doc. 1008 at 61. The Court also rejected some of Plaintiffs' proposed relief as overbroad and not needed to provide full but non-intrusive relief for the issues before it in the motion. *Id*. at 69-70.

Section 3626(a)(2) does not require a district court to make explicit "findings" related to the PLRA factors unless it also intends to make the order "final"(*see* 18 U.S.C. § 3626(a)(2))—thus that requirement did not apply to the September 12 order and does not apply to the renewal of that order, should the Court renew it now. Nevertheless, the Memorandum and Order also makes clear throughout that the Court had "evaluated the record as a whole and identified evidence that

fully supports the scope of the injunctive relief granted," which is all the Seventh Circuit has required to enter *any* order satisfying the PLRA. *See Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011) (the "statutory language" of the PLRA means only that "'courts must do what they have always done when determining the appropriateness of the relief ordered: consider the order as a whole,'" quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010)). Thus, the September 12 order satisfies all PLRA requirements. It is carefully targeted at the core problem, which is that, over time, Defendants have proven utterly incapable of providing even a minimum level of care for gender dysphoria for class members in custody at two of its prisons. Nevertheless, in renewing the order, Plaintiffs suggest that the Court make it explicit that the remedy is as narrow as the Court could make it, given Defendants' recent complaints that their administrative discretion has been disregarded. [4]

In its Memorandum and Order, the Court's framing of both the past and current record make abundantly clear that, as to Menard and Pinckneyville, the *only* remedy that would safeguard class members' constitutional right to treatment for their serious medical condition was to prohibit placement of class members at those facilities. The Court's careful consideration and construction of this PLRA-compliant remedy should be stated explicitly in any future court order. The Court was also careful to protect Defendants' administrative flexibility by not mandating that Defendants place the class members currently at Menard, or who otherwise might be there in the future, in any other *particular* facility or facilities within the large IDOC system. This should also be stated in the Court's reissued order.

---

[4] In *Fields*, by contrast, the defendants had conceded that the order in question was "as narrow as required." 653 F.3d at 558 (internal quotation omitted).

Defendants may dislike not having the full menu of choices to which they are accustomed, but an "otherwise proper remedy" is not invalid under the PLRA "simply because it will have collateral effects." *Brown*, 563 U.S. at 531. The Court's order satisfies the narrow tailoring requirement of the statute, and the Court should so declare when it reissues the injunction.

## CONCLUSION

For these reasons, Plaintiffs respectfully request the Court to reissue the September 12, 2025, preliminary injunction before its 90-day expiration date under the PLRA, on December 12, 2025.

Dated: October 24, 2025

Respectfully Submitted:

/s/ Mason Strand

**Brent P. Ray**
**Erica McCabe**
**Stephen Ferro**
ARNOLD & PORTER
KAYE SCHOLER LLP
70 West Madison Street Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2325
*brent.ray@arnoldporter.com*
*erica.mccabe@arnoldporter.com*
*stephen.ferro@arnoldporter.com*

**Abby L. Parsons**
ARNOLD & PORTER
KAYE SCHOLER LLP
700 Louisiana Street Suite 4000
Houston, TX 77002-2755
Telephone: (713) 576-2442
*abby.parsons@arnoldporter.com*

**Sarah Prather**
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-7816
*sarah.prather@arnoldporter.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street New
York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

**Camille E. Bennett**
**Michelle Teresa García**
**Mason Strand**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*mstrand@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Anne J. Hudson**
**Ashton Dubey**
**Nicole R. Marcotte**
**Sarah Legault**
KIRKLAND & ELLIS LLP
333 Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*anne.hudson@kirkland.com*
*ashton.dubey@kirkland.com*
*nikki.marcotte@kirkland.com*
*sarah.legault@kirkland.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on October 24, 2025, I electronically filed the foregoing document and exhibits with the Clerk of Court by using CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: /s/ *Mason Strand*

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 705

# (filed under seal)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**MOTION FOR TRANSFER OF CLASS MEMBER A.M. AND ALL OTHER CLASS MEMBERS OUT OF MENARD CORRECTIONAL CENTER**

Plaintiffs, by their attorneys, hereby move the Court to (1) order that class member [redacted] (known to IDOC as [redacted]) be immediately transferred out of Menard Correctional Center ("Menard") to Logan Correctional Center ("Logan") or another IDOC facility where she will be safe, and (2) also order the transfer (or immediate evaluation for transfer) of all other class members currently at Menard who wish to be transferred.

**INTRODUCTION**

Class members confined at Menard are enduring unimaginable terror. There is a pattern and practice of assault and sexual assault by male guards and inmates alike against class members that reside at Menard. Class members are beaten and raped and suffer relentless abuse and misgendering by staff and others at Menard. Class members have sporadic or no access to hormones, gender-affirming commissary items, or private showers. Cross-gender strip searches are the norm as the body scanner touted by IDOC there is broken. Female class members are

double-celled with cis-gender men who assault and threaten them because they are transgender, while others are consigned to segregation ("seg") or protective custody ("PC"), but even then, still share space with angry and violent inmates. Class members are routinely denied access to grievance forms, the law library, and now even phone calls with counsel. As this court has long recognized, "[s]ocial transition is 'an important component of medical treatment'" for transgender individuals. Dkt. 186 at 34. The conditions at Menard deprive class members of necessary medical care by making any meaningful social transition unsafe and, in the vast majority of cases, impossible. This Court has also ordered injunctive relief in an attempt to mitigate "the harm caused by misgendering and harassment." Dkt. 331 at 13. That harm is pervasive at Menard. Based on the accounts of class members, the conditions at Menard are worse than any other IDOC facility.

On October 12 and 23, 2023, this Court heard evidence about the shocking conditions at Pinckneyville. Plaintiffs presented witnesses that described, among other things, the failures by IDOC to comply with this Court's injunctive orders relating to access to private showers and cross-gender strip searches. The evidence was enough to convince this Court to issue an Order for IDOC to swiftly and comprehensively evaluate all class members at Pinckneyville for transfer to a facility where they can be safe. *See* Dkt. 680.

The Menard class members suffer the same harms caused by IDOC's failure to provide private showers and avoid cross-gender strip searches. That alone should be enough for this Court to grant this motion to transfer Ms. [redacted] and other class members out of Menard. But IDOC's failings about showers and strip-searches pale in comparison to the trauma caused by Menard's culture of rape, abuse, and torture of class members. The Court should immediately order IDOC to transfer (or evaluate for transfer) all class members to Logan or a safer prison if they want to be transferred.

## FACTUAL BACKGROUND

### A. Despite repeated requests from Plaintiffs' Counsel, Defendants Have Taken No Action to Protect Class Members at Menard.

On November 8, 2023, Plaintiffs' counsel notified Defendants and the Monitors by email that "class members that we have been able to talk to so far at Menard report consistent levels of abusive treatment (including beatings and sexual assault by staff) based on their status with gender dysphoria that are worse than any other facility we have heard of in the IDOC system." *See* Exhibit 1. Plaintiffs' counsel requested that Defendants transfer class members out of Menard, or we would be preparing to file another motion. *See id*. Defendants' response was less than helpful, suggesting we "encourage our clients to follow up by using the grievance procedure at Menard" and that they would "pass your message as to Ms. [redacted] to medical and mental health staff so that someone may look into that." *See id.*

On December 15, Plaintiff's counsel sent another email to Defendants concerning Ms. [redacted]'s experience to ask for an immediate transfer and offered to negotiate the transfers of other class members out of Menard, rather than file an enforcement motion. Defendants responded that they were "trying to get more information." *See* Exhibit 2. On December 19, Plaintiffs' counsel sent a final email requesting Defendants' voluntary assistance but to no avail. *See id.* On December 21, Defendants' counsel responded that "IDOC does not intend to move all class members out of Menard Correctional Center." *Id.* The present motion followed.

### B. Ms. [redacted]'s Experience at Menard

1. <u>Repeated sexual assaults by male guards and inmates.</u>

Ms. [redacted] is a transgender woman who has lived at Menard since October 2022. During that year, Ms. [redacted] has been raped or sexually assaulted four (4) times: twice by IDOC staff and twice by an inmate at knifepoint who was out of his cell as part of his employment at Menard. She has been beaten and maced by guards and officers have tampered with and possibly destroyed rape kit evidence. Each time, Ms. [redacted] cried out for help, but no one responded.

Ms. [redacted]'s most recent rape at the hands of IDOC was the catalyst of the present motion. On or about December 12, 2023, Ms. [redacted] was removed from the yard for pretextual reasons relating to her clothing when she was helping another transgender inmate in the yard. After the guards were provoking her, she was so upset that she asked the guards to take her to see mental health because she was in crisis. One male guard, c/o Dunbar, escorted her to mental health and was waiting with her in a private room. C/o Dunbar forced Ms. [redacted] to perform oral sex on him and Ms. [redacted] spit his semen onto her clothing as evidence. She reported the assault to mental health but instead of going to the hospital for a rape kit, she was returned to her cell.

Later that night, IDOC sent a TAC team (akin to a SWAT team) to take Ms. [redacted] from her cell to healthcare, where she believed she would get a rape kit. After a brief stop at healthcare where she was *not* treated, the TAC team took her to Reception and Classification Center ("R&C"). The TAC team placed her in a cell, uncuffed her through the chuck hole, then immediately maced her through the chuck hole. The macing was so significant that everyone in R&C was affected and Ms. [redacted] curled into a ball, struggling to breathe for nearly thirty (30) minutes. At that time, a sergeant led her to a different cell to get relief, but the TAC team returned and maced her again. From there, the TAC team pushed her to the ground and dragged her to seg. Ms. [redacted]'s horrifying account is corroborated entirely by the sworn declaration of class member Ms. [redacted] *See* Exhibit 5.

The following day, on or about December 13, Lieutenant Hanks from internal affairs interviewed her, took her statement, and made her initial it, but he did not let her read it first. He, too, ordered her back to her cell without a rape kit.

Later that day, Ms. [redacted] convinced the nurse who was bringing her hormone patch to send her to Memorial Hospital for a rape kit. At the hospital, IDOC officers took the rape kit and

Ms. [redacted]'s clothing back with them to Menard, despite the protests and phone calls to "legal" by nursing staff. When Ms. [redacted] returned to Menard, officers took her medical paperwork so she had no record of the visit.

This series of events is more than sufficient to order Ms. [redacted]'s transfer. But she and other class members suffer from IDOC's failure to provide constitutionally required and court-ordered care daily.

2. <u>Hormones</u>

For example, medical staff at Menard routinely administer hormone shots to Ms. [redacted], Ms. [redacted], and others with one or more male officers in the room, where female nursing staff require the male officers to remove clothing of the inmate to administer a shot in the buttocks. This inappropriate practice has been reported widely among class members; class members routinely protest this behavior and instead seek privacy during these medical appointments. If they complain, they do not get their hormones and are recorded as refusing medication. Medical staff at Menard even wrongly administered a hormone shot into Ms. [redacted]'s lower back in September 2023, causing a severe reaction that she was hospitalized for, but only after suffering extreme symptoms including vomiting blood in her cell for days.

3. <u>No private shower and strip-searches by male guards</u>

Ms. [redacted] does not have access to a private shower, despite living in PC. Her shower is open on two sides and guards and other inmates can easily watch as she bathes. In July, IDOC Lieutenant Dallas coerced her to perform oral sex on him in the shower with promises for her protection. In November, when she brought in her own rug for privacy, a guard told her to "take that faggot shit down." During her time at Menard, Ms. [redacted] has *never* been strip searched by a female guard, despite her ID badge reflecting she is female and a member of this class, and

despite her request for a female officer. She has been strip-searched by male guards approximately thirteen (13) times.

4. Unanswered requests for transfers and gender-affirming surgery

Ms. [redacted] has been seeking a transfer from Menard to Logan or any other facility (including back to Pontiac where she was badly beaten by guards), but there is no evidence she has ever been presented to TAC or received a written denial or feedback from IDOC. She also has been requesting gender-affirming surgery for years, but there is no evidence she has ever been presented to THAWC nor has she received any formal written denial.

5. Interference with grievance forms and access to counsel

Menard staff have interfered with class members' ability to file grievances and with counsel's ability to provide representation. For example, Ms. [redacted] has been interrogated by Internal Affairs without counsel present, and IDOC regularly denies Ms. [redacted] access to grievance forms and the law library. Ms. [redacted] was told by a c/o that he was intentionally interfering with her ability to access the PREA hotline. On December 6, 2023, IDOC cancelled Ms. [redacted]'s phone call with counsel without any justification, and others in the class have experienced similar problems, including Ms. [redacted] and Ms. [redacted]

Ms. [redacted] fears for her life daily at Menard. Ms. [redacted] will testify before this Court and has provided a sworn declaration of her personal experience at Menard. *See* Exhibit 3.

**C. Other Class Members' Experience at Menard**

Sadly, Ms. [redacted]'s experience is consistent with that of other class members at Menard who have suffered sexual assault by guards and cellmates, macing, refusal to provide hormones and other medicine (including for epilepsy), and commissary items. Many class members have no access to private showers, and several report having to shower with a group of 20 men at a time. Class members are routinely strip-searched by male guards. *See e.g.*, Dkt. 697 at 4 ("At Menard,

all seven class members who responded to the survey, said they could not ask for an officer of their preferred gender to search them.”).

Declarations of these class members are attached. These declarations are replete with quotations reported by class members of slurs, misgendering, and harassing remarks by IDOC staff. The following evidence should come to the attention of the Court immediately:

- [redacted], who is a class member that testified in the Pinckneyville hearing on October 12, was transferred shortly thereafter to Menard. On or about October 26, 2023, she was raped by a guard and no one would perform a rape kit for her. *See* Exhibit 4.

- [redacted] is afraid of her cell mates, forced to shower with 20 men at once, and has not received hormones in six months. She also felt the effects of the TAC team macing Ms. [redacted] on or about December 12, 2023. *See* Exhibit 5.

- [redacted] has been assaulted by staff, including choking her; she has attempted suicide several times in recent months (including an attempt so severe she was airlifted out). Instead of providing Ms. [redacted] with the urgent medical care she needed, each time, IDOC guards maced her. *See* Exhibit 6.

- [redacted] refuses to shower because there is no privacy and has been maced several times by officers. *See* Exhibit 7.

- [redacted] was forced to shower with groups of men, has been assaulted and threatened by her cell mates, and allegedly cannot be transferred due to a medical hold from a gunshot wound to the arm in 2012. *See* Exhibit 8.

- [redacted] is non-binary and Menard staff will not recognize them as a member of the class or provide any ordered relief. *See* Exhibit 9.

- [redacted] has been missing hormone shots, cannot get access to bras or panties at commissary, and has witnessed officers spitting in her food. *See* Exhibit 10.

- [redacted] identifies as transgender and recently got a cisgender man cellmate that she is so afraid of that she feels she has to hide the only gender-affirming items she has access to: her makeup and underwear. She has been denied gender-affirming medical care and a change on her ID. She has stopped showering because she is forced to do so with 20 men. *See* Exhibit 11.

## ARGUMENT

### A. Legal Standard

This Court set forth the proper legal standard for a motion to modify the permanent injunction to "adapt to changed circumstances" in its Order granting-in-part the Pinckneyville Transfer Motion. *See* Dkt. 680 at 23 (quoting *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 920 (7th Cir. 1996)). Lack of full compliance can be the sort of changed circumstance that justifies extending a means contemplated by the original injunction or issuing additional substantive measures and injunctive relief. *Norman v. McDonald*, 930 F. Supp. 1219, 1227 (N.D. Ill. 1996); *see also Hutto v. Finney*, 437 U.S. 678, 687 (1978) (a pre-PLRA case finding that the "long and unhappy history of the litigation" justified a comprehensive order with time limits to insure against the risk of inadequate compliance); *see also United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 358 (7th Cir. 2019) (approving the district court's reasonable modifications of a permanent injunction to ensure compliance with the spirit of the original injunction and prevent future similar harms that led to such injunction).

To grant any prospective relief under the Prison Litigation Reform Act, the court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id*.

### B. The Failures by IDOC at Menard are the Same (and Worse) That Supported This Court's Order Transferring Class Members from Pinckneyville.

This Court recently affirmed a permanent injunction against Defendants requiring them to provide constitutionally adequate medical and mental health care to class members in custody. *See* Dkt. 680 at 4 ("The Third Order for injunctive relief, filed in February 2022, provided permanent

injunctive relief after the bench trial on the merits [in August 2021] (Doc. 678).”). For Plaintiffs’ Motion to Transfer class members from Pinckneyville, the Court stated, “the additional relief directed Defendants to update the Court on steps taken to avoid cross-gender body searches including IDOC’s transgender identification policy, consideration of transfer requests, and measures taken to ensure private shower access (Doc. 383, pp. 78-81, 86-87).” Dkt. 680 at 4.

After hearing evidence in October regarding IDOC’s failures to comply with the Court’s injunctive orders to provide private showers and avoid cross-gender strip searches, the Court found a violation: “More than two years after the August 2021 bench trial, the testimony given in connection with Plaintiffs’ Motion to Transfer, as well as the Declarations from class members, demonstrates Defendants’ ongoing failure to comply with this Court’s Order to provide class members with private showers and to honor their choice of gender of the official who will perform body searches at Pinckneyville.” *See* Dkt. 360 at 26-27. The Court stated, “[c]lass members’ testimony regarding cross-gender body and strip searches is extremely concerning.” *See* Dkt. 360 at 28. “These ongoing violations of the unambiguous Orders of this Court are unacceptable, especially in light of IDOC officials’ knowledge that these Orders and IDOC’s own policies are not being followed.” *Id.*

In summary, the Court granted (in relevant part) Plaintiffs’ prior motion because “the evidence demonstrates that the constitutional violations previously found by this Court regarding searches and showers are still ongoing at Pinckneyville. The Court finds that to remedy the continuing constitutional violations experienced by the 22 class members at Pinckneyville who submitted a Declaration in support of the Motion to Transfer, additional injunctive relief is necessary. The additional relief outlined below is narrowly tailored to address the repeated and rampant harm and harassment faced by inmates at Pinckneyville, especially regarding shower and

search procedures. This relief is warranted due to the repeated violations of the Court's permanent injunction and constitutional violations described above." Dkt. 360 at 29-30.

The additional injunctive relief sought by Plaintiffs in the present motion should be granted because: (i) the evidence presented herein about lack of access to private showers and consistent cross-gender strip-searches is of the same type that the Court relied upon in its prior ruling regarding Plaintiffs' Pinckneyville motion; (ii) the relief sought in the present motion is the same as the Court previously ordered; (iii) additional, significant evidence presented by class members in the form of declarations supports this Court ordering immediate action by IDOC to transfer class members out of a prison where they suffer ongoing beatings, rapes, and mental abuse, and a critical lack of medical care, among many other things.

**CONCLUSION**

For these reasons, Plaintiffs respectfully but urgently request that the Court (1) order that class member Ms. [redacted] (known to IDOC as [redacted]) be immediately transferred out of Menard to Logan or another IDOC facility where she will be safe, and (2) also order the transfer (or evaluation for transfer) of all other class members currently at Menard who want to be transferred to Logan or other safer IDOC facilities due to Menard's repeated violations of the Court's orders.

Dated: December 21, 2023

Respectfully submitted by:

*/s/ Abby L. Parsons*

**Abby L. Parsons**
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

**Camille E. Bennett**
**Michelle T. García**
**Alexis Picard**
**Mason Strand**
ROGER BALDWIN FOUNDATION
OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*apicard@aclu-il.org*
*mstrand@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Ashton Dubey**
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*ashton.dubey@kirkland.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on December 21, 2023, I electronically filed the foregoing document and any exhibits with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: */s/ Abby L. Parsons*

# Exhibit 1

## Filed Under Seal

**From:** Camille Bennett <CBennett@aclu-il.org>
**Sent:** Friday, November 10, 2023 1:50 PM
**To:** Cook, Lisa; Beasley, Kyrstin
**Cc:** Shultz, Robert; j graham; Amanda Harris; Jennings, Melissa; #ACLU Transgender Prisoner Rights External
**Subject:** RE: Monroe/Menard class members

Lisa –

Thank you for pointing out that Ms. [redacted] does not, as she believed, have a pending case about mistreatment pertaining to her gender identity against Menard staff. We now see that she did have one that is no longer pending (also a '22 case, 22-2174), though the allegations were different from those in 22-89. It is not uncommon in my experience for persons in IDOC custody to be uncertain about the status of their pro se cases. However, it remains unknown to us what triggered the facility determination to transfer Ms. [redacted] from a medium to a maximum prison in early October. I can see from the documents defendants provided that on Sept. 9, she was ticketed for "attempt to hit staff w/ unknown substance" (which suggests she did not succeed in the attempt), and received various penalties; this appears to be the incident Warden Mitchell referenced as the explanation but transfer is not mentioned at that time. We do not have any records from the hearing on the ticket, and there is no explanatory email chain like that you filed relating to Ms. [redacted] which would summarize the decision to transfer Ms. [redacted] some weeks later, after we had interviewed her at Pinckneyville. So we do not "know very well" why she was transferred, or that it was not retaliatory.

As to the communication issue, I need, first, to direct you again to our reply brief (Dkt. 627 at 8), where we cited the Annotated Manual for Complex Litigation § 21.33 (4th ed. 2022) and explained our concerns about the interrogation of Ms. [redacted] by Lt. Frank. The same principle is set out in 2 Newberg, Class Actions § 2730(d), at 1220 (1977) (a defendant *may* be allowed to communicate with actual class members in the ordinary course of business, <u>so long as the communications do not relate to the claims involved in the litigation</u>). It seems clear that the parties need to have a discussion about this issue, and perhaps seek guidance from the court if we cannot reach an understanding. We certainly do urge our class members to take advantage of the grievance procedures, but as they testified on Oct. 12 and we routinely hear everywhere, it can be difficult or impossible at times to get grievance forms. We are also very discouraged (as they are) that in virtually all instances class member grievances are denied or determined to be moot, and do not result in any positive change or action.

Finally, I think that you or someone should let the warden know about Ms. [redacted]'s catheter problem, as addressing that almost certainly involves security staff movement as well as healthcare staff, and the warden is also per IDOC policy the final healthcare authority for the prison.

Thank you for your attention to Ms. [redacted]'s situation, and please let us know when would be a good time to meet about the communication issue – Camille

---

**From:** Cook, Lisa <Lisa.Cook@ilag.gov>
**Sent:** Thursday, November 9, 2023 11:27 AM
**To:** Camille Bennett <CBennett@aclu-il.org>; Beasley, Kyrstin <Kyrstin.Beasley@ilag.gov>
**Cc:** Shultz, Robert <Robert.Shultz@ilag.gov>; j graham <2282union@gmail.com>; Amanda Harris <drharris@urbanfamilydoctor.com>; Jennings, Melissa <Melissa.Jennings@illinois.gov>; #ACLU Transgender Prisoner Rights External <ACLU_Transgender_Prisoner_Rights_External@kirkland.com>
**Subject:** RE: Monroe/Menard class members

Counsel,

You know very well that [redacted] was not transferred as retaliation for testifying in the hearing. Her transfer had already been scheduled beforehand and was stayed in order to allow her to testify from Pinckneyville. I am also confused by your continued assertion that [redacted] has a lawsuit against Menard staff. The case you cited to previously (SDIL # 22-89) was filed while [redacted] was at Menard, but is against a Lawrence CC staff member regarding allegations arising out of Lawrence. It may help if you look at the complaint filed in that matter. Although she has other cases on the SDIL docket, most of them were dismissed at merit review.

You should encourage your clients to follow up by using the grievance procedure at Menard. We want to avoid any confusion or the appearance of us directing staff to communicate with your clients, which you have previously claimed, so will not be passing your message along to the Warden. I will, however, pass your message as to Ms. [redacted] to medical and mental health staff so that someone may look into that.

I would like to follow up on your assertion that a member of your team must be present if there is any investigation. I never received any authority from you nor any response to my 9/27/23 message on this issue. Please send support for your assertion that an attorney must be present.

Lisa

---

**From:** Camille Bennett <CBennett@aclu-il.org>
**Sent:** Wednesday, November 8, 2023 4:57 PM
**To:** Cook, Lisa <Lisa.Cook@ilag.gov>; Beasley, Kyrstin <Kyrstin.Beasley@ilag.gov>
**Cc:** Shultz, Robert <Robert.Shultz@ilag.gov>; j graham <2282union@gmail.com>; Amanda Harris <drharris@urbanfamilydoctor.com>; Jennings, Melissa <Melissa.Jennings@illinois.gov>; #ACLU Transgender Prisoner Rights External <ACLU_Transgender_Prisoner_Rights_External@kirkland.com>
**Subject:** [EXTERNAL] Monroe/Menard class members

Lisa, Kyrstin – Over the past couple of weeks, we have been in touch with class members at Menard, of whom there are over 20. This is partly as a result of [redacted] transfer from Pinckneyville to Menard after she testified in the Pinckneyville hearing, which we continue to regard as unintelligible given that she has an ongoing 1983 case regarding abuse she experienced there from correctional staff.

The class members we have been able to talk to so far at Menard report consistent levels of abusive treatment (including beatings and sexual assault by staff), based on their status as individuals with gender dysphoria, that are worse than any other facility we have heard of in the IDOC system. Class members have described policies and practices that foster and enable abuse, including being forcibly penetrated and left bleeding during strip searches by male officers, being coerced into sex acts by staff and prisoners, and being repeatedly beaten, Maced, and threatened by staff. **No Monroe class members should be housed at Menard.** We are collecting information, but given the reports of abuse we have received, we did not feel we could wait to reach out to urge that IDOC promptly move all these class members elsewhere, or at a minimum **immediately put them all in protective custody**.

This pattern of behavior makes it impossible for class members to safely transition or otherwise receive their constitutionally required treatment, and similar IDOC practices were the subject of trial testimony and the type of treatment the Court's orders were intended to prevent. As you will understand from this message, we are preparing to file another motion, this time about Menard. We would prefer not to have to do this. We would prefer to have IDOC recognize that this is not a prison where anyone who is transgender, non-binary, or otherwise gender nonconforming can be safely housed, and get them out of there. But if, instead of taking prompt action, the Department or the facility decides that "investigation" is needed, we want to remind you that no one should interview our class members about these matters without a member of our team present.

Finally, we need to raise an issue requiring immediate medical attention for one class member. [redacted] ("[redacted]) has been in extreme psychological distress since being placed at Menard in August and has engaged

in repeated acts of self-harm, including an episode of genital mutilation so severe that it required her being transported by airlift to a St. Louis hospital. She is not healing well, and requires a catheter to urinate, but staff will not leave the catheter with her and do not bring it when she needs it; consequently she can go for very extended periods without being able to urinate. (At the time of her legal call today she reported that it had been 48 hours.) We understand that Ms. [redacted] has been identified as needing an RTU level of mental health treatment, which Menard does not provide.

We are as previously cc'ing the monitors on this message. I am also cc'ing Melissa Jennings on this email due to Ms. [redacted]'s urgent medical situation.

Thank you, Camille

**Camille E. Bennett** *(she/her)*
Director, Corrections Reform
ACLU of Illinois
150 N. Michigan Ave., Ste. 600, Chicago, IL 60601
■ 312.201.9740 x336 ■ cbennett@aclu-il.org

# Exhibit 2

## Filed Under Seal

**From:** Cook, Lisa <Lisa.Cook@ilag.gov>
**Sent:** Thursday, December 21, 2023 10:28 AM
**To:** Abby Parsons; Beasley, Kyrstin; Shultz, Robert
**Cc:** #ACLU Transgender Prisoner Rights External; Noah Stid; Brent Ray
**Subject:** RE: Monroe Litigation - Urgent issue regarding Menard

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

IDOC does not intend to move all class members out of Menard Correctional Center.

There is an open investigation regarding Ms. [redacted]'s rape report. The matter is not being investigated by Lt. Frank, who works out of Pinckneyville, but an investigator named Lt. Mark Hanks (the IA Unit Coordinator at Menard).

---

**From:** Abby Parsons <AParsons@KSLAW.com>
**Sent:** Tuesday, December 19, 2023 4:07 PM
**To:** Cook, Lisa <Lisa.Cook@ilag.gov>; Beasley, Kyrstin <Kyrstin.Beasley@ilag.gov>; Shultz, Robert <Robert.Shultz@ilag.gov>
**Cc:** #ACLU Transgender Prisoner Rights External <ACLU_Transgender_Prisoner_Rights_External@kirkland.com>; Noah Stid <NStid@KSLAW.com>; Brent Ray <bray@kslaw.com>
**Subject:** [EXTERNAL] RE: Monroe Litigation - Urgent issue regarding Menard

Lisa:

We have been alerting IDOC to these urgent issues since at least November 8. Given the severity, we need to know by 10 am on Friday whether IDOC plans to work with us to move all class members out of Menard or we will file a motion by close of business Friday.

Best,
Abby

**Abby L. Parsons**
(She/her/hers)
*Partner*

T: +1 713 751 3294 | E: aparsons@kslaw.com | Bio | vCard

King & Spalding LLP
1100 Louisiana
Suite 4100
Houston, TX 77002

King & Spalding

kslaw.com

---

**From:** Cook, Lisa <Lisa.Cook@ilag.gov>
**Sent:** Tuesday, December 19, 2023 9:55 AM

**To:** Abby Parsons <APArsons@KSLAW.com>; Beasley, Kyrstin <Kyrstin.Beasley@ilag.gov>; Shultz, Robert <Robert.Shultz@ilag.gov>
**Cc:** #ACLU Transgender Prisoner Rights External <ACLU_Transgender_Prisoner_Rights_External@kirkland.com>; Noah Stid <NStid@KSLAW.com>; Brent Ray <bray@kslaw.com>
**Subject:** RE: Monroe Litigation - Urgent issue regarding Menard

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Hi Abby. We are trying to get more information.

---

**From:** Abby Parsons <AParsons@KSLAW.com>
**Sent:** Tuesday, December 19, 2023 9:41 AM
**To:** Cook, Lisa <Lisa.Cook@ilag.gov>; Beasley, Kyrstin <Kyrstin.Beasley@ilag.gov>; Shultz, Robert <Robert.Shultz@ilag.gov>
**Cc:** #ACLU Transgender Prisoner Rights External <ACLU_Transgender_Prisoner_Rights_External@kirkland.com>; Noah Stid <NStid@KSLAW.com>; Brent Ray <bray@kslaw.com>
**Subject:** [EXTERNAL] RE: Monroe Litigation - Urgent issue regarding Menard

Counsel:

These are urgent matters. We need a response immediately.

Best,
Abby

**Abby L. Parsons**
(She/her/hers)
*Partner*

T: +1 713 751 3294 | E: aparsons@kslaw.com | Bio | vCard

King & Spalding LLP
1100 Louisiana
Suite 4100
Houston, TX 77002

kslaw.com

---

**From:** Abby Parsons
**Sent:** Friday, December 15, 2023 7:01 PM
**To:** Cook, Lisa <Lisa.Cook@ilag.gov>; Beasley, Kyrstin <Kyrstin.Beasley@ilag.gov>; Shultz, Robert <Robert.Shultz@ilag.gov>
**Cc:** #ACLU Transgender Prisoner Rights External <ACLU_Transgender_Prisoner_Rights_External@kirkland.com>; Noah Stid <NStid@KSLAW.com>
**Subject:** Monroe Litigation - Urgent issue regarding Menard
**Importance:** High

Counsel:

We have an urgent issue that has come to our attention today from a class member at Menard, [redacted] (known to IDOC as [redacted]). Procedurally, IDOC cancelled a legal call we had scheduled with her on December 6, reportedly "due to the individual moving cell houses and no phones being available." The next available time was today. Today she reported she hadn't been moved and should have been able to speak to me on Dec. 6. This problem has been recurring with Menard cancelling legal calls for many class members without justification. Please address this with them.

Substantively, Ms. [redacted] reported being raped by an officer (C/O Dunbar) on December 12 while waiting for a consultation with mental health. She was denied medical attention and a rape kit for two additional days, including after speaking with internal affairs (Lieutenant "Hank," which I presume to be Lieutenant Frank). She reported tampering with the rape kit from the hospital (as officers took the kit back to the prison instead of having the hospital process it), as well as a TAC team assault: spraying her with mace in a cell at RNC twice in a matter of 30 minutes. This rape and TAC team assault are known to IDOC and immediate action needs to occur.

These shocking reports do not stand alone. We have been gathering declarations from multiple class members at Menard that include sexual assault by guards and other inmates. And nearly all have reported routine cross-gender strip searches and no access to a private shower – the very harms the Court found to be violations of the injunctive orders with regard to Pinkneyville just weeks ago. Dkt. 680 at 29.

In light of this highly troubling information, we ask that IDOC immediately transfer Ms. [redacted] to another facility and TAC consider her for a transfer to Logan or Centralia as part of the review conducted by IDOC this month. Plaintiffs are preparing a motion for transfer of all class members from Menard as well and will file in short order. If IDOC is agreeable to negotiate transfers without burdening the Court with another emergency motion and evidentiary hearing, please let us know.

Best,
Abby

**Abby L. Parsons**
(She/her/hers)
*Partner*

T: +1 713 751 3294 | E: aparsons@kslaw.com | Bio | vCard

King & Spalding LLP
1100 Louisiana
Suite 4100
Houston, TX 77002

kslaw.com

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message. Click here to view our Privacy Notice.

# Exhibit 3

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF A.M.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman. Since October 2022 I have been living at Menard Correctional Facility. Throughout this time, I have been suffering threats of and actual sexual violence by male guards and prisoners—with the knowledge and encouragement of the guards.

3. At the end of July 2023, I was sexually assaulted in the shower by Lt. Dallas. Lt. Dallas was outside the wing by the bullpen near the showers; they held me in a cage waiting for the next transgender woman to get out of the shower. The shower has two open ways to come in and out. I was brought into the shower, and after I started to wash up alone, Lieutenant Dallas entered through the other entrance. He stated that if I gave him what he wanted sexually, "things can be better" and "I could be safer" and "bad things wouldn't happen to me." Coerced, I gave him oral sex in the shower.

4. After this happened, I asked other transgender inmates if this type of thing happened to them too. Yes, other inmates said, and they named other correction officers who had coerced them into unwanted sexual activity like this.

5. I attempt to report the assault by Lt. Dallas to Lt. Mark Hanks from Internal Affairs (IA). He took down a statement on other PREA incidents I reported about showers, but he wouldn't write down anything about the incident with Lt. Dallas. Afterward he said he was focused on the other issues. I never heard anything back from Lt. Hanks.

6. On or about August 31, 2023, at around 8:00 pm, I was raped by a male inmate that goes by the name Jo Jo. He was out of his cell because he was working in my gallery. He had a knife and penetrated me through the bars of my cell. After the attack, I told c/o Williamson but he would not help me because his shift was almost over. I filed a Prison Rape Elimination Act (PREA) claim against c/o Williamson for not helping me.

7. The next day, early in the morning around 1 am, another inmate threw feces and urine on me and my property because I was telling an officer about the rape. Nothing was done by the guards to stop this assault.

8. That same morning, around 8 am, Jo Jo raped me again at knifepoint in the same way. I sustained injuries to my arm from the knife in addition to the rape. The officer in my gallery, c/o Reed, saw this happening (including seeing the knife), but he walked the other way and did not help me. When I was able, I told a sergeant about the rape and he laughed and walked off.

9. Because I was getting no help from the guards for my attacks, I used a tablet to send a message for help through the "system support link." I received a response that they would contact the prison for help. A short time later, I was brought before IA, where I got in trouble for using the

tablet to seek help. IA threatened me with placement in seg, but did not properly investigate the sexual assaults I experienced.

10. I finally got permission to go to the hospital off-site, and I was strip-searched by a male guard, c/o Little. He took me to the hospital along with c/o Jada (who is female). At the hospital, c/o Little was making sexually inappropriate comments to me and attempted to interfere with the administration of the rape kit. The medical staff and c/o Jada repeatedly told him to leave the room while I was undressed. He also was arguing with the nurse at the hospital because he wanted to take my clothing back to Menard in a bag he brought with him because "his boss told him to." The nurse said standard protocol for a rape kit was to keep the clothing, and that is true from previous experience I have with rape kits. After the nurse left the room, c/o Little took the bag with my clothing in it. Normally when the rape kit is complete, I am given a number for the kit, but this did not happen at this visit; I believe c/o Little tampered with the kit. When I returned to Menard, c/o Little wrote me a bogus ticket: he claimed that while I was in the hospital room, I said that I would kill a guard but I did not say that.

11. On or about December 12, 2023, I was helping my friend, [redacted], who is a transgender woman and has [redacted]. I was helping her in the yard and the officers were mad that I was helping her.

12. I got in trouble by the officers out in the yard because they said my clothing was not right, but I think it was because I was helping [redacted]. The guards continued to provoke me while I was upset while walking back to my cell. I was so upset that I asked to go to mental health because I felt I was in crisis. C/O Dunbar took me to mental health. As we were waiting in the private room outside mental health, C/O Dunbar forced me to have oral sex with him. I spit his semen on some of my clothes to save as evidence.

13. When I saw mental health, I told him about the assault. But instead of going to the hospital for a rape kit, I was walked back to my cell by c/o Dunbar and Lt. Brandt. When Lt. Brandt walked off from the cell, he said someone was coming to see me tonight. I expected it to be IA, but it was not.

14. About an hour or two after I got back to my cell, on around 330-4:00 pm, a TAC team showed up. They cuffed me and took me from my cell to healthcare, but I did not go in. The TAC team talked to the nurse, then said "let's get show on road." I thought I was going to the hospital for a rape kit but instead they took me to a holding cell at RNC. They uncuffed me through the chuck hole and immediately maced me. It burned my eyes and face and I couldn't breathe. I had to curl up in a ball in the corner of the cell to try to breathe.

15. I was there for a long time, possibly thirty (30) minutes. A sergeant finally came in and took me to a different cell so I could breathe. But the TAC team came back and maced me again. Then the TAC team pushed me to the ground and dragged me to seg. Everyone in RNC watched what happened and had effects from the mace.

16. The following day, on or about December 13, Lt. Hanks from IA interviewed me. He took down a written statement. He made me initial it but did not let me read it first. I expected to go to the hospital for a rape kit, but he also sent me back to seg.

17. On or about December 14, when I was getting my hormone patch, I finally convinced nurse Morgan to send me to the hospital for a rape kit. I went to Memorial Hospital and had the rape kit taken, but the IDOC officers took the rape kit and all my property back with them to Menard. Nurse Nikki (at the hospital) protested and said it was not protocol, and even made some phone calls to legal, but let the officers take my rape kit and things. When I got back to Menard, the officers took my medical paperwork so I had no record of the visit.

18. I have had a difficult time receiving my hormone shots on a regular basis and without problems. I have since switched to a hormone patch. As of November 2023, IDOC had not given me estrogen for a month and my spironolactone for three months. Nurse Amanda also asks male staff, including her husband, c/o Shaults, to come into the room where she administers my shots. This makes me very uncomfortable and I have told her this repeatedly.

19. On or about September 5, 2023, nurse Amanda asked a male staff in the room to pull down my pants for my shot. I refused to let him do this, but nurse Amanda said that if it did not comply, she would report that I refused my shot. I refused again, and c/o Shaults pulled me into the hallway (under a camera) and groped my butt. I complained and asked for help from Sergeant Jones who was walking past, but he slammed me forward, dragged me to a bullpen, and slammed me down inside. MHP Wilkes was present for this incident and documented it.

20. On or about September 7, 2023, nurse Nicole asked me if I still wanted my hormone injection, and I did. She injected the shot into my lower back instead of my butt. I heard a pop and felt intense pain. Four or five hours later I became seriously ill and in unbearable pain at my injection site. Many inmates saw me in my cell and tried to seek medical help for me, but no one helped. For days I was throwing up blood and a yellow substance, bleeding from my rectum, couldn’t walk or use the bathroom, and I could barely breathe and felt dizzy. During that time, on around September 10, c/o Williamson (a different person than in paragraph 6) came to my cell and observed my extreme medical distress but did not help.

21. The only reason I was let out of my cell was to attend a regularly scheduled visit with Dr. Catz on September 11, 2023. Because of my poor condition, Dr. Catz immediately hospitalized me at Menard and rescheduled my routine visit. Dr. Catz ordered the hospital to perform many tests to monitor my health, including tests for urinary tract infection and for blood

clots (an MRI). I stayed in the hospital for approximately 5 days but only received fluids and no other tests were performed to my knowledge. If it were not for this visit with Dr. Catz, I believe I would have died in my cell.

22. I am regularly strip-searched by male guards, despite my ID badge showing that I am a transgender woman and my requests to be searched by a female officer. During my time at Menard, I have never been strip-searched by a woman and strip searched by a man approximately thirteen (13) times.

23. I do not have access to a private shower. The shower I use is open on two sides and guards and other inmates can easily see in while I bathe. On or about November 13, I brought a rug from my cell to cover the side where the guards can see in. One guard said, "take that faggot shit down."

24. Since I entered IDOC custody I have been requesting a transfer to Logan. I regularly make this request to my mental health provider, MHP Wilkes. I have never received any information (in writing or otherwise) that my case for transfer has been considered or rejected by TAC. If I cannot go to Logan, I would transfer anywhere besides Menard—even back to Pontiac where I was attacked by guards.

25. I also have been requesting surgery since coming to IDOC. I regularly make this request to MHP Wilkes. I have never received any information (in writing or otherwise) that my case for surgery has been considered or rejected by THAWC.

26. I do not feel safe at Menard. I know I am vulnerable to attack and the prison guards here do nothing to protect me, especially c/o Shaults, who constantly harasses me. I feel that many guards want me to flirt with them and if I do not, they get violent and aggressive to me. The guards

also watch while other inmates attack and harass me and the other girls. I regularly feel forced to trade sex and sexual favors for my safety.

27. I regularly have difficulty obtaining grievance forms and accessing the law library. This has led to difficulties in reporting these issues to the proper authorities and channels.

28. Presently, I am in seg (since the incident on December 12) and have not had access to any of my medications other than my hormone patch.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Date: December 21, 2023 /s/[redacted]

[redacted]

Date: ______________________ ______________________

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 21, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted].

# Exhibit 4

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**<u>DECLARATION OF</u>** M.L.

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at Menard Correctional Facility.

3. On October 12, 2023, I testified at the evidentiary hearing to support Plaintiffs' Motion to Transfer Class Member and All Class Members out of Pinckneyville Correctional Center. At the time of my testimony, I was living in Pinckneyville, and I wanted to be transferred to Logan Correctional Center or the PRISM program at the Centralia Correctional Center.

4. On or about October 13, 2023, I was transferred from Pinckneyville to Menard. Before the transfer, no one from the Illinois Department of Corrections asked me whether I wanted to be transferred to Menard. I did not want to go to Menard because I have lived there before. It is extremely dangerous for transgender people, and I was afraid that I would face retaliation for speaking up about my rights and filing grievances. I filed a lawsuit against a correctional officer at Menard, [redacted] *v. Powell.*

5. When I arrived at Menard, despite having an ID that states that I am female and that I want a female officer to search me, I was strip-searched by a male officer, Officer Smith. Officer Smith showed me his large can of mace. I was afraid that he would spray me with mace if I did not let him strip-search me.

6. Afterward, I was placed in North 2 in a cell that did not have a mattress. I did not have a mattress for about six days.

7. When I first arrived, I did not receive any of my required medication including blister packs and hormone therapy. I believe that it is protocol when a new inmate arrives at a prison, that the person should be seen by medical staff. I have been at Menard for several weeks and I have not been evaluated by medical staff. I have repeatedly asked for medical attention.

8. On or about October 24, I went on suicide watch because I did not have a mattress and I believed that someone was messing with my food on my trays. I have not seen a mental health specialist in any serious way. Occasionally, someone from mental health will stop by my cell to ask if I am "good" but then they walk away.

9. On or about October 26, a male correctional officer took me out of my cell and told me that I was going to the room to see mental health. I was wearing a suicide watch smock. We went into a room and the door closed. While I was handcuffed, the male officer raped me. I screamed but no one heard me.

10. Afterward, I wrote a request for medical to see me, but no one visited me. I refused to wash up or shower that area of my body because I wanted to preserve the DNA but no one would give me a rape kit.

11. After I was on suicide watch, I was moved to housing in gallery 6 or 7 and I am in a single cell. There is one other transgender woman near me. The correctional officers use foul

language when talking about her. I hear them call her a "fag" or "gichy" an offense term for someone that is part of the LGBTQ community.

12. I try not to ask for anything from the correctional officers because I do not want them to do anything to me. The officers call me "fag" and "gichy," too.

13. I have spoken to both a nurse practitioner and mental health about receiving hormones and there are records that I used to receive hormones at other prisons. I have been at Menard for about a month, and no one has told me when I can receive hormones again. Not having hormones affects my gender dysphoria and it makes me feel terrible.

14. I have epilepsy but I have not received my medication since I was at Pinckneyville. Yesterday, I was shaking in my cell, and I was scared that I was going to have a seizure. I am worried that I will have a seizure, and no one will know about it or help me.

15. Recently, I have asked correctional officers and other staff for grievance forms, but I have been told that the printers are broken.

16. I cannot call PREA and report the rape because I do not get phone privileges in segregation.

17. I would like to transfer to Logan because I am woman or Centralia's PRISM program. If I must stay in a male maximum-security prison, I would prefer to transfer to Lawrence or Pontiac. While I have a pending case against a correctional officer at Lawrence, [redacted] *v. Gonzalez*, No. 3:22-cv-00089-NJR (S.D. Ill), at least I received my hormones and medication there.

18. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 14, 2023 /s/ [redacted] ______________________

[redacted]

Dated: ____________________ ______________________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on November 14, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted].

# Exhibit 5

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| STEVEN BOWMAN, LATOYA HUGHES, and MELVIN HINTON, | ) | |
| Defendants. | ) | |

**DECLARATION OF** [redacted] J.P.

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is at Menard Correctional Facility.

3. I was transferred to Menard in early May 2023, from Pontiac Correctional Facility.

4. At Pontiac, I was on a hunger strike because they would not give me hormones or gender-affirming surgery.

5. I was transferred to Menard after my relationship with a mental health specialist was exposed. In February 2022, I filed a PREA complaint against the mental health specialist and I cooperated with IA for the investigation.

6. When I first arrived at Menard, they put me in the general population in a cell with a known sex offender. My mom called Springfield to complain. Then, they moved me into another cell with a known sex offender. The entire time I was scared.

7. I am afraid of the general population of men at Menard. I believe that someone would stab or rape me in the yard because I am transgender.

8. On or about May 6, I was forced to shower with twenty men. There were only ten shower heads which meant prisoners would stand naked waiting for the opportunity to shower. This was very dangerous for me, and I felt exposed. The next day, I filed a grievance because I did not have a private shower.

9. From about May 6 to early December, I refused to shower because I would have to shower with groups of men and that would be dangerous.

10. On or about November 30, I asked to be moved to protective custody. They put me in an intermediate waiting space which is the reception area for new arrivals. Since then, I have been able to use a single cell shower which is an improvement because I don't have to fear someone would jump me.

11. On or about December 12, 2023, at about 3:45 p.m., two correctional officers in tactical gear brought another transgender woman into the galley where my cell is located. The woman was yelling that she was raped by her cellmate and that she had DNA on her.

12. The correctional officers yelled at her "You fucking nigger tranny" or words to that effect.

13. They sprayed OC spray or mace. They sprayed so much OC spray that it affected the entire galley. My chuckhole was open because it was about time for dinner and the OC spray caused me to cough and my eyes teared up.

14. They moved this transgender woman into another cell near me. The two correctional officers returned with the woman's property and opened the door. I heard a slamming sound and scuffling sounds. The transgender woman was crying and screaming.

15. I tried to calm her down by talking to her but this entire incident was terrifying for me.

16. When I arrived at Menard, I was not evaluated for hormones. On or about May 5, I asked the woman who worked in mental health for hormones. She told me that I would have to wait six months to get hormones. Over six months have passed, and I have not received hormones.

17. During the entire time that I have been at Menard, I cannot ask for a female officer to search me. I am routinely strip-searched by male officers.

18. Several months ago, a correctional officer told me that the scanner was broken.

19. I tried to buy makeup from the commissary, but I was told that they wouldn't sell it to me and that I would need to go to protective custody to get it. I would love to have a razor to shave my body hair, but they do not let me have one. Having body hair on my chest causes me a lot of distress.

20. I would like to transfer to any prison that is not a hostile environment for transgender women. I would like to transfer to Logan, Centralia PRISM program, or another prison where I will be safe as a transgender woman.

21. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 18, 2015

/s/ [redacted]

[redacted]

______________________________ Date

______________________________ [redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 18, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted].

# Exhibit 6

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF K.M.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since approximately August 2023.

3. I am classified as a Severely Mentally Ill (SMI) inmate and require inpatient level care. However, I have not received this level of care at Menard, and as far as I know, Menard does not have the capabilities to provide the necessary care.

4. I often feel like I have to deny or hide the fact that I am a transgender woman due to how unsafe I feel at this facility.

5. I have been self-harming as a result of my mistreatment at Menard. Approximately two or three months ago, I cut my genitalia and neck so badly that I had to be airlifted to a nearby hospital in St. Louis. I have needed a catheter during my recovery, but Menard staff will not give it to me, making it hard for me to use the restroom. Last week, I had to wait 48 hours before they

finally gave me the catheter so I could urinate properly. Sometimes, Menard medical staff have a hard time putting in the catheter, and I end up going to the hospital.

6. Some correctional officers at Menard have repeatedly physically assaulted me. They have threatened to kill me on numerous occasions, and have put their hands around my throat to choke me. The officers will also Mace me when I self-harm. When they are assaulting me, they yell out things like, "You wanna be a faggot? We don't accept that. We're gonna beat the faggot out of you."

7. I am currently being strip-searched and pat down searched by male officers, but I would prefer to be searched by female officers. It makes me feel really uncomfortable to have male officers search me.

8. My class member identification card does not show that I am a transgender woman, even though I have tried to change it at least ten times. No one has fixed it.

9. Some officers at Menard use disrespectful names and address me as "Mr. [redacted]" despite my request to be referred to as "Ms. [redacted]" since I am a woman.

10. I do not have access to gender-affirming commissary items like bras, panties, or cosmetics.

11. I do not feel safe at Menard. The scariest part is not knowing if I will make it through another day.

12. I am very interested in transferring out of Menard. I really want to go to JITC or Dixon Correctional Center.

13. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 21, 2023 /s/ [redacted] ___________

Date: ______________________ [redacted]

[1] On November 21, 2023, Alexis Picard, an ACLU of Illinois attorney in this case, reviewed the declaration with Ms. [redacted] Ms. [redacted] mentioned that she would not have access to a pen at Menard to sign her declaration but approved using an electronic signature.

# Exhibit 7

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF MS. M.D.**

I, Ms. [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since approximately March 2023.

3. The Menard correctional officers intimidate and harass class members. In or about November 2023, one male officer took me to the area where they keep inmates during transportation; it is called the bullpen. I asked the officer to take me back to my cell because it was cold near the bullpen. His response was, "I'm tired of you fag sissys." Later that day, the same male officer came to my cell, and even though I had my back turned to him, he sprayed Mace at me. He falsely claimed I tried to throw my TV at him.

4. On the same day as the incident above, another officer took me to the showers when the sergeant showed up and sprayed Mace at me. He then said, "one down, four to go," talking about transgender inmates.

5. Other people are around when I shower, and it makes me feel unsafe. I prefer washing up in my cell.

6. I have been trying to update my class member ID card to show my preferred gender for searches as female officers. However, I am still being searched by male officers, which makes me feel disrespected and violated. There is a body scanner at Menard, but the male officers rarely use it on me.

7. Correctional officers use disrespectful language like “gay sissy” when referring to class members. They do not address me as “Ms. [redacted]” or use my preferred pronouns.

8. I have not had my hormone treatment in about a month. I used to take hormone pills, but the nurses switched me to patches over two months ago. I am supposed to get a patch twice a week. Dr. Katz said to stay on the pills until my patches arrived, but my pills ran out a month ago, and I still do not have the patches. This means I am not getting my regular hormone treatment right now. My emotions are all over the place, and I am having hot flashes. I filed an emergency grievance about a week ago, but there has been no response. One nurse checks in on me, but I still have not received my patches.

9. I have been trying to transfer to PRISM and get gender-affirming surgery for over 2 years, but IDOC is taking a long time with the process.

10. I do not feel safe at Menard.

11. I am very interested in transferring out of Menard. I want to leave Menard and join the PRISM program at Centralia Correctional Center. Eventually, I hope to be transferred to Logan Correctional Center.

12. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 11, 2023 /s/_Ms. [redacted]
Ms. [redacted]

Dated: ______________ ____________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on November 9, 2023 and December 11, 2023, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Exhibit 8

Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN BOWMAN, LATOYA HUGHES, and MELVIN HINTON,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] C.B.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman known as a "T-girl" who is at Menard Correctional Facility.

3. I was transferred to Menard on or about March 23, 2023, from Dixon Correctional Facility.

4. I started hormones in 2017 before prison and took hormones at Dixon, but when I arrived at Menard, they stopped giving me hormones.

5. When I arrived at Menard, despite being a transgender woman, they put me in a cell with a male prisoner. Living with men is extremely dangerous for me and I am worried about my safety.

6. In or about May 2023, my male cellmate got drunk, became over-aggressive, and demanded oral sex. I told him no and he attacked me. I fought back and defended myself. Menard

disciplined me for fighting back by placing me in segregation on or about May 18, 2023, and I stayed until about October 18, 2023.

7. On the day that Menard put me into segregation, the male correctional officers took me to a cage where there were no cameras. The officers handcuffed me and beat up me, hurting my wrist. I was sprayed with pepper spray and strip-searched by force. They saw that I was wearing a bra and they laughed at me.

8. When I was in segregation, the nurse would walk by, and I would yell for hormones behind the door, but the correctional officers would tell the nurse not to give them to me. The officers would say I am being an "asshole."

9. When I was in segregation, I did not have my hormones or any female commissary items. That made me feel horrible.

10. When I was in segregation, the correctional officers would slam the door in my face. They treated me like I was nobody and they would call me a "fucking faggot."

11. On October 18, 2023, they reduced my discipline for defending myself from my cellmate's attack from one year to three months of segregation, but I still stayed in segregation for an extra two months.

12. I have mental health issues and I take psych medication. I am classified as SMI which means that I should not be in segregation for lengthy periods. Menard knew this information about me and still kept me in segregation for an extended time.

13. The entire time that I have been at Menard, only male correctional officers have conducted strip-searches of me. I cannot ask for a female officer to search me.

14. After I was released from segregation, Menard put me in a cell with another man. I am scared of him. He has hit on me and asked for oral sex. I tell him no. This gives me flashbacks of the attack by my other male cellmate that occurred in May 2023 at Menard.

15. After I was released from segregation, Menard started giving me hormones.

16. I do not have a private shower. I am forced to shower with groups of men. It does not matter that I have told the correctional officers that I am trans. Showering with men who can see my body makes me feel uncomfortable because they hit on me.

17. I try to stay humble and do not say anything back to the Menard correctional officers because I could go to segregation for something small.

18. In or about October 2023, I wrote to my counselor to ask for a transfer. I was told that I could not transfer because there was a medical hold for my shoulder. I was shot in 2012 and the bullet stayed in my arm. While it causes me pain, I take pain medication and I have not received any medical attention from a doctor that should prevent a transfer.

19. The Commissary often has little or no supplies for transgender women. I would like lotion, razors to remove body hair, and deodorant that smells feminine.

20. The entire time that I have been at Menard there has been no mental health support for me or other transgender women. There are no support groups.

21. I would like to transfer to Logan, Centralia PRISM program, or another prison where I will be safe as a transgender woman. If I must stay in Menard, I would like to live with another class member so that I am not in danger.

22. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 15, 2023 /s/ [redacted]

[redacted]

Dated: ____________________ ______________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 15, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# Exhibit 9

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] R.C.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a non-binary class member who is currently housed at the Menard Correctional Center. I have been at Menard since approximately April 2021.

3. I am currently being searched by male officers, but I would prefer to be searched by female officers which is indicated on my class member identification card.

4. A few months back, I was told that I did not meet the criteria to be confirmed as transgender, despite identifying as non-binary. My class member identification card still lists me as female, but I was not provided with any information from Menard officials on how to get recognized as part of the transgender and gender non-confirming population in IDOC.

5. Some officers at Menard call me derogatory names.

6. The most challenging part of being at Menard is the psychological and emotional distress I am experiencing. I struggle with depression, anxiety, feelings of unworthiness, and hopelessness.

7. I am very interested in transferring out of Menard. I really want to go to Centralia Correctional Center and be a part of the PRISM program.

8. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 6, 2023 /s/ [redacted] ______________________

Dated: ___________________ ______________________________________

[1] Plaintiffs' counsel spoke with [redacted] on November 6, 2023, by telephone. During this conversation, [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail [redacted]

# Exhibit 10

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF T.F. [redacted]**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman class member who is currently housed at Menard Correctional Center. I have been at Menard for approximately a month and a half.

3. When I was first brought to Menard, I was strip-searched by a male CO, Officer Baker, against my will, and despite the fact that my ID says that I should be searched by a female officer.

4. Officer Baker told me that Menard is "an all-male facility" and that they "don't do any of that gay shit." He threatened that if I didn't take my clothes off for the search he would pepper spray me and tear my clothes off. This frightened me, so I took my clothes off for the search, but I told him it was under protest.

5. Since I have been at Menard, I have been in segregated housing, in seg 6 gallery. I did not get a copy of my ticket until about a week ago, and I still have not been told how long I will have to stay in seg.

6. During my time here in seg 6, Officer House has been constantly sexually harassing me. He has said things like "I'm not with that gay shit, but you caught my eye." He has looked in on my cell while I was getting dressed, wearing only my bra and underwear. He calls me "sweetness," "hotness," and "juicy booty."

7. I had a conversation with Officer House where I asked him to leave me alone. He refused, and told me that he is taking advantage of the fact that I can't use the phone to call the PREA hotline while I'm in seg. I was able to file a PREA grievance against him, but I had to do it in writing rather than on the phone.

8. Even if I get out of seg, I know that while I am here at Menard I am going to have to check into protective custody. Transgender inmates who aren't in protective custody have things thrown at them by other inmates, such as water, cleaning solution, or urine. This has already happened to me as I was being taken back from showering, and the guard with me told me that there was nothing he could do about it. The prison will not honor transgender inmates' requests to house together in regular housing, so we end up housed with male inmates who are often violent toward us.

9. Protective custody is not a good solution to this housing problem, because you are kept in your cell basically all the time. You don't get to walk to chow, and you barely get to go to the yard. It's terrible for your mental health. The prison can also deny you protective custody, so I don't have a reliable safe alternative if my cellmate in regular housing is violent.

10. I am currently on hormones and people can see that I am a girl, which makes me feel very unsafe here at Menard. Already because of my appearance officers have denied me my food tray, and I have seen an officer spit in my food.

11. I have also recently been denied my hormones. When I first arrived at Menard, I was receiving my hormones as usual, which I take as a combination of daily pills and a weekly shot. Then, about a week ago they stopped giving me my pills. That same week, I noticed that my name wasn't on the medical list to go for my shot. When I asked why I was left off, the nurse told me that she was denying me my shot going forward because she didn't have a female officer available to be present while she does the shot. This was confusing to me because I never asked for a female officer to be present.

12. When I got my previous shots at Menard, there was always a male officer in the room watching me get the shot. The shot is given to me in my butt, so I have to have my pants pulled down as part of the procedure. Even though I was exposed, the nurse would leave the door to the room open, so any inmates or COs walking by could see in. I felt like this was an invasion of my privacy, but I did not complain.

13. I also have been unable to get replacement female undergarments, such as a bra and panties. The guards refuse to give me these things. The rulebook that I have tells me that I should contact Miss Wilkes in mental health if I am having trouble getting these items, because she is the coordinator for transgender inmates. I have tried to get in contact with her, but Officer House has been denying me access to mental health services, so I cannot speak with Miss Wilkes.

14. I feel like either I or one of the other transgender inmates is going to be killed with the way things are at Menard. There are a lot of people here in gangs, including many of the COs. The COs who are affiliated protect the inmates in gangs, and do whatever the inmates in gangs tell them to do. Transgender inmates are extremely unsafe here.

15. I am very interested in transferring out of Menard. I really want to go to Logan Correctional Center or Centralia Correctional Center and be a part of the PRISM program. If I

have to go to a maximum-security facility, I would like to go back to Lawrence. I would also be open to going to Big Muddy.

16. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 11/08/2023__ /s/[redacted]______

[redacted]

Dated: ____________ ________________________

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on November 8, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Exhibit 11

## Filed Under Seal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF T.S.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman class member who is currently housed at Menard Correctional Facility. I have been at Menard for approximately five months.

3. It has been so long since I have gone to the shower that I cannot even remember the last time I went. The prison refuses to allow me access to a private shower. The regular showers have 10 shower heads for 20 people at a time. Because I have been on hormones in the past and have breast development, I am afraid that I will be assaulted if I shower with the men. So, instead I take “bird baths” using the sink in my cell.

4. I have a diagnosis of gender dysphoria but have not been given access to any kind of gender affirming care. I have spoken to my mental health provider repeatedly about getting information about surgery, getting a female marker on my ID, and getting access to a private shower. To my knowledge, no progress has been made on getting me access to any of these critical services.

5. I have been told that in order to get surgery I must take hormones. While I have taken hormones in the past outside of prison, I am afraid to go back on them because of the health risks. I know that there is a risk of blood clots, and that this risk is higher because of my age. So, I prefer not to go back on hormones. However, I feel like I have to go on hormones and risk my health in order to get the surgery that is necessary to treat my gender dysphoria.

6. I have filed multiple grievances about the denial of my treatment and lack of access to a private shower but have gotten no response. It seems like the grievances just disappear.

7. I feel like I am being suffocated by the process of trying to access the services that I am entitled to. I just want to be in a facility that follows the court orders and treats transgender inmates with respect.

8. On or about December 14, after several months of being housed by myself, the prison moved a man into my cell as a cellmate. I feel extremely unsafe with this man in my cell. He is always saying things to the effect of "fags this, fags that," and is connected to an organization that would not tolerate him living with a transgender person. I have to hide my gender identity from him so that he doesn't assault me.

9. Because of this man being moved into my cell, I can no longer wear my makeup, underwear, or bra. In fact, I have had to hide these items so that he does not find out about them. If our cell gets tossed, which is very likely because of the organization my cellmate is affiliated with, he will find out about these items and will hurt me. Because of this, I am thinking about throwing these items away. If I do this, I will not be able to replace them later. People are always standing around at commissary and watching what you buy, so it would be too dangerous for me to repurchase these items.

10. Being able to wear my makeup and gender affirming clothing items was the one comfort I had in the face of being denied access to gender affirming services by IDOC. It was the only time I was able to feel like myself. Now, I do not even have that comfort. This has put me into a state of continuous mental distress worrying about being assaulted and being denied the ability to safely be myself, even for a little while.

11. I believe that this man was moved into my cell in retaliation for my legal phone calls regarding this case, as well as for the grievances I have filed. I know that the guards are not allowed to listen in on legal phone calls, but I have often seen the guards take actions that seem to respond to something that I talked about on those private calls. I think that is the situation this time, as well.

12. Prior to speaking to one of the attorneys on this case on or about December 1, 2023, I had been told that I was required to be housed alone for my safety. All of the other transgender inmates I know of are also housed alone. However, two weeks after my legal call, this man, who is an extreme danger to me, was moved into my cell. I know that this is not a space issue, because there is an open cell right next to mine. I believe that this is an attempt to intimidate me or to get me physically assaulted or worse.

13. I have already filed grievances about this matter, to no avail. It is extremely important for my physical and mental safety that he be moved out of my cell as soon as possible.

14. I would like to transfer to somewhere that will provide me the care that I need.

15. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 12/21/2023__ /s/ [redacted] _ [redacted] _

[redacted]

Dated: _____________ __________________________

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 20, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 740

# (filed under seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | To be filed |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | **Attached** |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | **Attached** |
| 14 | [redacted] | [redacted] | [redacted] | N/A | **Attached** |
| 15 | [redacted] | [redacted] | [redacted] | **Attached** | To be filed |
| 16 | [redacted] | [redacted] | [redacted] | N/A | To be filed |

# Exhibit 4
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF** [redacted] M.L.

I [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at Menard Correctional Facility.

3. On October 12, 2023, I testified at the evidentiary hearing to support Plaintiffs' Motion to Transfer Class Member and All Class Members out of Pinckneyville Correctional Center. At the time of my testimony, I was living in Pinckneyville, and I wanted to be transferred to Logan Correctional Center or the PRISM program at the Centralia Correctional Center.

4. On or about October 13, 2023, I was transferred from Pinckneyville to Menard. Before the transfer, no one from the Illinois Department of Corrections asked me whether I wanted to be transferred to Menard. I did not want to go to Menard because I have lived there before. It is extremely dangerous for transgender people, and I was afraid that I would face retaliation for speaking up about my rights and filing grievances. I filed a lawsuit against a correctional officer at Menard [redacted] *v. Powell.*

5. When I arrived at Menard, despite having an ID that states that I am female and that I want a female officer to search me, I was strip-searched by a male officer, Officer Smith. Officer Smith showed me his large can of mace. I was afraid that he would spray me with mace if I did not let him strip-search me.

6. Afterward, I was placed in North 2 in a cell that did not have a mattress. I did not have a mattress for about six days.

7. When I first arrived, I did not receive any of my required medication including blister packs and hormone therapy. I believe that it is protocol when a new inmate arrives at a prison, that the person should be seen by medical staff. I have been at Menard for several weeks and I have not been evaluated by medical staff. I have repeatedly asked for medical attention.

8. On or about October 24, I went on suicide watch because I did not have a mattress and I believed that someone was messing with my food on my trays. I have not seen a mental health specialist in any serious way. Occasionally, someone from mental health will stop by my cell to ask if I am "good" but then they walk away.

9. On or about October 26, a male correctional officer took me out of my cell and told me that I was going to the room to see mental health. I was wearing a suicide watch smock. We went into a room and the door closed. While I was handcuffed, the male officer raped me. I screamed but no one heard me.

10. Afterward, I wrote a request for medical to see me, but no one visited me. I refused to wash up or shower that area of my body because I wanted to preserve the DNA but no one would give me a rape kit.

11. After I was on suicide watch, I was moved to housing in gallery 6 or 7 and I am in a single cell. There is one other transgender woman near me. The correctional officers use foul

language when talking about her. I hear them call her a "fag" or "gichy" an offense term for someone that is part of the LGBTQ community.

12. I try not to ask for anything from the correctional officers because I do not want them to do anything to me. The officers call me "fag" and "gichy," too.

13. I have spoken to both a nurse practitioner and mental health about receiving hormones and there are records that I used to receive hormones at other prisons. I have been at Menard for about a month, and no one has told me when I can receive hormones again. Not having hormones affects my gender dysphoria and it makes me feel terrible.

14. I have epilepsy but I have not received my medication since I was at Pinckneyville. Yesterday, I was shaking in my cell, and I was scared that I was going to have a seizure. I am worried that I will have a seizure, and no one will know about it or help me.

15. Recently, I have asked correctional officers and other staff for grievance forms, but I have been told that the printers are broken.

16. I cannot call PREA and report the rape because I do not get phone privileges in segregation.

17. I would like to transfer to Logan because I am woman or Centralia's PRISM program. If I must stay in a male maximum-security prison, I would prefer to transfer to Lawrence or Pontiac. While I have a pending case against a correctional officer at Lawrence, [redacted]*. Gonzalez*, No. 3:22-cv-00089-NJR (S.D. Ill), at least I received my hormones and medication there.

18. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 14, 2023 /s/ [redacted]

Dated: 11-27-2023 [redacted]

[1] Plaintiffs' counsel spoke with Ms [redacted] on November 14, 2023, by telephone. During this conversation, Ms [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms [redacted] once it is returned to them by U.S. Mail from Ms [redacted]

# Exhibit 5
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN BOWMAN, LATOYA HUGHES, and MELVIN HINTON,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF J.P.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is at Menard Correctional Facility.

3. I was transferred to Menard in early May 2023, from Pontiac Correctional Facility.

4. At Pontiac, I was on a hunger strike because they would not give me hormones or gender-affirming surgery.

5. I was transferred to Menard after my relationship with a mental health specialist was exposed. In February 2022, I filed a PREA complaint against the mental health specialist and I cooperated with IA for the investigation.

6. When I first arrived at Menard, they put me in the general population in a cell with a known sex offender. My mom called Springfield to complain. Then, they moved me into another cell with a known sex offender. The entire time I was scared.

7. I am afraid of the general population of men at Menard. I believe that someone would stab or rape me in the yard because I am transgender.

8. On or about May 6, I was forced to shower with twenty men. There were only ten shower heads which meant prisoners would stand naked waiting for the opportunity to shower. This was very dangerous for me, and I felt exposed. The next day, I filed a grievance because I did not have a private shower.

9. From about May 6 to early December, I refused to shower because I would have to shower with groups of men and that would be dangerous.

10. On or about November 30, I asked to be moved to protective custody. They put me in an intermediate waiting space which is the reception area for new arrivals. Since then, I have been able to use a single cell shower which is an improvement because I don't have to fear someone would jump me.

11. On or about December 12, 2023, at about 3:45 p.m., two correctional officers in tactical gear brought another transgender woman into the galley where my cell is located. The woman was yelling that she was raped by her cellmate and that she had DNA on her.

12. The correctional officers yelled at her "You fucking nigger tranny" or words to that effect.

13. They sprayed OC spray or mace. They sprayed so much OC spray that it affected the entire galley. My chuckhole was open because it was about time for dinner and the OC spray caused me to cough and my eyes teared up.

14. They moved this transgender woman into another cell near me. The two correctional officers returned with the woman's property and opened the door. I heard a slamming sound and scuffling sounds. The transgender woman was crying and screaming.

15. I tried to calm her down by talking to her but this entire incident was terrifying for me.

16. When I arrived at Menard, I was not evaluated for hormones. On or about May 5, I asked the woman who worked in mental health for hormones. She told me that I would have to wait six months to get hormones. Over six months have passed, and I have not received hormones.

17. During the entire time that I have been at Menard, I cannot ask for a female officer to search me. I am routinely strip-searched by male officers.

18. Several months ago, a correctional officer told me that the scanner was broken.

19. I tried to buy makeup from the commissary, but I was told that they wouldn't sell it to me and that I would need to go to protective custody to get it. I would love to have a razor to shave my body hair, but they do not let me have one. Having body hair on my chest & face causes me a lot of distress. JP 12/27/23

20. I would like to transfer to any prison that is not a hostile environment for transgender women. I would like to transfer to Logan, Centralia PRISM program, or another prison where I will be safe as a transgender woman.

21. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 18, 2023

/s/[redacted]

Dated: December 27, 2023

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 18, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel [redacted] supplement this declaration with a signed copy from Ms [redacted] once it is returned to them by U.S. Mail from Ms [redacted]

# Exhibit 7
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF MS. M.D.**

I, Ms [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since approximately March 2023.

3. The Menard correctional officers intimidate and harass class members. In or about November 2023, one male officer took me to the area where they keep inmates during transportation; it is called the bullpen. I asked the officer to take me back to my cell because it was cold near the bullpen. His response was, "I'm tired of you fag sissys." Later that day, the same male officer came to my cell, and even though I had my back turned to him, he sprayed Mace at me. He falsely claimed I tried to throw my TV at him.

4. On the same day as the incident above, another officer took me to the showers when the sergeant showed up and sprayed Mace at me. He then said, "one down, four to go," talking about transgender inmates.

5. Other people are around when I shower, and it makes me feel unsafe. I prefer washing up in my cell.

6. I have been trying to update my class member ID card to show my preferred gender for searches as female officers. However, I am still being searched by male officers, which makes me feel disrespected and violated. There is a body scanner at Menard, but the male officers rarely use it on me.

7. Correctional officers use disrespectful language like "gay sissy" when referring to class members. They do not address me as "Ms[redacted]" or use my preferred pronouns.

8. I have not had my hormone treatment in about a month. I used to take hormone pills, but the nurses switched me to patches over two months ago. I am supposed to get a patch twice a week. Dr. Katz said to stay on the pills until my patches arrived, but my pills ran out a month ago, and I still do not have the patches. This means I am not getting my regular hormone treatment right now. My emotions are all over the place, and I am having hot flashes. I filed an emergency grievance about a week ago, but there has been no response. One nurse checks in on me, but I still have not received my patches.

9. I have been trying to transfer to PRISM and get gender-affirming surgery for over 2 years, but IDOC is taking a long time with the process.

10. I do not feel safe at Menard.

11. I am very interested in transferring out of Menard. I want to leave Menard and join the PRISM program at Centralia Correctional Center. Eventually, I hope to be transferred to Logan Correctional Center.

12. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 11, 2023

/s/ Ms[redacted]

Dated: 1/11/24

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on November 9, 2023 and December 11, 2023, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Exhibit 8
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

STEVEN BOWMAN, LATOYA HUGHES, and MELVIN HINTON,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF C.B.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman known as a "T-girl" who is at Menard Correctional Facility.

3. I was transferred to Menard on or about March 23, 2023, from Dixon Correctional Facility.

4. I started hormones in 2017 before prison and took hormones at Dixon, but when I arrived at Menard, they stopped giving me hormones.

5. When I arrived at Menard, despite being a transgender woman, they put me in a cell with a male prisoner. Living with men is extremely dangerous for me and I am worried about my safety.

6. In or about May 2023, my male cellmate got drunk, became over-aggressive, and demanded oral sex. I told him no and he attacked me. I fought back and defended myself. Menard

disciplined me for fighting back by placing me in segregation on or about May 18, 2023, and I stayed until about October 18, 2023.

7. On the day that Menard put me into segregation, the male correctional officers took me to a cage where there were no cameras. The officers handcuffed me and beat up me, hurting my wrist. I was sprayed with pepper spray and strip-searched by force. They saw that I was wearing a bra and they laughed at me.

8. When I was in segregation, the nurse would walk by, and I would yell for hormones behind the door, but the correctional officers would tell the nurse not to give them to me. The officers would say I am being an "asshole."

9. When I was in segregation, I did not have my hormones or any female commissary items. That made me feel horrible.

10. When I was in segregation, the correctional officers would slam the door in my face. They treated me like I was nobody and they would call me a "fucking faggot."

11. On October 18, 2023, they reduced my discipline for defending myself from my cellmate's attack from one year to three months of segregation, but I still stayed in segregation for an extra two months.

12. I have mental health issues and I take psych medication. I am classified as SMI which means that I should not be in segregation for lengthy periods. Menard knew this information about me and still kept me in segregation for an extended time.

13. The entire time that I have been at Menard, only male correctional officers have conducted strip-searches of me. I cannot ask for a female officer to search me.

14. After I was released from segregation, Menard put me in a cell with another man. I am scared of him. He has hit on me and asked for oral sex. I tell him no. This gives me flashbacks of the attack by my other male cellmate that occurred in May 2023 at Menard.

15. After I was released from segregation, Menard started giving me hormones.

16. I do not have a private shower. I am forced to shower with groups of men. It does not matter that I have told the correctional officers that I am trans. Showering with men who can see my body makes me feel uncomfortable because they hit on me.

17. I try to stay humble and do not say anything back to the Menard correctional officers because I could go to segregation for something small.

18. In or about October 2023, I wrote to my counselor to ask for a transfer. I was told that I could not transfer because there was a medical hold for my shoulder. I was shot in 2012 and the bullet stayed in my arm. While it causes me pain, I take pain medication and I have not received any medical attention from a doctor that should prevent a transfer.

19. The Commissary often has little or no supplies for transgender women. I would like lotion, razors to remove body hair, and deodorant that smells feminine.

20. The entire time that I have been at Menard there has been no mental health support for me or other transgender women. There are no support groups.

21. I would like to transfer to Logan, Centralia PRISM program, or another prison where I will be safe as a transgender woman. If I must stay in Menard, I would like to live with another class member so that I am not in danger.

22. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 15, 2023

/s/[redacted]

[redacted]

Dated: 12/26/23

[redacted]

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 15, 2023, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# Exhibit 9
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) | |
| Defendants. | ) | |

**DECLARATION OF R.C.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a non-binary class member who is currently housed at the Menard Correctional Center. I have been at Menard since approximately April 2021.

3. I am currently being searched by male officers, but I would prefer to be searched by female officers which is indicated on my class member identification card.

4. A few months back, I was told that I did not meet the criteria to be confirmed as transgender, despite identifying as non-binary. My class member identification card still lists me as female, but I was not provided with any information from Menard officials on how to get recognized as part of the transgender and gender non-confirming population in IDOC.

5. Some officers at Menard call me derogatory names.

6. The most challenging part of being at Menard is the psychological and emotional distress I am experiencing. I struggle with depression, anxiety, feelings of unworthiness, and hopelessness.

7. I am very interested in transferring out of Menard. I really want to go to Centralia Correctional Center and be a part of the PRISM program.

8. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 6, 2023 /s/ [redacted]

Dated: November 29, 2023 [redacted]

[1] Plaintiffs' counsel spoke with [redacted] on November 6, 2023, by telephone. During this conversation, [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail [redacted]

# Exhibit 10
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF T.F.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman class member who is currently housed at Menard Correctional Center. I have been at Menard for approximately a month and a half.

3. When I was first brought to Menard, I was strip-searched by a male CO, Officer Baker, against my will, and despite the fact that my ID says that I should be searched by a female officer.

4. Officer Baker told me that Menard is "an all-male facility" and that they "don't do any of that gay shit." He threatened that if I didn't take my clothes off for the search he would pepper spray me and tear my clothes off. This frightened me, so I took my clothes off for the search, but I told him it was under protest.

5. Since I have been at Menard, I have been in segregated housing, in seg 6 gallery. I did not get a copy of my ticket until about a week ago, and I still have not been told how long I will have to stay in seg.

6. During my time here in seg 6, Officer House has been constantly sexually harassing me. He has said things like "I'm not with that gay shit, but you caught my eye." He has looked in on my cell while I was getting dressed, wearing only my bra and underwear. He calls me "sweetness," "hotness," and "juicy booty."

7. I had a conversation with Officer House where I asked him to leave me alone. He refused, and told me that he is taking advantage of the fact that I can't use the phone to call the PREA hotline while I'm in seg. I was able to file a PREA grievance against him, but I had to do it in writing rather than on the phone.

8. Even if I get out of seg, I know that while I am here at Menard I am going to have to check into protective custody. Transgender inmates who aren't in protective custody have things thrown at them by other inmates, such as water, cleaning solution, or urine. This has already happened to me as I was being taken back from showering, and the guard with me told me that there was nothing he could do about it. The prison will not honor transgender inmates' requests to house together in regular housing, so we end up housed with male inmates who are often violent toward us.

9. Protective custody is not a good solution to this housing problem, because you are kept in your cell basically all the time. You don't get to walk to chow, and you barely get to go to the yard. It's terrible for your mental health. The prison can also deny you protective custody, so I don't have a reliable safe alternative if my cellmate in regular housing is violent.

10. I am currently on hormones and people can see that I am a girl, which makes me feel very unsafe here at Menard. Already because of my appearance officers have denied me my food tray, and I have seen an officer spit in my food.

11. I have also recently been denied my hormones. When I first arrived at Menard, I was receiving my hormones as usual, which I take as a combination of daily pills and a weekly shot. Then, about a week ago they stopped giving me my pills. That same week, I noticed that my name wasn't on the medical list to go for my shot. When I asked why I was left off, the nurse told me that she was denying me my shot going forward because she didn't have a female officer available to be present while she does the shot. This was confusing to me because I never asked for a female officer to be present.

12. When I got my previous shots at Menard, there was always a male officer in the room watching me get the shot. The shot is given to me in my butt, so I have to have my pants pulled down as part of the procedure. Even though I was exposed, the nurse would leave the door to the room open, so any inmates or COs walking by could see in. I felt like this was an invasion of my privacy, but I did not complain.

13. I also have been unable to get replacement female undergarments, such as a bra and panties. The guards refuse to give me these things. The rulebook that I have tells me that I should contact Miss Wilkes in mental health if I am having trouble getting these items, because she is the coordinator for transgender inmates. I have tried to get in contact with her, but Officer House has been denying me access to mental health services, so I cannot speak with Miss Wilkes.

14. I feel like either I or one of the other transgender inmates is going to be killed with the way things are at Menard. There are a lot of people here in gangs, including many of the COs. The COs who are affiliated protect the inmates in gangs, and do whatever the inmates in gangs tell them to do. Transgender inmates are extremely unsafe here.

15. I am very interested in transferring out of Menard. I really want to go to Logan Correctional Center or Centralia Correctional Center and be a part of the PRISM program. If I

have to go to a maximum-security facility, I would like to go back to Lawrence. I would also be open to going to Big Muddy.

16. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 1-4-2024 /s/ [redacted]

# Exhibit 11
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF T.S.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman class member who is currently housed at Menard Correctional Facility. I have been at Menard for approximately five months.

3. It has been so long since I have gone to the shower that I cannot even remember the last time I went. The prison refuses to allow me access to a private shower. The regular showers have 10 shower heads for 20 people at a time. Because I have been on hormones in the past and have breast development, I am afraid that I will be assaulted if I shower with the men. So, instead I take “bird baths” using the sink in my cell.

4. I have a diagnosis of gender dysphoria but have not been given access to any kind of gender affirming care. I have spoken to my mental health provider repeatedly about getting information about surgery, getting a female marker on my ID, and getting access to a private shower. To my knowledge, no progress has been made on getting me access to any of these critical services.

5. I have been told that in order to get surgery I must take hormones. While I have taken hormones in the past outside of prison, I am afraid to go back on them because of the health risks. I know that there is a risk of blood clots, and that this risk is higher because of my age. So, I prefer not to go back on hormones. However, I feel like I have to go on hormones and risk my health in order to get the surgery that is necessary to treat my gender dysphoria.

6. I have filed multiple grievances about the denial of my treatment and lack of access to a private shower but have gotten no response. It seems like the grievances just disappear.

7. I feel like I am being suffocated by the process of trying to access the services that I am entitled to. I just want to be in a facility that follows the court orders and treats transgender inmates with respect.

8. On or about December 14, after several months of being housed by myself, the prison moved a man into my cell as a cellmate. I feel extremely unsafe with this man in my cell. He is always saying things to the effect of "fags this, fags that," and is connected to an organization that would not tolerate him living with a transgender person. I have to hide my gender identity from him so that he doesn't assault me.

9. Because of this man being moved into my cell, I can no longer wear my makeup, underwear, or bra. In fact, I have had to hide these items so that he does not find out about them. If our cell gets tossed, which is very likely because of the organization my cellmate is affiliated with, he will find out about these items and will hurt me. Because of this, I am thinking about throwing these items away. If I do this, I will not be able to replace them later. People are always standing around at commissary and watching what you buy, so it would be too dangerous for me to repurchase these items.

10. Being able to wear my makeup and gender affirming clothing items was the one comfort I had in the face of being denied access to gender affirming services by IDOC. It was the only time I was able to feel like myself. Now, I do not even have that comfort. This has put me into a state of continuous mental distress worrying about being assaulted and being denied the ability to safely be myself, even for a little while.

11. I believe that this man was moved into my cell in retaliation for my legal phone calls regarding this case, as well as for the grievances I have filed. I know that the guards are not allowed to listen in on legal phone calls, but I have often seen the guards take actions that seem to respond to something that I talked about on those private calls. I think that is the situation this time, as well.

12. Prior to speaking to one of the attorneys on this case on or about December 1, 2023, I had been told that I was required to be housed alone for my safety. All of the other transgender inmates I know of are also housed alone. However, two weeks after my legal call, this man, who is an extreme danger to me, was moved into my cell. I know that this is not a space issue, because there is an open cell right next to mine. I believe that this is an attempt to intimidate me or to get me physically assaulted or worse.

13. I have already filed grievances about this matter, to no avail. It is extremely important for my physical and mental safety that he be moved out of my cell as soon as possible.

14. I would like to transfer to somewhere that will provide me the care that I need.

15. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 1-23-24

/s/ [redacted]

# Exhibit 12
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] P.M.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since approximately September 18, 2023.

3. I have never been in a facility like Menard. Since I got here a few months ago, transgender individuals and anyone from the LGBTQ+ community have been retaliated against and harassed by both cisgender inmates and officers. They say discriminatory and derogatory things to us, and it feels like they can do it without consequences. Even though I am in protective custody, I am not actually protected. I still face danger every day.

4. Officers here retaliate and threaten to use Mace. In or around late November 2023, I was just talking to my neighbor on the gallery, which is allowed. But then this officer, out of nowhere, said, [redacted].shut the fuck up…shut the fuck up…if you don't shut the fuck up I'm

going to come up there and Mace you." I have also witnessed this officer threaten another inmate with Mace to be quiet.

5. Most officers do not use my preferred name or pronouns. They call me [redacted] and use "he" or "him." My gender identity is not respected here.

6. I am currently being strip-searched and pat down searched by male officers, even though my class member identification card says I should be searched by female officers. When I first got to Menard, and I told them I have to be searched by female officers, the officer at the time contacted the Lieutenant and the Lieutenant responded saying that I would have to accept male officers searching me.

7. I am on hormone pills, and I have been on hormones since 2012. Managing my hormones and medication at Menard has been challenging. Getting my hormone pills is inconsistent – some days they bring them, some days they do not, and there are times they claim to be out of stock. It is really unreliable. When I do raise this issue with medical staff, nothing gets done and there seems to be never-ending delays.

8. I have been approved for gender-affirming surgery for about six months now. Unfortunately, no one from IDOC has provided me with updates on the process, the next steps, or information about my in-person consultation. I have put in many sick calls asking for an update on this process.

9. I do not feel safe at Menard.

10. I am very interested in transferring out of Menard. I really want to go to Logan Correctional Center.

11. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: January 5, 2024 /s/[redacted]

Dated: 1-18-2024 [redacted]

[1] Plaintiffs' counsel spoke with Ms[redacted] on December 4, 2023, December 18, 2023, and January 5, 2024, by telephone. During these conversations, Ms[redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms[redacted] once it is returned to them by U.S. Mail.

# Exhibit 13
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF C.P.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at Menard Correctional Center. I have been at Menard since approximately August 23 or 24, 2023.

3. I have severe osteoarthritis and can only walk with difficulty; I have both a back and a knee brace, and I use a cane when I am provided with one. I do not have one at Menard.

4. On or about October 23, 2023, I was taken to Menard segregation because of a false disciplinary ticket.

5. I felt panicked on the way and had chest pains, was trying to do deep breathing to help.

6. When I got to the infirmary to be searched before being placed in segregation, there were three male staff to search me: correctional officers Williamson and Connors, and Sargeant Rose. I showed them the back of my class member ID, but they refused to respect it and searched me anyway. There are no cameras in the infirmary unit.

7. After I stripped, Officer Connor made me bend over and he penetrated my rectum with something hard. At the time I thought it was a finger, but it might have been a hard object such as a walkie-talkie antenna. It hurt very badly. He kept putting it in and pulling it out and putting it in again, and it kept pinching and pinching me until I was bleeding.

8. While this was happening, Officer Williamson hit me hard on the left side of the head several times to try to keep me quiet.

9. Connor called me "nigger" while he was assaulting me and all three staff called me "nigger," "fag," "bitch," "ho," "cunt," and said they were going to kill me.

10. After the attack I was all bloody. It forced me to defecate on myself.

11. At the time, I asked for a rape test kit but was denied. I wrote a grievance as best I could and got a receipt for it, but I have not heard anything more about it. (I have written a number of grievances about this incident and other incidents but have had no responses to any of them.) I put PREA complaints in on all of the staff who were involved in the search but nothing happened with the PREAs except that the mental health staff, Ms. Connor, who took the PREA complaints, told everyone what had happened. I know this is a violation of HIPAA.

12. Over two weeks after the attack, I was finally taken to a local hospital in Carbondale for an examination by an Illinois State Police medical examiner. The examiner, who was a woman, told me that she could still see evidence of the attack. A copy of the report is attached to this statement. However, nothing has happened since then. I should have been interviewed by the Illinois State Police but no one has come to interview me.

13. It still hurts me to sit down and to go to the bathroom; I try to sit down on a cushion I have made from clothes.

14. Although I have not been physically assaulted again since October 23, I am terrified of many of the staff at Menard. Correctional officer Dumar has been trying to upset me, and the other day the officer they call "Rock" took down the shower curtain while I still had my clothes off and was trying to dress and others could (and did) see me. Staff routinely call me a "bug," "fag," "nigger," "bitch," they tell me I am a "troublemaker" and not to talk to them.

15. I have been on hormones for approximately 4-5 years now and I have been told that my hormones are in a good range for surgery. I have repeatedly asked mental health staff, the transgender coordinators, and nurses to put me in for gender-affirming surgery but to my knowledge no one has done so; some of them have flat-out refused.

16. During the time I was in segregation at Menard, I could sometimes have a private shower, but one staff (correctional officer Mitchell) would always try to make me take a shower with other prisoners. I would refuse to come out for a shower and wash up in my cell instead. On one occasion when I refused to come out, he wrote a ticket on me claiming that I had thrown an unknown liquid substance on his leg and boot from under my cell door, which is physically impossible. I had washed up and was asleep in my cell when the incident he wrote up supposedly occurred. However, the ticket resulted in my having to stay in seg for another 28 days.

17. I am very, very, very frightened to be at Menard. I often feel like taking my life. I would like to go to Logan, but I believe I would at least be safer at Centralia or Joliet Treatment Center.

18. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 01/18/2024. /s/[redacted] [redacted]

Dated: 01/18/2024. [redacted]

[redacted]

[1] Plaintiffs' counsel spoke with Ms.[redacted] on January 8, 2024, by telephone. During these conversations, Ms[redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms[redacted] once it is returned to them by U.S. Mail.

Illinois State Police
Division of Forensic Service

**Patient Consent: Collect and Test Evid[illegible] [illegible] Collect and Hold Evidence**

CSN: 538592083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

SENT

DO NOT COMPLETE THIS BOX WITHOUT PATIENT'S CONSENT

Patient's Name ______________________________

DOB ____________ Hospital Medical Record No. ______________________

**Medical Forensic Exam:** Patient of any age. If patient is unable to provide consent due to age or mental status, consent may be obtained from parent or guardian.
Initial one choice [redacted] I consent to _____I decline a medical forensic exam. I understand I can stop the exam at any time and can decline any portion of the exam. I understand that I will not be charged for any outpatient portion of the medical forensic exam. If declined, I understand that I can return to any facility for medical attention.

**Evidence Collection:** Patient of any age. If patient is unable to provide consent due to age or mental status, consent may be obtained from parent or guardian.
Initial one choice _____I consent to _____I decline evidence collection. I understand I can stop the exam at any time and can decline collection of any sample. I understand that I will not be charged for any outpatient portion of the medical forensic exam. If declined, I understand that I can return to any treatment facility within 7 days of the assault and request that and evidence collection be completed

**Photographic Evidence:** (must be 13 years old or older. If under 13 years old, consent may be obtained from parent or guardian, please circle)
Initial one choice [redacted] I consent to _____I decline the collection of photographic evidence. I understand these photos may include injuries and photos of my genital area. I understand law enforcement may request photos independent of the medical forensic exam if I choose to make a report.

**Reporting Decision and Evidence Analysis:** Initial one choice only from the 5 options below.
(must be 13 years old or older. If under 13 years old, consent may be obtained from parent, guardian, law enforcement or DCFS)

| | |
|---|---|
| **Patient Report & Test: Option A Test** | ___ I am choosing to **provide information directly to a law enforcement officer.** I understand that I may decide how much information I provide and that I may stop the interview at any time. I give permission for evidence and information gathered during my medical forensic exam to be released to law enforcement and analyzed at the forensic lab. I understand law enforcement will submit the evidence to a lab no later than 10 days after receiving it. I understand if the evidence is analyzed, law enforcement will receive the results for the purposes of investigation(s) and prosecution(s). |
| **Health Care Provider Report & Test: Option B Test** | [redacted] am choosing to **allow health care providers** to provide information to law enforcement regarding the sexual assault. I acknowledge that I do not have to speak with law enforcement at this time. I give permission for evidence and information gathered during my sexual assault exam to be released to law enforcement and analyzed at the forensic lab. I understand law enforcement will submit the evidence to a lab no later than 10 days after receiving it. I understand if the evidence is analyzed, law enforcement will receive the results for the purposes of investigation(s) and prosecution(s). ○ I will call law enforcement ○ Law enforcement can call me after _____day(s) |
| **Patient Report & Hold: Option A Hold** | ___ I am choosing to **provide information directly to a law enforcement officer.** I understand that I may decide how much information I provide and that I may stop the interview at any time. I consent only to the **collection and storage** of evidence at a law enforcement agency. I understand this means the evidence will NOT be submitted to a forensic lab for analysis. I understand I can change my mind, release the evidence and possibly have evidence analyzed at a forensic lab by contacting law enforcement or a rape crisis center at a later time. I understand law enforcement is only required to hold the evidence for a minimum of 10 years or until the 28th birthday of a patient under the age of 18. |
| **Health Care Provider Report & Hold: Option B Hold** | ___ I am choosing to **allow health care providers** to provide information to law enforcement regarding the sexual assault. I acknowledge that I do not have to speak with law enforcement at this time. I consent only to the **collection and storage** of evidence at a law enforcemen agency. I understand this means the evidence will NOT be submitted to a forensic lab for analysis. I understand I can change my mind, release the evidence and possibly have evidence analyzed at a forensic lab by contacting law enforcement or a rape crisis center at a later time. I understand law enforcement is only required to hold the evidence for a minimum of 10 years or until the 28th birthday of a patient under the age of 18. ○ I will call law enforcement ○ Law enforcement can call me after _____ day(s) |
| **Non-Report & Hold: Option C Hold** | ___ At this time I am choosing **NOT TO REPORT TO LAW ENFORCEMENT OR PARTICIPATE** in any investigation. I consent only to the **collection and storage** of evidence at a law enforcement agency. I understand this means the evidence will NOT be submitted to a forensic lab for analysis. I understand I can change my mind, make a report to law enforcement and possibly have evidence analyzed at a forensic lab by contacting law enforcement or a rape crisis center at a later time. I under- stand law enforcement is only required to hold the evidence for a minimum of 10 years or until the 28th birthday of a patient under the age of 18. (See page 2 mandated reporter clause) |

X [redacted]
Sign here if patient or health care provider report selected

______________________
Initial here if non-report and hold selected

Original to law enforcement case file, copy to hospital medical record, copy to patient.
**DO NOT SEAL THIS PAGE IN THE EVIDENCE COLLECTION KIT**

ISP 6-003 (06/23)

Illinois State Police
Division of Forensic Services

Step 13

PERRY, SIDNEY "Sidney"
DOB:11/17/86 M56 y.o. 11/8/2023

## Patient Discharge Materials page 2

****Consider screening pre-pubescent patients for STIs if:**

| | |
|---|---|
| Child is unable to verbalize details of the assault | Abuse by a stranger |
| Abuse by assailant known to be infected with or at high risk for an STI | Child lives in an area with high rate of STI |
| Child, sibling or another person in household with STI | Child or parent requests STI testing |
| Penetration or evidence of recent or healed penetrative injury to genitals, anus or oropharynx | |
| Signs or symptoms of STIs (vaginal discharge or pain, genital itching or odor, urinary symptoms, and genital lesions or ulcers) | |

**Counseling/Support Services:** As a survivor of sexual assault, you may experience sleep disturbances, anxiety, irritability, depression and other symptoms. These are normal reactions to trauma. You are encouraged to seek help in dealing with the effects of surviving an assault. Rape crisis centers offer free counseling services. You may call your local rape crisis center or 1-800-656- HOPE (4673) to schedule an appointment.

**Follow-up Health Care Provider:** SIU Family Medicine **Phone Number:** 618-536-10621

| | | |
|---|---|---|
| **< 1 week: If any positive test**<br>o Discuss results<br>o Provide treatment (if not administered at initial visit)<br>o Discuss follow-up for infections<br>o Re-check injuries if needed | **1-2 Weeks: If tests negative and treatment not provided**<br>o Repeat STI testing (detects infections that might not have produced a positive test result at the initial examination)<br>**Pre-pubescent:**<br>o If no infections identified or no diagnostic testing performed, consider follow-up with a qualified medical provider at approximately 2 weeks after the last exposure | **1-2 Weeks: If treatment provided at initial visit**<br>o Post treatment testing (only if having symptoms)<br>o Burning or pressure during urination<br>o Sores, blisters, white and/or gray growths or warts<br>o "Flu-like" symptoms<br>o Discharge or unexplained bleeding<br>o Pelvic pain or painful intercourse<br>o Rash on groin, mouth, palm of hands, arms, legs or torso<br>o Swollen areas in groin |
| **4-6 weeks**<br>o Blood test for syphilis<br>o Blood test for HIV<br>o Assess for anogenital warts<br>o Hepatitis B test (pre-pubescent)<br>o 2nd hepatitis B vaccination (if needed)<br>o 2nd HPV vaccination (if needed)<br>o Pregnancy test (if no period since assault) | **3 months**<br>o Blood test for syphilis<br>o Blood test for HIV<br>o Assess for anogenital warts<br>o Hepatitis B test (pre-pubescent) | **6 months**<br>o 3rd Hepatitis B vaccination (if needed)<br>o 3rd HPV vaccination (if needed)<br>o Assess for anogenital warts |

**Initial for documents and information you have received:**

✓ Medical Forensic services fact sheet
✓ Crime Victim Compensation
✓ Voucher for follow-up care (if applicable) NA
✓ After Sexual Assault brochure
✓ Hospital Billing Notice

NA Kit Tracking information envelope and Pin (Scan QR code or go the this website: https://paets.isp.illinois.gov/ )

K# and Pin Sticker (Patient copy only)

Other: (Check if appropriate)

- It is recommended that you use condoms or abstain from intercourse until STI prophylactic treatment is completed and all your cultures and blood tests return and are negative.
- Bring these discharge instructions with you to the follow-up appointment. This will help the follow-up healthcare provider.
- If you notice any new bruising, contact the law enforcement agency you reported to so they may take additional photographs.
- If you have any questions regarding the medical forensic examination or medications, please contact the examining health professional listed at the top of the paperwork.
- If you experience severe pain, heavy bleeding, breathing problems and/or other serious medical complaints, you should call 911 or return to the emergency department immediately.

**THE ABOVE INFORMATION HAS BEEN REVIEWED AND I HAVE NO ADDITIONAL QUESTIONS AT THIS TIME.**

PATIENT SIGNATURE: X [redacted] DATE: 11-8-23

HEALTH CARE PROVIDER SIGNATURE: [signature] DATE: 11-8-23

ISP 6-004 (06/23) Original to patient, copy to hospital medical record

CSN: 538592083 MRN: 1571588
SIDNEY
DOB:11/17/86 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 13

Label)

## Patient Discharge Materials page 1

| | |
|---|---|
| Patient Name | DOB/Age |
| Hospital Name MHC | Phone # (618-549-0721 |
| Examining Health Professional M Mayburn RN | Date of Exam 11-8-23 |

**Press firmly and mark all appropriate boxes below while providing patient with information and/or medications.**

| | Discussed & Completed | Discussed & Declined | Adult/Adolescent Patients (For alternate therapy refer to CDC guidelines*) | Pre-pubescent patients** |
|---|---|---|---|---|
| **Gonorrhea** | ☑ Testing<br>☐ Genital/Urine (Urine circled)<br>☐ Oral<br>☐ Anal<br>☐ Medication | ☐ Testing<br>☐ Genital/Urine<br>☐ Oral<br>☐ Anal<br>☐ Medication | ☑ Rocephin (Ceftriaxone) 500 mg IM injection single dose for patients weighing less than 150kg<br>*OR*<br>☐ Rocephin (Ceftriaxone) 1g IM injection single dose for patients weighing greater than or equal to 150kg | Testing REQUIRED before treatment<br>Presumptive treatment is not recommended |
| **Chlamydia** | ☑ Testing<br>☐ Genital/Urine (Urine circled)<br>☐ Oral<br>☐ Anal<br>☐ Medication | ☐ Testing<br>☐ Genital/Urine<br>☐ Oral<br>☐ Anal<br>☐ Medication | ☑ Doxycycline 100 mg by mouth twice a day for 7 days | Testing REQUIRED before treatment<br>Presumptive treatment is not recommended |
| **Trichomonas** | ☑ Testing<br>☐ Genital/Urine (Urine circled)<br>☐ Medication | ☐ Testing<br>☐ Genital/Urine<br>☐ Medication | ☐ Female: Flagyl (Metronidazole) 500mg by mouth twice a day for 7 days<br>☑ Male: Prophylactic treatment not generally recommended unless indicated by history | Testing REQUIRED before treatment<br>Presumptive treatment is not recommended |
| **Pregnancy (Emergency Contraception)** | ☐ Testing<br>☐ Urine<br>☐ Blood<br>☐ Medication | ☐ Testing<br>☐ Medication<br>☑ N/A (age or gender) | ☐ Plan B Onestep (Levonorgestrel) 1.5mg by mouth single dose up to 72 hours after assault<br>☐ Ella (Ulipristal acetate) 30 mg by mouth single dose up to 5 days after assault | N/A |
| **Anti-emetic** | ☐ Medication | ☑ Medication | ☐ Zofran (Ondasteron hydrochloride) 4 mg by mouth | ☐ Administer per protocol (if needed) |
| **Tetanus** | ☑ Medication | ☐ Medication | ☑ Tdap or Td vaccine | Check immunization history |

**Case-By-Case Basis According to Risk**

| | | | | |
|---|---|---|---|---|
| **HIV-** Must start within 72 hours | ☑ Testing<br>☐ Medication | ☐ Testing<br>☐ Medication<br>☑ N/A (over 72 hours) | ☐ Truvada (Tenofovir 300mg + Emtricitabine 200mg daily) by mouth daily *PLUS* Isentress (Raltegravir 400mg) by mouth twice a day for 28 days<br>*OR*<br>☐ Truvada (Tenofovir 300mg + Emtricitabine 200mg daily) by mouth daily *PLUS* Tivicay (Dolutegravir 50mg) by mouth daily for 28 days | Baseline blood testing on case-by-case basis depending on the likelihood of infection among assailant(s) |
| **Syphilis** | ☑ Testing: preferred<br>☐ Medication: not commonly indicated | ☐ Testing<br>☐ Medication | Due to long incubation periods, presumptive early treatment is **ONLY** recommended for a **KNOWN**** exposure to early syphilis within 90 days of exposure<br>(***Known exposure is defined as an assailant with a confirmed early syphilis diagnosis*)<br>☐ Benzathine Penicillin G 2.4 million units IM single dose | **Baseline blood testing** on case-by-case basis |
| **HPV** Age 9-26 years | ☐ Testing: visual screening<br>☐ Medication | ☐ Testing<br>☐ Medication<br>☑ N/A (age) | ☐ Gardasil 9 0.5ml IM injection (physician discretion age 26-45 years) | ☐ Gardasil 9 0.5ml IM injection (see age limits) |
| **Hepatitis B** | ☑ Testing<br>☑ Medication | ☐ Testing<br>☐ Medication | ☐ Hepatitis B vaccine booster: ____<br>☐ Hepatitis B vaccine: ____<br>☐ Hepatitis B immune globulin (HBIG) 0.06 mL/kg (See guidelines for more detailed instructions) | Baseline blood testing on case-by-case basis |

**The hospital should provide you with a medication instruction sheet for any medication that was provided to you in addition to this discharge instruction sheet.**

***CDC Treatment Guidelines Website:** https://www.cdc.gov/std/treatment-guidelines/default.htm

ISP 6-004 (06/23)

Original to patient, copy to hospital medical record

CSN:538592083 MRN:...571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

**Medical Forensic Documentation Forms**

page 1

| | |
|---|---|
| Legal Name: [redacted] | Current Name: |
| Address: [redacted] | |
| City: Menard | State: IL Zip: [redacted] County: Randolph |
| Contact Number: [redacted] | |
| DOB: [redacted] Menard Correctional Ctr | Age: 56 |
| Sex Assigned at Birth: M | Race: Black |

| | |
|---|---|
| Examiner: M. Newbury RN AASANE | Name of Guardian: N/A |
| Exam Date: 11-8-23 | Person Providing History: patient |
| Exam Begin Time: 1945 | Relationship to Patient: self |
| Medical Facility: MHC | Persons Present During Exam: Michele - SANE |
| Medical Facility Contact Number: 618-549-0721 | Lt Fitzgerald, CO Shepard |

Avoid multiple interviews. Take time to establish rapport. Avoid leading or yes/no questions. Use direct quotes whenever possible. Avoid surprise or negative emotions, while still showing concern and support.

| |
|---|
| Date of Assault: 10-23-23 |
| Time of Assault: 0120 |
| Location/ Physical Surroundings of Assault: Menard Correctional Center assault happened upstairs in infirmary |
| Name and/or Description of Assailant(s): (If assailant is under the age of 18, document age if known) |
| 1. CO Connor MCC employee<br>Relationship to Patient (if known): |
| 2. B. Williamson MCC employee<br>Relationship to Patient (if known): |
| 3.<br>Relationship to Patient (if known): |

ISP 6-002 (6/23) White (Original) to Hospital Medical Record; Yellow in Kit

CSN: 538552083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

**Medical Forensic Documentation Forms**

page 2

[illegible] attach additional pages if needed. Use [illegible] avoid leading or yes/no questions.

Information provided by: Patient

Pt reports having 2 offices at Menard Correctional Center take him to segregation. On the second floor, he was taken into the infirmary where he was forced to undress. Pt states "they took me into the infirmary where there are no cameras. CO Connor made me bend over and he put his fingers in and out of my rectum." "B. Williamson slapped me on the head." Pt reports burning sensation to anal area, and hematoma to (L) head. Pt states he reported to IA Hanks at MCC.

M Newbey RN AASANE

CSN: 538592083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

**Medical Forensic Documentation Forms** **page 3**

[illegible]

- ☐ Information not obtained at this time due to patient being pre-pubescent, unconscious, intubated, or other (please explain) ______________________ (Go to page 4):

**Penetration of Female Sex Organ (Vulva) by:** ☒ N/A

| | | | | | |
|---|---|---|---|---|---|
| Penis: | ☐ Yes | ☐ No | ☐ Touched | ☐ Unknown | |
| Finger: | ☐ Yes | ☐ No | ☐ Touched | ☐ Unknown | |
| Object: | ☐ Yes | ☐ No | ☐ Touched | ☐ Unknown | What: ______ |
| Mouth: | ☐ Yes | ☐ No | ☐ Touched | ☐ Unknown | |

**Penetration of Anus by:**

| | | | | | |
|---|---|---|---|---|---|
| Penis: | ☐ Yes | ☒ No | ☐ Touched | ☐ Unknown | |
| Finger: | ☒ Yes | ☐ No | ☐ Touched | ☐ Unknown | |
| Object: | ☐ Yes | ☒ No | ☐ Touched | ☐ Unknown | What: ______ |
| Mouth: | ☐ Yes | ☒ No | ☐ Touched | ☐ Unknown | |

**Did Patient Have Oral Contact with Assailant's:** (If yes, Miscellaneous Swab Collection Envelope may be appropriate)

| | | | | |
|---|---|---|---|---|
| Female Sex Organ (Vulva): | ☐ Yes | ☐ No | ☐ Unknown | ☒ N/A |
| Penis: | ☐ Yes | ☒ No | ☐ Unknown | ☐ N/A |
| Anus: | ☐ Yes | ☒ No | ☐ Unknown | |
| Mouth: | ☐ Yes | ☒ No | ☐ Unknown | |

Other (including biting): ______________________

**Did Assailant Have Oral Contact with Patient's:** (If yes, Miscellaneous Swab Collection Envelope may be appropriate)

| | | | | |
|---|---|---|---|---|
| Penis: | ☐ Yes | ☒ No | ☐ Unknown | ☐ N/A |
| Mouth: | ☐ Yes | ☒ No | ☐ Unknown | |

Other (including biting): ______________________

**Was any part of the patient's body kissed, licked, sucked or bitten?** (If yes, see Miscellaneous Swab Collection Envelope) ☐ Yes ☒ No ☐ Unknown

Describe: ______________________

**Did Patient Scratch Assailant:** (If yes, see Fingernail Specimen Envelope) ☐ Yes ☒ No ☐ Unknown

**Did Ejaculation Occur Outside:** (If yes, see Miscellaneous Swab Collection Envelope)

☐ Yes ☒ No ☐ Unknown Where: ______________________

**Did Ejaculation Occur Inside:** ☐ Yes ☒ No ☐ Unknown

**Condom Used by Assailant:** ☐ Yes ☒ No ☐ Unknown

Where Discarded: ______________ ☐ Unknown

CSN: 538592083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/88 M58 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

**Medical Forensic Documentation Forms**

page 4

[illegible]

○ Information not obtained at this time due to patient being pre-pubescent, unconscious, intubated, or other (please explain) ________ (Go to page Post-Assault Hygiene/Activity):

| | | | | |
|---|---|---|---|---|
| Weapon(s): | ☐ Yes | ☑ No | ☐ Unknown | Describe |
| Punched/Slapped/Kicked: | ☑ Yes | ☐ No | ☐ Unknown | Describe (L) head, hematoma, tender |
| Grabbed/Held Down: | ☑ Yes | ☐ No | ☐ Unknown | Describe bent over by guard |
| Physical Restraints: | ☐ Yes | ☑ No | ☐ Unknown | Describe |
| Burned: | ☐ Yes | ☑ No | ☐ Unknown | Describe |
| Verbal Threats: | ☐ Yes | ☑ No | ☐ Unknown | Describe |
| Use of Ligature: | ☐ Yes | ☑ No | ☐ Unknown | Describe |
| Strangulation: (If yes, complete a strangulation assessment) | ☐ Yes | ☑ No | ☐ Unknown | Describe |

Other ________

[illegible]

| | | | | | | |
|---|---|---|---|---|---|---|
| Urinated: | ☑ Yes | ☐ No | Vomited: | ☐ Yes | ☑ No | |
| Defecated: | ☑ Yes | ☐ No | Ate/Drank: | ☑ Yes | ☐ No | |
| Genital Wipe/Wash: | ☑ Yes | ☐ No | Brushed Teeth: | ☑ Yes | ☐ No | |
| Bathed: | ☐ Yes | ☑ No | Chewed Gum: | ☐ Yes | ☑ No | |
| Showered: | ☑ Yes | ☐ No | Smoked: | ☐ Yes | ☑ No | |
| Clothing change | ☑ Yes | ☐ No | Douched: | ☐ Yes | ☐ No | ☑ N/A |

Removed/Inserted a Tampon, Diaphragm, Sponge, Maxi pad (circle): ☐ Yes ☐ No ☑ N/A

[illegible]

| | | | |
|---|---|---|---|
| Loss of Memory: | ☐ Yes | ☑ No | ☐ Unknown |
| Loss of Consciousness: | ☐ Yes | ☑ No | ☐ Unknown |
| Nausea/Vomiting: | ☐ Yes | ☑ No | ☐ Unknown |
| Drug/Alcohol Use by Patient: | ☐ Yes | ☑ No | Describe: |

If the patient answered yes to any of the above questions, consider collecting toxicology samples. A urine specimen should be collected as evidence if DFSA is suspected. DO NOT INCLUDE URINE SPECIMEN IN THE KIT. The urine should be sealed, labeled and packaged separately and turned over to law enforcement per patient consent. Complete the "Consent To Toxicology" form and provide with the urine specimen. This form is available at www.isp.illinois.gov under the Forensics tab.

Urine Sample Obtained for Crime Lab: ☐ Offered and performed ☐ Offered and declined ☑ N/A

[illegible]

Was underwear collected: ☐ Yes ☑ No Was clothing collected: ☐ Yes ☑ No

Describe condition of underwear and/or clothing: ________

Illinois State Police
Division of Forensic Services

Step 2

CSN: 538592083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

**Medical Forensic Documentation Forms**



Last Menstrual Period: Date: ______________ [x] N/A

Sexual Contact within 3 Days (other than sexual assault): ☐ Yes ☐ No [x] N/A

| | | | |
|---|---|---|---|
| Female Sex Organ (Vulva) Contact: | ☐ Yes | ☐ No | ☐ N/A |
| Penile Contact: | ☐ Yes | ☐ No | ☐ N/A |
| Anal Contact: | ☐ Yes | ☐ No | ☐ N/A |
| Oral Contact: | ☐ Yes | ☐ No | ☐ N/A |
| Condom Used: | ☐ Yes | ☐ No | ☐ N/A |

Record all trauma on the diagrams below which may be used in a criminal proceeding. Trauma includes: burns, lacerations, abrasions, redness, scratches, bruises, bites, patterned injury, fractures and stains/ foreign materials on body, swelling, and tenderness. Be sure to note even the most minor signs of trauma. Document size, shape and color description for all findings. Add another page if more space is needed. Indicate if photos were taken, ALS used, patient report of how trauma occurred, etc.

Right Left Right Left




Happen 10/23/23

Alternative light source used ☐ Yes [x] No Describe: ______________

Photos taken [x] Yes ☐ No

CSN: 538592083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

**Medical Forensic Documentation Forms**



Record all trauma on the diagrams below which may be used in a criminal proceeding. Trauma includes: burns, lacerations, abrasions, redness, scratches, bruises, bites, patterned injury, fractures and stains/foreign materials on body, swelling, and tenderness. Be sure to note even the most minor signs of trauma. Document size, shape and color description for all findings. Add another page if more space is needed. Indicate if photos were taken, ALS used, patient report of how trauma occurred, etc.




Alternative light source used ☐ Yes ☒ No Describe: ____________
Photos taken ☒ Yes ☐ No

ISP 6-002 (6/23) White (Original) to Hospital Medical Record; Yellow in Kit

CSN: 538592083 MRN: 1571588
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

## Medical Forensic Documentation Forms



Record all trauma on the diagrams below which may be used in a criminal proceeding. Trauma includes: burns, lacerations, abrasions, redness, scratches, bruises, bites, patterned injury, stains and foreign materials, swelling, and tenderness. Be sure to note even the most minor signs of trauma. Document size, shape and color description for all findings. Use hours of the clock to describe location. Add another page if more space is needed. Indicate if photos were taken, patient reports how trauma occurred, etc.

| | | | | |
|---|---|---|---|---|
| Lateral-Down Separation: | ☐ Yes | ☐ No | ☑ N/A | Describe: |
| Outward Traction: | ☐ Yes | ☐ No | ☑ N/A | Describe: |
| Toluidine Blue Dye: | ☑ Yes | ☐ No | ☐ N/A | Describe: ⊕ uptake - anus |
| Foley Cath/Fox Swab: | ☐ Yes | ☐ No | ☑ N/A | Describe: |
| Ano-genital Photos taken | ☑ Yes | ☐ No | | |

Sexual Maturation Stage/Tanner Stage:
Breast ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☑ N/A
Pubic Hair ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5

Exam Positions: ☐ Lithotomy ☐ Frog- Leg ☐ Supine Knee Chest ☐ Prone Knee Chest ☐ Stand and Lean Over ☑ Other: L side lying

☐ Declined exam
☑ N/A



Hymen Description: ______

☐ Declined exam
☐ N/A




Circumcised: ☐ Yes ☑ No
Foreskin retracted: ☑ Yes ☐ No
Testes descended: ☑ Yes ☐ No

DO NOT PLACE A SPECULUM in a prepubescent female child. A minimal amount of water soluble, non-spermicidal lubricant or sterile water may be used for lubrication when speculum insertion is appropriate. Note injuries on diagram.

☐ Declined exam
☐ N/A Prepubescent



Lubricant used: ☐ Yes ☐ No

☐ Declined exam




Able to visualize anal verge: ☐ Yes ☑ No

CSN: 538592083 MRN: 1571586
PERRY, SIDNEY "Sidney"
DOB:11/17/66 M56 y.o. 11/8/2023

Illinois State Police
Division of Forensic Services

Step 2

# Medical Forensic Documentation Forms



[illegible]

Photographic documentation of injury and/or other visible evidence can be utilized to supplement the medical forensic history and written documentation. Consider the extent of forensic photography necessary. Be considerate of patient comfort and privacy. Take photographs according to hospital policy. Photographs taken by examiners should be considered as part of the patient's medical record and not automatically turned over to law enforcement. Photographs may be taken with the written consent of patient's 13 years of age or older. If under the age of 13, the patient's parent or guardian may provide consent. If the parent or guardian is not immediately available or refuses to consent, photographs may be taken and stored for release at a later time with consent of the investigating law enforcement officer or the Department of Children and Family Services.

[illegible] regarding whether an assault occurred.
[illegible] (DCFS, shelter, etc.).

pt calm and cooperative with exam. 2 guards remained in room during exam, and at all times.

[illegible]

| | |
|---|---|
| If the patient is less than 18 years of age, was DCFS notified, if appropriate? | ☐ Yes ☑ N/A |
| If the patient is 60 years of age or older, was the Department of Aging notified, if appropriate? | ☐ Yes ☑ N/A |
| If the patient is between the ages of 18-59, has a disability, and is unable to self-report, was the Department of Aging notified? | ☐ Yes ☑ N/A |
| Was "Patient Consent: Collect and Test or Collect and Hold Evidence" form completed? | ☑ Yes ☐ No |
| Was "Consent to Toxicology" form completed? | ☐ Yes ☑ N/A |
| Were police notified? If no, indicate why: ______ | ☑ Yes ☐ No |

[illegible]

| | |
|---|---|
| M Newbury RN (Examining Health Professional Signature) | [signature] (Assisting Health Professional Signature) |
| Michele Newbury RN AASANE (please print) | (please print) |

[illegible]

1. All information requested on sample envelopes and bag labels are completed.
2. Separate forms and follow distribution requirements on the bottom of each form.
3. If underwear and/or clothing bags and urine are collected: seal, label, and package separately from the kit. Complete *Toxicology Consent* form. **DO NOT PACKAGE URINE, UNDERWEAR OR CLOTHING INSIDE THE KIT.**
4. Return all evidence envelopes to the kit box.
5. Initial red evidence tape and secure to kit box.
6. Fill out information, as appropriate, on top of box.
7. Hand the sealed kit, sealed bags, and sealed urine sample to appropriate law enforcement agency.

NOTE: If law enforcement is not present: place sealed kit, sealed bags, and sealed urine sample at room temperature in a secure area, maintaining chain of custody until law enforcement can collect the evidence.

# Exhibit 14
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) | |
| Defendants. | ) | |

**DECLARATION OF** [redacted] D.F.

I[redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since about June 7, 2022.

3. It is very unsafe to be a transgender woman at Menard and I have repeatedly applied for protective custody, but I have been denied. I do not feel safe living in the general population because there are a lot of sexually aggressive and violent people toward the LGBTQ population at Menard.

4. In or about September or October 2023, after I was denied protective custody, I was on "kick out status" in the 5-gallery intake housing. They placed me in a cell with a man who was a known sex offender. He groped me when I was asleep. Although I was scared, I did not feel it was safe to report it.

5. Later when I applied for protective custody, I told the internal affairs officer that my cellmate, who was a sex offender, groped me while I was asleep. Afterward, I was not placed in housing with this man for several months.

6. Recently, in or about December 2023, my request for protective custody was denied and they placed me in the cell with the man who groped me. I told a correctional officer that I should not be in a cell with this man. The correctional officer said they would call placement. The correctional officer returned and told me that the man who groped me would continue to be my cellmate.

7. I do not understand why they do not place me or other transgender women in protective custody. I have seen empty single cells, but I keep getting denied.

8. Officials at Menard have known that I am transgender for about a year, and they have done little to help me. In or about January 2023, I spoke with a PREA investigator and told her that I was a transgender woman. Afterward, on or about January 16, 2023, I notified Menard that I wanted to change my gender to female by filing a grievance. I was told I that needed to meet with the Transgender Mental Health Coordinator, Ms. Wilks.

9. Beginning in about January or February 2023, I met with the Transgender Mental Health Coordinator, Ms. Wilks. I asked to be placed in protective custody because I felt unsafe. I also, requested hormones, a new ID that reflects that I am a woman, a private shower, and to be searched by female officers. Ms. Wilks gave me Transgender Commissary form which had items but no prices, I filled it out and requested black eyeliner and nail polish. I also requested a bra and feminine clothing.

10. I continued to meet Ms. Wilks for about six or seven months. She diagnosed me with gender dysphoria, but I never received a new ID, hormones, a private shower, searches by female officers, feminine clothing, or even eyeliner and nail polish.

11. After six or seven months of receiving nothing to help me as a transgender woman, I became discouraged and stopped seeing Ms. Wilks.

12. Not having an ID which reflects that I am a woman, means that men conduct strip searches of me. I feel unsafe, violated, and depressed when this happens. It also means that I cannot shower without men watching me.

13. I have requested and wanted hormones for a long time, and I have been ignored by mental health repeatedly. I am having a hard time living at Menard. There is nothing for me and no one seems to care.

14. I believe that Menard officials are planning on transferring me to a section of Menard which is medium security because my aggression level is lower, and I have not received a disciplinary ticket in a long time. I am worried because medium security does not have protective custody. I am worried that in the general population, someone will attack me because I am transgender.

15. I want to transfer out of Menard. I want to go to Logan Correctional Center and live with other women. I do not want to transfer to Pontiac because I have heard that although it has protective custody, a lot of sex offenders and rapists are housed there, and it is unsafe for transgender women.

16. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 1\18\24 [redacted]

# Exhibit 15
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF D.L.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since approximately March 2022.

3. The correctional officers at Menard do whatever they want here. In or around February 2023, I asked to see a mental health professional. I was taken out of my cell by an officer with my hands cuffed behind my back. As we walked down the hallway, the officer asked me about something that happened yesterday with my food tray. I did not respond to the officer at first, but after awhile I asked him, “Why are you trying to get a reaction out of me?” When we got to the room for mental health, at least three officers began beating me. This included the officer who was walking me to mental health. While I was still in handcuffs, they hit me with their fists about 12 to 15 times. My jumpsuit fell down to my waist when I was being hit and my skin turned red. There are no cameras in the evaluation room.

4. After this incident, I talked to Internal Affairs but as far as I know, nothing came of it. In fact, the officers have made up a story that I was the one who assaulted them, and I am now going to court over it.

5. This is the norm at Menard. Officers get away with this type of behavior. When I went to segregation recently, one of the officers who had previously beat me cavity checked me.

6. I have also been Maced by officers twice in the face and placed in segregation afterwards. This means I am not able to wash my eyes for around 25 minutes while I am being transported to segregation. I feel like my vision has gotten worse because I have been Maced. Officers are supposed to give a warning before using Mace, but they do not do that. I have also seen them Mace people dealing with a mental health crisis and even laugh about it.

7. Most officers do not use my preferred name or pronouns.

8. I do not have access to a private shower. I shower alone, but the curtains are not up, so just the shower door partially covers you, and anyone in the general population walking by may see you. This makes me feel exposed and like a specimen. Other people in the prison know you are transgender if you take a shower by yourself.

9. I am currently being strip-searched and pat down searched by male officers, even though my class member identification card says I should be searched by female officers. Officers have only used the body scanner on me once when I was going to court. This happened a few months ago.

10. Officers at Menard have been fabricating disciplinary tickets, particularly targeting transgender inmates. In September 2023, an officer falsely accused me of threatening to attack them, which I did not do. The officer had denied me my outdoor time because I wanted to bring a book with me outside. The officer returned to my cell about an hour later and began intimidating

me, saying things like, "What's your problem?" Out of fear, I did not respond to the officer, and when I remained silent, they made up a story about me threatening to assault them. I received a disciplinary ticket for this, and they sent me to segregation for almost a week.

11. I do not feel safe at Menard.

12. I am very interested in transferring out of Menard. I really want to go to Logan Correctional Center.

13. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: January 25, 2024 /s/ [redacted]

[redacted]

Dated: ____________________ ______________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 3, 2023, December 22, 2023, and January 25, 2024, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 763

# (filed under seal)

## EXHIBIT INDEX
## DECLARATIONS OF MENARD INMATES

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | **Attached** |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; **Amended attached** |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | **Attached** |
| 16 | [redacted] | [redacted] | [redacted] | N/A | **Attached** |

# Exhibit 3
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF A.M.**

I [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman. Since October 2022 I have been living at Menard Correctional Facility. Throughout this time, I have been suffering threats of and actual sexual violence by male guards and prisoners—with the knowledge and encouragement of the guards.

3. At the end of July 2023, I was sexually assaulted in the shower by Lt. Dallas. Lt. Dallas was outside the wing by the bullpen near the showers; they held me in a cage waiting for the next transgender woman to get out of the shower. The shower has two open ways to come in and out. I was brought into the shower, and after I started to wash up alone, Lieutenant Dallas entered through the other entrance. He stated that if I gave him what he wanted sexually, "things can be better" and "I could be safer" and "bad things wouldn't happen to me." Coerced, I gave him oral sex in the shower.

4. After this happened, I asked other transgender inmates if this type of thing happened to them too. Yes, other inmates said, and they named other correction officers who had coerced them into unwanted sexual activity like this.

5. I attempt to report the assault by Lt. Dallas to Lt. Mark Hanks from Internal Affairs (IA). He took down a statement on other PREA incidents I reported about showers, but he wouldn't write down anything about the incident with Lt. Dallas. Afterward he said he was focused on the other issues. I never heard anything back from Lt. Hanks.

6. On or about August 31, 2023, at around 8:00 pm, I was raped by a male inmate that goes by the name Jo Jo. He was out of his cell because he was working in my gallery. He had a knife and penetrated me through the bars of my cell. After the attack, I told c/o Williamson but he would not help me because his shift was almost over. I filed a Prison Rape Elimination Act (PREA) claim against c/o Williamson for not helping me.

7. The next day, early in the morning around 1 am, another inmate threw feces and urine on me and my property because I was telling an officer about the rape. Nothing was done by the guards to stop this assault.

8. That same morning, around 8 am, Jo Jo raped me again at knifepoint in the same way. I sustained injuries to my arm from the knife in addition to the rape. The officer in my gallery, c/o Reed, saw this happening (including seeing the knife), but he walked the other way and did not help me. When I was able, I told a sergeant about the rape and he laughed and walked off.

9. Because I was getting no help from the guards for my attacks, I used a tablet to send a message for help through the "system support link." I received a response that they would contact the prison for help. A short time later, I was brought before IA, where I got in trouble for using the

tablet to seek help. IA threatened me with placement in seg, but did not properly investigate the sexual assaults I experienced.

10. I finally got permission to go to the hospital off-site, and I was strip-searched by a male guard, c/o Little. He took me to the hospital along with c/o Jada (who is female). At the hospital, c/o Little was making sexually inappropriate comments to me and attempted to interfere with the administration of the rape kit. The medical staff and c/o Jada repeatedly told him to leave the room while I was undressed. He also was arguing with the nurse at the hospital because he wanted to take my clothing back to Menard in a bag he brought with him because "his boss told him to." The nurse said standard protocol for a rape kit was to keep the clothing, and that is true from previous experience I have with rape kits. After the nurse left the room, c/o Little took the bag with my clothing in it. Normally when the rape kit is complete, I am given a number for the kit, but this did not happen at this visit; I believe c/o Little tampered with the kit. When I returned to Menard, c/o Little wrote me a bogus ticket: he claimed that while I was in the hospital room, I said that I would kill a guard but I did not say that.

11. On or about December 12, 2023, I was helping my frien[redacted] who is a transgender woman and ha[redacted] I was helping her in the yard and the officers were mad that I was helping her.

12. I got in trouble by the officers out in the yard because they said my clothing was not right, but I think it was because I was helpin[redacted]he guards continued to provoke me while I was upset while walking back to my cell. I was so upset that I asked to go to mental health because I felt I was in crisis. C/O Dunbar took me to mental health. As we were waiting in the private room outside mental health, C/O Dunbar forced me to have oral sex with him. I spit his semen on some of my clothes to save as evidence.

13. When I saw mental health, I told him about the assault. But instead of going to the hospital for a rape kit, I was walked back to my cell by c/o Dunbar and Lt. Brandt. When Lt. Brandt walked off from the cell, he said someone was coming to see me tonight. I expected it to be IA, but it was not.

14. About an hour or two after I got back to my cell, on around 330-4:00 pm, a TAC team showed up. They cuffed me and took me from my cell to healthcare, but I did not go in. The TAC team talked to the nurse, then said "let's get show on road." I thought I was going to the hospital for a rape kit but instead they took me to a holding cell at RNC. They uncuffed me through the chuck hole and immediately maced me. It burned my eyes and face and I couldn't breathe. I had to curl up in a ball in the corner of the cell to try to breathe.

15. I was there for a long time, possibly thirty (30) minutes. A sergeant finally came in and took me to a different cell so I could breathe. But the TAC team came back and maced me again. Then the TAC team pushed me to the ground and dragged me to seg. Everyone in RNC watched what happened and had effects from the mace.

16. The following day, on or about December 13, Lt. Hanks from IA interviewed me. He took down a written statement. He made me initial it but did not let me read it first. I expected to go to the hospital for a rape kit, but he also sent me back to seg.

17. On or about December 14, when I was getting my hormone patch, I finally convinced nurse Morgan to send me to the hospital for a rape kit. I went to Memorial Hospital and had the rape kit taken, but the IDOC officers took the rape kit and all my property back with them to Menard. Nurse Nikki (at the hospital) protested and said it was not protocol, and even made some phone calls to legal, but let the officers take my rape kit and things. When I got back to Menard, the officers took my medical paperwork so I had no record of the visit.

18. I have had a difficult time receiving my hormone shots on a regular basis and without problems. I have since switched to a hormone patch. As of November 2023, IDOC had not given me estrogen for a month and my spironolactone for three months. Nurse Amanda also asks male staff, including her husband, c/o Shaults, to come into the room where she administers my shots. This makes me very uncomfortable and I have told her this repeatedly.

19. On or about September 5, 2023, nurse Amanda asked a male staff in the room to pull down my pants for my shot. I refused to let him do this, but nurse Amanda said that if it did not comply, she would report that I refused my shot. I refused again, and c/o Shaults pulled me into the hallway (under a camera) and groped my butt. I complained and asked for help from Sergeant Jones who was walking past, but he slammed me forward, dragged me to a bullpen, and slammed me down inside. MHP Wilkes was present for this incident and documented it.

20. On or about September 7, 2023, nurse Nicole asked me if I still wanted my hormone injection, and I did. She injected the shot into my lower back instead of my butt. I heard a pop and felt intense pain. Four or five hours later I became seriously ill and in unbearable pain at my injection site. Many inmates saw me in my cell and tried to seek medical help for me, but no one helped. For days I was throwing up blood and a yellow substance, bleeding from my rectum, couldn't walk or use the bathroom, and I could barely breathe and felt dizzy. During that time, on around September 10, c/o Williamson (a different person than in paragraph 6) came to my cell and observed my extreme medical distress but did not help.

21. The only reason I was let out of my cell was to attend a regularly scheduled visit with Dr. Catz on September 11, 2023. Because of my poor condition, Dr. Catz immediately hospitalized me at Menard and rescheduled my routine visit. Dr. Catz ordered the hospital to perform many tests to monitor my health, including tests for urinary tract infection and for blood

clots (an MRI). I stayed in the hospital for approximately 5 days but only received fluids and no other tests were performed to my knowledge. If it were not for this visit with Dr. Catz, I believe I would have died in my cell.

22. I am regularly strip-searched by male guards, despite my ID badge showing that I am a transgender woman and my requests to be searched by a female officer. During my time at Menard, I have never been strip-searched by a woman and strip searched by a man approximately thirteen (13) times.

23. I do not have access to a private shower. The shower I use is open on two sides and guards and other inmates can easily see in while I bathe. On or about November 13, I brought a rug from my cell to cover the side where the guards can see in. One guard said, "take that faggot shit down."

24. Since I entered IDOC custody I have been requesting a transfer to Logan. I regularly make this request to my mental health provider, MHP Wilkes. I have never received any information (in writing or otherwise) that my case for transfer has been considered or rejected by TAC. If I cannot go to Logan, I would transfer anywhere besides Menard—even back to Pontiac where I was attacked by guards.

25. I also have been requesting surgery since coming to IDOC. I regularly make this request to MHP Wilkes. I have never received any information (in writing or otherwise) that my case for surgery has been considered or rejected by THAWC.

26. I do not feel safe at Menard. I know I am vulnerable to attack and the prison guards here do nothing to protect me, especially c/o Shaults, who constantly harasses me. I feel that many guards want me to flirt with them and if I do not, they get violent and aggressive to me. The guards

also watch while other inmates attack and harass me and the other girls. I regularly feel forced to trade sex and sexual favors for my safety.

27. I regularly have difficulty obtaining grievance forms and accessing the law library. This has led to difficulties in reporting these issues to the proper authorities and channels.

28. Presently, I am in seg (since the incident on December 12) and have not had access to any of my medications other than my hormone patch.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Date: December 21, 2023 /s/[redacted]

Date: 03-08-24 [redacted]

[1] Plaintiffs' counsel spoke with M[redacted] on December 21, 2023, by telephone. During this conversation, Ms. [redacted]uthorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted]nce it is returned to them by U.S. Mail from Ms. [redacted]

# Exhibit 14
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) | |
| Defendants. | ) | |

**DECLARATION OF D.F.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since about June 7, 2022.

3. It is very unsafe to be a transgender woman at Menard and I have repeatedly applied for protective custody, but I have been denied. I do not feel safe living in the general population because there are a lot of sexually aggressive and violent people toward the LGBTQ population at Menard.

4. In or about September or October 2023, after I was denied protective custody, I was on "kick out status" in the 5-gallery intake housing. They placed me in a cell with a man who was a known sex offender. During this month, I woke up because my cellmate was groping me and masturbating. I fought him off. Although I was scared, I did not feel it was safe to report this sexual assault.

5. Later when I applied for protective custody, I told the internal affairs officer that my cellmate, who was a sex offender, sexually assaulted me or words to that effect. The internal affairs officer told me that I was not the first person to complain about him. I told the internal affairs officer that I did not want to be in a cell with him and that I wanted a KSF (Keep Separate From). The internal affairs officer told me that he didn't have the authority to give me a KSF but afterward, I was not placed in housing with this man for several months.

6. In or about December 2023, my request for protective custody was denied and they placed me in the cell with the same man who sexually assaulted me. I told a correctional officer that I should not be in a cell with this man. The correctional officer said they would call placement. The correctional officer returned and told me that the man would continue to be my cellmate.

7. Later in about January 2024, the man who sexually assaulted me was approved for protective custody and I was denied again. I will be given a cellmate next week, and I am scared.

8. I do not understand why they do not place me or other transgender women in protective custody. I have seen empty single cells, but I keep getting denied.

9. Officials at Menard have known that I am transgender for about a year, and they have done little to help me. In or about January 2023, I spoke with a PREA investigator and told her that I was a transgender woman. Afterward, on or about January 16, 2023, I notified Menard that I wanted to change my gender to female by filing a grievance. I was told I that needed to meet with the Transgender Mental Health Coordinator, Ms. Wilks.

10. Beginning in about January or February 2023, I met with the Transgender Mental Health Coordinator, Ms. Wilks. I asked to be placed in protective custody because I felt unsafe. I also, requested hormones, a new ID that reflects that I am a woman, a private shower, and to be searched by female officers. Ms. Wilks gave me Transgender Commissary form which had items

but no prices, I filled it out and requested black eyeliner and nail polish. I also requested a bra and feminine clothing.

11. I continued to meet Ms. Wilks for about six or seven months. She diagnosed me with gender dysphoria, but I never received a new ID, hormones, a private shower, searches by female officers, feminine clothing, or even eyeliner and nail polish.

12. After six or seven months of receiving nothing to help me as a transgender woman, I became discouraged and stopped seeing Ms. Wilks.

13. Not having an ID which reflects that I am a woman, means that men conduct strip searches of me. I feel unsafe, violated, and depressed when this happens. It also means that I cannot shower without men watching me.

14. I have requested and wanted hormones for a long time, and I have been ignored by mental health repeatedly. I am having a hard time living at Menard. There is nothing for me and no one seems to care.

15. I believe that Menard officials are planning on transferring me to a section of Menard which is medium security because my aggression level is lower, and I have not received a disciplinary ticket in a long time. I am worried because medium security does not have protective custody. I am worried that in the general population, someone will attack me because I am transgender.

16. I want to transfer out of Menard. I want to go to Logan Correctional Center and live with other women. I do not want to transfer to Pontiac because I have heard that although it has protective custody, a lot of sex offenders and rapists are housed there, and it is unsafe for transgender women.

17. Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: January 19, 2024 /s[redacted]

Dated: 2\8\24 [redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on January 19, 2024, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Exhibit 15
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF D.L.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since approximately March 2022.

3. The correctional officers at Menard do whatever they want here. In or around February 2023, I asked to see a mental health professional. I was taken out of my cell by an officer with my hands cuffed behind my back. As we walked down the hallway, the officer asked me about something that happened yesterday with my food tray. I did not respond to the officer at first, but after awhile I asked him, "Why are you trying to get a reaction out of me?" When we got to the room for mental health, at least three officers began beating me. This included the officer who was walking me to mental health. While I was still in handcuffs, they hit me with their fists about 12 to 15 times. My jumpsuit fell down to my waist when I was being hit and my skin turned red. There are no cameras in the evaluation room.

4. After this incident, I talked to Internal Affairs but as far as I know, nothing came of it. In fact, the officers have made up a story that I was the one who assaulted them, and I am now going to court over it.

5. This is the norm at Menard. Officers get away with this type of behavior. When I went to segregation recently, one of the officers who had previously beat me cavity checked me.

6. I have also been Maced by officers twice in the face and placed in segregation afterwards. This means I am not able to wash my eyes for around 25 minutes while I am being transported to segregation. I feel like my vision has gotten worse because I have been Maced. Officers are supposed to give a warning before using Mace, but they do not do that. I have also seen them Mace people dealing with a mental health crisis and even laugh about it.

7. Most officers do not use my preferred name or pronouns.

8. I do not have access to a private shower. I shower alone, but the curtains are not up, so just the shower door partially covers you, and anyone in the general population walking by may see you. This makes me feel exposed and like a specimen. Other people in the prison know you are transgender if you take a shower by yourself.

9. I am currently being strip-searched and pat down searched by male officers, even though my class member identification card says I should be searched by female officers. Officers have only used the body scanner on me once when I was going to court. This happened a few months ago.

10. Officers at Menard have been fabricating disciplinary tickets, particularly targeting transgender inmates. In September 2023, an officer falsely accused me of threatening to attack them, which I did not do. The officer had denied me my outdoor time because I wanted to bring a book with me outside. The officer returned to my cell about an hour later and began intimidating

me, saying things like, "What's your problem?" Out of fear, I did not respond to the officer, and when I remained silent, they made up a story about me threatening to assault them. I received a disciplinary ticket for this, and they sent me to segregation for almost a week.

11. I do not feel safe at Menard.

12. I am very interested in transferring out of Menard. I really want to go to Logan Correctional Center.

13. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: January 25, 2024 /s/[redacted]

Dated: Feb, 26th, 2024 [redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 3, 2023, December 22, 2023, and January 25, 2024, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Exhibit 16
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF** [redacted] S.M.

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman class member who is currently housed at Menard Correctional Center. I have been at Menard for approximately one year.

3. On or about December 8, 2023, CO Rock sexually assaulted me in my cell. Just before the assault, the wing I live on had been called out to commissary. While I was walking to commissary, I got called back for a video call. When I reentered my cell on the now-empty wing, CO Rock rushed in behind me. I became very nervous and put my hands up in front of me to guard myself. CO Rock was blocking the exit to my cell, and through his words and actions forced me to perform oral sex on him, saying "just suck it, just suck it," or words to that effect. I didn't feel like I could refuse and was forced to perform oral sex on him.

4. After the incident, I sent an email to my family complaining about CO Rock assaulting me. I believe that the email was monitored, and that CO Rock is retaliating against me.

5. Since the incident I have been very afraid for my safety. CO Rock is on the Tactical (TAC) team and is very large and muscular. COs on the TAC team are also very tight knit, so they will back up his version of events any time he is reported. I am also afraid of retaliation by the TAC team.

6. On at least one occasion, CO Rock visited my cell and asked me if "I'm good" while touching his mace. He told me that I better "not fuck [him] up down here" or words to that effect, which I took to mean, that I should not report him or I will be hurt.

7. On or about January 1, 2024, a porter came by my cell and told me that the COs were trying to get other inmates "to whoop me" or physically attack me.

8. On or about January 9, 2024, I was in the yard when another inmate attacked me. I had to defend myself, but the COs sprayed me with pepper spray pellets. They put me into segregation.

9. Before I was sent to segregation, I lived in West Block. It has no cameras, so guards here know that they can get away with pretty much anything. I have seen guards assault people and then give that person a ticket to make it look like that person started the incident. Guards regularly skip our meals or turn off our water as punishment if we do something they don't like. Transgender inmates are treated particularly badly at Menard.

10. My family used to call the prison to complain about my mistreatment. Officers at the prison would lie to my family and give them names of fake counselors that I was supposedly seeing, so that it looked like the prison was addressing my mistreatment. In retaliation for my family's calls, the guards used another inmate to intimidate me into being quiet and making the calls stop. This inmate, whom I had a keep separate from (KSF) order against, was brought to my area of the prison and encouraged to walk around near my cell. Bringing this inmate near me is a

violation of IDOC policy because of the KSF I have. This inmate really hates transgender inmates, and I was afraid for my safety.

11. When I have filed grievances, nothing has been done about them. I either never hear anything, or they are determined to be unfounded.

12. I filed a grievance on an inmate that had been repeatedly threatening to rape me, and even included kites where I asked him to stop and he responded "no." IA came to investigate, but in their report they wrote that I told them I had no problem with the inmate who had been threatening me. This was completely untrue, and I had told IA exactly the opposite.

13. To get any amount of safety at Menard as a transgender woman, I had to check myself into protective custody (PC). This means that I rarely get to leave my cell, and even when I do, I am not allowed to go outside. People in PC also do not have cellmates, so I spend almost all of my time locked in my cell, alone.

14. I have a diagnosis of gender dysphoria and have been on hormones since before I came to Menard. At Menard, my hormones are withheld from me if I have been sent to segregated housing.

15. Getting sent to seg happens frequently to transgender inmates, because we are punished for trying to protect ourselves or else given tickets to cover up assaults by guards. I have also had a nurse ask me whether it "reverses me" to not have my hormones for a while, which I felt was very disrespectful and ignorant.

16. I told Ms. Wilks, the mental health provider, that I was requesting bottom surgery, but she told me if my "time in prison is less than a year, then you can't have surgery."

17. Guards refuse to use the correct pronouns for me and have told me that I "need Jesus" or words to that effect because I am transgender.

18. My ID says that I should be searched by a woman, but I have been force-searched by male guards while in segregation. These searches are done out in the open by the bullpen, where everyone can see me being searched. If I refuse to let the male guards search me, they will mace me, take away my property, and refuse to feed me.

19. I would like to go anywhere besides Menard. However, I believe that I would feel safer if I was sent to Centralia and the PRISM program, or to Logan.

20. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 2/5/24 [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 780

# (filed under seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Amended Dkts. 762, 763 |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | **Attached** |

# Exhibit 17
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF D.H.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter, and I use she, they, and them pronouns.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have lived at Menard since about November 2021.

3. Despite telling Menard's mental health staff and correctional officers that I am transgender, I do not have an ID that reflects who I am. I do not have access to a private shower, and I am searched by male correctional officers. I face abuse by other inmates and correctional officers because I am transgender.

4. My mental health is struggling. It is very hard to be openly transgender at Menard. There is a real hatred of transgender people. It's almost like a religious hatred. Menard is a place where you do not want to make a big spectacle because it makes you a punching bag for correctional officers and inmates.

5. In or about March 2024, I was jumped by other inmates in the shower. I was physically and sexually assaulted. It was a nightmare that I do not want to talk about. Afterward, I cut my long hair to stop getting attention as a transgender woman.

6. This was not the first time that I have been assaulted for being transgender. In or about July 2023, a leader of a gang jumped me or attacked me because I was transgender. A correctional officer watched the entire attack and let other inmates jump on me without doing anything to help me.

7. In or about March 2024, a correctional officer gave me a ticket for putting up a curtain to have some privacy when I wash-up in my cell.

8. In or about April 2024, there was a shakedown of my cell and correctional officers took my hearing aid.

9. In January or February 2024, the mental health specialist told me that there wasn't much she could do to help me and other class members at Menard, and she was quitting. That was one of the saddest things I have ever heard.

10. In or about December 2023, I spoke to a counselor about transferring out of Menard. The counselor told me that I could not transfer because there was a medical hold for my eye which has limited vision. I do not receive any medical care for my eye, so I do not understand why the medical hold existed.

11. In or about April 2023, I told the Menard staff that I wanted protected custody to be safe, and I believe the staff and correctional officers told people that I was transgender. Despite asking for protective custody, I have been denied twice, and I fear for my safety.

12. In or about April 2023, when I told a Sargent that I was transgender, he said, "how the hell are you transgender? You are no more transgender than that rock over there. Do you want to cut your dick off?" or words to that effect.

13. Since I started speaking with the ACLU and being more open about being transgender, my legal mail has disappeared, and I cannot go to the law library.

14. I believe that the medical hold has been lifted and I would like to transfer to Logan or Centralia-PRISM where I can be safe and live as who I am.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: April 24th, 2024 [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 787

# (filed under seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Amended Dkts. 762, 763 |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 779, 780 |
| 18 | [redacted] | [redacted] | [redacted] | **Attached** | |

# Exhibit 18
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 3:18-cv-00156-NJR |

**SUPPLEMENTAL DECLARATION OF T.F.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. On or about May 6, around 6:40-7:00pm, I was finishing my private shower when the water suddenly shut off. I looked around and could see that an officer had shut the water off at the control panel.

3. Since I was finished showering, I began to dry myself off and get dressed. While doing this, I heard the key click in the door lock, and saw the door open. Three COs entered the shower room. Two were officers – Officer Lloyd and Officer Loera. The other was a Sergeant whose name I don't know.

4. The room that I was in is no bigger than the size of a cell.

5. The officers immediately approached me and grabbed me. One tore my panties off. All three began to grope me, squeezing my breasts so hard that it hurt. One forced his finger into my butt. I struggled with them, but I did not fight too hard because I didn't want them to hurt me more, or to give me a ticket.

6. I did not file a grievance immediately after the assault because I did not think it would do any good. Later, a fellow inmate convinced me I should file one, but the prison was on lockdown by then. The only way to file grievances while on lockdown is for the guard to bring around the box to put them in. This has not happened since we have been on lockdown.

7. On or about May 27, 2024, sometime during the 3-11 shift, I was taken out of my cell for a follow up visit to mental health regarding a PREA complaint.

8. Once the mental health provider left the room after my visit, an officer in the room came to unlock me from the bench I was cuffed to. He then threw me against the desk in the office. He grabbed my cuffed hands and pulled my arms back so hard my shoulders popped. Then he bent me over the desk, grabbed my hair in his fist, and pulled it back. He was holding me in a position like he was going to sexually assault me.

9. There were two other officers in the room. They started taunting me, saying "oh you snitch on us now?" and "next time we're going to get what we want," or words to that effect.

10. There are many areas where there are no cameras at Menard, so officers feel like they can do what they want without any fear of repercussions.

11. Other than the visit about the PREA complaint, I have not been able to get any mental health treatment regarding either of these incidents, or really at all since I have been at Menard. The gender dysphoria coordinator at Menard quit a while back because a transgender inmate got beat up while in segregation.

12. What happened to me is typical of CO behavior here at Menard. The guards here are so violent I worry that I'm going to end up dead.

13. I would still like to be transferred to Centralia and the PRISM program, or to Logan. I have not had any tickets recently, so I should be approved for transfer.

14. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 6/12/2024 /s/ [redacted]

Dated: ____________ ______________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on May 22, 2024 and June 3, 2024, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 811

# (filed under seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Amended Dkts. 762, 763 |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 779, 780 |
| 18 | [redacted] | [redacted] | [redacted] | Dkts. 786, 787 | |
| 19 | [redacted] | [redacted] | [redacted] | Dkts. 795, 796 | **Attached** |
| 20 | [redacted] | [redacted] | [redacted] | Dkts. 799, 800 | |

# Exhibit 19
# (filed under seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

STEVEN BOWMAN, LATOYA HUGHES, and MELVIN HINTON,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF [redacted] M.M.**

I [redacted] hereby state:

1. My legal name is [redacted] but I prefer Ms [redacted] I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at Menard Correctional Center. I was transferred from Pinckneyville Correctional Center to Menard on or about September 15, 2023.

3. I have requested hormones many times, but I have not received them. Before I was transferred to Menard in 2023, I requested hormones at Pinckneyville, but I did not get them. When I arrived at Menard, I requested hormones, and in or about February 2024, I requested hormones.

4. I want hormones because I don't feel like I am in the right body. Not having hormones gives me anxiety. This prison is setting me up to fail. They are not giving me the medication that I need to help me.

5. I do not have a private shower. Every other day, Menard guards force me to shower with groups of men. The men sexually harass me in the shower.

6. On or about May 26, I filed a PREA complaint about the officers forcing me to shower with male inmates.

7. On or about May 27, I filed an emergency grievance asking for hormones, single-cell, and private shower. After I filed the grievance, Officer Dunbar threatened me that my "time is numbered. Your time is coming" or words to that effect.

8. Although I am housed in protective custody, it is still very dangerous. There are no cameras on the wing and guards can write bogus tickets and send us to seg.

9. Even though I am in protected custody, I am forced to share a cell with a man who sexually harasses me. I have reported that my "cellie" says sexual comments and touches me, but no one has helped me.

10. On or about May 20, 2024, he came on to me. He said, "You look good, can I pay you for sex?" I told him no. I sent a kite, a message, to ask for help because I am vulnerable. Also, I told the 5-Day officer about the harassment, but his response was "You guys are all men, and you can figure it out" or words to that effect.

11. The sexual harassment from my "cellie" has gotten so bad that I sleep with my tablet so that I can send messages for help. On or about May 29, 2024, at about 3:27 in the morning, I sent a kite to the gallery officer stating that my cellie was sexually touching me. No one came to help me.

12. On or about May 29, 2024, as I was going to the law library, a guard or a C.O., pulled me over and told me that he, "was sick of these fags always filing PREA" or words to that effect. He said, "We got a surprise.' I asked if it was "good or bad." He responded, "Anything from a fag is bad" or words to that effect.

13. In early May 2024, I had a job working in the cell house. A guard then told me that I could not have a job because "I am a transgender." Even though I would like to have a job, I have not worked since.

14. I have repeatedly requested a female ID, but I have not received one.

15. On or about June 5, 2024, another transgender woman, named [redacted] walked past my cell to go to the showers. When she returned, she was crying and I asked, "What was wrong?" [redacted] told me that the officers "beat her ass" and "put her up against a wall."

16. I would like to transfer to Logan where there are women who I can relate to, and where I can be safe living as a woman.

17. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 6-27-2024 [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 823

# (filed under seal)

# Exhibit 20
# (filed under seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Amended Dkts. 762, 763 |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 779, 780 |
| 18 | [redacted] | [redacted] | [redacted] | Dkts. 786, 787 | |
| 19 | [redacted] | [redacted] | [redacted] | Dkts. 795, 796 | Dkts. 810, 811 |
| 20 | [redacted] | [redacted] | [redacted] | Dkts. 799, 800 | **Attached** |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, | ) | |
| Defendants. | ) | |

**DECLARATION OF A.B.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who was transferred to Menard Correctional Center in November 2023.

3. I testified in the hearing in this case seeking transfer out of Pinckneyville Correctional Center in late October 2023. Thereafter, I was told by Pinckneyville staff that I was going to be transferred to Centralia Correctional Center or Joliet Treatment Center but that I had to sign a refusal of medical services first. I was reluctant to sign this refusal because I had been experiencing ongoing and severe gastrointestinal pain, and I had been told that I was scheduled for outside testing about these problems, but staff told me that the only way to enable the transfer out of Pinckneyville to Centralia or Joliet Treatment Center was to sign the refusal. So I signed the refusal and was immediately moved to Menard.

4. My gastrointestinal problems continued at Menard and I was not sent to any outside testing. While I was in mental distress at Pinckneyville on two occasions I had swallowed the head

of a disposable razor, and I was told while still at Pinckneyville that an x-ray showed that one of these was still in my digestive tract. At Pinckneyville and still at Menard I have episodes during which I vomit blood; I also have blood in my stool at times, and I experience severe stomach pain every day.

5. In January or February 2024, I was finally able to see a doctor at Menard, Dr. Babich. He told me that he did not want to refer me for hormone treatment until after my stomach problems were addressed. I was told that I was scheduled for outside testing for my stomach issues, but they do not tell you when the outside medical visit will take place.

6. On May 18, I was told that I was going out on a medical writ for a colonoscopy and an EGD. The following day, I was given a liquid to drink to clear my digestive system for the colonoscopy and I drank it. However, on May 20, when I was supposed to go out for the tests, I was told by staff that the writ was being cancelled because they could not find a female officer to search me.

7. I did not go out for my appointments on May 20. I was told they would be rescheduled, but they have not yet taken place as of July 1.

8. I am always nauseous, and the medication they give me does not help the nausea; and the medicine they give me for the pain does not help the pain. During the week of June 17, I was lying on the floor of my cell one night throwing up blood; other prisoners in West House, where I am housed, were trying to get the correctional officers to attend to me and get a nurse to come but they paid no attention. I put in requests for sick call almost every day but so far no one has seen me, although I was finally told today (July 1) that I might be seen after my call with the lawyer.

9. I also put in regular requests to see mental health but no one sees me. I have deteriorated to the point where I have started cutting myself again.

10. Until about a month ago, I was not going out for showers and was washing up in my cell because the correctional officers told me that I could not have a private shower, I had to shower with everyone else. Starting about four weeks ago, I was finally permitted to go out to the single shower. However, it is only private if I am permitted to shower during first shift; on second shift the officers refuse to put up the shower curtain, and can and do watch me as I shower.

11. In addition, one of the correctional officers who sometimes staffs my wing tells the other transgender prisoners that I am not transgender, and this officer will not let me out for single showers at all.

12. I do not feel safe at Menard. Staff constantly misgender me and call me "Mr. Billips." I would like to be able to sign out of protective custody in West House so that I could go to school and go to mental health groups; I feel isolated and depressed. I have written the warden about this but he has not responded. As I told the court, I want to go to the PRISM program at Centralia Correctional Center. I was previously approved for PRISM and as of July 1, I have gone approximately nine months without any disciplinary tickets.

13. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: July 1, 2024 /s/[redacted]

Dated: 7-15-24 [redacted]

[1]Plaintiffs' counsel spoke with Ms. [redacted] on July 1, 2024, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 843

# (filed under seal)

# Exhibit 21
# (Filed Under Seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Amended Dkts. 762, 763 |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 779, 780 |
| 18 | [redacted] | [redacted] | [redacted] | Dkts. 786, 787 | |
| 19 | [redacted] | [redacted] | [redacted] | Dkts. 795, 796 | Dkts. 810, 811 |
| 20 | [redacted] | [redacted] | [redacted] | Dkts. 799, 800 | **Dtks. 822, 823** |
| 21 | [redacted] | [redacted] | [redacted] | Attached | |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| STEVEN BOWMAN, MELVIN HINTON, and LATONYA HUGHES, | ) | |
| Defendants. | ) | |

**<u>DECLARATION OF</u> [redacted] D.H. [redacted]**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter, and I use she, they, and their pronouns.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have lived in Menard since about November 2021.

3. Menard is dangerous for transgender women. We also have to worry about retaliation by correctional officers and male prisoners if we complain when we are hurt or mistreated. After I was sexually assaulted by male prisoners in the shower in about March 2024, I was afraid to complain. I waited to grieve it until about May 2024, when I was in protective custody without a cellmate. I did not file a grievance or PREA before then because I was afraid of retaliation.

4. On or about July 9, 2024, I went to see mental health. I was asked if there was any retaliation for reporting the March assault and I said no. I did not have a cellmate in protective custody at that time.

5. On or about July 9, 2024, when I returned to my cell in protective custody from a call pass, there was [redacted] a new cellmate in my cell. He had a five-point star on his face, a gang sign for the Vice Lords. It is well known that the Vice Lords hate transgender prisoners. I looked at the correctional officer (C.O.) and told him, "This isn't supposed to happen. I am not supposed to have him in my cell," or words to that effect.

6. When the second shift C.O. Sheppard passed out ice, he whispered "careful" because [redacted] was "crazy."

7. On or about July 14, 2024, when I was in my cell, [redacted] punched me and knocked me unconscious. When I woke up, he was on top of me on the bottom bunk bed, my shorts and underwear were down, and [redacted] was grinding into me. He pinned me face-down on the bed and he was very heavy. I tried to push him off of me with my right hand because my left hand was injured in a car accident. I used my elbow to get him off of me and hit my right hand against the wall. He would not stop going after me, so I had to defend myself. At some point, a C.O. came by the cell, but the officer did not protect me or stop the fight. The C.O. watched the fight and then he left. I called out to the C.O. on the catwalk for help. Then [redacted] pinned me up against the cell bars. Finally, correctional officers and a lieutenant came and told me to "cuff up," which is being placed into handcuffs. I asked to be "cuffed up" at the same time as [redacted] because I was afraid that he would hit me when I was in cuffs. The lieutenant accused me of refusing an order.

8. That day, I showed the correctional officers my class ID which shows that I am female. I asked why they put [redacted] in my cell. I asked to talk to someone about the rape. A new

C.O. told me he "did not know how to report PREA." I told him "I wanted to report this right now, so this guy doesn't hurt anyone else" or words to that effect.

9. After the rape and assault, I went to health care. My right hand hurt, my back was scratched, and the area from my scrotum to my rectum was extremely raw and irritated. I asked the nurse to report the rape to PREA. The nurse said she was "new and did not know what to do." The nurse did not offer me a rape kit exam.

10. C.O. Shepard was at the healthcare unit. When he saw me, he said, "I told you so."

11. Then, Menard staff placed me in segregation. At least one Internal Affairs (I.A.) officer took me to the interview room. The I.A. officer took pictures of my back. I told the I.A. officer that Tate attacked me and tried to rape me. I was scared to give more details because the room was not private, and others could hear me. I was afraid that I would face retaliation again.

12. About three days after [redacted] attacked me, although I had not received a ticket or a ticket summary report, I was taken to a Justice Committee hearing about the events on July 14. I told them that I was not guilty of fighting or disobeying a direct order.

13. I complained daily for about three days that I was losing mobility in my right hand and that it hurt. A passing nurse told me that I only needed ice. After about four days of asking for medical help, I was finally sent to healthcare. They sent me out for an emergency furlough to get an x-ray where it was discovered that I had a broken finger and needed a cast.

14. About this time, I asked a C.O. about my discipline and was told that I was sentenced to 21 days in segregation and to C grade.

15. After I got out of segregation, I thought I was supposed to be in the health care unit because of my cast. Instead, Menard staff placed me into East House which is in the general population and is dangerous for transgender women. I immediately signed myself into protective

custody. Then, while I was in protective custody, Menard staff moved me into another cell with another Vice Lord. I could not believe that Menard staff was placing me in the same danger again. Luckily, this prisoner was about to be released and did not want to risk a fight.

16. At Menard, the correctional officers and the prisoners do not treat me like a regular person. Since I came out as transgender, they openly hate me. It is like a religious cult against me and other trans women.

17. The Menard correctional officers do not allow transgender people to shower if someone in my community "acts up."

18. I believe the Menard correctional officers use or work with the prisoners who are Vice Lords to hurt transgender prisoners, and to retaliate against transgender women if they file grievances or PREA complaints.

19. Before I defended myself in July, my security risk was lower and I asked to be transferred to Mt. Sterling, which is known as Western Illinois Correctional Center, a medium security facility. In my other declaration supporting the motion to transfer class members out of Menard, I asked to be transferred to Logan or Centralia - PRISM. I want to be transferred to a medium security facility where I can be safe and openly transgender.

Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 19, 2024 /s/[redacted]

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on November 19, 2024 by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

Dated: ____________________ ________________________________________

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 909

# (filed under seal)

## EXHIBIT INDEX
## DECLARATIONS OF MENARD INMATES

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Dkts. 762, 763 (amended) |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 779, 780 |
| 18 | [redacted] | [redacted] | [redacted] | Dkts. 786, 787 | |
| 19 | [redacted] | [redacted] | [redacted] | Dkts. 795, 796 | Dkts. 810, 811 |
| 20 | [redacted] | [redacted] | [redacted] | Dkts. 799, 800 | Dtks. 822, 823 |
| 21 | [redacted] | [redacted] | [redacted] | Dkts. 842, 843 | |
| D | [redacted] | [redacted] | [redacted] | Dkts. 880, 881-1 | **Attached** |
| E | [redacted] | [redacted] | [redacted] | Dkts. 880, 881-2 | |
| F | [redacted] | [redacted] | [redacted] | Dkts. 880, 881-3 | **Attached** |
| G | [redacted] | [redacted] | [redacted] | N/A | **Attached** |

# Exhibit D
# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF MS. D.F.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since about June 7, 2022.

3. I requested protective custody for over two years because Menard is extremely dangerous for transgender women. As I have explained in my prior declaration, a male sex offender who Menard placed in my cell, sexually assaulted me. After I reported the sexual assault, Menard placed me again in a cell with the man who assaulted me.

4. In or about December 2024, Menard finally granted me protective custody and put me in a single cell, but I still feel very vulnerable and unsafe as a transgender woman. Both the male guards and the male prisoners are abusive to transgender women. To protect myself, I leave my cell on rare occasions such as when I am ordered to do so, if I have a legal call, or to go to the Commissary about once a month.

5. In or about January 2025, there was a "shakedown" of the prison. The guards took me and other transgender women out of our cells in 10 galley to the body scanner. The guards mocked me and other transgender women by calling us "tranny" and threatening to cut our hair off.

6. I have a class ID that identifies me as a female, and I would like a female guard to search me, but male guards still strip-search me.

7. In or about December 2024, male guards came to my cell and ordered me to leave my ID behind and to "cuff-up" or handcuff me. They took me to the showers where a male guard stripped-searched me. Afterward, they took my sweatpants and made me walk back to my cell in thermal underwear. I felt exposed, humiliated, and degraded.

8. Although I have a class ID that identifies me as female, Menard guards do not provide me with a private shower. As a result, to protect myself from having to take a shower with men who could hurt me because I am a transgender woman, I wash up in my cell.

9. From about July 2024 to about November 2024, I was on a testosterone blocker, spironolactone but the Menard nurse stopped giving me hormone therapy without any explanation. I wrote a grievance form, but I did not turn it in because writing grievances at Menard does nothing. I desperately want to resume my hormone therapy.

10. I want to wear a bra, but Menard has not offered me this underwear. I believe that I would have to purchase a bra and that it costs $20, which I cannot afford.

11. In or about 2023, I requested a transfer to Logan Correctional Center, but I was denied. Mental health told me that I was not eligible to transfer to Logan, but I do not understand why. Shouldn't Logan provide mental health support to transgender women?

12. I want to transfer out of Menard. I want to go to Logan Correctional Center and live with other women. If I cannot live in Logan, my second choice would be Centralia because I have heard it is safer for transgender women.

13. Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: March 5, 2025 /s/[redacted]

Dated: 3\18\25 [redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on March 5, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Exhibit F
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF [redacted] A.R.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter. I identify as a transgender woman and non-binary. I am currently housed at Menard Correctional Center.

2. Even as a child, my grandmother told me I should have been a girl. She saw me for who I am. In prison and especially at Menard, it is a daily struggle to feel comfortable in my skin.

3. In or about 2021, I told the Dixon Correctional Center staff that I was transgender but no one at Dixon provided me with mental health support, gender-affirming medical care like hormone therapy, or even an ID stating that I was female.

4. In or about 2024, I was transferred to Menard, which is a "pit of hell."

5. In or about September 2024, I told the Menard counselor, Ms. Smith that I was transgender. But no one at Menard did anything to give me medical care because I am transgender. They did not provide me with mental health support or hormone therapy, tell me about female commissary items like make-up or clothing, or even give me an ID stating that I was female.

6. In 2024, I requested five times to live in protective custody at Menard on May 29, July 29, September 23, October 24, and December 27, 2024, but I was denied. The Administrative Review Board and Defendant Latoya Hughes concurred with those denials.

7. I wanted to live in protective custody because it is very dangerous to be a transgender woman living in the general population at Menard. The prisoners who are in gangs in the general population hate us. They do not want us in their cells, the yard, or even in the shower. Other prisoners have been physically abusive towards me because I am transgender.

8. For example, on or about October 14, 2024, an officer came to my cell and asked if I wanted a shower. I asked to have a private shower, but the officer told me that I had to shower with male prisoners. While I was in the shower, a male prisoner walked up and tried to hit me. I defended myself and fought back. The guards maced me and put me in segregation.

9. The guards at Menard have been abusive to me because I am transgender, too.

10. On or about July 17, 2024, Menard guards took me out of my cell. They took me to the front of the West House, where there were no cameras. They choked me. Other prisoners screamed to let me go. I told the guards I was not going to fight back. The lieutenant screamed that I was a "pussy" and I "should be in general population."

11. I want to be searched by female guards, but at Menard, male guards search me and threaten to use mace if I refuse to let them search me.

12. In about mid-February 2025, Menard finally approved my request to live in protected custody.

13. Despite being approved for protective custody, I still do not have mental health support, hormone therapy, nor access to female commissary items like make-up and razors to remove body hair. I still do not have an ID identifying me as a female.

14. I would like to transfer to a prison where I can live as a transgender woman and receive gender-affirming medical care including mental health support and hormones and not be hurt by guards or male prisoners. I would like to transfer to Centralia - PRISM.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 3.17., 2025

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on February 28, 2024, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# Exhibit G
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**<u>THIRD DECLARATION OF</u> A.B.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who was transferred to Menard Correctional Center in November 2023. I am still at Menard. As stated in my previous (second) declaration, I was transferred to Menard from Pinckneyville Correctional Center not long after I had testified in the hearing about transfer of *Monroe* class members out of Pinckneyville in October 2023. In November 2023 I was told by Pinckneyville staff that I was going to be transferred to Centralia Correctional Center or Joliet Treatment Center, but that I had to sign a refusal of medical services first. Immediately after I had signed the refusal I was moved to Menard.

3. Except for the times when I have been on crisis at Menard, I have been housed in West House, in protective custody.

4. In my previous (second) declaration, from July 2024, I had reported that approximately four weeks prior to that declaration, I had finally been given access to a single shower in West House, although it was only a private shower if I was able to shower during first

shift; on second shift the officers refused to put up the shower curtain. Now, starting some three or four months ago, I no longer have access to the single shower at any time; I am not being let out to shower in it. As far as I know, none of the other *Monroe* class members housed in West House/protective custody have access to the private shower either. Since I will not use the group shower, I have not had a shower in three or four months. I have been washing up in my cell. I put up a cloth barrier so that the officers or inmate porters cannot see me when I wash up, but sometimes the officers get mad at this and tear the curtain down.

5. Although West House is protective custody, West House is not safe. There are still no cameras, so anything can happen. The officers are verbally abusive and "out" us, and mistreat us in other ways; recently one officer told me that he was not going to let me out for a call pass to go to clinical services because I was a "trannie." He was as good as his word; he did not let me out and I missed the appointment. Currently the only times I get out of my cell are when I have call passes; there is no yard, we do not go out for meals, and as stated I do not get let out for single showers anymore.

6. In late summer last year, an inmate porter known as [redacted] came to my cell bars and demanded oral sex from me. He said that he would shank me in the yard if I refused to do as he asked. I was afraid of him, so I performed the sex act. About a month later, I was out of the unit on crisis after I had cut myself, and when I returned to the unit [redacted] was no longer there. I was told by others that he had been transferred to Lawrence after he had beaten another prisoner to death. The officers who were working the unit before I went on crisis were also no longer there.

7. I did not grieve or file a PREA complaint about the sexual assault; I was afraid of being retaliated against and becoming a target. I just want to keep my head down.

8. I have requested transfer since being placed at Menard. I have not had any disciplinary tickets since I arrived in November 2023, and I believe that I should be classified as medium and permitted to go to a medium security prison. Pinckneyville, where I was housed previously, was medium security. When my transfer request was denied recently, I was told that it was an "administrative decision" to be keep me classified as maximum. I was not given a copy of the decision but I know that it was signed by the warden and by Latoya Hughes. I tried to ask my counsellor the reason for the "administrative decision," but my counsellor never got back to me.

9. I still have the severe stomach pain described in my previous (second) declaration. My stomach hurts and I rarely have an appetite. I still have not had an outside appointment with a gastroenterologist that I have been told more than once was scheduled for me. I was told in October 2024 that it had been scheduled again but that it had been cancelled. About two months ago a nurse at Menard told me that it was scheduled once again, but it still has not happened.

10. I know that if the appointment has not taken place and a transfer was granted, I would have to sign a medical refusal in order to be transferred. In spite of the fact that I really need gastroenterological attention, I would gladly sign a medical refusal to get out of Menard. I live in fear here. I would like to be transferred to Centralia Correctional Center and to participate in the PRISM program there, for which I was previously approved.

11. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 3-24-25 [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 941 and attachments

# (filed under seal)

**EXHIBIT INDEX**
**DECLARATIONS OF MENARD INMATES**

| Ex. | Declarant's Preferred Name | Legal Name | IDOC No. | Filed w/ E-Signature | Filed w/ Hand Signature |
|---|---|---|---|---|---|
| 3 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 762, 763 |
| 4 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 5 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 6 | [redacted] | [redacted] | [redacted] | Dkt. 705 | N/A |
| 7 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 8 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 9 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 10 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 11 | [redacted] | [redacted] | [redacted] | Dkt. 705 | Dkts. 739, 740 |
| 12 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 13 | [redacted] | [redacted] | [redacted] | Dkts. 716, 717 | Dkts. 739, 740 |
| 14 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 739, 740; Dkts. 762, 763 (amended) |
| 15 | [redacted] | [redacted] | [redacted] | Dkts. 739, 740 | Dkts. 762, 763 |
| 16 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 762, 763 |
| 17 | [redacted] | [redacted] | [redacted] | N/A | Dkts. 779, 780 |
| 18 | [redacted] | [redacted] | [redacted] | Dkts. 786, 787 | |
| 19 | [redacted] | [redacted] | [redacted] | Dkts. 795, 796 | Dkts. 810, 811 |
| 20 | [redacted] | [redacted] | [redacted] | Dkts. 799, 800 | Dtks. 822, 823 |
| 21 | [redacted] | [redacted] | [redacted] | Dkts. 842, 843 | |
| B | [redacted] | [redacted] | [redacted] | Dkt. 874 | **Attached** |
| D | [redacted] | [redacted] | [redacted] | Dkts. 880, 881-1 | Dkts. 908, 909-1 |
| E | [redacted] | [redacted] | [redacted] | Dkts. 880, 881-2 | **Attached** |
| F | [redacted] | [redacted] | [redacted] | Dkts. 880, 881-3 | Dkts. 908, 909-2 |
| G | [redacted] | [redacted] | [redacted] | N/A | Dkts. 908, 909-3 |

| | | | | | |
|---|---|---|---|---|---|
| H | [redacted] | [redacted] | [redacted] | **Attached** | |
| I | [redacted] | [redacted] | [redacted] | **Attached** | |
| J | [redacted] | [redacted] | [redacted] | **Attached** | |
| K | [redacted] | [redacted] | [redacted] | **Attached** | |
| L | [redacted] | [redacted] | [redacted] | **Attached** | |
| M | [redacted] | [redacted] | [redacted] | N/A | **Attached** |
| N | [redacted] | [redacted] | [redacted] | **Attached** | |
| O | [redacted] | [redacted] | [redacted] | **Attached** | |

# EXHIBIT B
# (Filed Under Seal)

United States District Court
Southern District of Illinois

Janiah Monroe
Marilyn Melendez
Lydia Helena Vision
Sora Kuykendall
Sasha Reed,
Plaintiffs
vs.
Latoya Hughes
Melvin Hinton
Steven Bowman,
Defendants

#3:18-cv-00156-NJR

Second Declaration of T.S.

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.
2. I am a Transgender woman who is currently housed at Menard correctional center.
3. On September 6, 2024, officers in tactical gear conducted a facility-wide search of every cell and Prisoner at Menard.
4. When it was my turn, a male tactical officer appeared in front of my cell in an aggressive stance and ordered me to "give [him my] fucken cloth," by which he meant for me to undress.

5. I responded that i am a Transgender woman and showed him my I.D. that has "Female" stamped on the back.

6. The officer took my I.D and walked away, and shortly after returned with a 12 oz can of pepper spray in his hand and two other male officers also dressed in tactical gear. He threatened to spray me with pepper spray if i did not remove my clothing.

7. under duress, I removed my shirt and bra, exposing my breasts to the three male officers.

8. They then forced me to take off my pants and underwear, bend over, and spread my buttocks for the three of them. while inspecting my anus, one of the officers "Joked" that i might in fact be Transgender.

9. Having to undress under threat of violence, and then being mocked while naked and in a vulnerable position caused me severe mental distress, not to mention fear of being sexually assaulted. This feeling led me to self-harm, something that i have not done in 6 years.

10. I cannot name the officers who did this to me. I did not recognize them as people who normally work in my area of the prison, and they deliberately not required to wear nametags when they have on tactical gear to hide they identity.

11. once removed from my cell, the officers tossed it. when i returned, my bras, underwear, and make-up had been taken and presumably thrown away in retaliation. never to be replaced. My I.D was also missing at that time.

12. I wrote a grievance #[redacted] about the incident. Asking that the officers name's be given to me, and that they be disciplined. I know from experience that they will not be disciplined, but i wanted to document what happened.

13. I would like to request again that i be transferred out of Menard. Because i am a Transgender Female. I'm forced to be housed in the Restrictive Housing area of the Facility. Along with Disciplinary Segregational prisoners, and to date. For the year of 2025, I have only been allowed out of cell recreation two times.

As my placement have subdected me to physical assault by way of being repeatedly spit on as i pass Disciplinary segregational prisoners cells. As well as subdected me to marathons of sexual verbal abuse and constant harassment which have caused me to self-harm.

14. Pursuant to 28 u.s.c. 1246, I declare that the Foregoing is true and correct.

[redacted]
A-K-A
[redacted]
5-16-25

# EXHIBIT E

# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF B.M.**

I, [redacted] hereby state:

1. I am a non-binary class member in the above-captioned matter who is currently housed at the Menard Correctional Center. I have been at Menard since around April 15, 2023.

2. For almost two years at Menard, I've felt unsafe, and both the COs and other inmates have made things really tough for me just because of my gender identity.

3. I have to shower with male inmates because I don't have a private shower. This makes me feel uncomfortable. I would prefer to shower alone.

4. I'm housed with male cellmates who don't understand my gender identity. Even though I asked to be separated from these cellmates, they still put me with them. I was in protective custody ("PC"), but I signed myself out of PC because a CO and other staff were making things hard for me. This CO wouldn't let me go to the law library and kept harassing me. One day, I tried to talk to him and ended up being sent to segregation for around 30 days. When I got out of seg, I found out that the same CO let other inmates into my cell to steal my stuff. I signed out of PC

because that CO was still bothering me, but honestly, I'd rather go back because it feels safer than being in general population.

5. The COs at Menard have immunity and do whatever they want. It's always my word against theirs. The COs also act with a lot of aggression.

6. I've heard correctional officers call me names, like "faggot." And they make monkey sounds when I'm around them. This happens all the time.

7. Around June 2024, I was sprayed with Mace while shackled in a medical holding room, waiting to see mental health. I was just looking out the window when two Sergeants came in and maced me. They said it was because I was looking out the window, then wrote me a disciplinary ticket accusing me of trying to escape. I was just looking out the window.

8. In August 2024, the COs sprayed me with bear spray because I was fighting with my male cellmate who was trying to have sex with me. I had a keep separate order ("KSF") on him, but Menard still put me in the same cell with him. I told the COs about my KSF, but they didn't care. I ended up having to fight my cellmate to protect myself. Normally, after being sprayed, you're supposed to shower, get clean clothes, and go into a holding cell. Instead, the COs only let me rinse my eyes and gave me new clothes, but the bear spray was still on my body, and it burned like crazy. It felt like I was on fire. Bear spray is not like regular Mace spray. I filed a grievance, because that's pretty much all you can do at Menard, and I just had to deal with it. The burning lasted for hours before it finally stopped. I did get a response to my grievance about the bear spray, but Menard dismissed it.

9. Around the same time, I was searched by a male Sergeant. I went along with it because I didn't want to cause a big scene, and during the search the Sergeant asked me to bend over so he could look up my butt. After checking, he and another officer in the area started

laughing. I thought the search was over, but the Sergeant asked me to bend over again to look up my butt, and they laughed again. Then they sprayed me with Mace.

10. I've written grievances, but grievances are pointless at Menard. Nothing ever happens, and nothing changes here.

11. The COs don't just treat me this way either. The COs treat transgender people like a disease at Menard.

12. I am very interested in transferring out of Menard. Anywhere is better than Menard but I really want to go to Lawrence Correctional Center or Centralia Correctional Center and be a part of the PRISM program.

13. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: March 12, 2025 /s/ [redacted]

Dated: 04-28-2025 [redacted]

[1] Plaintiffs' counsel spoke with [redacted] on February 5, 2025, February 21, 2025, and March 12, 2025, by telephone. During these conversations, [redacted] authorized Plaintiffs' counsel to file this declaration on their behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT H

# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Case No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] K.A.**

1. I, [redacted], hereby state:

2. I am a class member in the above-captioned matter.

3. I am a 37 year old transgender woman. I grew up in Chicago, Illinois. Ever since I was six years old, I knew I was a girl. I remember the first time I put on a pair of heels—it was the first moment I truly felt like myself. Before I was incarcerated, I expressed my identity as a woman in the privacy of my home. I wore wigs, makeup, heels, and painted my nails. Dressing up in that way allowed me to feel aligned with who I am.

4. I came out as a woman when I was 34 years old. Since coming out, I have tried to live my life with honesty and dignity. Being transferred to Menard Correctional Center made that impossible.

5. I was transferred to Menard Correctional Center in January 2025. When I was transferred, I told the intake staff that I am a transgender woman.

6. I was diagnosed with gender dysphoria by an Illinois Department of Corrections (IDOC) medical professional when I was in receiving. Despite having been diagnosed with gender dysphoria, my initial requests for hormone therapy at Menard were denied. I filed multiple grievances challenging IDOC's refusal to provide treatment. I also repeatedly spoke with medical staff at Menard, pleading with them to assist me in accessing hormone therapy.

7. After waiting numerous months, I was finally able to start hormone therapy. The hormone therapy has have helped me, but my access to medication at Menard has not been consistent. I am prescribed Spironolactone to be taken daily, but several times each week I do not receive it because the IDOC regularly runs out of the medication. Due to the ongoing shortages, I was told that I would be switched to another medication, ELIGARD, which I am supposed to receive once a month. However, it has now been three weeks since my scheduled dose, and I still have not received any doses of ELIGARD. When I am unable to take my hormone therapy medication as prescribed because I have not received it due to IDOC running out of it, I feel miserable and I don't feel safe—I feel like I am being held back from my transition.

8. I am frequently misgendered at Menard. IDOC staff refuses to acknowledge my gender identity. IDOC staff, including correctional officers, mental health professionals, and medical professionals, continue to put "Mr." in front of my name, even though I have repeatedly told the staff that I am a woman and have asked them to use the correct pronouns. Guards have told me, "you are a not a woman, you are a man." The misgendering is constant and degrading. It wears me down and has negatively affected my mental health.

9. I have been strip searched by male guards and officers at Menard numerous times, even though I always ask to be searched by a woman guard or officer. Each time it happens, I feel violated.

10. I have not been able to shower since I have arrived at Menard—over five months ago—because I have never been provided with private shower accommodations. I have persistently asked for private shower accommodations, but IDOC staff tells me that I can only shower with the general male population. They cuff everyone up and send them all into the shower together. I do not feel safe to shower with the general male population, so I clean up in my sink.

11. I have also been denied access to basic items that help me affirm my gender and align with my female gender identity. I have repeatedly requested gender affirming clothing and grooming items, but all of my requests have been ignored.

12. There is a transgender group therapy session that is supposed to happen once a month at Menard, but it is always scheduled at the same time as commissary. I have to choose between getting food and hygiene items from commissary or attending the therapy session, and am not allowed to partake in both. I can't afford to skip commissary, so I have only been able to attend the group therapy one time.

13. Since I was transferred to Menard in January 2025, I have been confined to my cell 24 hours a day, seven days a week. We are supposed to be allowed to go to the yard twice a week, but that has not been happening; yard time is always canceled. There have been week-long stretches where I have not had any time outside my cell. I have only been outside about three times since I arrived at Menard nearly five months ago.

14. Correctional officers have made comments about my clothing being "too tight," even though I am wearing the standard uniform that was issued to me. Every time these comments are made, I feel extremely uncomfortable.

15. Living at Menard has taken a tremendous toll on my mental health. I cry every day because of my situation. The constant misgendering, strip searches by men, lack of access to private

showers and hygiene issues without such access, lack of access to gender-affirming clothing and other commissary items, irregular access to my prescribed hormone therapy medication, and inconsistent medical care have made me feel dehumanized and invisible. Every day I live in fear. I would rather be dead than be at Menard.

16. I would like to transfer out of Menard.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 5/19/2025 /s/ [redacted] ________________

Dated:__________ ______________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on May 19, 2025, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail

# EXHIBIT I

# (File Under Seal)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF C.B. (KNOWN TO ILLINOIS DEPARTMENT OF CORRECTIONS AS [redacted]**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I have previously submitted declarations in this matter, asking to be transferred out of Menard. (*See* Dkt. 740, Ex. 8.)

3. Since my last declaration was filed, I was paroled from Menard on July 23, 2024. I was then reincarcerated on December 22, 2024, and I was transferred back to Menard on March 12, 2025.

4. Conditions at Menard have only gotten worse since I returned.

5. Upon arrival, the staff at Menard gave me altered clothes and housed me with a male cellmate, despite my transgender status. This cellmate harassed me until I was placed in protective custody, showing me his penis and asking if I "wanted this."

6. When Menard staff moved me into protective custody, they placed me in a dirty cell containing several items that, I believe, belonged to the inmate who previously lived in the cell. I asked the staff at Menard to remove these items, but they did not do so, telling me to get rid of them myself.

7. Thirty minutes later, a correctional officer began a shakedown of my cell and disciplined me for wearing altered clothes (which Menard provided to me) and having contraband in my cell (which did not belong to me). In other words, this officer disciplined me for actions I did not take.

8. When I tried to explain the situation to the officer, he told me, “Shut up fag. You don’t get to speak.” He then pepper sprayed me for continuing to talk.

9. During the shakedown, this officer and others ripped up my bra, underwear, and shower shoes, saying, “You want to alter our clothes? We’ll alter your clothes.”

10. Since the shakedown, I have been kept in segregation. I only eat one meal a day, since the staff responsible for providing me with lunch and dinner have subjected me to regular harassment, and I fear they may be tampering with my food. I have also seen black fuzz on the food that has been given to me. I only eat food that has been delivered to me in sealed containers. I have lost a significant amount of weight because of these issues with accessing meals. I now weigh about 155 pounds, even though I weighed well over 200 pounds when I was reincarcerated.

11. The staff who patrol my gallery have also subjected me to verbal harassment and physical threats.

12. Because I fear for my safety, I have not taken a single shower since returning to Menard. I have instead been forced to take “bird baths” in my cell for over sixty days.

13. I have also been denied access to bras, panties, razors, and other gender-affirming care items from commissary since returning to Menard. I do not even have a pair of shoes to wear. My requests for these items have been denied, with some staffers telling me that it "sucks to be a fag."

14. I would still like to transfer to Logan, Centralia PRISM program, or another prison where I will be safe as a transgender woman. I did not feel safe at Menard when I was released on parole, and I feel even less safe now that I have returned.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.[1]

Dated: May 20, 2025 /s/[redacted]

Dated:______________ ______________________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on May 20, 2025. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# EXHIBIT J
# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF MS. D.L.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since about March 2025.

3. I was also at Menard between about 2022 and 2023.

4. Before I was transferred to Menard this year, I was at Pontiac Correctional Center. At Pontiac, I was told that I could ask for a transfer south. I was also told that I would not be transferred back to Menard.

5. I have asked to be transferred out of Menard. I have not received a response to my transfer request.

6. I feel very vulnerable and unsafe as a transgender woman at Menard. I requested protective custody because Menard is extremely dangerous for transgender women. Being at Menard is affecting my mental health.

7. I have a class ID that identifies me as a female, and I would like a female guard to search me, but male guards still strip-search me. Since March 2025, I have been cavity searched about three or four times by men. The guards have said that transgender protections do not exist at Menard. When I was at Pontiac, female guards searched me. At Pontiac, if a female guard was not available, they would take me to a body scanner. Menard has a body scanner that they refuse to use.

8. Although I have a class ID that identifies me as female, Menard guards do not offer me a private shower. As a result, to protect myself from having to take a shower with men, I am forced to wash up in my cell. When I was at Pontiac, guards offered me a private shower.

9. The guards at Menard regularly do not respect my pronouns.

10. In or about March 2025, I was placed in segregation. I had a disagreement with a guard. The guard fabricated a reason to mace me. He maced me multiple times as I approached the front of the cell and I was being handcuffed. The guard reported the incident as an assault on him. I believe I was targeted because the guard did not like me.

11. In the last year, I have stopped taking hormones and wearing makeup. I do not want people to know that I am transgender because it makes me a target.

12. I want to transfer out of Menard. My first choice would be to go to Logan Correctional Center and live with other women. My second choice would be Centralia because there is a community that is strictly transgender women. I also would like to be placed in the PRISM program at Centralia because I understand that it provides services that help transgender women transfer to Logan.

13. Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: May 19, 2025 /s/ [redacted]

Dated: ____________________ ______________________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on May 19, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT K

# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants.

Civil No. 3:18-cv-00156-NJR

**DECLARATION OF MS. [redacted] K.M.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. With the exception of a one-year period at Hill Correctional Center from 2023 to 2024, I have been incarcerated at Menard since December 8, 2017.

3. I have identified as a trans woman for much of my adult life, although I did not fully understand what that term meant until more recently. I just knew that, for a long time, I felt like a woman trapped inside of a man's body.

4. I kept this fact hidden for much of my life because I was afraid that if people knew I was a trans woman, they would physically harm and abuse me.

5. When I began my sentence at Menard in 2017, I came out to the staff as "gay," thinking they would understand that I was also trans. Again, this was largely due to the fact that I did not fully understand what being trans meant.

6. I was transferred to Hill in 2023. But in early 2024, I was raped by another prisoner there. I requested to be placed in protective custody following the assault. However, I was told I had to be transferred back to Menard in March 2024 as Hill did not have a protective custody wing.

7. Upon my return to Menard, I was housed in general population, and I was scared for my safety considering that I had just been raped at Hill and that other prisoners at Menard knew I was a trans woman. Menard is an extremely dangerous place for trans individuals. All throughout 2024, I repeatedly requested to be placed in protective custody at Menard because of this, but each request was denied.

8. In early January 2025, I had another interview with Internal Affairs staff to be placed in protective custody. It was during this interview I realized that Menard staff did not understand that I am a trans woman and that I was not safe in general population. So, I told the interviewers that I am trans and that I needed to be placed in protective custody. My request was finally approved a week after this interview.

9. Later in January 2025, I had a telehealth appointment with a psychiatrist and believed I was going to evaluated for gender dysphoria at that time. During that appointment, I explained to the psychiatrist that I was trans, but the psychiatrist rolled her eyes and asked me, "What does that even mean?" I then asked her if there was a problem, and she responded that my being trans would "create a lot of paperwork" for her to be able to put me on her trans caseload.

10. Instead of exploring my gender identity further during this appointment, the psychiatrist continuously dismissed me and rejected that I was actually trans. I later discovered that following this appointment, the psychiatrist did not diagnose me with gender dysphoria and did not refer me to any other mental health or medical services to discuss a gender dysphoria diagnosis. For months after this, I went without receiving a gender dysphoria evaluation.

11. At first, while I was awaiting approval for protective custody, I was single-celled in protective custody. However, as soon as my protective custody request was approved, Menard staff placed me in a cell with a known and self-proclaimed predator. I tried explaining to staff that I was supposed to be single-celled because I was a trans woman.

12. Almost immediately after I was celled with this other prisoner, he began making inappropriate sexual advances and gestures toward me. He told me that he was a "predator," and I became terrified for my personal safety. He then began trying to get close enough to me in the cell so he could rub his penis on me. I tried reporting this behavior to Menard staff numerous times—including telling correctional officers and writing to the placement officer—but no one did anything to help me.

13. On February 5, 2025, my cellmate forced me to perform oral sex on him. He told me that if I refused, he threatened to beat me up and hurt me. I was so scared because he was much bigger and stronger than I was, and I knew he would follow through on his promise if I didn't comply with his demands.

14. Later that day, I wrote to the placement officer again to report what happened and to request to be moved to a single cell. However, the placement officer once again ignored me.

15. That same day, I also wrote to the Assistant Warden of Operations to report the rape and to request a different single-cell placement. When I didn't hear anything from him, I wrote to him again on February 9 pleading him to be moved out of my cell because I was in fear for my safety. I never got a response.

16. I also wrote a letter to Warden Anthony Wills on February 11, 2025, telling him about the rape and asking for his help. He never responded.

17. I wrote several notes to different corrections officers on the gallery reporting the rape and asking them to move me away from my cellmate as soon as possible. But none of them helped me.

18. I told my mental health counselor about the rape and asked her to help get me moved into a single cell. Instead of listening to my concerns, she just told me that it was out of her hands and that I didn't get my own cell "just because [I'm] trans."

19. It wasn't until I was able to file a PREA report on February 28, 2025, that Menard staff finally investigated the incident and sent me to have a rape kit done. After that and after serving some time in segregation, I was finally placed back in a single cell in protective custody. I was never told about the results of the PREA investigation into my rape.

20. However, I continued having issues with accessing gender-affirming treatment despite having come out to staff as trans. Since coming out to staff in January, I've been subjected to numerous cross-gender strip searches (even though I've told corrections officers that I'm trans and want a female guard to perform these searches), I have not been allowed to access a private shower (I have resorted to bathing myself in my cell), I have not been given gender-affirming clothing, I have not been allowed access to gender-affirming commissary items, and I have not been allowed to seek gender-affirming medical treatment. I have been told I keep getting denied these things because I do not have the "trans" label on my ID card.

21. In late April or early May, I was told that I would be taken to medical for an exam. I met with a doctor who explained I had been identified as a trans individual at Menard. He discussed medical transitioning options with me, like hormone therapy and gender-affirming surgery. I told him I wanted to move forward with hormone therapy and that I was interested in gender-affirming surgery. However, he noticed that the psychiatrist had not diagnosed me with

gender dysphoria and that he could not begin my treatments until I met with the psychiatrist and got that evaluation.

22. Since meeting with the doctor, I requested to speak with the psychiatrist on several occasions and, despite those repeated requests, it took two to three weeks before I was able to see one. Every time mental health staff came through to do their rounds, I asked to be put on the psychiatrist's schedule so that I could be formally evaluated for gender dysphoria. Each time, they either refused to put my name on the call list or told me I had to make that request through my counselor.

23. I was finally referred to a new psychiatrist who evaluated me and diagnosed me with gender dysphoria on or around May 15, 2025. This psychiatrist told me he would submit his recommendations so that I could begin medically and socially transitioning. However, I have not yet received any additional information about when this would happen, and as of the date of this declaration, I am still waiting to start treatment.

24. I want to transfer out of Menard. I want to go to Logan Correctional Center and live with other women. If I cannot live in Logan, my second choice would be Centralia because I have heard it is safer for transgender women there.

25. Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: May 20, 2025 /s/ [redacted] ____________________

Dated: ____________________ ____________________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on March 26, May 12, and May 20, 2025, by telephone. During these conversations, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT L
# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] M.S.**

I, [redacted], hereby state:

1. I am a transgender woman in the above-captioned matter. I am currently housed at the Menard Correctional Center. I have been housed at Menard since around April 2025. Prior to Menard, I was detained at the Cook County Jail, and before that, I was at Stateville Correctional Center.

2. I have been a transgender woman since around 2016.

3. My experience at Menard has been terrible and very hard.

4. I do not feel safe at Menard. I am currently housed in general population, and I think there is only one other transgender woman in my gallery in general population. When I first got to Menard, I asked at least eight different officers to be placed in protective custody (PC). They told me to just wait or said I needed to fill out a form, but no one ever gave me the form to make the request. I am still in general population today, and still haven't been given the form. Officers also won't bring me grievance forms to grieve my housing placement.

5. I want to be in PC because I do not feel safe in general population. People call me names like “faggot ass bitch” and I feel scared. It is very scary being in general population and we’re constantly on lockdown here—general population feels more like segregation.

6. The correctional officers at Menard are terrifying. I am scared to talk to them or ask for things like more yard time, more phone calls, to fix my toilet, and my dietary restrictions. I’m also scared to ask them about my PC housing request. I have also seen officers beat up other inmates here. Just a few days ago they beat someone up and Maced his cell. The Mace then spreads through the gallery and I couldn’t breathe or talk. Officers use Mace a lot in Menard.

7. My aggression level is very low. It is a 10, which means I shouldn’t even be at Menard. I’ve never gotten a disciplinary ticket at Menard either.

8. I have been diagnosed with gender dysphoria, and I have a class member ID card that lists my gender as female and says I should be searched by female officers. Even though my ID card says I should only be searched by female officers, I am still being strip searched and pat searched by male officers. I show them my ID, but they ignore it and usually give me a disrespectful and disgusting look. Male officers will just say there is no one to search me and force me to strip, even when I see a female staff nearby. I feel so embarrassed and disrespected every time a male officer searches me.

9. I am misgendered a lot by staff and other inmates. I’ve been called faggot. It makes me feel unsafe and disrespected.

10. I am currently on hormones, but they usually give me my hormones at 2, 3, or 4 in the morning. I need to take my hormones with food, so I try to wait until breakfast to take them. But sometimes officers do sweeps on the gallery to take meds away, so it’s hard to hold onto my hormone pills and take them properly.

11. I have not talked to mental health staff in over a month. In general population, mental health staff only come to your cell door to talk to you, so it's not private. I want to talk to someone, but I would feel better doing it in a private room.

12. Transgender women at Menard do not get the same treatment as cisgender inmates. For example, we do not get to go outside as much or use the phone as often.

13. There are no transgender support groups or programs at Menard. When I was in the Cook County Jail, there was a beauty shop and other support for transgender women. There is nothing like that at Menard.

14. I feel very unsafe at Menard. You can hear people screaming all the time here. I feel helpless and hopeless here.

15. I am very interested in transferring out of Menard. I would like to go to Centralia Correctional Center and be a part of the PRISM program.

16. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: May 21, 2025 /s/ [redacted]

Dated: _______________ ______________________

[1] Plaintiffs' counsel spoke with [redacted] on May 7, 2025 and May 21, 2025, by telephone. During these conversations, [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT M
# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] H.W.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter.

2. I am transgender, nonbinary, and gender fluid, and I use the pronouns, they/them. I have lived at Menard Correctional Center since August 2023.

3. I would like mental health therapy to treat my gender dysphoria. At Menard, I asked for an evaluation for gender dysphoria under the Transgender Offender Manual, but no one has evaluated me or provided any treatment.

4. Before I was transferred to Menard, I lived at Dixon Correctional Center. The male inmate in my cell sexually assaulted me, and I had to fight him to defend myself. I went on a hunger strike to get mental health support, and the Dixon staff removed me from the cell. After I recovered, Dixon put me back in the same cell as my abuser. One day, when I was in the yard, I climbed a tree and did not come down for four hours. Afterward, I was disciplined and sent to Menard.

5. In or about April 2024, I told the Menard mental health staff that I was transgender and needed help. I was afraid that I would be raped at Menard. That month, I attempted suicide by slitting my wrist to my elbow.

6. After my suicide attempt, Menard staff placed me on crisis watch for three and a half months. During the time that I was on crisis watch at Menard, the male guards abused me. I thought I was in hell, and I would die. They called me "fag" and "Tranny." The male guards made me show my genitalia to get food trays. The male guards played "Gay Basher," where they would pretend to bash my head in. The male guards told me "we rape fags" or words to that effect.

7. During the time I was on crisis watch, the male guards sprayed mace at the prisoners. At least one time, I woke up and the mace was so strong that it caused diarrhea.

8. During the time I was on crisis watch, I was given medication against my will by nurses. Several times I woke up and my anus and buttocks were sore. It felt like I had been assaulted.

9. On or about November 17, 2024, I sent an emergency grievance after I recognized the officers who abused me on crisis watch. I asked for an investigation into the abuse and a referral to the Department of Justice. I asked for a transfer out of Menard to be away from the male guards who abused me. I asked for full compliance with PREA (Prison Rape Elimination Act).

10. On or about December 1, 2024, I sent another emergency grievance where I explained that I have gender dysphoria, and I identify as queer nonbinary and transgender. I explained that I have a history of being abused as a child, and I have PTSD. At the Illinois Department of Corrections, I have encountered sexual abuse and assault because of my gender identity. Again, I asked to be evaluated for gender dysphoria.

11. In or about January 2025, internal affairs interviewed me, but no one has provided me with mental health care for my gender dysphoria or the abuse that I have suffered at Menard.

12. I want to transfer out of Menard. I want to go to Centralia-PRISM or Pontiac. I want to live in a prison where I will receive therapy for gender dysphoria, and male prisoners and guards will not abuse me because I am transgender and nonbinary.

13. Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 5/11-25 [redacted]

# EXHIBIT N
# (File Under Seal)

**Privileged and Confidential**
**Attorney Work Product**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF G.R.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who was transferred to Menard Correctional Center ("Menard") in 2022.

3. In January 2025, I informed mental health them that I am a transgender woman. I threatened self-harm unless I received treatment for my gender dysphoria.

4. I began hormone treatment a few weeks ago.

5. I was told I could not access hormone treatment, private showers, gender-affirming commissary items, or searches by same-gender guards until I received a new ID that stated I was female. I finally received my new ID on May 8, 2025.

6. Although I now have my new ID, I am still searched by male guards, despite my requests to be searched by female guards. I see that other trans women at Menard continue to be searched by male guards as well.

**Privileged and Confidential**
**Attorney Work Product**

7. I am also denied gender-affirming commissary items, like female underwear, even though in-stock items are visible behind the commissary counter.

8. I am also denied private showers during day shift. Private showers are only allowed to me during second shift.

9. I do not feel safe at Menard as a transgender woman, and I am currently in protective custody. I am routinely called homophobic and transphobic slurs by inmates and guards. I am also targeted physically, and do not believe that Menard staff are willing to protect me.

10. For example, officers have disclosed my criminal offense history to other inmates. I believe they did this so that inmates will target me with violence.

11. In another incident, in February 2025, an officer grabbed me by the back and threatened to rape me. I filed a PREA complaint. I was immediately told to withdraw my complaint, and was threatened with time in segregation if I did not comply. In retaliation for my complaint, officers seized my religious reading materials and legal mail. In fear, I withdrew my complaint. They still have not returned my readings or legal mail.

12. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: May 23, 2025 /s/ [redacted]

Dated:______________ ________________________________

[1]Plaintiffs' counsel spoke with Ms. [redacted] on May 16, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# EXHIBIT O
# (File Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF MS.** [redacted] Z.M.

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter.

2. I am a transgender woman who is currently housed at the Menard Correctional Center. I have been at Menard since about March 2025.

3. Transgender women at Menard are isolated and treated like we are nothing.

4. The guards refuse to use my or other transgender women's proper pronouns. They call us "he" to our faces and act like it is a joke and game to them.

5. In April 2025, I was strip searched by a male guard, even though I have a class ID that identifies me as female. When I requested a female guard, the guard told me to turn around for the search or I would go to segregation. Although I have filed a grievance complaining about the search, I have not received a response. Based on what other transgender women have told me, I fear that Menard staff threw my grievance away because I complained about them.

6. For a week in March, the Menard staff stopped giving me and other transgender women our hormone medication with no explanation.

7. Also, even though I have a class ID that identifies me as female, I shower in my cell because the guards will not take us to private showers.

8. I do not have access to gender-affirming commissary items.

9. I have asked to be transferred out of Menard. My first choice would be to go to Logan. My second choice would be to go to Pontiac; then, Centralia, or Big Muddy.

10. Under 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: May 21, 2025 /s/ Ms. [redacted]

Dated: ____________________ ______________________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on May 21, 2025 by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 962-1

# (filed under seal)

# Exhibit P

# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] C.A.**

I, [redacted], hereby state:

1. I am a non-binary class member in the above-captioned matter who is currently housed at the Menard Correctional Center. I have been at Menard since approximately May of 2024.

2. I had my first legal call with a lawyer from this case on May 23, 2025. While I was taking the call, an officer shook down my cell. That officer only took my things, and asked my cellmate or "cellie" which things were his so that they could be left alone. My cellie told me that the officer stated they were doing this because I was speaking to a lawyer about this case. I am more terrified now than ever.

3. From the day I got to Menard I have felt unsafe. I have a rainbow tattoo on my right wrist. One of the correctional officers, Officer Williamson, immediately focused in on my tattoo and thought it would be funny to call me "skittles" because of the slogan "taste the rainbow." Now

all the officers have started using the nickname, and I know they do not mean it as a friendly joke. It makes me feel mocked and vulnerable.

4. The COs seem to be obsessed with my identity. They bring it up all the time and try to get a rise out of me by making fun of me, calling me the head of the rainbow coalition, and using slurs against me. I am afraid to get an identity card that says I am non-binary because I know it would make me even more of a target for the guards.

5. Approximately ten months ago, I wrote a grievance about an incident with Lt. Sadler. My cellie was washing up behind a privacy curtain, and I was also in the cell. Lt. Sadler walked by and ripped the curtain down without giving any kind of verbal warning. My cellie was naked. There were three other correctional officer present, Officer Williamson, Sgt Taylor, and Officer McDonald. They all mocked us, and CO McDonald said "you queers can just suck dick in broad daylight" or words to that effect. He was implying that my cellie was naked because we were engaged in sexual activity, which was not true.

6. It took nine months for the grievance I wrote about that incident to be investigated. I finally saw someone named Rush from internal affairs within the last two weeks. He said that the grievance likely "fell through the cracks" or words to that effect.

7. I don't believe that my grievance fell through the cracks because I have been retaliated against since I filed it. A few weeks ago, I spoke to an Officer Rayford who told me that after I filed the grievance, Lt. Sadler said that he wasn't going to let me leave Menard alive. Just this past Friday, on June 6, 2025, Lt. Sadler visited my cell to tell me that he heard I was having problems at Menard, and that he was sorry to hear that because I'm never going to get to leave, or words to that effect. I am terrified for my safety.

8. Further, about four weeks ago, around the beginning of May 2025, Officer McDonald came and shook down my cell and sent me to segregation. The ticket I got was for a modified fan that belonged to my cellmate, but I got in trouble for it anyway. This was the first ticket I have had in nineteen months. I believe that the officers were just looking for a reason to send me to segregation.

9. When I came back, I was put in a cell that had a non-flushing toilet. After complaining about the toilet for a week, I was moved to another cell, but it was even worse than the first. The cell has mold growing around the toilet, mold under the seat, and I don't have any cleaning products to clean it with aside from an ordinary bar of body soap. I've developed warts and burning skin on my hands from trying to clean up the grey water that comes out from the wall by the toilet and covers the floor of my cell. The water smells foul, and I believe there is raw sewage in it. Lt. Sadler has told me that I will never be moved from this cell. I believe I was sent to segregation and put in these uninhabitable cells as retaliation.

10. In a separate incident, one day when Officer Williamson was letting me out to shower he came into my cell, right up in my face and said, "You suck dick. Do you want to file a PREA?" I didn't because file a PREA because Warden Wills has said that it isn't a PREA violation if the guards remark on your sexuality, gender, the way you walk, etc.

11. At this point I refuse to even use the shower because when I go out the correctional officers whistle at me, cat-call me, and make me feel very unsafe and uncomfortable.

12. I am also scared to complain too much because the use of mace at Menard is out of control. Just recently, on approximately May 22, 2025, Officer McDonald maced someone on 4 gallery just because he didn't like him. Officer McDonald used the entire can of mace, which is a very excessive amount, and said that he did so because "he didn't want to put half a can of mace

away," or words to that effect. People are maced every day here at Menard, and I live in fear of ending up as a target one day.

13. I wasn't aware until my first legal call for this case that I could see a therapist about my gender identity. I have since set up an appointment to see the therapist about being non-binary. I would like to be put in a single cell for my safety, because my identity makes me a target here at Menard. I would also like to change my ID to say non-binary, although I would not do this while at Menard because I am frightened of how the guards would react. It is also my understanding that IDOC only allows you to change your ID to female. I do not identify as female, and would not want female on my ID.

14. I want to be transferred out of Menard as soon as possible. I was recently reclassified, but I am still maximum even though my aggression level is a 6, and I have only gotten the retaliatory contraband ticket mentioned above. If I could be reclassified as medium, I would like to be transferred to Centralia. If I have to go to a maximum prison, I would like to go to Lawrence.

15. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: June 9, 2025 /s/ [redacted]

Dated: _______________ ____________________

[1] Plaintiffs' counsel spoke with [redacted] on May 23, 2025 and June 9, 2025, by telephone. During these conversations, [redacted] authorized Plaintiffs' counsel to file this declaration on their behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail.

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 1061 attachments

# (filed under seal)

# EXHIBIT N

# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, *et al.*, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**<u>SECOND DECLARATION OF</u> C.A.**

I, [redacted], hereby state:

1. I am a non-binary class member in the above-captioned matter who is currently housed at the Pontiac Correctional Center. I have been at Pontiac since approximately October 23, 2025.

2. I was transferred to Pontiac from Menard as a result of the preliminary injunction this court issued on September 12, 2025. My first declaration was written in support of that motion.

3. Three days after I was transferred to Pontiac, I had a visit with two people from mental health: Dr. Zarif[1], the on-site psychiatrist at Pontiac, and Mental Health Professional (MHP) Harty. In my understanding, they visited me to talk to me about being transgender.

4. Dr. Zarif and MHP Harty asked me a series of questions relating to gender dysphoria, including whether I wanted hormones, whether I wanted surgery, and whether I wanted

[1] I am unsure of the exact spelling.

therapy. I told them that I was not interested in hormones or surgery, but that I did want therapy for gender dysphoria.

5. After answering these questions, Dr. Zarif told me that I am not transgender, I'm a homosexual. I told him that isn't correct; that I identify as non-binary and that means I am transgender. MHP Harty told me that at Pontiac if you aren't on hormones, you aren't transgender, or words to that effect. I felt like they were telling me that I was faking my identity.

6. Dr. Zarif and MHP Harty also told me that they knew there were a lot more of us coming over from Menard because of this lawsuit, and that they were trying to figure out what to do with all of us. Dr. Zarif and MHP Harty both said that they were looking for ways to transfer out some of the influx of people coming from Menard.

7. The next day, my ID card identifying me as transgender was taken from me. I am housed in Protective Custody (PC) but no longer required to be single-celled because I am not considered a class member. I do not have a cellmate yet but have been told I should expect one. I also fear that I will be transferred back to Menard since IDOC no longer considers me part of the class.

8. On November 20, 2025, I went to see Dr. Zarif again. I again told him that I am transgender, and that I identify as non-binary. He once again told me that I am not transgender, that I am a homosexual. At that point I felt there was nothing else to say to him and ended the visit.

9. I have identified as non-binary since around the middle of 2024. I was diagnosed with gender dysphoria in the summer of 2025. I think it is outrageous that the mental health professionals at Pontiac would claim to know more about my identity than I do after only one brief meeting.

10. A similar process has happened to all of the other class members I am aware of who were transferred from Menard to Pontiac and who are not seeking surgery or hormone treatment. This includes people who identify as non-binary and people who identify as female. They have had their IDs taken away, been told they are not transgender and no longer a member of the class, and had any class protections, treatments, and privileges taken away.

11. As an example, Pontiac held a transgender group therapy session recently and I was not allowed to go, even though I wanted to. Other "former" class members I know had the same issue. Only one class member I know of was allowed to attend the "group" session.

12. I also wrote to the counselor at Pontiac, Tyler Leadbetter, to request consideration for another transfer, as permitted by the preliminary injunction. Mr. Leadbetter said that I am not eligible for reconsideration, and that I would have to wait for my yearly reclassification. Other class members at Pontiac have also made this request and received effectively the same response.

13. In general, my treatment has been better at Pontiac than at Menard, but I do not want to be at a prison where they deny my identity and refuse treatment. Ideally, I would like to go to Centralia and be a part of the PRISM program. I was approved for the program back in 2021 but never transferred. I at least want to be considered for that transfer, as allowed by the preliminary injunction, and to be told why I am still maximum security when I have an aggression level of 6 and should be medium security. Most importantly, I would like to have my status as a class member reaffirmed, the ID that identifies me as a member of the class returned, and to be able to resume the treatment I am entitled to receive.

14. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 20, 2025 /s/ [redacted]_____

Dated: _______________ ____________________

[2] Plaintiffs' counsel spoke with [redacted] on November 13, 2025 and November 20, 2025, by telephone. During these conversations, [redacted] authorized Plaintiffs' counsel to file this declaration on their behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT O
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, *et al.*, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**<u>DECLARATION OF</u> Z.M.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter who is currently housed at the Pontiac Correctional Center. I have been at Pontiac since approximately October 10, 2025.

2. I was transferred to Pontiac from Menard as a result of the preliminary injunction this court issued on September 12, 2025.

3. When I was at Menard, I witnessed correctional officers target transgender inmates at random for shake downs. This happened multiple times leading up to September 2025 and continued during September 2025.

4. During these shake downs at Menard, the correctional officers would throw transgender inmates' gender-affirming commissary items, like razors and feminine hair products, into the toilet. I remember one specific incident happened to [redacted]) at the end of September 2025.

5. At Menard, I also did not have access to private showers. Because I did not want to shower in front of men, I would put up a sheet for some privacy. On numerous occasions, correctional officer Kevin Beuttner would remove my sheet. I filed multiple grievances requesting a private shower and reporting harassment from correctional officer Beuttner.

6. For example, on June 1, 2025, I filed a grievance because while I was showering with my sheet up, officer Beuttner moved the sheet, looked at my body, and said, "I just wanted to see."

7. Menard also stopped offering transgender group at the beginning of October 2025, right before I was transferred.

8. Five days after I was transferred to Pontiac, my ID badge identifying me as a transgender woman was taken away from me.

9. At Pontiac, I met with mental health provider Harty, who told me that I "didn't qualify to be trans" or words to that effect.

10. Because my ID was taken away and provider Harty told me that I didn't qualify to be transgender, I have been refused transgender group, taken off of hormones, and denied other gender-affirming treatment at Pontiac.

11. I am aware of a similar process happening to five or six other class members who were transferred from Menard to Pontiac. They have had their IDs taken away, been told they are not transgender and no longer a member of the class, and had any class protections, treatments, and privileges taken away.

12. I am scared that IDOC is trying to transfer me back to Menard because Pontiac has told me that I am not transgender and denied me gender affirming care.

13. In general, my treatment has been better at Pontiac than at Menard, but I do not want to be at a prison where they deny my identity and refuse treatment. Ideally, I would like to go to Centralia and be a part of the PRISM program. I at least want to be considered for that transfer, as allowed by the preliminary injunction. Most importantly, I would like to have my status as a class member reaffirmed, the ID that identifies me as a member of the class returned, and to be able to resume the treatment I am entitled to receive.

14. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 25, 2025 /s/ Ms. [redacted]

Dated:____________________ ____________________________

[1] Plaintiffs' counsel spoke with [redacted] on November 25, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on their behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT O
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, *et al.*, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF** Z.M.

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter who is currently housed at the Pontiac Correctional Center. I have been at Pontiac since approximately October 10, 2025.

2. I was transferred to Pontiac from Menard as a result of the preliminary injunction this court issued on September 12, 2025.

3. When I was at Menard, I witnessed correctional officers target transgender inmates at random for shake downs. This happened multiple times leading up to September 2025 and continued during September 2025.

4. During these shake downs at Menard, the correctional officers would throw transgender inmates' gender-affirming commissary items, like razors and feminine hair products, into the toilet. I remember one specific incident happened to [redacted]) at the end of September 2025.

5. At Menard, I also did not have access to private showers. Because I did not want to shower in front of men, I would put up a sheet for some privacy. On numerous occasions, correctional officer Kevin Beuttner would remove my sheet. I filed multiple grievances requesting a private shower and reporting harassment from correctional officer Beuttner.

6. For example, on June 1, 2025, I filed a grievance because while I was showering with my sheet up, officer Beuttner moved the sheet, looked at my body, and said, "I just wanted to see."

7. Menard also stopped offering transgender group at the beginning of October 2025, right before I was transferred.

8. Five days after I was transferred to Pontiac, my ID badge identifying me as a transgender woman was taken away from me.

9. At Pontiac, I met with mental health provider Harty, who told me that I "didn't qualify to be trans" or words to that effect.

10. Because my ID was taken away and provider Harty told me that I didn't qualify to be transgender, I have been refused transgender group, taken off of hormones, and denied other gender-affirming treatment at Pontiac.

11. I am aware of a similar process happening to five or six other class members who were transferred from Menard to Pontiac. They have had their IDs taken away, been told they are not transgender and no longer a member of the class, and had any class protections, treatments, and privileges taken away.

12. I am scared that IDOC is trying to transfer me back to Menard because Pontiac has told me that I am not transgender and denied me gender affirming care.

13. In general, my treatment has been better at Pontiac than at Menard, but I do not want to be at a prison where they deny my identity and refuse treatment. Ideally, I would like to go to Centralia and be a part of the PRISM program. I at least want to be considered for that transfer, as allowed by the preliminary injunction. Most importantly, I would like to have my status as a class member reaffirmed, the ID that identifies me as a member of the class returned, and to be able to resume the treatment I am entitled to receive.

14. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 25, 2025 /s/ [redacted]

Dated:____________________ __________________________

[1] Plaintiffs' counsel spoke with [redacted] on November 25, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on their behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail.

# EXHIBIT P

# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF L.D.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter. I identify as gender non-conforming (non-binary) and have gender dysphoria. I am currently housed at Lawrence Correctional Center.

2. I was previously housed at Menard Correctional Center from February 2020 to September 2023 and again from February 2024 to November 2025.

3. When I arrived at Menard in February 2020, I told a mental health provider that I identified as gender non-conforming. On or around July 2023, I told the Menard Correctional Center staff that I was nonbinary again. I also notified them on May 30, 2024, that I am gender nonconforming. I was supposed to have a mental health appointment the next day, but the guards told the mental health provider that I refused, even though I did not.

4. I requested gender affirming care in February 2024 when I came back to Menard, and I was told that they would look into it. Menard staff later told me that, per IDOC policy, gender affirming care was for transgender individuals, and that that did not include nonbinary individuals.

5. Menard never evaluated me for gender dysphoria.

6. I was, and still am, afraid to come forward with who I am, because Menard discriminates against gender non-conforming people and abuses gender-nonconforming people.

7. Up to the time I was transferred, correctional officers at Menard continued to assault inmates for being transgender. Just in the last month I was at Menard, I witnessed thirteen separate incidents where correctional officers maced transgender and nonbinary people for no reason.

8. For example, at the end of August, I witnessed the guards drag [redacted] by her shirt and throw her in the shower while macing her and punching her.

9. I also feared harm from other inmates at Menard, who yelled and screamed profanities and disrespectful remarks at me every day. I avoided socializing to prevent others from learning that I am nonbinary and avoided yard for fear of being beaten by other inmates for my identity.

10. Menard not only failed to protect me from harm by other inmates. They also put me at risk of being assaulted by other inmates by outing me to them.

11. For example, around Friday, October 24, 2025, a correctional officer outed me to other inmates in the gallery, asking them, “Did you know that this guy is a girl?” or words to that effect. This put me at great risk of harm from the other inmates.

12. Additionally, when I received my transfer preference document on or around November 4, 2025, a correctional officer read it out loud in front of everyone in the gallery, once

again outing me to other inmates and putting me at risk of violence. When he did this, he said, “I don’t give a fuck about no fags,” or words to that effect. Other inmates responded by saying things like, “this bitch ass fag, we gonna fuck you up.”

13. I used to file grievances about harassment, abuse, and not receiving access to gender-affirming care, but I stopped while I was at Menard due to fear of violence. Some of my past grievances have gone missing and guards would physically assault me in retaliation for filing grievances.

14. I have also seen guards retaliate against sisters filing grievances by fabricating tickets against them.

15. For example, I recently helped other transgender inmates file grievances, and witnessed those inmates get put in segregation in retaliation for filing the grievances.

16. Around October 23, 2025, officers fabricated a ticket to put me into segregation after a search on September 19, 2025. They claimed they found a piece of paper with cannabis residue in my cell, even though I have never had a ticket dealing with any type of drugs in my entire 22 years of being incarcerated.

17. When I was put in segregation at Menard because of one of these tickets, I could not access gender affirming care.

18. For example, I was not allowed to purchase any gender-affirming items at commissary, and did not have access to bras, women’s underwear, or makeup.

19. Security also denied me mental health treatment at Menard by telling mental health that I refuse treatment, even when I do not refuse treatment.

20. I would like to be transferred to Pontiac Correctional center and receive a consultation for hormones. If I am forced to return to Menard, I am scared for my physical safety

and worried that I will have to stall my transition further to avoid being targeted by inmates and staff.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 1, 2025 [redacted][1]

Date:______________________ ______________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 1, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 1067

# (filed under seal)

# EXHIBIT R

# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF [redacted] K.W.**

I, [redacted] hereby state:

1. I am a class member in the above-captioned matter. I identify as a transgender woman. I am currently housed at Pontiac Correctional Center.

2. I was previously housed at Menard Correctional Center from June 2024 to on or around November 19, 2025, when I was transferred to Pontiac Correctional Center.

3. When I arrived at Menard in or about June 2024, I spoke to telepsychiatry about being transgender and wanting gender-affirming care. They told me that I needed to speak to Mental Health.

4. So, I made a request for Mental Health. I wanted to talk to Mental Health to access gender affirming services, including hormones and an ID that would allow me to buy gender affirming commissary items. I did not write this on the kite, however, because correctional officers would read the kites and harass individuals in custody for being transgender.

5. Mental Health never came, even though I made requests three or four times. My most recent request was on or around October 26, 2025. I was still scared to write that I wanted gender affirming care on the kite, so the requests were general in nature.

6. Part of this fear came from watching correctional officers harass other individuals in custody who were openly trans. These comments happened across my time at Menard, including in the months of September and October 2025.

7. For example, I heard correctional officers say comments like, "don't wear your hair like that—you're a man," "you're gonna be treated like a man," and "you look sexy today" or words to that effect. I received comments like these a few times across September and October 2025.

8. Generally, I stayed in my cell to avoid harassment. Even though I did not tell the correctional officers that I was transgender, I wore my hair and makeup and spent time with other transgender prisoners, so some people could tell that I was transgender and harassed me because of it.

9. Correctional officers at Menard would target transgender prisoners during shakedowns, treating them worse than other prisoners during shakedowns.

10. The worst shakedowns occurred in September and October 2025. Correctional officers destroyed transgender prisoners' gender affirming items like makeup and female clothing when they shook down transgender individuals' cells.

11. Now that I am at Pontiac, I have requested Mental Health and am hoping to get hormones and be who I want to be. I feel safe enough to write on kites that I am transgender without fearing harassment.

12. I would like to stay at Pontiac Correctional Center, where I feel safe to request access to gender affirming care. If I am forced to return to Menard, I am scared that I will face harassment from correctional officers and inmates and that I will not be able to access gender affirming services, including Mental Health.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 9, 2025 /s/ [redacted]
[redacted][1]

Dated:____________________ ________________________

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 9, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 1080-1

# (filed under seal)

# EXHIBIT N
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, *et al.*, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**<u>SECOND DECLARATION OF [redacted] C.A.</u>**

I [redacted], hereby state:

1. I am a non-binary class member in the above-captioned matter who is currently housed at the Pontiac Correctional Center. I have been at Pontiac since approximately October 23, 2025.

2. I was transferred to Pontiac from Menard as a result of the preliminary injunction this court issued on September 12, 2025. My first declaration was written in support of that motion.

3. Three days after I was transferred to Pontiac, I had a visit with two people from mental health: Dr. Zarif[1], the on-site psychiatrist at Pontiac, and Mental Health Professional (MHP) Harty. In my understanding, they visited me to talk to me about being transgender.

4. Dr. Zarif and MHP Harty asked me a series of questions relating to gender dysphoria, including whether I wanted hormones, whether I wanted surgery, and whether I wanted

[1] I am unsure of the exact spelling.

therapy. I told them that I was not interested in hormones or surgery, but that I did want therapy for gender dysphoria.

5. After answering these questions, Dr. Zarif told me that I am not transgender, I'm a homosexual. I told him that isn't correct; that I identify as non-binary and that means I am transgender. MHP Harty told me that at Pontiac if you aren't on hormones, you aren't transgender, or words to that effect. I felt like they were telling me that I was faking my identity.

6. Dr. Zarif and MHP Harty also told me that they knew there were a lot more of us coming over from Menard because of this lawsuit, and that they were trying to figure out what to do with all of us. Dr. Zarif and MHP Harty both said that they were looking for ways to transfer out some of the influx of people coming from Menard.

7. The next day, my ID card identifying me as transgender was taken from me. I am housed in Protective Custody (PC) but no longer required to be single-celled because I am not considered a class member. I do not have a cellmate yet but have been told I should expect one. I also fear that I will be transferred back to Menard since IDOC no longer considers me part of the class.

8. On November 20, 2025, I went to see Dr. Zarif again. I again told him that I am transgender, and that I identify as non-binary. He once again told me that I am not transgender, that I am a homosexual. At that point I felt there was nothing else to say to him and ended the visit.

9. I have identified as non-binary since around the middle of 2024. I was diagnosed with gender dysphoria in the summer of 2025. I think it is outrageous that the mental health professionals at Pontiac would claim to know more about my identity than I do after only one brief meeting.

10. A similar process has happened to all of the other class members I am aware of who were transferred from Menard to Pontiac and who are not seeking surgery or hormone treatment. This includes people who identify as non-binary and people who identify as female. They have had their IDs taken away, been told they are not transgender and no longer a member of the class, and had any class protections, treatments, and privileges taken away.

11. As an example, Pontiac held a transgender group therapy session recently and I was not allowed to go, even though I wanted to. Other "former" class members I know had the same issue. Only one class member I know of was allowed to attend the "group" session.

12. I also wrote to the counselor at Pontiac, Tyler Leadbetter, to request consideration for another transfer, as permitted by the preliminary injunction. Mr. Leadbetter said that I am not eligible for reconsideration, and that I would have to wait for my yearly reclassification. Other class members at Pontiac have also made this request and received effectively the same response.

13. In general, my treatment has been better at Pontiac than at Menard, but I do not want to be at a prison where they deny my identity and refuse treatment. Ideally, I would like to go to Centralia and be a part of the PRISM program. I was approved for the program back in 2021 but never transferred. I at least want to be considered for that transfer, as allowed by the preliminary injunction, and to be told why I am still maximum security when I have an aggression level of 6 and should be medium security. Most importantly, I would like to have my status as a class member reaffirmed, the ID that identifies me as a member of the class returned, and to be able to resume the treatment I am entitled to receive.

14. Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: November 20, 2025 /s/ [redacted]

Dated: 12-9-2025 [redacted]

[2] Plaintiffs' counsel spoke wit[redacted]on November 13, 2025 and November 20, 2025, by telephone. During these conversations, [redacted] authorized Plaintiffs' counsel to file this declaration on their behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from [redacted] once it is returned to them by U.S. Mail.

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 1088-1

# (filed under seal)

# EXHIBIT S
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) | |
| Plaintiffs, | ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) | |
| LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY, | ) | |
| Defendants. | ) | |

**DECLARATION OF [redacted] R.K.**

[redacted] hereby state:

1. I am a class member in the above-captioned matter. I identify as a transgender woman. I am currently housed at Joliet Treatment Center.

2. I was previously housed at Menard Correctional Center from approximately September 21, 2023 to approximately November 15, 2025, when I was transferred to Joliet Treatment Center.

3. I first told a nurse at Menard that I identified as gender non-conforming when I first arrived at Menard in September 2023. I did not receive a response.

4. I requested hormones and a mental health evaluation around a week after I arrived at Menard—late September 2023 or early October 2023—but my requests were denied.

5. Throughout my time at Menard, I was often told by staff that they "did not cater to transgenders," or words to that effect. This was often paired with mistreatment or denial of medical care.

6. For example, Nurses Cassandra Kitty Benard, Amanda Choate, and Rachel McKistry have all said some version of "we don't cater to transgenders" when denying me medical treatment at Menard. One of these incidents happened around October 10, 2025.

7. In early August 2025, I also did not receive my prescribed eye drops, and once again was told words to the effect of "we don't cater to transgenders."

8. In another example, when I went through Adjustment Committee, Chairwoman Sandy L. Walker also said words to the effect of "You're guilty. We don't cater to transgenders at Menard." She said this after refusing to consider video evidence that would have shown my innocence.

9. Menard staff has also taken away my property because I am transgender.

10. For example, correctional officer Tyson J. Choate stole my prayer beads in early August 2025 while saying, "You want to wear beads here, drag-queen?" or words to that effect.

11. Menard staff has also put me in unlivable conditions because I am transgender.

12. For example, on July 10, 2025, I was released from segregation and moved into a cell where the toilet was broken and flooding, the lights were out, and the sink wouldn't stop running. Correctional officer Justin Kolich told me, "This is the transgender treatment at MCC" or words to that effect.

13. Menard staff has also outed me as transgender to other inmates, putting me at increased risk of harm.

14. For example, when I had rectal bleeding in early September, Nurse Amanda Choate yelled out, "Which one of y'all fucked [redacted]? His ass is bleeding!" or words to that effect.

15. Inmates at Menard threatened me daily, and I felt that I repeatedly had to harm myself to get on crisis watch and protect myself from others.

16. Mental Health staff also exacerbated my mental health issues by encouraging myself and others to kill ourselves because we are transgender.

17. For example, around October 10, 2025, Nurse Rachel McKistry told me to go out with a noose and jump "and then we'll be rid of transgenders at Menard," or words to that effect.

18. Nurse McKistry has also said this to other transgender inmates. Around October 10, 2025, one inmate scaled a wall inside of the building and threatened to jump because staff members were discriminating against them. They were then punished with a ticket.

19. Another inmate, [redacted] also burned up their cell earlier this year after receiving the same harassment from correctional officer Quentin Bent, who told [redacted] to kill themself.

20. Mental Health staff Erin M. Nicholson also told me to kill myself.

21. Some of these attempts to harm myself were actual suicide attempts, however, brought on by the terrible conditions and treatment I received at Menard for being transgender.

22. For example, I cut my vein open on June 17, 2025, because I could not stand the harassment I was facing for being transgender. and Sept. 04, 2025

23. Including in September and October of 2025, I also witnessed Menard physically abuse transgender inmates. For example, I saw staff pull transgender inmates out of their cells, take them through infirmary, mace and jump them, chain them to the bench, and bring them back with their head down, dripping wet.

24. One inmate, [redacted], who is transgender, would fight them back until he was forced on medication so that she could not resist anymore. This occurred around May-June 2025.

25. I would like to stay at Joliet Treatment Center. If I am forced to return to Menard, I am scared for my physical safety and life.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 10, 2025

/s/ [redacted]

[redacted]

Dated: Dec, 10, 2025

[1] Plaintiffs' counsel spoke with Ms [redacted] on December 10, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 1094-1

# (filed under seal)

# EXHIBIT P
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF L.D. [redacted]**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter. I identify as gender non-conforming (non-binary) and have gender dysphoria. I am currently housed at Lawrence Correctional Center.

2. I was previously housed at Menard Correctional Center from February 2020 to September 2023 and again from February 2024 to November 2025.

3. When I arrived at Menard in February 2020, I told a mental health provider that I identified as gender non-conforming. On or around July 2023, I told the Menard Correctional Center staff that I was nonbinary again. I also notified them on May 30, 2024, that I am gender nonconforming. I was supposed to have a mental health appointment the next day, but the guards told the mental health provider that I refused, even though I did not.

4. I requested gender affirming care in February 2024 when I came back to Menard, and I was told that they would look into it. Menard staff later told me that, per IDOC policy, gender affirming care was for transgender individuals, and that that did not include nonbinary individuals.

5. Menard never evaluated me for gender dysphoria.

6. I was, and still am, afraid to come forward with who I am, because Menard discriminates against gender non-conforming people and abuses gender-nonconforming people.

7. Up to the time I was transferred, correctional officers at Menard continued to assault inmates for being transgender. Just in the last month I was at Menard, I witnessed thirteen separate incidents where correctional officers maced transgender and nonbinary people for no reason.

8. For example, at the end of August, I witnessed the guards drag [redacted] by her shirt and throw her in the shower while macing her and punching her.

9. I also feared harm from other inmates at Menard, who yelled and screamed profanities and disrespectful remarks at me every day. I avoided socializing to prevent others from learning that I am nonbinary and avoided yard for fear of being beaten by other inmates for my identity.

10. Menard not only failed to protect me from harm by other inmates. They also put me at risk of being assaulted by other inmates by outing me to them.

11. For example, around Friday, October 24, 2025, a correctional officer outed me to other inmates in the gallery, asking them, "Did you know that this guy is a girl?" or words to that effect. This put me at great risk of harm from the other inmates.

12. Additionally, when I received my transfer preference document on or around November 4, 2025, a correctional officer read it out loud in front of everyone in the gallery, once

again outing me to other inmates and putting me at risk of violence. When he did this, he said, "I don't give a fuck about no fags," or words to that effect. Other inmates responded by saying things like, "this bitch ass fag, we gonna fuck you up."

13. I used to file grievances about harassment, abuse, and not receiving access to gender-affirming care, but I stopped while I was at Menard due to fear of violence. Some of my past grievances have gone missing and guards would physically assault me in retaliation for filing grievances.

14. I have also seen guards retaliate against sisters filing grievances by fabricating tickets against them.

15. For example, I recently helped other transgender inmates file grievances, and witnessed those inmates get put in segregation in retaliation for filing the grievances.

16. Around October 23, 2025, officers fabricated a ticket to put me into segregation after a search on September 19, 2025. They claimed they found a piece of paper with cannabis residue in my cell, even though I have never had a ticket dealing with any type of drugs in my entire 22 years of being incarcerated.

17. When I was put in segregation at Menard because of one of these tickets, I could not access gender affirming care.

18. For example, I was not allowed to purchase any gender-affirming items at commissary, and did not have access to bras, women's underwear, or makeup.

19. Security also denied me mental health treatment at Menard by telling mental health that I refuse treatment, even when I do not refuse treatment.

20. I would like to be transferred to Pontiac Correctional center and receive a consultation for hormones. If I am forced to return to Menard, I am scared for my physical safety

and worried that I will have to stall my transition further to avoid being targeted by inmates and staff.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 1, 2025 [redacted]

Date: 12/21/25 [redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 1, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted].

# Monroe v. Hughes

# 3:18-cv-000156-NJR

# Doc. 1094-2

# (filed under seal)

# EXHIBIT Q
# (Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**DECLARATION OF S.H.**

I, [redacted], hereby state:

1. I am a class member in the above-captioned matter. I identify as a transgender woman. I was previously housed at Menard Correctional Center from around November 2023 to November 3, 2025, when I was transferred to Pontiac Correctional Center.

2. I told the Menard Correctional Center staff that I was transgender when I first arrived at Menard two years ago and asked for an evaluation at the same time.

3. I never received an evaluation even though I requested one from Mental Health about four times.

4. Menard never provided me with any gender affirming care, including private showers, group therapy, or an ID badge.

5. I requested protective custody when I told Menard Correctional Center staff that I was transgender, but they told me that I would be fine in general population. Menard only put me in protective custody a year later after I received multiple threats of violence from other inmates.

6. In protective custody, staff targeted transgender inmates, including myself, by writing us fake tickets, destroying our property, and throwing our food away.

7. Staff at Menard also sexually harassed me because I am transgender, including during the period of August through October 2025.

8. For example, towards the end of October 2025, a group of five or six correctional officers told me that I should "learn to swallow and not spit" and that "they like they niggas wet." These sounded like threats.

9. Menard also put me at continued risk of harm by constantly outing me to other inmates and placing me with inmates much larger than myself.

10. For example, at the end of October 2025, when I was getting ready to transfer to Pontiac pursuant to the September PI, the correctional officers let everyone know next door that I was transferring because I am transgender.

11. This also put me at increased risk of harm from other inmates who tried to force themselves on me because I am transgender.

12. For example, I had to give my previous cellmate my food tray because I was scared that he would rape me, as he was much bigger than me—about 200 pounds to my 130 pounds.

13. I am scared to go back to Menard. I am scared that the staff there will retaliate against me and that I will not be safe. I feel like I cannot be myself there because of what happened, and I am worried if I start to transition again, I will become a real target again.

14. I would like to transfer to a prison where I can live as a transgender woman and receive gender-affirming medical care including mental health support and not be hurt by guards or male prisoners. While Pontiac is much better than Menard, I would like to transfer to Logan or Sheridan.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: December 2, 2025 /s/ [redacted]

[redacted] [1]

Dated: 12/22/25 [redacted]

[redacted]

[1] Plaintiffs' counsel spoke with Ms. [redacted] on December 2, 2025, by telephone. During this conversation, Ms. [redacted] authorized Plaintiffs' counsel to file this declaration on her behalf. Plaintiffs' counsel will supplement this declaration with a signed copy from Ms. [redacted] once it is returned to them by U.S. Mail from Ms. [redacted]